FILED

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

FEB 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Name _Hulsey_____        _Cleve_____        _____
    (Last)                                (First)                         (Initial)

Prisoner Number ___E53226_____

Institutional Address P.O. Box 689, FW-235, Soledad, CA 93960-0689

===========================================================

UNITED STATES DISTRICT COURT

**E-filing**          NORTHERN DISTRICT OF CALIFORNIA          **JSW**

_Cleve Otis Hulsey_____        **CV 08    1009**

Full Name of Petitioner            Case No.(To be provided by the
                                   clerk of court)

vs.                                                    **(PR)**

_Ben Curry, Warden_____        PETITION FOR A WRIT OF HABEAS CORPUS
Name of Respondent
(Warden or jailor)

===========================================================

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

1

petition will likely be transferred to the district court for the district that includes the institution where you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| Tulare County Superior Court | Visalia, CA |
|---|---|
| Court | Location |

(b)    Case number, if known __27850__

(c)    Date and terms of sentence __April 19, 1990, 25 years-to-life__

(d) .  Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes X No

Where? Correctional Training Facility, P.O. Box 689, Soledad, CA

(Name of Institution)                    (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

First Degree Murder

3.    Did you have any of the following?

Arraignment: Yes X_ No __   Preliminary Hearing: Yes X No ___Motion to Suppress: Yes __ No X_

3

4.    How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

5.    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone __X__    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes _X_  No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes _X_           No __
(b)    Preliminary hearing              Yes  X         No __
(c)    Time of plea   Yes _X_          No __
(d)    Trial   Yes _X_          No __
(e)    Sentencing    Yes _X_          No __
(f)    Appeal           Yes              No X
(g)    Other post-conviction proceeding    Yes __        No _X_

8.    Did you appeal your conviction?    Yes __  No _X_

(a)    If you did, to what court(s) did you appeal?

Court of Appeal        Yes __        No _X_        _____
                                                  (Year)                    (Result)

Supreme Court of
California             Yes __        No _X_        _____
                                                  (Year)                    (Result)

Any other court        Yes __        No _X_        _____
                                                  (Year)                    (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this petition?
                                          Yes __  No __

(c)    Was there an opinion?    Yes __    No __

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                          Yes __        No __

4

If you did, give the name of the court and the result:

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes ____    No _X_

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.   Name of Court Superior Court of California, County of Tulare

Type of Proceeding Writ of Habeas Corpus

Grounds raised (Be brief but specific):

a.   See Claim 1, EXHIBIT A at page 11-20

b.   See Claim 2, EXHIBIT A at page 20-25

c.

d.

Result Denied, see EXHIBIT B, case #27850        Date of Result March 26, 2007

II.   Name of Court Court of Appeals, 5th Appeallate District, Calofornia

Type of Proceeding Writ of Habeas Corpus

Grounds raised (Be brief but specific):

a.   See Claim 1, EXHIBIT A at page 11-20

b.   See Claim 2, EXHIBIT A at page 20-25

c.

d.

Result Denied, see EXHIBIT D, case #F052769  Date of Result October 25, 2007

III.   Name of Court Supreme Court of the State of California

6

Type of Proceeding <u>Petition for Review</u>

Grounds raised (Be brief but specific):

a.   <u>See Claim 1, EXHIBIT A at page 11-20</u>

b.   <u>See Claim 2, EXHIBIT A at page 20-25</u>

c.   _____

d.   _____

Result <u>Denied, see EXHIBIT F, case #S157961</u>   Date of Result <u>January 3, 2008</u>

    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?   Yes __ No <u>X</u>

---

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: <u>The Board's decision violated the Fifth, Sixth and Fourteenth</u>

7

Amendments of the Constitution due to lack of required supporting evidence

Supporting Facts: See attached Memorandum of Law

Claim Two: The Board's decision violated the due process clause of the Constitution when it relied on unchanging factors

Supporting Facts: See attached Memorandum of Law

Claim Three: _____

Supporting Facts: _____

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

_____

_____

_____

Do you have an attorney for this petition?    Yes __ No X

If you do, give the name and address of your attorney:

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on _February 15, 2008_        _____
          Date        Signature of Petitioner

( rev. 5/96)

9

**MEMORANDUM OF LAW**

"When a liberty interest arises out of state law, the substantive and procedural protections to be accorded that question is a question of federal law." (Blearing v. George, 461 U.S. 660, 665 n7 (1998); Vitec v. Jones , 445 U.S. 480, 488-489 (1980), Or when a state administrative agency's actions are contrary to statutory law or regulations the action is reviewable under the due process clause of the Fifth and Fourtenth Amendments to the United States Constitution (Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Wasko v. Vasquez, 820 F.2d1090, 1091 (9th Cir. 1987)). If a statute or regulation establishes a rule governing conduct of an agency with respect to an aspect of agency action, the court may determine whether the agencyhas complied with the rule (City of Santa Clara, California v. Andus , 572 F.2d 660, 668 (9th Cir. 1978))

California Penal Code section 3041 vests all California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause. (Sass v. Cal. Board of Prison Terms, 461 F. 3d 1123, 1128; Biggs v. Terhune , 334 F. 3d 910,914 (9th Cir. 2003); McQuillion v. Duncan, 306 F. 3d 895, 903 (9th Cir. 2002); see also Bd. of Pardons v. Allen, 482 U.S. 369, 377-378 (1987) quoting Greenhltz y. Inmates of Nebraska Penal and Correc-tional Complex, 442 U.S. 1, 12 (1979).) The United States Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," Sass, 461 F. 3d at 1128-1129 citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F. 3d at 915 (citing McQuillion 306 F. 3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at

457 n2. When assessing whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, the analysis is framed  by the statutes andregulations governing parole suitability determinations in the relevant state. See Biggs, 334 F. 3d at 915.

Under California law, prisoners serving an indeterminate sentence for first degree murder "may serve up to life in prison, but[] become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal. 4th 1061,1078. Although the board must "normally set a parole release date" before the minimum term has been served, Id.,an inmate "shallbe found unsuitable for parole and denied parole if, in the judgement of the board, the prisoner will pose an unreasonable risk of danger to society if released from prison," Id. at 1080 (quoting Cal. Code of Regulations, Title 15, § 2402 (a)).

The board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the "circumstances tending to show unsuitability" and the "circumstances tending to show suitability" set forth in Cal. Code Regs., Title 15, §2402 (c)-(d). A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole maybe predicated on a prisoner's commitment offense only where the board can "point to factors beyond the minimum elements of the crime for which the inmate will, at the time of the suitability hearing, present a danger to society if released. Dannenberg, 34 Cal. 4th at 1071.

This petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA) and this court cannot grant the relief petitioner seeks unless the State decisions that are challenged

11

are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. "28 U.S.C. §2254(d)(1). AEDPA limits the source of clearly established federal law to Supreme Court precedent, including the legal principles that flow from that precedent. Here the controlling United States Supreme Court law is clearly established: a board's decision, like a disciplinary board's decision, deprives a prisoner of due process if it is not supported by "some evidence" or is otherwise arbitrary." (Superintendant v. Hill, 472 U.S. 445, 457; see McQuillion, 306 F. 3d at 905.) "If a state court's decision that a parole board's determination is both supported by "some evidence" and not "otherwise arbitrary" constitutes an unreasonable application of Hill, the court decision must be reversed under AEDPA and the writ must be granted. (Sass, 461 F. 3d at 1123.)

Petitioner has exhausted his state court remedies. Petitioner received a reasoned opinion denying his petition for writ of habeas corpus from the Superior Court of California, County of Tulare. (Exhibit B) Petitioner also received silent denials from the Court of Appeal of the State of California, Fifth Appeallate District and the California State Supreme Court. (Exhibits D and F, respectively)

Petitioner argues that there was not sufficient evidence to find him unsuitable for parole, that the board failed to follow the required regulations and the board illegally relied on unchanging factors.

I

PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BECAUSE THE BOARD'S DECISION WAS WITHOUT SUPPORTING EVIDENCE THAT THE COMMITMENT OFFENSE WAS PARTICULARLY EGREGIOUS AND THAT PETITIONER CURRENTLY POSED AN UNREASONABLE RISK OR THREAT TO PUBLIC SAFETY.

The California Supreme Court has held that a board's decision violates due process and must be reversed if there is not "some evidence" in the record to support it. Also, although parole may in some cases be denied on the basis of the crime, there must be evidence to support a finding that the crime was particularly egregious. (In re Rosenkrantz, (2002) 29 Cal. 4th 616, 683.)

In petitioner's case, as in all board decisions, the commitment ofense is the evidence relied on by the board to support a finding that the crime was particularly egregious. However, the test is not whether some evidence supports the reasons the board cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. (Cal. Code Regs., tit. 15 §2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison."]; see e.g. In re Scott (2005) 133 Cal. App. 4th 573, 595 ["the commitment offense can negate suitability [for parole] only if circumstances of the crime...rationally indicate that the offender will present an unreasonable public safety risk if released from prison"].) Therefore, it is axiomatic that if the board does not cite or demonstrate that some evidence exists in the record that parole applicants, at the time of the parole consideration hearing, pose an unreasonable public safety risk, then parole is mandatory.

A cursory review of the record in this case demonstrates that the State Court's decision was unreasonable under the applicable "some evidence" rule and was "otherwise arbitrary". The record simply does not contain any evidence that petitioner's act of conspiracy to commit first degree murder was, in contrast to the large majority of such offenses, particularly egregious. Nor does the record contain any

13

evidence that petitioner is currently a threat to society. Given that both findings are required by California law, there is <u>zero</u> evidence in the record to support the board's decision.

II

**PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE BOARD RELIED ON UNCHANGING FACTORS AFTER PETITIONER HAD SERVED HIS MINIMUM TERM**

The circumstances of petitioner's crime do not amount to "some evidence" supporting the conclusion that petitioner poses an unreasonable risk of danger or threat to society if released.

"In the parole context, the requirements of due process are not if 'some evidence' supports the decision." <u>Biggs</u>, 334 F 3d at 915. "Some evidence", however, does not mean literally "any evidence". If it did, the protection afforded by due process would be meaningless. In addition, the evidence underlying the decision must possess some indicia of reliability. <u>Biggs</u>, 334 F. 3d at 916; <u>Caswell</u>, 363 F. 3d at 839; see <u>Hill</u>, 472 U.S. at 455-456. Evidence that lacks any real probative value cannot constitute "some evidence". Otherwise, the requirement of "some evidence" could be satisfied by baseless speculation, superstition or stereotyping. That, too, would reduce the requirement of "some evidence" to a sham or mockery.

Even the most perfunctory review of the board's determination, and and the rationale offered to justify it, reveals that the decision was not supported by "some evidence" <u>and</u> that it is "otherwise arbitrary". What in the record makes petitioner's conviction such as to warrant the conclusion that regardless of the extent of his rehabilitation, he remain, indefinately unsuitable for parole. Or what in the record justifies singling out petitioner's case from the vast majority in which individuals who have been convicted of first degree

14

murder become eligible for a parole date in the absense of prison conduct that demonstrates a lack of suitability.

The Ninth Circuit Court of Appeal has has held, "[I]n all cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass and here [Irons], the petitioner had not served the minimum number of years which they have been sentenced at the time of the challenged parole denial by the Board. Biggs, 334 F 3d at 912; Sass, 461 F. 3d at 1123, 1125. All we held in those cases and all we hold today, therefore, is that, given the particular cicumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons v. Carey, 479 F. 3d 658, 665. However, the Court did not allow for the legal reduction of the minimum term provided by California law. For the purposes of parole, the "fixed minimum" is not necessarily the determinate term specified in the statutes in effect at the time the court sentenced the defendant. That minimum can be decreased by credits for time served, work and good conduct in prison. ["Except where otherwise prohibited by law, inmates sentenced under Penal Code section 190 to an indeterminate term of 15 years-to-life or 25 years-to-life and received by the department on or after May 27, 1987 shall be credited with a one fourth reduction on their minimum eligible parole date... (Cal. Code Regs., tit. 15, division 3, §3043".]

Petitioner has served over eighteen years of incarceration on a conviction of first degree murder and sentenced to twenty-five years-

15

to-life. Therefore, according to the precedent articulated in Irons, adjusting for the reduction of sentence allowed by law, petitioner has served over the minimum number of years to which he had been sentenced at the time the board denied the grant of parole, resulting in a violation of the due process clause of the constitution.

## CONCLUSION

Regardless of whether the board even was entitled to rely upon the commitment offense to find that petitioner posed an unreasonable risk of danger and was unsuitable for parole, in the exceptional circumstance presented by this case, the board's reliance on the commitment offense violates due process because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" possessing "some indicia of reliability" that petitioner poses a danger to the community. See Hill, 472 U.S. at 455; Biggs, 334 F. 3d at 917; and Irons, 358 F. Supp. 2d at 947.

Because there is no reliable evidence to support the board's conclusion that petitioner is unsuitable for parole; that determination violates due process. See Hill, 472 U.S. at 455. The state court's determination to the contrary was based upon an unreasonable determination of the facts in light of the evidence presented during the parole hearing and that determination amounted to an unreasonable application of clearly established Supreme Court precedent.

The record before the board provided no evidence upon which to find petitioner unsuitable for release on parole on the grounds relied upon by the board or any other grounds identified by applicable law and regulations.

Considering that the board's decision denying petitioner a parole release date was not made in accordance with applicable legal principles and was not supported by "some evidence", that denial resulted in a violation of the due process clause of the constitution. Petitioner is therefore entitled to have the board's denial of parole reversed, a new parole hearing should be ordered and the board ordered to follow both the letter and spirit of the applicable law, regulations and court precedents.

Dated: February 15, 2008

Respectfully submitted,

Cleve Otis Hulsey

In Pro Per

## VERIFICATION

I, Cleve Otis Hulsey, hereby declare under penalty of perjury and the law of the UNited States, that the foregoing facts are true and correct, and I would testify to the same in a court of law if called upon to do so. Executed this 15th day of February, 2008, at Soledad, California.

Cleve Otis Hulsey

17

Exhibit A

    Petition for Writ of Habeas Corpus
    Superior Court of California, County of Tulare

Exhibit B

    Order Denying Petition

Exhibit C

    Petition for Writ of Habeas Corpus
    Court of Appeal of the State of California, Fifth Appealate District

Exhibit D

    Order Denying Petition

Exhibit E

    Request for Review
    California State Supreme Court

Exhibit F

    Order Denying Request

EXHIBIT

A

MC-275

Name **Cleve Hulsey**

Address **P. O. Box 705, WA-350L**

**Soledad,   CA   93960-0705**

CDC or ID Number **E-53226**

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF TULARE

(Court)

Cleve Hulsey

Petitioner

vs.

Board of Parole Hearings, et. al

Respondent

### PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 (Rev. July 1, 2005)

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction                    ☒ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name:  Cleve Hulsey

2. Where are you incarcerated?  Correctional Training Facility, Soledad,  CA

3. Why are you in custody?    ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder, First Degree
   _____

   b. Penal or other code sections:  187

   c. Name and location of sentencing or committing court:  Superior Court of California, County

   of Tulare

   d. Case number:  27850

   e. Date convicted or committed:  March 28, 1990

   f. Date sentenced:  April 19, 1990

   g. Length of sentence:  25 years to life

   h. When do you expect to be released?  unknown

   i. Were you represented by counsel in the trial court?  ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

   James T. Wilson, Attorney At Law, 3714 W. Mineral King Ave.

   Visalia,   CA   93291

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☒ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6.  GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a.  Supporting facts:
    Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b.  Supporting cases, rules, or other authority (optional):
    *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

7. **Ground 2 or Ground** _____ (if applicable):

See attached petition

a. Supporting facts:

b. Supporting cases, rules, or other authority:

8. Did you appeal from the conviction, sentence, or commitment?    ☐ Yes.  ☒ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   _____

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

   (2) _____

   (3) _____

   f. Were you represented by counsel on appeal?    ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.    If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

   (2) _____

   (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   N/A _____

   _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   N/A _____

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available?    ☐ Yes.  ☐ No.

   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?     [  ] Yes. If yes, continue with number 13.     [X] No. If no, skip to number 15.

13. a.  (1) Name of court: _____

        (2) Nature of proceeding (for example, "habeas corpus petition"): _____

        (3) Issues raised:  (a) _____

            (b) _____

        (4) Result *(Attach order or explain why unavailable)*: _____

        (5) Date of decision: _____

    b.  (1) Name of court: _____

        (2) Nature of proceeding: _____

        (3) Issues raised:  (a) _____

            (b) _____

        (4) Result *(Attach order or explain why unavailable)*: _____

        (5) Date of decision: _____

    c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

    N/A
_____

_____

16. Are you presently represented by counsel?     [  ] Yes.     [X] No.  If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court?     [  ] Yes.     [X] No.  If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    N/A
_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: March 11, 2007

▶ _____
(SIGNATURE OF PETITIONER)

1 | Cleve Hulsey, E-53226
P. O. Box 705, WA-350L
2 | Soledad, CA 93960-0705

3 | Petitioner, In Pro Per

4

5

6

7

8

9

10 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11 | **COUNTY OF TULARE**

12

13

14

15 | Cleve Hulsey,

Case No.

16 |     Petitioner,

17 |     v.     **PETITION FOR WRIT OF
HABEAS CORPUS**

18 | Board of Parole Hearings, et al.,

19 |     Respondent.

20

21 | **TO THE HONORABLE JUDGE OF THE SUPERIOR COURT OF
CALIFORNIA, IN AND FOR THE COUNTY OF TULARE**

22

23 |     Petitioner hereby petitions for a Writ of Habeas Corpus and

24 | by this verified petition states as follows:

25 | **I**

26 | **INTRODUCTION**

27 |     1.  The Board of Parole Hearings [hereinafter Board] failed

28 | to make its suitability determination in a manner consistent

1

1  with its obligation under the California Penal Code, California
2  Code of Regulations and settled California law.  The Board's
3  decision failed to follow or apply controlling legal principles
4  and its own regulations in finding petitioner unsuitable for
5  parole, the decision was devoid of the "some evidence" required
6  by law, and was arbitrary and capricious resulting in a due
7  process violation of Article 1, § 7 of the California
8  Constitution and the Fifth and Fourteenth Amendments to the
9  United States Constitution.  The Board violated the Due Process
10 Clause of the Fifth Amendment and the notice and jury trial
11 guarantees of the Sixth Amendment of the United States
12 Constitution.  For these reasons the Board's finding that
13 petitioner is unsuitable for parole should be reversed.

## II

## PARTIES

16    2.   Petitioner Cleve Hulsey is a prisoner of the State of
17 California and is currently incarcerated at the Correctional
18 Training Facility in Soledad, California.

19    3.   Respondent Ben Curry is the Acting Warden of the
20 Correctional Training Facility, Soledad, California.

21    4.   Respondent J. Dovey is the Director of the California
22 Department of Corrections and Rehabilitations.

23    5.   Respondent James Davis is the Chairperson of the Board
24 of Parole Hearings and is responsible for its operations.
25 (Penal Code § 5075.)

26    6.   Respondent Arnold Schwarzenegger is the Governor of the
27 State of California and is responsible for the Board's
28 operation.   (Penal Code §§ 5075, 3041.1 and 3041.2.)

2

1

2

**III**

**STATEMENT OF FACTS**

3     7.   Petitioner was convicted of first degree murder on March

4   28, 1990, and sentenced to 25 years-to-life on April 19,1990.

5     8.   On May 9, 2006, Petitioner's Initial Parole

6   Consideration Hearing was held before the Board.  Petitioner was

7   found unsuitable and denied parole for a period of three years.

8     9.   Petitioner has no other plain or adequate remedy in the

9   ordinary course of the law.  This petition is addressed to this

10   courts original habeas corpus jurisdiction because the issues

11   raised are of constitutional dimension, questioning the legality

12   of petitioner's confinement.  A petition for a Writ of Habeas

13   Corpus based upon factual allegations to be determined by

14   reviewing court is generally first brought in the Superior

15   Court.  (*In re Hillery* (1972) 202 Cal.App.2nd 293.)  Petitioner

16   alleges that the Board violated his due process rights by

17   failing to find him suitable for parole, thus depriving him of a

18   liberty interest.  The Fifth and Fourteenth Amendments of the

19   United States Constitution and the California Constitution,

20   Article I, section 7, subdivision (a), prohibit the government

21   from depriving an inmate of life, liberty, or property without

22   due process of law.  Petitioner has been denied due process of

23   law in violation of not only the United States Constitution but

24   also the Constitution of the State of California, the California

25   Penal Code, the California Code of Regulations, and established

26   law.  This is petitioner's first request for habeas relief, and

27   thus is properly filed in this court.

28     10.   The accompanying Memorandum of Points and Authorities

3

1   and factual allegations contained herein, as well as the exhibits

2   appended to this petition are incorporated herein by reference.

3       WHEREFORE, petitioner respectfully prays that this Court:

4       A.   Issue a Writ of Habeas Corpus directing the Director of

5   the Department of Corrections and Rehabilitation to inquire into

6   the legality of petitioner's incarceration;

7       B.   Order the immediate release of the petitioner; or

8       C.   Order the Board to schedule and commence a new term-

9   fixing hearing within thirty days, and to render a new

10  determination in strict accordance with both the letter and

11  spirit of the regulations and law;

12      D.   Conduct an evidentiary hearing;

13      E.   Appoint counsel;

14      F.   Declare the rights of the parties; and

15      G.   Grant any and all relief the court deems appropriate.

16

17  DATED:  March 11, 2007                    Respectfully submitted,

18

19

20                                           Cleve Hulsey
                                             Petitioner, In Pro Per

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

4

**VERIFICATION**

I, Cleve Hulsey, state:

I am the petitioner in this action.  I have read the foregoing petition for writ of habeas corpus and the attached memorandum of points of authority, and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on March 11, 2007.

Cleve Hulsey
Petitioner, In Pro Per

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM AND POINTS OF AUTHORITY

### INTRODUCTION

"The Board of Prison Terms is authorized by statute to determine parole suitability, and to exercise its discretion in deciding whether to grant or deny parole." (*In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 423; Penal Code, § 3040.)

Penal Code section 3041 sets forth criteria for determining parole and provides in pertinent part: "(a) ... One year prior to the inmate's minimum eligible release date a panel consisting of at least two commissioners on the Board of Prison Terms shall ... meet with the inmate and shall normally set a parole release date.... The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The Board shall establish criteria for setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime ... [¶] (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offenses, or the timing and gravity of current or past convicted offense, or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

The California Code of Regulations (hereinafter CCR), title

6

1  15, division 2, chapter 3, article 11, section 2400 et seq. set
2  forth additional criteria for determining parole suitability for
3  persons found guilty of murders committed after November 7,
4  1978.  Subdivision (a) of section 2402 provides: "The panel
5  shall first determine whether the life prisoner is suitable for
6  release on parole.  Regardless of the length of time served, a
7  life prisoner shall be found unsuitable for and denied parole if
8  in the judgment of the panel the prisoner will pose an
9  unreasonable risk of danger to society if released from prison."

10      Subdivision (b) of section 2402 directs the Board to
11  consider "[a]ll relevant, reliable information available to the
12  panel ... in determining suitability for parole.  Such
13  information shall include [(1)] the circumstances of the
14  prisoner's social history; [(2)] past and present mental state;
15  [(3)] past criminal history; including involvement in other
16  criminal misconduct which is reliable documented; [(4)] the base
17  and other commitment offenses, including behavior before, during
18  and after the crime; [(5)] past and present attitude towards the
19  crime; [(6)] any conditions of treatment or control, including
20  the use of special conditions under which the prisoner may
21  safely be released to the community; and [(7)] any other
22  information which bears on the prisoner's suitability for
23  release.  Circumstances which taken alone may not firmly
24  establish unsuitability for parole may contribute to a pattern
25  which results in a finding of unsuitability."

26      Subdivision (c) of section 2402 sets forth the
27  "circumstances tending to show unsuitability" for parole, which
28  "include: [¶] (1) Commitment Offense.  The prisoner committed

7

1 the offense in an especially heinous, atrocious or cruel manner.
2 The factors to be considered include: [¶] (A) Multiple victims
3 were attacked, injured or killed in the same or separate
4 incidents.  [¶] (B) the offense was carried out in a
5 dispassionate and calculated manner, such as an execution-style
6 murder.  [¶] (C) The victim was abused, defiled or mutilated
7 during or after the offense.  [¶] (D) The offense was carried
8 out in a manner which demonstrates an exceptionally callous
9 disregard for human suffering.  [¶] (E) The motive for the crime
10 is inexplicable or very trivial in relation to the offense.  [¶]
11 (2) Previous Record of Violence.  The prisoner on previous
12 occasions inflicted or attempted to inflict serious injury on a
13 victim, particularly if the prisoner demonstrated serious
14 assaultive behavior at an early age.  [¶] (3) Unstable Social
15 History.  The prisoner has a history of unstable or tumultuous
16 relationships with others.  [¶] (4) Sadistic Sexual Offenses.
17 The prisoner has previously sexually assaulted another in a
18 manner calculated to inflict unusual pain or fear upon the
19 victim.  [¶] (5) Psychological Factors.  The prisoner has a
20 lengthy history of severe mental problems related to the
21 offense.  [¶] (6) Institutional Behavior.  The prisoner has
22 engaged in serious misconduct in prison or jail."

23 Subdivision (d) of section 2402 sets forth the
24 "circumstances tending to show suitability" for parole, which
25 "include: [¶] (1) No Juvenile record.  The prisoner does not have
26 a record of assaulting others as a juvenile or committing crimes
27 with a potential of personal harm to victims.  [¶] (2) Stable
28 Social History.  The prisoner has experienced reasonable stable

8

1  relationships with others. [¶] (3) Signs of Remorse. The
2  prisoner performed acts which tends to indicate the presence of
3  remorse, such as attempting to repair the damage, seeking help
4  for or relieving suffering of the victim, or indicating that he
5  understands the nature and magnitude of the offense. [¶] (4)
6  Motivation for Crime. The prisoner committed his crime as the
7  result of significant stress in his life, especially if the
8  stress has built over a long period of time. ... [¶] (6) Lack of
9  Criminal History. The prisoner lacks any significant history of
10 violent crime. [¶] (7) Age. The prisoner's present age reduces
11 the probability of recidivism. [¶] (8) Understanding and Plans
12 for Future. The prisoner has made realistic plans for release
13 or has developed marketable skills that can be put to use upon
14 release. [¶] (9) Institutional Behavior. Institutional
15 activities indicate an enhanced ability to function within the
16 law upon release."

17     In *Rosenkrantz*, our Supreme Court held "that the judicial
18 branch is authorized to review the factual basis of a decision
19 of the Board denying parole in order to ensure that the decision
20 comports with the requirements of due process of law, but that
21 in conducting such a review, the court may inquire only whether
22 *some evidence* in the record before the Board supports the
23 decision to deny parole, based upon *the factors specified by*
24 *statute and regulation*. If the decision's consideration of the
25 specified factors is not supported by some evidence in the record
26 and thus is devoid of a factual basis, the court should grant
27 the prisoner's petition for writ of habeas corpus and should
28 order the Board to vacate its decision denying parole and

1  therefore to proceed in accordance with due process of law."
2  (*In re Rosenkrantz (2002)* 29 Cal.4th 616, 658, emphasis added.)

3        In *Dannenberg* the Supreme Court held "In that regard, we
4  noted that 'the nature of the prisoner's offense, alone, can
5  constitute a sufficient basis for denying parole. [Citations.]'
6  (*Rosenkrantz, supra*, 29 Cal.4th 616, 682.)  While neither the
7  board nor the Governor may adopt a blanket no-parole policy for
8  particular offenses, we said, 'the [parole] authority properly
9  may weigh heavily the degree of violence used and the amount of
10 viciousness shown by a defendant.'  (*Id.*, at p. 683.) [¶]
11 However, we cautioned, sole reliance on the commitment offense
12 might, in particular cases, violate section 3041, subdivision
13 (a)'s provision that a parole date 'shall normally be set' under
14 'uniform term' principles, and might thus also contravene the
15 inmate's constitutionally protected expectation of parole.  We
16 explained that such a violation could occur, 'for example[,]
17 where no circumstances of the offense reasonable could be
18 considered more aggravated or violent than the minimum necessary
19 to sustain a conviction for that offense.'  (*Rosenkrantz, supra*,
20 29 Cal.4th 616, 683.)  Quoting *Ramirez, supra*, 94 Cal.App.4th
21 549, 570, we suggested that, in order to prevent the parole
22 authority's case-by-case suitability determinations from
23 swallowing the rule that parole should 'normally' be granted, an
24 offense must be *'particularly egregious'* to justify the denial
25 of parole.  (*Rosenkrantz, supra*, at 683.)" (*In re Dannenberg*,
26 (2005) 34 Cal.4th 1061, 1094-1095.)

27        The Supreme Court then held "As we have explained, however,
28 the Board must apply detailed standards when evaluating whether

10

1  an individual inmate is unsuitable for parole on public safety
2  grounds.   (See § 3041, subd. (b); CCR § 2402.)   When the Board
3  bases unsuitability on the circumstances of the commitment
4  offense, it must cite 'some evidence' of aggravating facts
5  *beyond the minimum elements of that offense.   (Rosenkrantz,*
6  *supra*, 29 Cal.4th 616, 658, 683.)"   (*In re Dannenberg, supra*, 34
7  Cal.4th 1061, 1095.)

8      Therefore, the Board must follow and apply the standards
9  set forth above in determining that the circumstances of the
10  commitment offense were "particularly egregious" and support
11  that determination with "some evidence" in the record.   As will
12  be shown below, the Board failed to meet this requirement, as
13  well as controlling legal principles, which resulted in a
14  violation of petitioner's due process rights and other state and
15  federal constitutional rights.

16                                I

17      *Claim*:   The Board failed to follow or apply the controlling
18  legal principles, the decision was devoid of the "some evidence"
19  required by law and was arbitrary and capricious, resulting in a
20  due process violation of Article I, § 7 of the California
21  Constitution and the Fifth and Fourteenth Amendment to the
22  United States Constitution.

23      *Argument*:   In finding petitioner unsuitable for parole the
24  Board relied on CCR, § 2402, subdivisions (c)(1)(B), (c)(1)(D),
25  and (c)(1)(E), as "some evidence" that petitioner's crime was
26  "particularly egregious," making him unsuitable for parole, and
27  that he *currently* poses a threat to public safety if released at
28  this time.

                                11

1   First, a cursory review of the record in this case
2   demonstrates that the Board's decision was unreasonable under
3   the applicable "some evidence" rule. The record simply does not
4   contain *any* evidence that petitioner's first degree murder was
5   *particularly* egregious. Nor does the record contain *any*
6   evidence that petitioner is currently a threat to society.
7   Given that both findings are required by California Law, there
8   is *zero* evidence in the record to support the Board's decision.

9   Second, the nature of the offense may justify a denial of
10  parole if the crime was committed in an "especially heinous,
11  atrocious or cruel manner." An offense that was "no more
12  aggravated or violent than the minimum necessary to sustain a
13  conviction" for first degree murder does not justify a finding
14  of unsuitability for parole. (*Rosenkrantz* at p. 682.)

15  To guide this determination, CCR, § 2402, subd. (c)(1)(A)-
16  (E) establishes the specified criteria the Board must rely on to
17  demonstrate that a prisoner committed his offense in an
18  "especially heinous, atrocious or cruel manner." It is
19  axiomatic that absent the required "some evidence" supporting
20  any of the specified factors that decision would be arbitrary
21  and capricious and result in a due process violation.

22  Petitioner will demonstrate that each of the Board's
23  unsuitability findings failed to meet the specified regulatory
24  requirements.

25  A.  The Board's finding that petitioner's crime was perpetrated
    in a dispassionate and calculated manner, such as an
26  execution-style murder, lacks any supporting evidence.
27  CCR, § 2402 (c)(1)(B) states, "The offense was carried out
28  in a dispassionate and calculated manner, such as an execution-

12

1  style murder."

2       In support of this factor the Board found, "It [the
3  commitment offense] was carried out in an especially cruel and
4  callous manner in that his crime partner, who I read in the
5  legal documents got life without the possibility of parole."
6  (Exhibit 1, Initial Parole Consideration Hearing Transcript, May
7  9, 2006 [hereinafter HT], p. 66, L 15:18.)

8       The relevant evidence does not merely fail to support but
9  refutes the conclusion that petitioner committed his offense in
10  a dispassionate and calculated manner, such as an execution-
11  style murder.

12       The Probation Officer's Report [hereinafter POR] states,
13  "Circumstances in the presenting matter indicates that the
14  defendant and an alleged co-participant preplanned a robbery at
15  a rural Woodlake convenience store in order to obtain money with
16  which to buy beer."  (Exhibit 2, POR, pp. 5-6.)

17       The circumstances of the offense, as noted by the Board,
18  were, "At some point Abele [the co-defendant] had began - had
19  begun to talk about robbing a store in Woodlake." (Exhibit 1,
20  HT, p. 16, L 11:14.)

21       During the Proceedings On Sentencing hearing, held on April
22  19, 1990, the Honorable Robert C. Van Auken, Judge, stated, "And
23  I realize that Mr. Hulsey was a participant by reason of the
24  aider and abettor rule, and that he was outside of the
25  particular store in question, and there was a young man, 17
26  years of age, behind a counter who's no longer on earth because
27  of the fact that Mr. Hulsey's cohort - however that occurred,
28  but apparently the gun went off and killed that individual."

13

1  (Exhibit 6, Proceedings On Sentencing, p. 14, L 4:12.)

2      To sum up the evidence and the circumstances of the offense
3  as reported in the record: 1) Petitioner, at worst, aided and
4  abetted a plan to commit an armed robbery; and 2) Petitioner was
5  found guilty of first degree murder based on the felony-murder
6  rule in that a person died during the commission of a robbery.
7  There is absolutely no evidence that petitioner premeditated or
8  planned to commit a murder.  Was the *robbery* calculated?  Yes.
9  Was the murder committed in an execution-style manner?  No.  Was
10 petitioner found guilty of special circumstances that could have
11 resulted in either life without the possibility of parole or the
12 death penalty?  No.  The judge convicted petitioner on the
13 felony-murder rule, which does not require malice or
14 premeditation.

15     The Board's finding that petitioner acted "in a
16 dispassionate and calculated manner, such as an execution-style
17 murder" was wholly inconsistent for the record provides not a
18 scintilla of evidence in support.  Because the record lacks even
19 the "modicum" of evidence required by law, the Board's decision
20 is arbitrary and capricious and resulted in a due process
21 violation.

22 B.   The Board's finding that petitioner demonstrated an
        exceptionally callous disregard for human suffering is not
23      supported by any evidence.

24      CCR, § 2402 (c)(1)(D) states, "The offense was carried out
25 in a manner which demonstrates an exceptionally callous
26 disregard for human suffering."

27     The Board stated, "The way it was carried out demonstrated
28 an exceptional callous disregard for human suffering in that a

                              14

1  life was taken for five dollars..."  (HT, p. 67, L 22:25.)

2      All first degree murders by definition involve some

3  callousness - i.e., lack of emotion or sympathy, emotional

4  insensitivity, indifference to the feelings and suffering of

5  others.  As noted, however, parole is the rule, rather than the

6  exception, and a conviction for first degree murder does not

7  automatically render one unsuitable."  (*In re Smith* (2003) 114

8  Cal.App.4th 343, 366.)  In *In re Ramirez* (2001) 94 Cal.App.4th

9  549, as in this case, the Board denied a parole release date on

10  the basis of a finding that the nature of the inmate's offense

11  displayed a "callous disregard for human suffering." (*Id.* at pp.

12  558, 568.)  Setting aside that determination, the court agreed

13  that "the gravity of the commitment offense or offenses alone

14  *may* be a sufficient basis for denying a parole application, so

15  long as the board does not fail to consider all other relevant

16  factors," *Id.* at p. 569, but attached an important caveat.  As

17  the court explained, "[a]ll violent crime demonstrates the

18  perpetrator's potential for posing a grave risk to public

19  safety, yet parole is mandatory for violent felons serving

20  determinate sentences.  (Pen. Code, § 3000, subd. (b)(1).)  And

21  the Legislature has clearly expressed its intent that when

22  murderers - who are the great majority of inmates serving

23  indeterminate sentences - approach their minimum eligible parole

24  date, the Board 'shall normally set a parole release date.'

25  (Pen. Code, § 3041, subd. (a).)  The Board's authority to make

26  an exception based on the gravity of a life term inmate's

27  current or past offenses should not operate so as to swallow the

28  rule that parole is 'normally' to be granted.  Otherwise, the

15

1   Board's case-by-case rulings would destroy the proportionality

2   contemplated by Penal Code section 3041, subdivision (a), and

3   also the murder statutes, which provide distinct terms of life

4   without possibility of parole, 25 years to life, and 15 years to

5   life for various degrees and kinds of murder.  (Pen. Code, § 190

6   et seq.)."  (*Ramirez*, at p. 570.)   Therefore, to demonstrate "an

7   exceptionally callous disregard for human suffering" (§ 2402,

8   subd. (c)(1)(D)) the offense in question must have been

9   committed in a more aggravated or violent manner than that

10  ordinarily shown in the commission of first degree murder.

11       *In re Van Houten* (2004) 116 Cal.App.4th 339 illustrates the

12  sort of gratuitous cruelty required.  The prisoner in that case

13  was involved in multiple stabbings of a woman with a knife and

14  bayonet.  While she was dying, the victim was made aware her

15  husband was suffering a similarly gruesome fate.  As stated by

16  the court, "[t]hese acts of cruelty far exceeded the minimum

17  necessary to stab a victim to death."  (*Id.* at p. 351.)   Other

18  examples of aggravated conduct reflecting an "exceptionally

19  callous disregard for human suffering," are set forth in Board

20  regulations relating to the matrix used to set base terms for

21  life prisoners (§ 2282, subd. (b)); namely, "torture," as where

22  the "[v]ictim was subjected to the prolonged infliction of

23  physical pain through the use of non-deadly force prior to act

24  resulting in death," and "severe trauma," as where "[d]eath

25  resulted from severe trauma inflicted with deadly intensity;

26  e.g., beating, clubbing, stabbing, strangulation, suffocation,

27  burning, multiple wounds inflicted with a weapon not resulting

28  in immediate death or actions calculated to induce terror in the

16

1   victim." (*Ibid.*) No such facts or anything remotely similar
2   are present in this case. As in *In re Smith, supra*, 114
3   Cal.App.4th 343, there is no evidence petitioner "tormented,
4   terrorized, or injured the victim before his crime partner shot
5   the victim, or that he gratuitously increased or unnecessarily
6   prolonged the victim's pain and suffering. As the *Scott* court
7   stated, "Was the crime callous? Yes. However, are the facts of
8   the crime some evidence that [he] acted with exceptionally
9   callous disregard for [the victim's] suffering; or do the facts
10  distinguished this crime from other [first] degree murders as
11  exceptionally callous? No. (*Id.* at p. 367.)" (*In re Scott*,
12  (2004) 119 Cal.App.4th 871, 891-892.)

13       Because the relevant evidence shows no more callous
14  disregard for human suffering than is shown by most first degree
15  murder offenses, the Board's use of this factor to conclude that
16  petitioner committed his offense "in an especially cruel and
17  callous manner" was arbitrary and capricious.

18  C.   The Board's finding that petitioner's motive for the crime
         was inexplicable lacks evidentiary support.
19

20       CCR, § 2402 (c)(1)(E) states, "The motive for the crime is
21  inexplicable or very trivial in relation to the offense."

22       The final factor relied upon by the Board was the motive
23  for the crime. The Board stated, "The way it was carried out
24  demonstrated an exceptional callous disregard for human
25  suffering in that a life was taken for five dollars, which the
26  motive for this crime is certainly inexplicable." (HT, p. 67, L
27  22:26.)

28       "The epistemological and ethical problems involved in the

17

1    ascertainment and evaluation of motive are among the reasons the
2    law has sought to avoid the subject. As one authority has
3    stated, '[h]ardly any part of penal law is more definitely
4    settled than that motive is irrelevant.' (Hall, General
5    Principles of Criminal Law (2d ed. 1960) at p. 88; see also
6    Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.
7    Justice Ethics 3.) An 'inexplicable' motive is one that is
8    unexplained or unintelligible, as where the commitment offense
9    does not appear to be related to the conduct of the victim and
10   has no other discernible purpose. A person whose motive for a
11   criminal act cannot be explained or is unintelligible is
12   therefore unusually unpredictable and dangerous." (*Scott* at pp.
13   892-893.) The finding that petitioner's motive was
14   "inexplicable" ignores the evidence. Not even a "modicum of
15   evidence" shows petitioner's motive was anything other than to
16   commit a robbery, not a murder, and that his release would
17   therefore pose a greater threat to society than the release of
18   most life prisoners. To permit petitioner's motive to be used
19   to deny him release would allow almost any motive to be used to
20   deny a prisoner release, making a mockery of the legislative
21   declaration that life prisoner are "normally" entitled to
22   receive a release date shortly before they first become eligible
23   for parole. (Penal Code, § 3041, subd. (a).)

24       As it was required to do, the Board considered whether
25   petitioner was suitable for parole – that is, whether he
26   presented an unreasonable risk of danger to society if released.
27   (See Penal Code § 3041 (b); CCR, § 2402.) It decided that
28   petitioner posed an unreasonable risk of danger (and, therefore,

18

1  was unsuitable for parole) because his crime was especially
2  heinous.   While relying upon the nature of petitioner's crime as
3  an indicator of his dangerousness -- after nearly two decades of
4  incarceration -- violates due process because petitioner's
5  commitment offense has become such an unreliable predictor of
6  his present and future dangerousness that it does not satisfy
7  the "some evidence" standard.   After nearly twenty years of
8  rehabilitation, the ability to predict a prisoner's future
9  dangerousness based simply on the circumstances of his or her
10 crime is nil.   (See *Irons v. Warden of California State Prison -*
11 *Solano,* 358 F.Supp.2d 936, 947 n1 ["To a point, it is true, the
12 circumstances of the crime and motivation for it may indicate a
13 petitioner's instability, cruelty, impulsiveness, violent
14 tendencies and the like.   However, after fifteen or so years in
15 the caldron of prison life, not exactly an ideal therapeutic
16 environment to say the least, and after repeated demonstrations
17 that despite the recognized hardships of prison, this petitioner
18 does not possess those attributes, the predictive ability of the
19 circumstances of the crime is near zero."]   Even California
20 courts have said as much.   (*In re Scott* (2005) 133 Cal.App.4th
21 573, 595 ["The commitment offense can negate suitability only if
22 circumstances of the crime reliably established by evidence in
23 the record rationally indicate that the offender will present an
24 unreasonable public safety risk if released from prison.   Yet,
25 the predictive value of the commitment offense may be very
26 questionable after a long period of time."].)

27      Regardless of whether the Board ever was entitled to rely
28 upon the commitment offense to find that petitioner posed an

19

1    unreasonable risk of danger and was unsuitable for parole, in
2    the exceptional circumstances presented by this case, the
3    Board's reliance on the commitment offense violates due process
4    because it resulted in an arbitrary decision and because the
5    facts surrounding the offense do not now constitute "some
6    evidence" possessing "some indicia of reliability" that
7    petitioner poses a danger to the community.

8        Because there is no reliable evidence supporting the
9    Board's conclusion that petitioner is unsuitable for parole,
10   that determination violates due process.

11                                    II

12       *Claim:*  The Board violated the Due Process Clause of the
13   Fifth Amendment and the notice and jury trial guarantees of the
14   Sixth Amendment of the United States Constitution.

15       *Argument:*  The Board, in finding petitioner unsuitable for
16   parole, relied on facts and elements of the crime that were
17   neither charged in the original indictment nor admitted by
18   petitioner.  This is a violation of the Due Process Clause of
19   the Fifth Amendment and of petitioner's right to trial by jury
20   which offended the Sixth Amendment to the United States
21   Constitution.  "Under the Due Process Clause of the Fifth
22   Amendment and the notice and jury trial guarantees of the Sixth
23   Amendment, any fact (other than prior conviction) that increases
24   the maximum penalty for a crime must be charged in an
25   indictment, submitted to a jury, and proven beyond a reasonable
26   doubt."  (*Jones v. United States*, 526 U.S. 227, 244 (1999).)  As
27   Justice Stevens, in his concurring opinion, stated, "I am
28   convinced that it is unconstitutional for a legislature to

                                    20

1  remove from the jury the assessment of facts that increase the
2  prescribed range of penalties to which a criminal defendant is
3  exposed.  It is equally clear that such facts must be
4  established by proof beyond a reasonable doubt." (*Id.* at pp.
5  252-253.)

6      The Board found that petitioner was unsuitable for parole
7  because it found the following "facts" proved that he posed an
8  unreasonable risk of danger to society if granted a parole
9  release date, and this increased the prescribed range of his
10 sentence.

11     The Board found that: 1) "The offense was carried out in
12 dispassionate and calculated manner, such as an execution-style
13 murder" (Exhibit 1, HT, p. 66, L 15:18); 2)  "The offense was
14 carried out in a manner which demonstrated an exceptional
15 callous disregard for human suffering" (Exhibit 1, HT, p. 67, L
16 22:25); and 3)  "The motive for the crime is inexplicable or
17 very trivial in relation to the offense."  (Exhibit 1, HT, p.
18 64, L 22:26.)  The Board then extended petitioner's
19 incarceration period for at least another three years.  (Exhibit
20 1, HT p. 81, L 3:4.)

21     "The Sixth Amendment by its terms is not a limitation on
22 judicial power, but a reservation of jury power.  It limits
23 judicial power only to the extent that the claimed judicial
24 power infringes on the province of the jury.  Indeterminate
25 sentencing does not do so.  It increases judicial discretion, to
26 be sure, but not at the expense of the jury's traditional
27 function of finding the facts essential to lawful imposition of
28 the penalty.  Of course indeterminate schemes involve judicial

1  factfinding, in that a judge (like a parole board) may
2  implicitly rule on those facts he deems important to the
3  exercise of his discretion.  But the facts do not pertain to
4  whether the defendant has a legal *right* to a lesser sentence –
5  and that makes all the difference insofar as judicial
6  impingement upon the traditional role of the jury is concerned."
7  (*Blakely v. Washington*, 542 U.S. 206, 308-309 (2004).)

8      "The governing rule in this area was articulated by the
9  Supreme Court in *Greenholtz v. Inmates of Nebraska Penal*, 442
10  U.S. 1 (1979), and *Board of Pardons v. Allen*, 482, U.S. 369
11  (1987).  *Greenholtz* and *Allen* established that, while '[t]here
12  is no constitutional or inherent right of a convicted person to
13  be conditionally released before the expiration of a valid
14  sentence[,]' *Greenholtz*, 442 U.S. at 7, a state's statutory
15  scheme, if it uses mandatory language, 'creates a presumption
16  that parole release will be granted' when or unless certain
17  designated findings are made, and thereby gives rise to a
18  constitutional liberty interest.  *Id* at 12; *Allen*, 482 U.S. at
19  377-78.  The California parole scheme uses mandatory language
20  and is largely parallel to the schemes found in *Greenholtz* and
21  *Allen* to give rise to such an interest."  (*McQuillon v. Duncan*,
22  306 F.3d 895, 901 (2002).)

23      "Under the 'clearly established' framework of *Greenholtz*
24  and *Allen*, we hold that California's parole scheme gives rise to
25  a cognizable liberty interest in release on parole.  The scheme
26  'creates a presumption that parole release will be granted'
27  unless the statutorily defined determinations are made.  *Allen*,
28  482 U.S. at 378 (quoting *Greenholtz*, 442 U.S. at 12.)"  (*Id.* at

22

1  | 902.)

2  |     Petitioner would contend that his "statutory maximum"
3  | period of confinement is 25 years based on the finding of facts
4  | at the time of his trial. Petitioner has a legal right to a
5  | sentence of less that life. The Board's reliance on facts not
6  | charged in the indictment, proven beyond a reasonable doubt to a
7  | judge or jury, or admitted by petitioner, resulted in a
8  | constitutional violation of his Fifth and Sixth Amendment
9  | rights. (See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)
10 | ["Other than the fact of a prior conviction, any fact that
11 | increases the penalty for a crime beyond the prescribed
12 | statutory maximum must be submitted to a jury, and proved beyond
13 | a reasonable doubt"; see also *Ring v. Arizona*, 536 U.S. 584, 602
14 | ["`the maximum he would receive if punished according to the
15 | facts reflected in the jury verdict alone'" )quoting *Apprendi,*
16 | *supra*, at 483).)

17 |     The facts relied on by the Board, had they been found
18 | beyond a reasonable doubt by the judge, would have resulted in a
19 | sentence of death or life without the possibility of parole. As
20 | this was not the case, the Board's increase of petitioner's
21 | sentence beyond the legally defined 25 years is a clear
22 | violation of the United States Constitution.

23 |     Therefore, the decision of unsuitability should be reversed
24 | and the Board should be ordered to schedule a new hearing at
25 | which a parole release date will be set.

26 |                          **CONCLUSION**

27 |     The California rules governing parole in murder cases, for
28 | which parole eligibility is provided by statute, [See CCR §

23

1  2402] are as follows: "[P]arole eligibility is the rule, rather
2  than the exception." (*In re Scott*, *supra,* 119 Cal.App.4th at p.
3  891.) "[P]arole is 'normally' to be granted." (*Id.* [quoting
4  Penal Code § 3041 (a)].) The murder giving rise to the
5  prisoner's incarceration must be "particularly egregious" for
6  parole to be denied. (*In re Rosenkrantz, supra*, 29 Cal.4th at p.
7  683.) Indeed, a murder must be "heinous, atrocious or cruel"
8  if, as here, the offense is to serve as the basis for parole
9  denial. (CCR, § 2402 (c)(1).) In addition, in such cases, the
10 prisoner must *presently* present a danger to society. (Penal
11 Code § 3401 (b).) In short, in petitioner's case, the
12 circumstances surrounding the crime or the manner in which it
13 was committed must show not only that the first degree murder at
14 issue was more cruel or vicious than the ordinary first degree
15 murder, but also that petitioner would likely pose a current
16 risk to public safety if released. The record in this case
17 contains absolutely *no* evidence that would meet *either* of the
18 two requirements. Thus, there can be little doubt that the
19 Board violated the applicable rules when it denied petitioner
20 parole solely on the basis of his commitment offense.

21 All murders represent the basest form of human behavior.
22 Our laws, however, provide for mechanisms by which even
23 murderers, in limited circumstances, are entitled to be paroled.
24 The judiciary has an obligation to execute those laws. The
25 record establishes that petitioner does not pose an unreasonable
26 risk to public safety. Any contrary conclusion lacks any
27 evidentiary support. Therefore, petitioner prays that this
28 court will grant the petition for habeas corpus.

24

1   DATED: March 11, 2007                         Respectfully submitted,

2

3                                                 Cleve Hulsey
                                                  Petitioner, In Pro Per
4   ///

5   ///

6   ///

7   ///

8   ///

9   ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## TABLE OF EXHIBITS

EXHIBIT 1
    Initial Parole Consideration Hearing Transcript
    May 9, 2006

EXHIBIT 2
    Probation Officer's Report
    March 26, 1990

EXHIBIT 3
    Abstract of Judgment
    April 19, 1990
    (Amendment to Abstract of Judgment, August 1, 1991)

EXHIBIT 4
    Psychological Evaluation
    February 25, 1993

EXHIBIT 5
    Psychological Evaluation
    April 25, 2006

EXHIBIT 6
    Proceedings On Sentencing Transcript
    April 19, 1990, pages 1 and 14

**E X H I B I T**

1

Initial Parole Consideration Hearing Transcript
May 9, 2005

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )          CDC Number E-53226
Hearing of:               )
                          )
CLEVE HULSEY               )          **INMATE**
_____  )          **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2006

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DAVID YACONO, Deputy Commissioner

OTHERS PRESENT:

CLEVE HULSEY, Inmate
MARY ANN TARDIFF, Attorney for Inmate
DANIEL UNDERWOOD, Deputy District Attorney
CORRECTIONAL OFFICER, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No         See Review of Hearing
_____  Yes        Transcript Memorandum

**Marsha Mees, Peters Shorthand Reporting**

ii

## INDEX

Page

Proceedings........................................... 1

Case Factors......................................... 14

Pre-Commitment Factors............................... 22

Post-Commitment Factors.............................. 37

Parole Plans......................................... 27

Closing Statements................................... 55

Recess............................................... 65

Decision............................................. 66

Adjournment.......................................... 82

Transcriber Certification............................ 83

--oOo--

1

1    **P R O C E E D I N G S**

2        **DEPUTY COMMISSIONER YACONO:**  And our tape

3    is rolling.

4        **PRESIDING COMMISSIONER SAWYER:**  Very

5    good.  This is an initial hearing for Mr. Cleve,

6    C-L-E-V-E, Hulsey, H-U-L-S-E-Y, CDC number E as

7    in Edward 53226.  Today's date is Tuesday, May 9

8    and it's 2006.  We're located at the

9    Correctional Training Facility in Soledad.  Date

10    received was 4-23-1990 from the County of

11    Tulare.  The offense is murder in the first

12    degree with armed with a firearm, case number

13    27850.  Count number one is 187 and 12022(a) PC.

14    The term is 25 plus one to life.  Minimum

15    eligible parole date was 11-27-2000.  And we

16    have some other commitment offenses.  In count

17    two is robbery, first degree, 211 PC, Tulare

18    County, same case number.  Also an enhancement

19    on that, armed with a firearm, 12022(a).  And

20    count three a burglary, 459 PC, Tulare County,

21    same case in all those case numbers.

22        **DEPUTY COMMISSIONER YACONO:**  Excuse me,

23    Commissioner, I think the minimum date is 2006.

24    My handwriting version didn't but

25    (indiscernible).

26        **PRESIDING COMMISSIONER SAWYER:**  Is that

27    what they're saying.  Okay.  We're going to --

1    Let's verify that first of all.

2         **ATTORNEY TARDIFF:**  What is it?

3         **PRESIDING COMMISSIONER SAWYER:**  Minimum

4    eligible parole date is 2006.  I misstated that,

5    yes, thank you.  Because on my legal status

6    report it says the year 2000 minimum eligible

7    parole date.  I was going -- The next question I

8    was going to ask is what have you been doing

9    since 2000.  But I've corrected it on my sheet

10   and corrected it in the record.  This hearing is

11   being tape recorded.  And for the purpose of

12   identification we are required to state our

13   first and last name, spelling our last name.

14   When it comes to your turn, after you spell you

15   last name then I want you to also give us your

16   CDC number.  I'll start and go to my left.  Tom

17   Sawyer, S-A-W-Y-E-R, Commissioner.

18        **DEPUTY COMMISSIONER YACONO:**  David

19   Yacono, that's Y-A-C-O-N-O, Deputy Commissioner.

20        **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

21   T-A-R-D-I double F, attorney for Mr. Hulsey.

22        **INMATE HULSEY:**  Cleve Hulsey,

23   H-U-L-S-E-Y, E-53226.

24        **PRESIDING COMMISSIONER SAWYER:**  Very

25   good.  Thank you.  Mr. Underwood.

26        **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**

27   Daniel Underwood, U-N-D-E-R-W-O-O-D, Deputy

3

1    District Attorney, Tulare County.

2         **PRESIDING COMMISSIONER SAWYER:**  Thank

3    you.  We also have two correctional peace

4    officers in the room for security purposes.

5    Mr. Hulsey, before you taped to the table

6    underneath your file there is an ADA

7    self-identification statement which I'll ask you

8    to read out loud and then I'll ask you what it

9    means.  Could you read that for us into the

10   record.

11        **INMATE HULSEY:**

12        "ADA, Americans With Disabilities

13        Act.  The Americans With

14        Disabilities Act, ADA, is a law to

15        help people with disabilities.

16        Disabilities are problems that

17        make it harder for some people to

18        see, hear, breathe, talk, walk,

19        learn, think, work or take care of

20        themselves than it is for others.

21        Nobody can be kept out of public

22        places or activities because of a

23        disability.  If you have a

24        disability, you have the right to

25        ask for help to get ready for your

26        BPT hearing, get to the hearing,

27        talk, read forms and papers and

4

1        understand the hearing process.

2        BPT will look at what you asked

3        for to make sure that you have a

4        disability that is covered by the

5        ADA and that you have asked for

6        the right kind of help.  If you do

7        not get help or if you don't think

8        you got the kind of help you need,

9        ask for a BPT 1074 Grievance Form.

10       You can also get help to fill it

11       out."

12   **PRESIDING COMMISSIONER SAWYER:**  Okay.

13  What does that mean to you, sir?

14       **INMATE HULSEY:**  It means if I got

15  problems understanding what's going on or

16  participating in the hearing then I can get

17  help.

18       **PRESIDING COMMISSIONER SAWYER:**  That's

19  correct.  Okay.  I have a form, BPT Form 1073

20  which was signed by you on October -- looks

21  like, yeah, 30, 2002.  And you indicate on here

22  you do not have a disability.  Is that correct,

23  sir?

24       **INMATE HULSEY:**  Yeah.

25       **PRESIDING COMMISSIONER SAWYER:**  Okay.

26  Tell me about your glasses.

27       **INMATE HULSEY:**  I'm nearsighted.

5

1          **PRESIDING COMMISSIONER SAWYER:**  Okay.  So
2     you need those to see me or to read?
3          **INMATE HULSEY:**  To see you.
4          **PRESIDING COMMISSIONER SAWYER:**  Okay.
5          **INMATE HULSEY:**  I can up close just fine.
6          **PRESIDING COMMISSIONER SAWYER:**  Okay.
7     Very good.  That would -- we would -- If you
8     didn't have those glasses, we may have to -- we
9     may have -- have to accommodate you.  Okay.  So
10    that is --
11         **INMATE HULSEY:**  Yeah.
12         **PRESIDING COMMISSIONER SAWYER:**  --
13    essentially -- disability.  Okay.  That's fine.
14    The information on this form is current and
15    correct?
16         **INMATE HULSEY:**  As far as I can tell,
17    yes.
18         **PRESIDING COMMISSIONER SAWYER:**  As far as
19    you know, okay.  I'm going to ask you some
20    questions.  Do you have any problems walking up
21    and down stairs or for distances of 100 yards or
22    more?
23         **INMATE HULSEY:**  No.
24         **PRESIDING COMMISSIONER SAWYER:**  Do you
25    have any hearing impairments?
26         **INMATE HULSEY:**  No.
27         **PRESIDING COMMISSIONER SAWYER:**  Have you

1    ever been included in Triple CMS or EOP

2    programs?

3         **INMATE HULSEY:** No.

4         **PRESIDING COMMISSIONER SAWYER:** How far

5    did you get through school?

6         **INMATE HULSEY:** Graduated high school and

7    took some college courses at Old Folsom when

8    they were available.

9         **PRESIDING COMMISSIONER SAWYER:** Okay.

10   Graduated high school outside?

11        **INMATE HULSEY:** Yeah.

12        **PRESIDING COMMISSIONER SAWYER:** Did you

13   take any special education while you were

14   growing up?

15        **INMATE HULSEY:** No.

16        **PRESIDING COMMISSIONER SAWYER:** Suffer

17   from any disability that would prevent you from

18   participating in today's hearing?

19        **INMATE HULSEY:** No.

20        **PRESIDING COMMISSIONER SAWYER:** Very

21   good.  Okay.  I'm going to read the outline of

22   the hearing procedure.  And as I read along

23   here, I'll be asking you if you understand some

24   of the critical areas.  Okay.

25        **INMATE HULSEY:** Okay.

26        **PRESIDING COMMISSIONER SAWYER:** This

27   hearing is being conducted pursuant to Penal

1    Code Sections 3041 and 3042 and the rules and

2    regulations of the Board of Prison Terms

3    governing parole consideration hearings for life

4    inmates.  The purpose of the hearing today is to

5    consider your suitability for parole.  In doing

6    so we'll consider the number and the nature of

7    the crimes you were committed for, your prior

8    criminal and social behavior and your behavior

9    and programming since your commitment.  We've

10   had an opportunity to review your Central File

11   and you'll be given the opportunity to correct

12   or clarify the record.  We'll consider your

13   progress since your commitment, your counselor's

14   report and your psychological report.  Any

15   change in parole plans should be brought to our

16   attention.  We'll reach a decision today and

17   inform you whether or not we find you suitable

18   for parole and the reasons for our decision.  If

19   you are found suitable for parole, the length of

20   your confinement will be explained to you.

21   Before we go any further we want to advise you

22   that we expect you to be totally honest with us

23   today.  You understand?

24        **INMATE HULSEY:**  Yes.

25        **PRESIDING COMMISSIONER SAWYER:**  If you do

26   not get a date today, the hearing will form a

27   foundation for all future hearings.  If you do

8

1    not get a date today, any false statements that
2    you make could have an adverse effect on your
3    ability to get a date in the future.  Do you
4    understand?

5         **INMATE HULSEY:**  Yes.

6         **PRESIDING COMMISSIONER SAWYER:**  Nothing
7    that happens here today will change the findings
8    of the court.  We are not here to retry your
9    case.  We're here for the sole purpose of
10   determining your suitability for parole.  This
11   hearing will be conducted in two phases.  I'll
12   discuss with you the crime that you're committed
13   for, your prior criminal and social history,
14   your parole plans and any letters of support or
15   opposition that may be in your file.
16   Commissioner Yacono will discuss with you your
17   progress since your commitment, your counselor's
18   report and your psychological evaluation.  Once
19   that's concluded, the District Attorney and the
20   -- and your attorney will be given the
21   opportunity to ask you questions.  Questions
22   from the District Attorney will be -- actually
23   he'll ask the Board to ask -- ask you if he has
24   any questions.  And your response then would be
25   to hear his questions so I don't have to repeat
26   it and then you respond back to us.  Okay?

27        **INMATE HULSEY:**  All right.

9

1          **PRESIDING COMMISSIONER SAWYER:**  Okay.  So
2    we're acting as his questioner.  Before we
3    recess for deliberations, the District Attorney,
4    your attorney and you will be given an
5    opportunity to make a final statement regarding
6    your suitability for parole.  We'll then recess,
7    clear the room and deliberate.  Once we've
8    completed our deliberation, we'll resume the
9    hearing and announce our decision.  California
10   Code of Regulations states that regardless of
11   time served a life inmate shall be found
12   unsuitable and denied parole if in the judgment
13   of the Panel the inmate would pose an
14   unreasonable risk of danger to society if
15   released from prison.  You have certain rights.
16   These rights include the right to a timely
17   notice of this hearing, the right to review your
18   Central File and the right to present relevant
19   documents.  Ms. Tardiff, has the inmate's rights
20   been met?

21          **ATTORNEY TARDIFF:**  They have.

22          **PRESIDING COMMISSIONER SAWYER:**  You also
23   have the right to be heard by an impartial
24   Panel.  Is there any objection to this Panel?

25          **INMATE HULSEY:**  No.

26          **PRESIDING COMMISSIONER SAWYER:**  Thank
27   you.  You'll receive a copy of our written

1   tentative decision today.  The decision is

2   subject to review by the Decision Review Unit

3   and by the entire Board meeting as a body.  It

4   will become effective within 120 days.  It's

5   also subject to review by the Governor.  A copy

6   of the tentative decision and a copy of the

7   transcript will be sent to you.  As of May 1,

8   2004 there were major changes limiting your

9   former rights to appeal Board decisions or

10  actions directly to the Board.  Old Board

11  regulations were repealed.  The current policy's

12  entitled Administrative Appeals, Correspondence

13  And Grievances Concerning Board Of Prison Terms

14  Decisions and it's available at the prison

15  library.  The real important here, you are not

16  required to admit your offense or discuss your

17  offense if you do not wish to do so.  However,

18  this Panel does accept as true the finding of

19  the court and you're invited to discuss the

20  facts and circumstances of the offenses if you

21  desire.  The Board will review and consider your

22  prior statements you have made regarding the

23  offense in determining your suitability for

24  parole.  Commissioner Yacono, is there any

25  confidential material?

26          **DEPUTY COMMISSIONER YACONO:**  No, Sir.

27          **PRESIDING COMMISSIONER SAWYER:**  Thank

11

1    you.  Mr. Underwood, if you'd check your hearing

2    checklist, I'm going to pass mine to -- Exhibit

3    One to Ms. Tardiff.  And I'm going to mark on it

4    that we do have a new psychiatric report.

5           **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  I do

6    have all the contents including the psychiatric

7    report which was faxed to me this afternoon.

8           **PRESIDING COMMISSIONER SAWYER:**  Thank

9    you.

10          **ATTORNEY TARDIFF:**  I have these documents

11   as well.  I have nothing further to submit.

12          **PRESIDING COMMISSIONER SAWYER:**  Okay.

13   Let the record reflect that you did bring in --

14   before we started the hearing today you did

15   bring in six pages of artwork.

16          **ATTORNEY TARDIFF:**  Correct.

17          **PRESIDING COMMISSIONER SAWYER:**  That

18   Mr. Hulsey sells, you sell these?

19          **INMATE HULSEY:**  I try.

20          **PRESIDING COMMISSIONER SAWYER:**  You try.

21          **INMATE HULSEY:**  Yeah.

22          **PRESIDING COMMISSIONER SAWYER:**  But

23   you're not starving.

24          **INMATE HULSEY:**  No.

25          **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

26   think I'll mention them right -- just right now

27   because I'm not sure where to put them.  And I

12

1    don't want -- certainly don't want to lose them.

2    He's got -- He's got his name, address and CDC

3    number and where he lives. And it says

4    Mr. Cleve Hulsey has sent us two magnificent

5    drawings which are able -- which are please --

6    which we are pleased to post. Who's posting

7    these?

8         **INMATE HULSEY:** It's a website,

9    prisoners.com. I'm not even sure if it's still

10   up and running. I haven't had any contact with

11   the person that runs it in almost a year.

12        **PRESIDING COMMISSIONER SAWYER:** I see.

13        **INMATE HULSEY:** Yeah.

14        **PRESIDING COMMISSIONER SAWYER:** We need

15   to take a short recess.

16              [Off the record]

17        **ATTORNEY TARDIFF:** It's not a good way to

18   start out your initial hearing.

19        **PRESIDING COMMISSIONER SAWYER:** Okay.

20   We're back on tape. The reason we stopped the

21   tape and took about a five minute recess to talk

22   about a potential legal conflict or discipline

23   conflict. But for the purpose of this hearing

24   we're not going to expand on that. I do want to

25   recognize the fact that I do have the six pages

26   of six different drawings. You drew all of

27   these?

13

1     **INMATE HULSEY:**  Yes.

2     **PRESIDING COMMISSIONER SAWYER:**  And

3  what's the medium?

4     **INMATE HULSEY:**  Some of them -- Three of

5  them are penned in ink and three are pencil.

6     **PRESIDING COMMISSIONER SAWYER:**  And I

7  think we all were impressed by your artistic

8  ability.  These are dynamite.

9     **INMATE HULSEY:**  Thank you.

10    **PRESIDING COMMISSIONER SAWYER:**

11  Absolutely dynamite.  Don't you agree,

12  Commissioner?

13    **DEPUTY COMMISSIONER YACONO:**  Absolutely.

14    **PRESIDING COMMISSIONER SAWYER:**  So I

15  guess we can include that in a marketable skill

16  down the road.

17    **DEPUTY COMMISSIONER YACONO:**  I think

18  definitely graphic arts category.

19    **PRESIDING COMMISSIONER SAWYER:**  Right.

20  Okay.  Very good.  Do you have any preliminary

21  objections, counsel?

22    **ATTORNEY TARDIFF:**  I do not.

23    **PRESIDING COMMISSIONER SAWYER:**  Will the

24  inmate be speaking with the Panel?

25    **ATTORNEY TARDIFF:**  Yes.

26    **PRESIDING COMMISSIONER SAWYER:**  On all

27  matters?

14

1      **ATTORNEY TARDIFF:** It's my understanding

2      he has no memory of the commitment offense.

3      **PRESIDING COMMISSIONER SAWYER:** Okay.

4      Then there you have it. Would you raise your

5      right hand. Do you solemnly swear or affirm the

6      testimony you're about to give in this hearing

7      will be the truth, the whole truth and nothing

8      by the truth?

9      **INMATE HULSEY:** Yes.

10     **PRESIDING COMMISSIONER SAWYER:** Thank

11     you. I'm going to be reading from the October

12     2005 calendar Board report, commitment offense,

13     summary of the crime, page one.

14            "On the morning of June 26, 1989

15            18-year-old Cleve Hulsey was

16            drinking beer with Charles Abele,

17            A-B-E-L-E, in Exeter. On the same

18            morning three minors, Michael

19            Darren, D-A-R-R-E-N, and Anthony

20            -- I'm sorry -- Michael and

21            because they're minors we have no

22            last name, Michael S., Darren S.

23            and Anthony C. were collecting

24            cans and had turned them in for

25            seven dollars. The three minors

26            were walking when Abele drove by

27            with Hulsey in Abele's car.

15

1       Hulsey and Abele stopped and asked

2       them if they would like to go

3       swimming at the lake.  They

4       agreed.  Abele used minors' seven

5       dollars and earnings to buy

6       gasoline and a 12-pack of beer.

7       Once they arrived at the lake,

8       everyone drank beer except

9       Michael.  They swam for about one

10      and a half hours.  Abele then

11      suggested that they go and get a

12      gun so they could target shoot.

13      After Anthony and Michael were

14      unsuccessful in their attempt to

15      get a gun, Hulsey suggested

16      borrowing a gun from his brother

17      Marvin.  After driving to Marvin's

18      house, Hulsey, along with Abele,

19      walked inside.  The three minors

20      remained outside in the car.

21      Abele and Hulsey told Marvin they

22      wanted to borrow the gun so they

23      could go shooting.  Marvin was

24      hesitant to give them the gun

25      because it appeared Abele and

26      Hulsey had been drinking.  Marvin

27      agreed to give them the gun but

16

1    first removed all the live rounds.

2    Hulsey and Abele left, placing the

3    gun in the trunk of the car.  In

4    search of ammunition, the group

5    went to the home of Cody Grim,

6    G-R-I-M.  Abele asked to borrow

7    three bullets from Cody.  Hulsey

8    was present during parts -- during

9    part of this conversation.  The

10   three minors remained in the car.

11   Cody gave Abele three bullets.  At

12   some point Abele had began -- had

13   begun to talk about robbing a

14   store in Woodlake.  Apparently for

15   this purpose Abele who -- was

16   driving headed towards Woodlake.

17   Darren asked Abele to stop so he

18   could relieve his bladder.  Abele

19   pulled to the side of the road.

20   Darren went off into the bushes.

21   While Darren was in the bushes,

22   the gun was retrieved from the

23   trunk.  Hulsey took over as the

24   driver and Abele sat in the front

25   passenger's seat.  The three

26   minors remained in the back.  At

27   this point, the three minors

17

1       became frightened and asked to be

2       let out of the car.  Abele refused

3       and Hulsey said there's not enough

4       gasoline to keep -- and kept

5       driving.  Hulsey stopped the car

6       at the A&H Market to observe the

7       flow of customers at the market.

8       Hulsey waited for all the cars --

9       for all the cars to leave.  Abele

10      went in -- Abele went in quickly

11      and returned to the car saying

12      there was no one in the store.

13      Lorenzo Valencia, V-A-L-E-N-C-I-A,

14      had gone to help his friend Amed,

15      A-M-E-D, last name of A-L dash

16      capital K-A-B-A-B-I, I'll spell it

17      again, A-L dash capital

18      K-A-B-A-D-I, who was working as a

19      clerk in the market.  He was

20      helping Mr. Kabadi, Al-Kabadi in

21      the back of the store when

22      Al-Kabadi thought he saw a masked

23      person run in and out of the

24      store.  The two went outside and

25      looked but saw no one.  After

26      Abele returned to the car, Hulsey

27      drove off and returned to the

18

1    store -- then returned to the
2    store.  The three minors were
3    crouched down in the backseat and
4    afraid of what might happen.
5    Abele again went into the market
6    armed with a rifle and a ski mask
7    pulled over his face.  At this
8    time, Valencia and Al-Kabadi were
9    in the front of the store.  Abele
10   pointed the gun at Al-Kabadi and
11   demanded money.  Al-Kabadi gave
12   Abele five dollars and Abele shot
13   him in the chest, fatally wounding
14   him.  Reportedly, a youthful --
15   the youthful clerk grabbed the
16   rifle at the front side causing
17   the firearm to discharge.  When
18   Abele left the store, he was seen
19   by Barbara Bidwell, B-I-D-W-E-L-L,
20   and her daughter.  Bidwell wrote
21   down the license plate number of
22   the car.  Abele returned to the
23   car and said he shot someone for
24   five dollars.  Abele told Hulsey
25   to take off.  He did.  The group
26   drove to another store where Abele
27   got out and purchased gas, beer

19

1    and cigarettes.  Hulsey discovered
2    that one of -- discovered that one
3    of the casings in the gun was
4    used.  He chewed on it and spit it
5    out the window.  The group
6    returned to Exeter after dropping
7    off the three minors.  Hulsey and
8    Abele returned the rifle to Marvin
9    Hulsey.  Hulsey provided a
10   voluntary statement on June 28,
11   1989 -- initially claimed that
12   he'd suffered -- alcohol blackout
13   and was unable to recall his
14   activities.  He subsequently
15   admitted that talk about
16   committing a robbery began while
17   they were at the river.  He
18   acknowledged that it was his idea
19   to attempt to obtain a weapon from
20   his brother.  He contended that he
21   was extremely intoxicated at the
22   time and that the amount of
23   alcohol consumed impaired his
24   judgment.  He told authorities, I
25   was drunk out of my mind."
26 In your version it says you stated that you were
27 drunk and doesn't remember anything.  But you do

20

1   remember getting the gun, right?  That's what it

2   says here.

3       **INMATE HULSEY:**  I don't remember anything

4   after leaving the river.

5       **PRESIDING COMMISSIONER SAWYER:**  After

6   leaving the river?

7       **INMATE HULSEY:**  After leaving the lake,

8   no.

9       **PRESIDING COMMISSIONER SAWYER:**  Do you

10  remember talking about -- at the lake about

11  getting a gun from your brother to Abele?  Maybe

12  I'll ask this question, what do you remember?

13  You remember -- with other guys at the -- at the

14  river?

15      **INMATE HULSEY:**  I remember going up there

16  and swimming for a little while.  Then we're all

17  sitting around drinking.  And Charles said it

18  was time to go or something like that, something

19  to that effect.

20      **PRESIDING COMMISSIONER SAWYER:**  And then

21  you don't remember anymore?

22      **INMATE HULSEY:**  After that, no, it was

23  all --

24      **PRESIDING COMMISSIONER SAWYER:**  How much

25  did you have to drink?

26      **INMATE HULSEY:**  A lot.

27      **PRESIDING COMMISSIONER SAWYER:**  Well you

1    bought a six-pack, right, or a 12-pack?

2         **INMATE HULSEY:**  That was with him.

3         **PRESIDING COMMISSIONER SAWYER:**  With the

4    original seven dollars.

5         **INMATE HULSEY:**  When we met the minors,

6    yeah.

7         **PRESIDING COMMISSIONER SAWYER:**  Yeah.

8    Okay.  Had you been drinking prior to that?

9         **INMATE HULSEY:**  Yes.

10        **PRESIDING COMMISSIONER SAWYER:**  What were

11   you drinking prior?

12        **INMATE HULSEY:**  Beer.

13        **PRESIDING COMMISSIONER SAWYER:**  You drink

14   anything else?

15        **INMATE HULSEY:**  No.

16        **PRESIDING COMMISSIONER SAWYER:**  Do any

17   dope?

18        **INMATE HULSEY:**  No, not that I can

19   remember.  I think at some point someone lit up

20   a joint and passed it to me.  And I thought it

21   was a cigarette so I might have took a hit or

22   two off of it.  But I was never really into

23   that.

24        **PRESIDING COMMISSIONER SAWYER:**  Okay.

25   The aggravating factors in this case, had an

26   opportunity -- "Hulsey had an opportunity to

27   cease by continued with the crime.  The murder

22

1    was senseless, served no purpose in completing

2    the crime and a weapon, the rifle was used.

3    Mitigating factors.  Hulsey has minimal or no

4    history of criminal behavior."  And as I see

5    here, at age 15 and again at 17 attended

6    meetings of Narcotics Anonymous following

7    arrests for minor in possession of alcohol and

8    public intoxication.  When did you start

9    drinking?  What age?

10        **INMATE HULSEY:**  It was before I started

11   high school.  It was actually the summer between

12   eighth grade and my freshman year in high

13   school.

14        **PRESIDING COMMISSIONER SAWYER:**  Why was

15   that?

16        **INMATE HULSEY:**  You know what, I have no

17   idea.

18        **PRESIDING COMMISSIONER SAWYER:**  You don't

19   know why you were drinking?

20        **INMATE HULSEY:**  No, none whatsoever.  I

21   don't know why I started.  I claim peer

22   pressure, but that's not a good excuse.  That's

23   terrible.

24        **PRESIDING COMMISSIONER SAWYER:**  And did

25   you do any drugs during that period of your

26   life?

27        **INMATE HULSEY:**  No.

23

1      **PRESIDING COMMISSIONER SAWYER:** You had

2  to think about it.

3      **INMATE HULSEY:** I tried marijuana one

4  before earlier when I was younger and didn't

5  like it.

6      **PRESIDING COMMISSIONER SAWYER:** Yeah.

7  Have you tried meth or LSD or --

8      **INMATE HULSEY:** No, no.

9      **PRESIDING COMMISSIONER SAWYER:** -- coke?

10     **INMATE HULSEY:** Nothing like that.

11     **PRESIDING COMMISSIONER SAWYER:** PCP?

12     **INMATE HULSEY:** No.

13     **PRESIDING COMMISSIONER SAWYER:** Okay.

14  You were the seventh of eight children born to

15  your parents Coy and Martha Hulsey.

16     **INMATE HULSEY:** Yes.

17     **PRESIDING COMMISSIONER SAWYER:** Siblings

18  included four brothers and three sisters.

19  Family is very close and supportive.  Graduated

20  from Kaweath --

21     **INMATE HULSEY:** Yeah.

22     **PRESIDING COMMISSIONER SAWYER:** --

23  K-A-W-E-A-T-H -- High School in Exeter.

24  Reportedly enlisted in the Navy following

25  graduation in June of 1989 but was discharged as

26  a consequence of the arrest in the present case.

27  His employment history was limited to -- for the

24

1   most part due to his age time of arrest.  You

2   were 18 at the time, right?

3         **INMATE HULSEY:**  Yes.

4         **PRESIDING COMMISSIONER SAWYER:**  He

5   acknowledged a problem with alcohol abuse.

6   Reported that he began consuming alcohol,

7   intoxicants about four years before his arrest

8   and then -- and that until his arrest in the

9   instant matter he consumed alcoholic beverages

10  on a daily basis frequently just to get drunk.

11  Indicates previous participation in alcohol

12  abuse counseling.  That didn't do much good

13  then, huh?  He reported that at 15 and 17 he

14  attended Narcotics Anonymous following arrests

15  for possession of alcohol and public

16  intoxication.  Was that a condition of the

17  arrest?

18        **INMATE HULSEY:**  Sorry, what?

19        **PRESIDING COMMISSIONER SAWYER:**  Was that

20  a condition of the -- of the probation --

21  probation?

22        **INMATE HULSEY:**  Yeah.

23        **PRESIDING COMMISSIONER SAWYER:**  That you

24  -- Did you do any time in juvenile hall?

25        **INMATE HULSEY:**  Nope.

26        **PRESIDING COMMISSIONER SAWYER:**  They just

27  took you home?

25

1          **INMATE HULSEY:**  Yeah, took me back to my

2     parents.

3          **PRESIDING COMMISSIONER SAWYER:**  All

4     right.  Write you a ticket?

5          **INMATE HULSEY:**  Yeah, I think so.

6          **PRESIDING COMMISSIONER SAWYER:**  Regarding

7     the use of controlled substance, acknowledge

8     prior experimentation with marijuana.  Indicated

9     that he's used the substance infrequently,

10    claiming that he tried once when he was 15 and

11    on the date of the offense now before the court.

12    Okay.  Your future plans, well let me ask you

13    this before I get off your personal -- who

14    visits with you?

15         **INMATE HULSEY:**  At the moment, my mother

16    and my sister.  My oldest sister.

17         **PRESIDING COMMISSIONER SAWYER:**  And

18    where's your father?

19         **INMATE HULSEY:**  He's not able to travel

20    as well as he used to.

21         **PRESIDING COMMISSIONER SAWYER:**  He's

22    infirmed?

23         **INMATE HULSEY:**  Kind of, yeah.  He's

24    getting up there.

25         **PRESIDING COMMISSIONER SAWYER:**  How old

26    is he?

27         **INMATE HULSEY:**  Late 60's.

26

1        **PRESIDING COMMISSIONER SAWYER:**  Okay.

2    Retired?

3        **INMATE HULSEY:**  Yes.

4        **PRESIDING COMMISSIONER SAWYER:**  How's

5    your mom's health?

6        **INMATE HULSEY:**  It's fair.

7        **PRESIDING COMMISSIONER SAWYER:**  Okay.

8    And your sister, your oldest sister --

9        **INMATE HULSEY:**  Yeah.

10        **PRESIDING COMMISSIONER SAWYER:**  -- visits

11    with you?  How about your other siblings?

12    You've got six other ones.

13        **INMATE HULSEY:**  Yeah, they have lives.

14    They'd come if they could, but --

15        **PRESIDING COMMISSIONER SAWYER:**  Do they

16    write?

17        **INMATE HULSEY:**  Sometimes.  Infrequently.

18        **PRESIDING COMMISSIONER SAWYER:**  Phone

19    calls?

20        **INMATE HULSEY:**  Yeah, I call them quite a

21    bit.

22        **PRESIDING COMMISSIONER SAWYER:**  Are you

23    in touch -- Everybody's okay?  Nobody's in

24    prison?

25        **INMATE HULSEY:**  No, no one.  I'm the only

26    one.

27        **PRESIDING COMMISSIONER SAWYER:**  Okay.

27

1    Did you conceive any children?

2        **INMATE HULSEY:**  No.

3        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do

4    you have a girlfriend now?

5        **INMATE HULSEY:**  No.

6        **PRESIDING COMMISSIONER SAWYER:**  No.  No

7    wife?

8        **INMATE HULSEY:**  No.

9        **PRESIDING COMMISSIONER SAWYER:**  Okay.

10   Your future plans include a primary residence.

11   You plan to live with your mother Coy and your

12   father Coy -- Martha Hulsey in Exeter.  It this

13   the old family home?

14       **INMATE HULSEY:**  Yep.

15       **PRESIDING COMMISSIONER SAWYER:**  On West

16   Maple Street?

17       **INMATE HULSEY:**  Yes, Sir.

18       **PRESIDING COMMISSIONER SAWYER:**  Also has

19   other family members who'd be willing to help

20   him and keep him on the straight and narrow.

21   Hulsey states he can do practically anything in

22   construction.  His brother Coy Albert Hulsey is

23   an independent contractor who would give me a

24   job.  And you don't have any INS holds on you.

25   Okay.  Let's look at your letters.  I did

26   receive a letter today from the County of

27   Tulare, the Office of the Sheriff/Coroner Bill

28

1   Whitman.

2            "The Sheriff's Office, citizens of

3            Tulare County strongly oppose the

4            release of Cleve Hulsey.  He's

5            convicted of murder first degree

6            and justice -- not be served

7            unless he serves his entire

8            sentence.  Because of the serious

9            nature of the crime we

10           respectfully request you keep

11           Hulsey incarcerated for the crime

12           as long as legally possible."

13   Okay.  Then I have a handwritten letter received

14   on November 14, 2005.

15           "I'm writing this for my brother.

16           I'm the oldest brother of four

17           brothers and three sisters.  Large

18           family.  I'm the boss of a

19           construction crew.  I would give

20           my brother a job when he gets out.

21           I also own my own home and Cleve

22           can live with me and my family.

23           If Cleve needs money or help with

24           anything, I can -- I can and will

25           help him.  I know Cleve won't be a

26           threat to anyone.  He will obey

27           the laws.  I know he's learned

1          from his mistake.  All his family

2          is willing to help any way they

3          can.  We all live close where

4          Cleve was raised.  We would love

5          to have him home.  Cleve will be

6          took care of by all the family."

7    And he gives -- He lives in Farmersville.  How

8    close is that to Exeter?

9          **INMATE HULSEY:**  I think it's about three

10   miles.

11         **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

12   have a letter undated, this is Shirley Cotta.

13   This is your -- This is your aunt.  C-O-T-T-A.

14   Says -- Says you're a nephew.

15         **INMATE HULSEY:**  Yeah.  I never got a copy

16   of this.

17         **PRESIDING COMMISSIONER SAWYER:**  Aunt

18   Shirley.

19         **INMATE HULSEY:**  Yeah.

20         **PRESIDING COMMISSIONER SAWYER:**  Okay.

21   Always been a good person, very decent, law

22   abiding citizen.  If released to the community,

23   his attitude, behavior, maturity is excellent.

24   Very proud of Cleve.  Cleve has wonderful

25   parents.  Stood by him all the way.  Shirley

26   Cotta and she gives a phone number.  And then

27   from Albuquerque, New Mexico dated September 22,

30

1    '05, this is from Margaret Trujillo,

2    T-R-U-J-I-L-L-O.  I'm the sister of Cleve

3    Hulsey.  We've grown up together.  I'm only

4    three years younger than him.  She talks about

5    what a great guy you are.  He's never been in

6    trouble.  I still remember when he came home

7    that afternoon.  He'd been drinking.  He had a

8    big cut on the bottom of his foot.  How did you

9    cut you foot?

10        **INMATE HULSEY:**  I have no idea.

11        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do

12   you remember her cleaning it up and --

13        **INMATE HULSEY:**  Nope.

14        **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

15   you felt no pain, huh.  Do you remember when you

16   sobered up that you had a cut on your foot?

17        **INMATE HULSEY:**  Yeah, I think so.  It was

18   a long time ago.

19        **PRESIDING COMMISSIONER SAWYER:**  Okay.

20   She talks about you.  Has always kept a steady

21   job.  She feels you've been rehabilitated, speak

22   with him frequently over the phone.  Loving and

23   caring, has many job opportunities if given the

24   chance.  He's a great artist, a hard worker.  "I

25   will help him find a great job or go to school,

26   get his college degree in any field he desires.

27   I know that my children are looking forward to

31

1    meeting their Uncle Cleve outside the prison

2    walls someday." And she's just very, very

3    supportive here. Thank you for taking care of

4    my brother for all these years. You're welcome.

5    The utmost trust and belief in your decision,

6    trust you'll see my brother outside prison soon.

7    It's a very nice letter. She writes a good

8    letter. What does she do for a living?

9        **INMATE HULSEY:** She is -- I think she's a

10    receptionist at a major hotel, hotel resort in

11    Albuquerque.

12        **PRESIDING COMMISSIONER SAWYER:** Okay. I

13    have a handwritten letter on 9-2-05 from your

14    mother. Talks about the large family, talks

15    about where you were born. Unfortunately, the

16    copy machine cut off both ends of the sentences

17    so I know -- I have no problems with him. Does

18    anybody have a better copy? Do you have the

19    original letter for this?

20        **INMATE HULSEY:** No, all I ever get are

21    the photocopies.

22        **PRESIDING COMMISSIONER SAWYER:** Okay.

23    It's a terrible copy. Let me -- I'm looking for

24    the offer to come home and live with her. I'm

25    sure it's here.

26        **INMATE HULSEY:** Oddly enough my copy

27    hasn't been cut off.

32

1          **ATTORNEY TARDIFF:**  He's got --

2          **INMATE HULSEY:**  I got a copy.

3          **PRESIDING COMMISSIONER SAWYER:**  You got a

4     better copy?

5          **INMATE HULSEY:**  This copy's got both

6     sides.

7          **PRESIDING COMMISSIONER SAWYER:**  Can I

8     borrow that?  Okay.

9          **DEPUTY COMMISSIONER YACONO:**  I have the

10    original.

11         **PRESIDING COMMISSIONER SAWYER:**  You have

12    the -- this is -- This is fine.

13         **DEPUTY COMMISSIONER YACONO:**  Okay.

14         **PRESIDING COMMISSIONER SAWYER:**  Yeah,

15    it's clearly a bad copy in his file.  Okay.  She

16    talks about your history, no problems with him.

17    That's not entirely true.  She knew about you

18    getting arrested for drinking.  Graduated from

19    -- was speaker of his class.  Were you

20    valedictorian?

21         **INMATE HULSEY:**  Yeah, but it was a very

22    small class.  There was only like about eight or

23    nine graduating students.

24         **PRESIDING COMMISSIONER SAWYER:**  You were

25    tops, huh.  You had also joined the Navy as I

26    read before.  Loves to draw.  We know that.

27    He's sold some of his work.  He will be -- This

33

1    is what I'm looking for.  He will be living with

2    myself and his dad and his two twin nephews who

3    are 14-years-old.  She's caring for some

4    nephews?

5              INMATE HULSEY:  Yeah.

6              PRESIDING COMMISSIONER SAWYER:  Why is

7    that?

8              INMATE HULSEY:  Long story.

9              PRESIDING COMMISSIONER SAWYER:  Can you

10   make it like one sentence?  Your sister or your

11   brother?

12             INMATE HULSEY:  Sister got pregnant too

13   early, couldn't take care of them.

14             PRESIDING COMMISSIONER SAWYER:  Okay.

15             INMATE HULSEY:  Gave them to mom and dad

16   to keep them in the family.

17             PRESIDING COMMISSIONER SAWYER:  Okay.

18   Very good.  Certainly commendable from your mom

19   and dad's point of view.  Fourteen-year-olds,

20   she obviously needs you home.  They could be a

21   handful.  They've visited with you?

22             INMATE HULSEY:  Yes.

23             PRESIDING COMMISSIONER SAWYER:  You know

24   them?

25             INMATE HULSEY:  Yes.

26             PRESIDING COMMISSIONER SAWYER:  Okay.

27   Your dad's been sick.  High blood pressure and

34

1   the gout.  Using a breathing machine.  We're

2   getting old.  He's 68, she's 66.  Okay.  Nice

3   letter.  I don't want to lose that

4   (indiscernible).  Okay.  Then I have a letter,

5   two-page letter from Hazel Lopez, Farmersville.

6   Who's Hazel Lopez?  Your sister?

7         **INMATE HULSEY:**  My sister, yeah.

8         **PRESIDING COMMISSIONER SAWYER:**  Okay.

9   This is your older sister.  Talks about your

10  history.  He's grown up a lot, understands what

11  happened, was very wrong, feels if he could

12  change it, he would.  He's learned a lot.  And

13  will not break any laws.  Is a very decent

14  person.  He tries to help us with our problems

15  by talking with us.  I know when he gets out, be

16  right there when any of us need him or his help.

17  She thinks you've improved.  Says you're

18  respectful.  Okay.  Here's what I'm looking for.

19          "My husband and I are more than

20          willing to help my brother in any

21          way he needs in housing, money,

22          transportation.  We will help him

23          find work.  My husband's company

24          is always looking for help.  He's

25          willing to give Cleve a job.  My

26          brother means everything to us.

27          Love to have him come home again.

35

1          Family hasn't been complete since

2          this happened.  We miss him

3          badly."

4     And that's signed by Hazel Lopez.  What does her

5     husband do?

6          **INMATE HULSEY:**  He works for an

7     irrigation company installing pumps, at least

8     that's what he did when I was out there.  I'm

9     pretty sure he's still doing that.  I think he

10    might have moved up.

11         **PRESIDING COMMISSIONER SAWYER:**  Okay.

12    And I have a letter, another poorly copied

13    letter.  Could you find me a letter that's dated

14    8-23-05 from someone, Lemus.  Is there a Lemus?

15         **INMATE HULSEY:**  Yes.

16         **PRESIDING COMMISSIONER SAWYER:**  What's

17    her first name or his first name?

18         **INMATE HULSEY:**  It's Mark Lemus.

19         **PRESIDING COMMISSIONER SAWYER:**  Mark

20    Lemus and who's that?

21         **INMATE HULSEY:**  He's just a friend.

22         **PRESIDING COMMISSIONER SAWYER:**  Just a

23    friend.

24         **INMATE HULSEY:**  And about the only one I

25    got left.

26         **PRESIDING COMMISSIONER SAWYER:**  Yeah,

27    addressed to Studebaker.  Sending this letter on

36

1   behalf of Cleve Hulsey. Known all of our

2   childhood lives. I believe he would be a law

3   abiding citizen -- released in the community.

4   Good decent young man. I'm sure he's learned a

5   very tough lesson. He's matured and aged

6   (indiscernible) ready to get on with his life.

7   I'm willing to help with transportation when

8   needed. Also ready to see his friend -- be his

9   friend once -- once again and help him adapt to

10  public work. Mark Lemus. Very nice letter.

11  What does Mr. Lemus do for a living?

12      **INMATE HULSEY:** Last I heard he was

13  working for a plastics company. Not exactly

14  sure what he was doing.

15      **PRESIDING COMMISSIONER SAWYER:** You were

16  kind of a hippie then, weren't you?

17      **INMATE HULSEY:** What's that?

18      **PRESIDING COMMISSIONER SAWYER:** You were

19  kind of a hippie. I'm looking at your pictures

20  in your C-File back in '93.

21      **DEPUTY COMMISSIONER YACONO:** This is --

22  he came in.

23      **PRESIDING COMMISSIONER SAWYER:** Back in

24  '90 you had semi-long hair but you -- really got

25  long in '93. Okay. You have any additional

26  letters that you'd like to share with us?

27      **INMATE HULSEY:** No.

37

1 **PRESIDING COMMISSIONER SAWYER:** At this

2 time. None, okay. Very good. I'll turn it

3 over to Commissioner Yacono.

4 **DEPUTY COMMISSIONER YACONO:** Okay.

5 Because this is the initial hearing we have a

6 lot of ground to cover. And I'm going to try

7 and make sure that I hit all the points, all the

8 documents but I'm going to also, during this

9 timeframe and before we get done, I'll ask you

10 and your attorney if there's anything additional

11 if some of the facts don't jive quite right.

12 Because I have a couple of question marks on

13 these. But I'm going to try and run through

14 this as close to chronologically as I can on

15 some of the -- especially on the work and the

16 self-help group area. You got a lot of material

17 to cover on this one. So what I'm looking at is

18 the Central File, a life prisoner evaluation

19 report prepared for the October '05 calendar by

20 Correctional Counselor J. Studebaker and signed

21 off on 7-20-2005. Now, the post-conviction

22 reports, Correctional Counselor (indiscernible)

23 signed off 3-10-93 and covered the period

24 4-23-90 until 3 of '93. Then Correctional

25 Counselor Jordine (phonetic) signed off 3-14-96

26 for the period of 3-1-93 through 3-3-96.

27 Correctional Counselor Donnelly signed off

38

1   1-27-99 on a report from 3-96 to January of '99.

2   Then E. Washington was the correctional

3   counselor on a report signed 10-29-02 covering

4   the period of 2-99 until 3 of '02. And I have a

5   month break. But from April of '02 until

6   July 20, '05 signature date by Correctional

7   Counselor Studebaker. Looking at psychiatric

8   evaluation prepared by Dr. Merrick, Ph.D., April

9   25, 2006, and I see one prior from a Dr. Larson,

10  M.D., dated 2-25-93. The documentation hearings

11  show me April 27, '93, April 2, '96, April 14,

12  '99, November 7, 2002. Obtain -- The

13  recommendations. Obtain vocational trades, stay

14  disciplinary-free, participate in self-help

15  programs and the '96 specified AA. The records

16  reflect that coming into Department of

17  Corrections on 4-23-90 at DVI reception center,

18  then 5-22-90 to Folsom, 8-3-93 to Lancaster as a

19  Close B. You started off at Close A with 67

20  points. Then 9-14-93, Corcoran, was a Close B.

21  Pleasant Valley, 11-39-93, Close -- Close B.

22  And then here to Soledad on 5-28-93 as a

23  Medium A. Nine one of '98, Close B. Four

24  thirteen of 2000, Medium A where you are today.

25  Your points range from the high 67 when you came

26  in, dropping steadily and then November 16, '99

27  I'm seeing 11 points. It used to be you could

39

```
1    go to zero but 19 is minimum now.  But it looks
2    like you've been pretty much -- low points since
3    '99.  I see an April 29, '99 at 25 and then by
4    November you're 11.  And from that point on it's
5    been minimal points.  The one thing I don't see
6    is any vocational instruction.  Am I missing
7    something?  Ever done any voc?
8         INMATE HULSEY:  No.
9         DEPUTY COMMISSIONER YACONO:  Okay.  You
10   need to be in graphic arts.  Anyhow, the
11   academic education.  We do have your diploma
12   from your high school and that graduation date
13   was June 9, '89.  In 1990 we did an assessment
14   of you.  Your level at that time was 12.9 which
15   is as high as we do.  There are some other
16   notations in there and I put it under academic.
17   I probably should have put it under laudatory
18   because I read it a couple of times.  But I'd
19   already written it.  Reader I, 7-17-91,
20   satisfactory or exceptional ratings on that.
21   And then what I found later on is basically
22   you're doing like books for the blind.
23        INMATE HULSEY:  Yes.
24        DEPUTY COMMISSIONER YACONO:  So get that
25   on the record even though it's in the wrong
26   category.  I do note college classes.  You got
27   three semester units in English with grades of B
```

40

1  as of a chrono 6-19-91 and psychology one, three

2  units with A grade and that was 6-10-91. So you

3  took pretty much six units all at the same time.

4  **INMATE HULSEY:** Yeah.

5  **DEPUTY COMMISSIONER YACONO:**

6  Correspondence?

7  **INMATE HULSEY:** No, they actually had

8  college instructors coming into Old Folsom at

9  the time.

10  **DEPUTY COMMISSIONER YACONO:** That's

11  right. You were at Folsom then. Okay. All

12  right. This is where it gets hard. It's good

13  for you. It's hard for me. First entry I show

14  is assignment to the dental lab on 8-11-92

15  showing satisfactory or exceptional ratings.

16  Then I show a Corcoran work crew October '94

17  through November 18, '94 and I show porter and

18  lieutenant's clerk December of '94 with evals

19  continuing January of '95. Then assignment to

20  the clothing room, January of '95, satisfactory

21  exceptional marks as of 4-17-96. Then I'm

22  showing a clerk 5-31-95 with exceptional grades;

23  5-15-98 which is -- I don't understand why the

24  dates flip flop but May of '98. I also found

25  one that I believe was 3-19-98 showing again

26  exceptional marks. I was a little confused on

27  that one so I put on the clerk. Then I'm

41

1   showing PIA textiles 6-13-98 through 9-1-98.

2   Reassignment to porter in '99 with evals

3   4-20-2000, 7-6-2000 at satisfactory.  Now, I had

4   one in here as well that show me 11-16-99 you

5   were put out of the assignment based on 128(g)

6   of 4-2-2000.  So I'm confused how you're getting

7   good grades, good marks on your work but it

8   seems like you were put out.  But obviously they

9   must have put you back in again for the porter

10  duties.  Okay.  And this is where I got

11  contradictory.  I'm showing a patio clerk

12  1-12-2001 but I'm showing the date as sergeant's

13  work crew.

14       [Thereupon, the tape was turned over.]

15       **DEPUTY COMMISSIONER YACONO:**  Okay.  All

16  right.  So again my problem is I got patio

17  clerk, showing me evals and then I've got

18  sergeant's work crew.  And it seems to be kind

19  of the same timeframe for the work crew,

20  3-12-02, above average.  Then I'm showing

21  July 26, August 9 and August 31 for the patio

22  clerk, above average.  Is sergeant's work crew

23  and patio clerk kind of the same?

24       **INMATE HULSEY:**  Yeah.

25       **DEPUTY COMMISSIONER YACONO:**  Okay.  So

26  I've got dates from two different sources.  Next

27  I'm showing, confusing again, because I'm

1   showing you as watch clerk May 18, 2002 with

2   above average evaluation on 8-6-2002.  Then a

3   movement to statistics clerk, 4-22-04,

4   satisfactory and above, 6-1-2004.  Then the

5   watch commander's clerk, 6-5-04.  Again, how do

6   we get a satisfactory evaluation or you got a

7   satisfactory evaluation or above, noting

8   4-14-05, 4-6-05, 4-20-05 and then 5-31-05

9   exceptional.  And then I got nothing for the

10  last year.  What have you been doing for the

11  last year?

12       **INMATE HULSEY:**  Up until January of this

13  year I was in the same job.  I was a clerk, the

14  patio clerk or watch commander's clerk.  And as

15  of January of this year, I think it was

16  effective January this year, it might have been

17  late last year, I was put in the dental lab.

18  They have a dental lab here.  A position came

19  open and I went back in there.

20       **DEPUTY COMMISSIONER YACONO:**  And I'm not

21  seeing any chronos for it, which is a little

22  unfortunate.  This is your initial, but it makes

23  sense.  Will suffice it to say that you have

24  never gotten less than a satisfactory

25  evaluation.  You know what, I did see something

26  for January.

27       **ATTORNEY TARDIFF:**  There was an AA

43

1   chrono.

2       **DEPUTY COMMISSIONER YACONO:** Thank you.

3   For that same timeframe?

4       **ATTORNEY TARDIFF:** One three '06.

5       **DEPUTY COMMISSIONER YACONO:** All right.

6   Okay. While we're talking about self-help and

7   specifically AA, I've got one chrono showing me

8   10-4-97, participation, and then a December 31,

9   '97. From there I've got nothing until July

10  2001. Is there a break there? What happened?

11      **INMATE HULSEY:** In -- What was it, '97?

12      **DEPUTY COMMISSIONER YACONO:** So we're

13  talking '98, '99, 2000 and it looks like

14  probably the first two quarters of 2001 or the

15  first quarter of 2000 --

16      **INMATE HULSEY:** That's when I was

17  transferred here from Pleasant Valley.

18      **DEPUTY COMMISSIONER YACONO:** Got it.

19  Okay. Then I'm showing chronos July '01,

20  October, December '01, April '02, July '02,

21  September '02, December '02. I don't show

22  anything in '03. There was something 4-03 but

23  it may be a reference but it wasn't specific.

24  And then 7-03, 10-3, January '04, April '04,

25  July, October, December '04. Then I don't show

26  anything for first and second quarter of 2005.

27  Then I got a January 3, '06 which refers to

44

1  third and fourth quarter for AA.  So we had a

2  break for first and second quarter in 2005?

3       **INMATE HULSEY:**  I think there might have

4  been in between sponsors.  I'm not sure why I

5  never got a chrono.

6       **DEPUTY COMMISSIONER YACONO:**  Okay.  And

7  anything since January of this year?

8       **INMATE HULSEY:**  I haven't been able to

9  go.  Our facility's been locked down since

10  February 7.

11       **DEPUTY COMMISSIONER YACONO:**  Okay.  Now,

12  I'm out of chronology here, but I want to do all

13  those -- that run.  Pretty consistent AA

14  attendance.  I've got a Men's Advisory Council,

15  March '95.  Then I'm showing Captive Audience

16  Literacy Group, 5-9-98.  The classes for

17  Hepatitis C, July '99, HIV slash AIDS.  I've

18  seen you've taken that April '99 and August '99.

19  And then Arts In Correction for the period of

20  '98 to '99 with a chrono dated 6-24-99.  Under

21  laudatories, although -- should have done the

22  Reader one here, but I'm seeing Literacy Action

23  certificate 3-22-94, 12-hour workshop tutoring.

24  I had Inmate Peer Education program and I

25  crossed it out.

26       **ATTORNEY TARDIFF:**  He's got some chronos.

27       **DEPUTY COMMISSIONER YACONO:**  Well I'm

45

1    showing Literacy Group, 5-9-98 and then a

2    12-16-05 Children's Holiday Festival.

3         **ATTORNEY TARDIFF:**   You should have those.

4    Inmate Peer --

5         **INMATE HULSEY:**   Yeah, those are --

6         **DEPUTY COMMISSIONER YACONO:**   Those are --

7         **INMATE HULSEY:**   -- miscellaneous.

8         **DEPUTY COMMISSIONER YACONO:**   -- HIV and

9    the Hep C's.

10        **ATTORNEY TARDIFF:**   Yeah.

11        **DEPUTY COMMISSIONER YACONO:**   Okay.   I

12   think the Inmate Peer Education program was part

13   and party of the Literacy Action certificate.

14   It was mentioned somewhere else.

15        **ATTORNEY TARDIFF:**   Okay.

16        **DEPUTY COMMISSIONER YACONO:**   And that's

17   why I crossed it out.   Okay.   Let's do the

18   psych.   I'm looking at April 25, 2006.   The

19   diagnostic impression shows me Axis I, Alcohol

20   Dependence In Institutional Remission.   Axis II,

21   None.   Axis III, Back Problem.   Axis IV,

22   Incarceration and Axis V shows us a GAF of 90 --

23   of 100.   Assessment of dangerousness is showing

24   past six years disciplinary-free.   Dangerousness

25   within a controlled setting is lower than the

26   inmate population.   Released to the community,

27   it appears he would be able to maintain his

46

 1    current sobriety and commitment to remain

 2    abstinent.  His assessment of dangerousness in

 3    the community is no more than the average person

 4    in a non-prison population.  Significant risk

 5    factor or precursor to violence for Hulsey would

 6    be return to alcohol use.  He should be

 7    periodically tested and attendance at Alcoholics

 8    Anonymous or some other alcohol treatment

 9    modality should be a mandatory requirement of

10    parole.  Hulsey is competent, responsible for

11    his behavior.  Capacity to abide by institution

12    standards.  Should do well in the future as long

13    as he remains drug and alcohol free.  Any

14    treatment program is recommended -- will help

15    him maintain long term sobriety.  Does not have

16    mental health disorder which would necessitate

17    treatment either during his incarceration or on

18    parole.  That was one by Dr. Merrick (phonetic).

19    And I'm showing an April '93 for --

20    documentation hearing, short one-pager by

21    Dr. Larson (phonetic).  My specific note on this

22    was the most appropriate psychiatric diagnosis

23    would be that of alcohol dependence in

24    institutional remission.  Express interest in

25    college as well as Alcoholics Anonymous.

26    Appears sincere.  Hopes to major in psychology,

27    though express an interest in physical sciences

1     such as chemistry. His violence potential

2     appears to be considerably less than that of the

3     average inmate population. "To this evaluator,

4     he appears to be an individual who should, when

5     it is administratively possible, do as much of

6     his programming as possible at CMC, eventually

7     entering into a Category T program. College is

8     encouraged if available." And that seems to be

9     February 25, '93 on that. Okay. And lastly,

10    115's, 128's. I'm showing four 128's, 3-24-93,

11    possession of contraband; 8-20-95, unauthorized

12    window covering; 5-17-99, failure to report to

13    work; 11-01-00, failure to report to work. And

14    115's, 12-8-94 for performance, guilty,

15    counseled and reprimanded. Eight four '99,

16    refusing to work, guilty, assessed 30 days, 10

17    days loss of privilege, counseled, warned and

18    reprimanded. Did I miss anything?

19          **INMATE HULSEY:** Not that I can tell.

20          **DEPUTY COMMISSIONER YACONO:** Counsel, did

21    you have anything else?

22          **ATTORNEY TARDIFF:** No.

23          **DEPUTY COMMISSIONER YACONO:** Okay.

24    Commissioner.

25          **PRESIDING COMMISSIONER SAWYER:** How much

26    of your $10,000 restitution have you paid off?

27          **INMATE HULSEY:** I think just under

48

1    $1,500.

2         **PRESIDING COMMISSIONER SAWYER:**  Okay.

3    Are you -- Is this current dental lab job of

4    yours a pay number?

5         **INMATE HULSEY:**  Yes.

6         **PRESIDING COMMISSIONER SAWYER:**  What are

7    you getting paid there?

8         **INMATE HULSEY:**  It's 36 a month.

9         **PRESIDING COMMISSIONER SAWYER:**  Okay.

10   And why no vocation?

11        **INMATE HULSEY:**  For a great deal of time

12   vocations weren't available to Close Custody

13   inmates.  And I've only been Medium Custody

14   since I think it was 2000, since I've been here.

15        **PRESIDING COMMISSIONER SAWYER:**  April 13.

16        **INMATE HULSEY:**  Yeah, of 2000.

17        **PRESIDING COMMISSIONER SAWYER:**  That's

18   six years.

19        **INMATE HULSEY:**  Yeah.  Where I was at

20   over at north facility, they don't have any

21   vocations that particularly interest me.  They

22   have a graphic arts program over here, it's the

23   print shop, which I would like to take, and a

24   drafting class, computer aided drafting class at

25   that, here that I would like to take.  But --

26        **PRESIDING COMMISSIONER SAWYER:**  You on

27   the waiting list?

49

1          **INMATE HULSEY:**  I'm not even on the

2    waiting list.  They won't put me on it because

3    I'm not here in central facility.

4          **PRESIDING COMMISSIONER SAWYER:**  I see.

5    Okay.  How many college units have you -- six?

6          **DEPUTY COMMISSIONER YACONO:**  That's what

7    I'm showing.

8          **PRESIDING COMMISSIONER SAWYER:**  Okay.

9    And those are in English?

10          **INMATE HULSEY:**  Three in English and I

11    think three in psychology.

12          **PRESIDING COMMISSIONER SAWYER:**  Yeah,

13    three units so looks like two classes.

14          **INMATE HULSEY:**  Yeah.

15          **PRESIDING COMMISSIONER SAWYER:**  Is there

16    anything you can do in terms of vocation or

17    self-help with a correspondence course?

18          **INMATE HULSEY:**  If I have the means,

19    yeah.  If I can just -- If I know who to write

20    to start, I wouldn't have a problem doing

21    anything like that at all.

22          **PRESIDING COMMISSIONER SAWYER:**  Do you

23    meet with other lifers?  Is there any kind of

24    lifers group meetings here?

25          **INMATE HULSEY:**  Not where I'm at.

26          **PRESIDING COMMISSIONER SAWYER:**  What are

27    you doing now in the dental lab?

50

1        **INMATE HULSEY:**  Making dentures.

2    Partials and full dentures.  Well, actually I

3    haven't started doing the full's yet.  I just do

4    partial dentures.

5        **PRESIDING COMMISSIONER SAWYER:**  Are you

6    just learning that?  You've been in the dental

7    lab once before.

8        **INMATE HULSEY:**  Yeah.

9        **PRESIDING COMMISSIONER SAWYER:**  Right?

10       **INMATE HULSEY:**  But that was a long time

11   before.

12       **PRESIDING COMMISSIONER SAWYER:**  Things

13   change?

14       **INMATE HULSEY:**  The procedures, no, not

15   really.  It's just getting back in the swing of

16   doing it.

17       **PRESIDING COMMISSIONER SAWYER:**  Enjoy it?

18       **INMATE HULSEY:**  Yes, very much so.

19       **PRESIDING COMMISSIONER SAWYER:**  You see

20   that as a potential vocation?

21       **INMATE HULSEY:**  Yeah.  I wouldn't mind

22   doing it out on the streets.

23       **PRESIDING COMMISSIONER SAWYER:**

24   Somebody's got to do it.

25       **INMATE HULSEY:**  Yeah, everybody needs

26   teeth.

27       **PRESIDING COMMISSIONER SAWYER:**  Not

51

1  everybody, but most of us do. What did you

2  learn when you were in PIA in textiles?

3      **INMATE HULSEY:** I didn't.

4      **PRESIDING COMMISSIONER SAWYER:** You

5  didn't learn?

6      **INMATE HULSEY:** I was only there for

7  three months. And when I was assigned, they

8  were at their -- some kind of break where they

9  do an inventory. So they had just a minimal

10  crew coming in. I think it was maybe like eight

11  or nine guys, like a skeleton crew just to keep

12  the sewing machines running so to speak.

13      **PRESIDING COMMISSIONER SAWYER:** And what

14  did you learn in Arts In Corrections?

15      **INMATE HULSEY:** That was voluntary. And

16  it was just art classes. Some of it -- one

17  thing -- Part of it taught me was to loosen up,

18  not try to be so -- it's hard to describe, not

19  try to be so rigid in what I did, loosen up and

20  kind of just do different things. They had one

21  instructor come in that showed us -- working

22  with ceramics, did a little bit of that. That's

23  really it. Just go in there and do artwork.

24      **PRESIDING COMMISSIONER SAWYER:** So they

25  taught you how to color outside the lines, huh?

26      **INMATE HULSEY:** Basically, yeah.

27      **PRESIDING COMMISSIONER SAWYER:** And tell

52

1    me about this reading for the blind, what was

2    that?

3        **INMATE HULSEY:** That was the Folsom

4    Project for the Visually Impaired. And what we

5    do is we'd sit down and we would read books onto

6    tapes. And it was like a lending library.

7    People that have vision problems would -- it was

8    done through another company, not a company,

9    another organization outside the prison. The

10   visually impaired people, they would call this

11   organization. This organization would get a

12   hold of the institution and say, okay, do you

13   have this, do you have that, this book, that

14   book. If we didn't, if they could provide the

15   book, we'd get the permission to read it on the

16   tape and then loan it them. Just like a

17   library.

18       **PRESIDING COMMISSIONER SAWYER:**

19   Interesting. Did you ever make license plates

20   in Folsom?

21       **INMATE HULSEY:** No. No, never did that.

22       **PRESIDING COMMISSIONER SAWYER:** Okay.

23   And you started AA in 1997. But then got back

24   into in '01?

25       **INMATE HULSEY:** Yeah, I think so.

26       **PRESIDING COMMISSIONER SAWYER:** How many

27   years did you have in the AA in '97?

53

1        **INMATE HULSEY:** Prior to '97?

2        **PRESIDING COMMISSIONER SAWYER:** Yeah, did

3    you have some prior to '97?

4        **INMATE HULSEY:** No. Closed Custody, in

5    '97 was when they got a Closed Custody AA

6    program going.

7        **PRESIDING COMMISSIONER SAWYER:** And how

8    many years did you do it in '97 until when?

9        **INMATE HULSEY:** Well, I'm unsure of when

10   they started it in '97 but it only lasted until

11   like May of '98 when I got transferred here.

12       **PRESIDING COMMISSIONER SAWYER:** And then

13   it took you all this time to get it here

14   (indiscernible) --

15       **INMATE HULSEY:** (Indiscernible) --

16       **PRESIDING COMMISSIONER SAWYER:**   --

17   position here?

18       **INMATE HULSEY:** Yeah. Because I was

19   still Closed Custody. Well, I was Medium

20   Custody and then Closed Custody again. And they

21   didn't have an AA program for Closed Custody's

22   because Closed Custody's could not leave the

23   cells in the evening.

24       **PRESIDING COMMISSIONER SAWYER:** So you've

25   got AA regularly from -- did I read that right,

26   regularly from '01 until now?

27       **INMATE HULSEY:** Yeah.

54

1      **PRESIDING COMMISSIONER SAWYER:**   As

2    regular as it can be?

3           **INMATE HULSEY:**   Well, yeah, barring any

4    --

5           **PRESIDING COMMISSIONER SAWYER:**

6    Lockdowns.

7           **INMATE HULSEY:**   Yeah, lockdowns, lack of

8    program which has been happening a lot since

9    2001.

10          **PRESIDING COMMISSIONER SAWYER:**   You know

11    your steps?

12          **INMATE HULSEY:**   I've only gotten -- far

13    as number two and that's the one I have the

14    biggest problem with.

15          **PRESIDING COMMISSIONER SAWYER:**   What step

16    is that?

17          **INMATE HULSEY:**   Put myself in the hands

18    of a higher power.   I've always felt I'm

19    responsible for my own actions.

20          **PRESIDING COMMISSIONER SAWYER:**   Is that

21    -- Is that what that means?

22          **INMATE HULSEY:**   No, well, to me it kind

23    of does.   To me it's like asking me to say,

24    okay, it's not my fault.   It's asking me to do

25    something that I don't believe in.   I guess you

26    could say, for lack of a better term, I'm an

27    atheist.   And I don't -- By putting myself in

1    the hands of a higher power, they're asking me

2    to basically quit taking the blame for my

3    alcoholism.  And I can't do that.  I know I have

4    a problem with alcohol and I'm the only one

5    that's going to be able to solve it.

6        **PRESIDING COMMISSIONER SAWYER:**  Okay.

7    Very good.  Mr. Underwood, do you have any

8    questions for the inmate?

9        **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  No,

10   I don't.  Thank you.

11       **PRESIDING COMMISSIONER SAWYER:**  Thank

12   you.  Ms. Tardiff?

13       **ATTORNEY TARDIFF:**  I have none.

14       **PRESIDING COMMISSIONER SAWYER:**  Okay.

15   Mr. Underwood, would you like to make a closing

16   statement.

17       **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  I

18   would.  Thank you.  I see a lot -- a lot of good

19   that I don't (indiscernible) when I come to

20   these hearings of what the inmate's doing to

21   better himself in prison.  But I see some things

22   that are troubling.  And I'm sure the citizens

23   of our community would find them troubling.  And

24   I begin there with the defendant's memory of the

25   crime, what he's told people happened at various

26   stages.  And beginning in the current report the

27   inmate says he was drunk and he doesn't remember

1   anything.  Going back to the probation report
2   after the defendant was convicted he made the
3   statement that it's real terrible that someone
4   died, it shouldn't have happened, and had I been
5   sober, it wouldn't have, that's all I can say.
6   Going back before -- That was on March 19, 1990,
7   so about nine months or so after the crime was
8   committed.  Going back to two days after the
9   crime was committed, on page three of the
10  probation report he initially said he had a
11  blackout and was unable to recall his
12  activities.  He subsequently admitted that talk
13  about committing -- robbery began while they
14  were at the river.  He acknowledged that it was
15  his idea to attempt to obtain a weapon from his
16  brother.  He contended that he was extremely
17  intoxicated at the time and that the amount of
18  alcohol consumed impaired his judgment.  I was
19  drunk out of my mind.  The common theme here is
20  that there -- it seems to be that alcohol's to
21  blame here and not the inmate.  But what strikes
22  me when you went through the narration of the
23  facts of the current crime is that they show a
24  mind that doesn't appear to be impaired to that
25  degree.  In other words, the planning done, the
26  driving from the lake, which it's not clear in
27  here, but I'm assuming he's talking about Lake

57

1   (indiscernible) here, little northeast of Exeter

2   and also east of Woodlake. So he's able to

3   drive this car around, they're able to stake the

4   place out, check the amount of traffic going in

5   and out of the store. Four other people are in

6   the car. I conclude that the impairment was not

7   that bad if none of those four people at that

8   time said, for their own safety, holy cow, get

9   this guy away from the wheel if he's that

10   intoxicated to where he's blacked out. Get him

11   away from the wheel. I don't want to be a

12   passenger in this car because he's too drunk.

13   But we don't see any of that in the report. So

14   it's somewhat troubling. I don't want to say

15   the inmate's not telling you the truth here, but

16   I just wonder if he's really accounting for what

17   happened back then. I don't believe he is. He

18   accounted back in June of '89 to some degree,

19   but since then it seems -- it seems to be I

20   don't remember anything, I was drunk, if I

21   wouldn't have got drunk, it wouldn't have

22   happened. And I don't know if that's taking

23   accountability for what happened. I don't

24   believe it is. We're also concerned by the

25   128's seen in the report. Now I note that the

26   possession of contraband, it appears to be

27   before he attended his AA meetings. But if it's

58

1    the alcohol that that's the problem, well here

2    we see in 1993 an attempt to get contraband

3    while he was in custody.  We have all these

4    letters saying once he's on the outside, hey, we

5    got a place for him to work, why don't you come

6    with us, it sounds like he has a family who's

7    very supportive.  But here when I look at his

8    disciplinary histories I see quite a few

9    failures to report to work and refusing to work.

10   I don't know the circumstances behind those, but

11   those also cause us some concern too.  For these

12   reasons we feel he's not a suitable candidate

13   for release.  Thank you.

14        **PRESIDING COMMISSIONER SAWYER:**  Thank

15   you.  Ms. Tardiff.

16        **ATTORNEY TARDIFF:**  I just have a

17   question.  The '93 possession of contraband,

18   what was that for?

19        **INMATE HULSEY:**  Just a bunch of crap.

20        **ATTORNEY TARDIFF:**  The 128's are not

21   alcohol related.  Contraband can be a rubber

22   band I guess, anything that they're not supposed

23   to have is contraband.

24        **DEPUTY COMMISSIONER YACONO:**  Do you want

25   me to read it, counsel?

26        **ATTORNEY TARDIFF:**  Sure.

27        **DEPUTY COMMISSIONER YACONO:**  Three 24,

59

1    '93, during a cell search of inmates Hulsey and

2    Bishop, found and confiscated numerous items of

3    contraband, some of which were inmate

4    manufactured tools, screwdrivers, utility knife,

5    numerous strips of civilian clothing, prints,

6    two civilian shirts, black and white, wax for

7    sealing televisions, one television set, seals

8    broken.  These items were found in Hulsey's

9    living space, under and near his bunk.  He

10   admitted to using dental epoxy resin which he

11   obtained from the dental lab.  And there was an

12   evaluation it might be used to aid in an escape

13   attempt.  All the above listed contraband will

14   be pending investigation.  And that's the most

15   significant part of that.  So no, it is not

16   substance abuse.

17        **ATTORNEY TARDIFF:**  So it was not alcohol

18   related.  Okay.  Thanks.  So I would -- those

19   remarks regarding the 128's by the District

20   Attorney I don't think were appropriate since

21   they did not involve any kind of substance

22   abuse.  Further, 128's are counseling chronos

23   and disciplinary actions, making his last 115 in

24   '99.  So were going almost on seven years since

25   he's had a 115 which I think is excellent

26   behavior.  Only two 115's, no force or violence.

27   Again, almost seven-years-old.  So his

1    performance in terms of disciplinary or abiding
2    by institutional standards I submit is
3    excellent. But let me go to his
4    pre-incarceration history first. He appeared to
5    have a stable social history. He was a high
6    school graduate. His family appeared to be
7    stable and intact. And currently that seems to
8    be the case as well. He's got a lot of letters
9    from his family which appear to be very
10   supportive of him. All mention that they were a
11   close knit family. So his pre-incarceration
12   history, non-criminal, appears to be supportive.
13   His post -- And his criminal history, he didn't
14   have any prior criminal history at all. He had
15   an arrest for minor in possession of alcohol and
16   public intoxication when he was 15 and 17, but
17   that was it. No force or violence either before
18   the commitment offense. This was the only
19   indication of any violence. And I'd like to
20   point out that Mr. Hulsey was not the shooter.
21   And in his sentencing report the judge noted
22   that: "And I realize that Mr. Hulsey was a
23   participant by reason of the aider and abetter
24   rule and I -- " And then it goes on to say:
25            "I am well aware -- I am well
26            aware of the particular problems
27            that all of us face with the

61

1          felony murder rule and there have

2          been other cases in this

3          courthouse where other individuals

4          were outside a particular

5          residence and/or commercial

6          establishment where a homicide's

7          occurred and they too suffered the

8          consequences of the main principal

9          in the action.  And I am afraid

10         that in Mr. Hulsey's circumstance

11         because of the fact perhaps that

12         he was drinking alcohol that day

13         or because of the other factors

14         that were mentioned in the 25 page

15         report supplied by defense counsel

16         he found himself in a situation

17         that he now has to pay his debt to

18         society.  Again, I am shocked and

19         distressed that I have to impose

20         these types of sentences on a

21         young man with no record."

22    And he's referring to granting a motion to have

23    this reduced to a manslaughter.  So even the

24    court, I believe by those statements, had no

25    discretion at all and had to impose, but the

26    court was troubled by the fact that Mr. Hulsey

27    did not have any prior record and was in the car

62

1    at the time of the offense. And I submit that

2    in mitigating his factors in the commitment

3    offense. Also, the probation officer's report

4    noted that he was highly intoxicated which

5    significantly reduced his culpability for the

6    crime. And I believe it was a .17 was his

7    alcohol reading at the time of the commitment

8    offense if I'm not mistaken.

9        **PRESIDING COMMISSIONER SAWYER:** Counsel,

10    I read it two one.

11        **ATTORNEY TARDIFF:** Did you, two one.

12        **PRESIDING COMMISSIONER SAWYER:** From

13    testimony from a doctor.

14        **ATTORNEY TARDIFF:** Okay. So he was -- It

15    was pretty high that's for sure. Way over the

16    limit, twice over the limit either reading and

17    that's significant. Not that that should

18    diminish his culpability in terms of this young

19    clerk's demise. But I think it does

20    substantiate Mr. Hulsey's testimony regarding

21    how intoxicated he was. And I think also in

22    reference to some of the remarks made by the

23    District Attorney for -- I don't think

24    particularly then young teens were not going to

25    say, hey, maybe he better not be driving. I

26    just can't see teenage boys even doing that.

27    They're reckless, particularly if they're

63

1   involved with companions that are drinking a

2   lot.  It's not just something that's done.

3   Since he's been incarcerated, I've addressed the

4   115's and the 128's.  He has participated in

5   programming when it's available.  Due to the

6   lockdowns and his custody level, he hasn't been

7   able to do as much as I believe he would like to

8   do.  And I don't think there's any indication

9   that he would not want to be participating more.

10  He does get good work reports, satisfactory to

11  above average.  Been a clerk for the watch

12  commander.  He's volunteered a lot of his time

13  in terms of literacy group.  He seems to have

14  found some sort of niche in his artwork.  I'll

15  also submit that that is also a form of

16  self-help for many individuals I'm sure,

17  including Mr. Hulsey.  He has good psych

18  reports, two of them only, but the most recent,

19  '06, the high GAF at 90.  No mental health

20  diagnosis.  Average citizen.  And the one before

21  that was also good.  His regret for instant

22  offense appears authentic.  This is from '93,

23  that's a long time ago.  And his violence

24  potential appears to be considerably less than

25  that of the average inmate population.  He's

26  done some college since he's been incarcerated.

27  So I believe that Mr. Hulsey has programmed in a

64

1    very positive fashion.  And up to this point

2    he's done everything he can.  If he is not found

3    suitable, I think he should only be given a one

4    year denial due to his good programming.  Thank

5    you.

6         **PRESIDING COMMISSIONER SAWYER:**  Thank

7    you.  Mr. Hulsey, this is your opportunity to

8    tell this Board why you feel you're suitable for

9    parole at this time.

10        **INMATE HULSEY:**  Wow.

11        **PRESIDING COMMISSIONER SAWYER:**  You

12   didn't realize you were going to have this

13   opportunity?

14        **INMATE HULSEY:**  Well, I did but I went

15   over in my head many times what I think I would

16   say why I should be found suitable.  But I think

17   my lawyer's pretty much covered it all.

18        **PRESIDING COMMISSIONER SAWYER:**  Well you

19   don't have to say anything if you don't -- if

20   you don't want to.

21        **INMATE HULSEY:**  The only thing I can add

22   is if I'm found suitable and I'm paroled, I'll

23   still have a chance to make something of my

24   life.  Go out work, pay taxes and complain about

25   them being too high.

26        **PRESIDING COMMISSIONER SAWYER:**  Okay.

27   And gasoline too.

65

1       **INMATE HULSEY:**  Yeah.  Yeah.

2       **PRESIDING COMMISSIONER SAWYER:**  That's

3   it?

4       **INMATE HULSEY:**  Yes.

5       **PRESIDING COMMISSIONER SAWYER:**  Okay.

6   Thank you.  It's 2:30 and we will recess for

7   deliberations.

8                   **R E C E S S**

9                     --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

66

1 **CALIFORNIA BOARD OF PAROLE HEARINGS**

2 **D E C I S I O N**

3 **DEPUTY COMMISSIONER YACONO:** Okay. Our

4 tape's rolling.

5 **PRESIDING COMMISSIONER SAWYER:** Okay.

6 The time is 2:50 in the afternoon in the matter

7 of Mr. Hulsey. And everyone has returned to the

8 hearing. The Panel's reviewed all the

9 information received from the public and relied

10 on the following circumstances in concluding

11 that the prisoner is not suitable for parole and

12 would pose an unreasonable risk of danger to

13 society or a threat to public safety if released

14 from prison. First of all we'll talk about the

15 commitment offense. It was carried out in an

16 especially cruel and callous manner in that his

17 crime partner, who I read in the legal documents

18 got life without the possibility of parole.

19 **INMATE HULSEY:** I think so, yeah.

20 **PRESIDING COMMISSIONER SAWYER:** His crime

21 partner, Mr. Abele, ultimately after spending

22 the time with Mr. Hulsey and three juveniles

23 went into a store and robbed it with

24 Mr. Hulsey's brother's .22 rifle with three

25 rounds in it. The storekeeper was ultimately

26 murdered in this particular case which earned

27 **CLEVE HULSEY   E-53226   DECISION PAGE 1   5/9/06**

1   them five dollars.  Five dollars in this

2   robbery.  While Mr. Hulsey did not do the

3   robbery himself, he was in the car.  He was a

4   participant and was found -- Did you have a

5   court trial or a jury trial?

6       **INMATE HULSEY:**  Court trial.

7       **PRESIDING COMMISSIONER SAWYER:**  Court

8   trial.  He's ultimately found guilty of murder

9   in the first degree, armed with a firearm and

10  the second count of robbery to run concurrent

11  with the -- with the murder and an enhancement

12  on both for the -- for the weapon which he

13  received a 12022.5 of the Penal Code.  The facts

14  that he -- The fact is that he and his crime

15  partner had been drinking.  He's 18 years of

16  age.  He had a history -- And so he was only 18.

17  He had a brief history, three years of history

18  with alcohol abuse.  There was an attempt made

19  to get him squared away with that by sending him

20  to Narcotics Anonymous or a program and he

21  wasn't successful obviously at that time of his

22  life.  This certainly demonstrated -- The way it

23  was carried out demonstrated an exceptional

24  callous disregard for human suffering in that a

25  life was taken for five dollars, which the

26  motive for this crime is certainly inexplicable.

27  **CLEVE HULSEY   E-53226   DECISION PAGE 2   5/9/06**

68

1    Mr. Hulsey, as said before, does not have a

2    serious previous record, has no violence in his

3    previous record as a juvenile.  Did have an

4    alcohol problem and has -- did not -- certainly

5    did not benefit from the program that he

6    attended.  And unfortunately continued to drink;

7    otherwise, he probably wouldn't be sitting here

8    today as he claims he if wasn't under the

9    influence he wouldn't have happened.  Is that

10   correct, sir?

11        **INMATE HULSEY:**  Yes.

12        **PRESIDING COMMISSIONER SAWYER:**  He

13   remembers some of the events leading up to this

14   but claims that he was blacked out.  He did have

15   a high blood alcohol when it was calculated as

16   to what he drank.  It was somewhere around two

17   -- .20 which certainly by today's standards

18   would be almost three times the legal limit, two

19   and a half times the legal limit of .08.  And

20   certainly was a danger while driving around in

21   that condition.  His institutional behavior, he

22   has -- he's programmed in a -- has done -- has

23   done well given the circumstances of his custody

24   level.  He's gotten -- Up until recently he was

25   the watch commander's clerk, received above

26   average work reports.  He was a patio clerk in

27   **CLEVE HULSEY   E-53226   DECISION PAGE 3   5/9/06**

69

1    '01.  He was also -- did a stint as watch clerk.

2    He was a porter in 1999.  In 1998 he worked at

3    PIA in textiles for a brief period of time.  He

4    was a sergeant's clerk or with the sergeant's

5    yard crew in '01, above average or average work

6    reports and above average work reports.  The --

7    Most recently and currently he's in the dental

8    lab which he expressed that he likes and his

9    body language indicated that as well.  He kind

10   of lit up.  And his self-help programs, the most

11   critical program, AA, he did get a start in '97.

12   But again, based on custody level had some

13   difficulty but he started again when he came

14   here in '01 to the present and claims to be

15   working the first two steps.  And if there's

16   some alternative program that isn't so

17   spiritually based that you find, whether it's

18   correspondence or a program in the institution

19   that might suit you better based on the fact of

20   the higher power issue that would do similar --

21   same thing as a 12-step program -- We're big

22   fans of -- 12-step program because we see

23   results, positive -- very positive results if

24   people stick to it.  And there -- And they take

25   -- they take the stress off of people when

26   they're on the outside (indiscernible) and they

27   **CLEVE HULSEY   E-53226   DECISION PAGE 4   5/9/06**

70

1    continue to go and they have sponsors and they

2    have a safety net so to speak that they can --

3    You know, if you look at all the steps, you'll

4    see the last two steps are maintenance. And you

5    know -- And you develop a relapse prevention

6    program and things like that that help you --

7    help you deal with the day to day life without

8    alcohol and/or drugs. So if you can, you know,

9    find something. It doesn't have to be AA. None

10   of the Panels will say go to AA. We'll just

11   tell you to get self-help in some sort of

12   12-step program, something to deal with

13   addictions. Do you understand what I'm saying?

14        **INMATE HULSEY:** Yes.

15        **PRESIDING COMMISSIONER SAWYER:** Okay.

16   That will help you -- That should help you in

17   the future. Nineteen '98; the Captive Audience

18   Literacy Group. In '99 you took a series of

19   courses for Hepatitis, HIV and AIDS courses.

20   You know about Hepatitis C?

21        **INMATE HULSEY:** Yeah.

22        **PRESIDING COMMISSIONER SAWYER:** You know

23   how to get it?

24        **INMATE HULSEY:** Yes.

25        **PRESIDING COMMISSIONER SAWYER:** Okay. So

26   you don't do any of that?

27   **CLEVE HULSEY   E-53226   DECISION PAGE 5   5/9/06**

71

1          **INMATE HULSEY:** No.

2          **PRESIDING COMMISSIONER SAWYER:** You don't

3    have any tattoos, do you?

4          **INMATE HULSEY:** None.

5          **PRESIDING COMMISSIONER SAWYER:** Very

6    good. Okay. Arts In Corrections. You did a

7    stint in that and explained a little about that,

8    what he was doing in 1998 and 1999. He's gotten

9    six units in -- three in psychology, three in

10   English from college courses. He's done Inmate

11   Peer Education and gotten some certificates for

12   those particular things. While all these -- any

13   one of these things isn't much, all of them

14   together are much. You know what I mean?

15         **INMATE HULSEY:** Yeah.

16         **PRESIDING COMMISSIONER SAWYER:** You just

17   kind of keep stacking up, making that stack

18   bigger and bigger, it's the scale of justice

19   here. And you want all the good stuff on one

20   side and all the bad stuff you can't change on

21   the outside. That stuff being 115's.

22         **INMATE HULSEY:** Yeah.

23         **PRESIDING COMMISSIONER SAWYER:** Last one

24   was 1999 for refusing to work. The previous one

25   was 1994 for performance. And then received

26   four counseling chronos, 128's, last one being

27   **CLEVE HULSEY   E-53226   DECISION PAGE 6   5/9/06**

72

1   in the year 2000, nearly seven years ago.  Are

2   you aware of how a date's determined for you?

3   If we feel you're ready for parole today, you

4   know how we calculate it?

5       **INMATE HULSEY:**  No, no idea.

6       **PRESIDING COMMISSIONER SAWYER:**  Okay.

7   Well we have a -- And your attorney can explain

8   it to you and maybe even show you.  We have a

9   matrix.

10      **INMATE HULSEY:**  This I've heard of.

11      **PRESIDING COMMISSIONER SAWYER:**  Okay.  We

12  have a matrix and we go, you know, we put you in

13  a category on the top and a category on the side

14  and bring them together and then we've got a

15  choice of three different years that we can give

16  you.  And we pick -- we pick out where you fall

17  into the matrix.  Now what's real important that

18  you know is for every year that you go without a

19  115 you get four months of credit, good time.

20      **INMATE HULSEY:**  Okay.

21      **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

22  you've done, what, 16 years?

23      **INMATE HULSEY:**  Sixteen, seventeen.

24      **PRESIDING COMMISSIONER SAWYER:**  Yeah.

25  Since you've come to the prison.

26      **INMATE HULSEY:**  Yeah, 16.

27  **CLEVE HULSEY   E-53226   DECISION PAGE 7   5/9/06**

 1       **PRESIDING COMMISSIONER SAWYER:**  Sixteen

 2     years.  Sixteen years minus two in your case.

 3     So you get 14 times four, whatever that works

 4     out to be, number of months, and then we take

 5     that off of that matrix number.  So every year

 6     that you go without a 115, you're picking up

 7     four months, you're picking up a third of a

 8     year.  And that's particularly important to you.

 9     Again, your -- your attorney can show you how

10     that works.

11       **INMATE HULSEY:**  Okay.

12       **PRESIDING COMMISSIONER SAWYER:**  So it's

13     real important you stay discipline-free.  That's

14     what -- That's the bottom line I'm getting at.

15     You get rewarded immensely for this.

16       **INMATE HULSEY:**  Okay.

17       **PRESIDING COMMISSIONER SAWYER:**  Plus, if

18     you got a 115 today, it's almost like starting

19     all over again with your -- with your time.

20       **INMATE HULSEY:**  Yeah.

21       **PRESIDING COMMISSIONER SAWYER:**  We look

22     at -- we look -- we look -- You know, it's a --

23     it's a violation of the rules which equate to a

24     violation of the law on the outside.  And if you

25     can't follow the rules in here, especially with

26     your history here, history being the time you

27     **CLEVE HULSEY   E-53226   DECISION PAGE 8   5/9/06**

74

1    spent here, knowing how it works and working it,
2    you've got to be real careful and continue to --
3    continue to do what you're doing.  We did -- I
4    did mention the dental lab that you're currently
5    in that and that that's certainly a very
6    positive vocational tool that you might get,
7    that you might want to look at.  You might want
8    to look at what else -- As time goes on, you're
9    going to have more and more opportunities for
10   vocation, something that obviously is
11   interesting to you and something that you can
12   use on the outside as a marketable skill in the
13   future.  So your -- your -- you're doing well.
14   You present very well.

15        **INMATE HULSEY:**  Thank you.

16        **PRESIDING COMMISSIONER SAWYER:**  You
17   present yourself as very intelligent.  You're
18   making this hearing go real easy for us because
19   you seem to absorb what we have to say and you
20   communicate very, very well.  So you know, you
21   can look at this as one of the hardest job
22   interviews you'll ever go to, you know.  This is
23   a tough job interview.

24        **INMATE HULSEY:**  Yeah.

25        **PRESIDING COMMISSIONER SAWYER:**  Nothing
26   will ever be this tough.  Especially on your
27   **CLEVE HULSEY   E-53226   DECISION PAGE 9   5/9/06**

1    initial hearing when you're not quite sure what
2    to expect and you've heard rumors and those
3    rumors are generally not true.  But we're not
4    all that bad.  Psychiatric factors.
5    Commissioner.

6         **DEPUTY COMMISSIONER YACONO:**  I was going
7    to say speak for yourself, you're not that bad.
8    Okay.  Just a quick review of the psych.  What
9    I'm keying in on is the alcohol dependence issue
10   and in this case the psychiatric evaluation
11   showed it in institutional remission.  And the
12   other axis show basically no other problems and
13   actually a GAF score of 90 out of 100 is quite
14   high.  The assessment of dangerousness noted as
15   lower than the inmate population.  And for a
16   community base as long as -- maintain current
17   sobriety and commitment to remain abstinent then
18   the assessment would be no more than average
19   than the average person in a non-prison
20   population.  I guess that would be the
21   community.  Significant risk factor of course is
22   the alcohol use.  And the prior evaluation
23   basically hits on the same point of alcohol
24   dependence and to maintain sobriety.

25        [Thereupon, tape two was recorded.]
26        **DEPUTY COMMISSIONER YACONO:**  Okay.  We're
27   **CLEVE HULSEY   E-53226   DECISION PAGE 10   5/9/06**

76

1    rolling on both.

2        **PRESIDING COMMISSIONER SAWYER:**  Okay.  As

3    I was talking about -- asked the question of the

4    inmate do you see the connection of the

5    psychological report to your programming.

6    Psychological report says that your risk factors

7    are much higher if you're not abstinent.

8        **INMATE HULSEY:**  Yes.

9        **PRESIDING COMMISSIONER SAWYER:**  And so

10   that's why the AA or equivalent program is so

11   important to make us feel that you have that

12   safety net, you have that -- you have something

13   to fall back on so you don't relapse and start

14   drinking again and get yourself -- and do

15   something -- something that you're going to

16   regret.

17       **INMATE HULSEY:**  Yeah.

18       **PRESIDING COMMISSIONER SAWYER:**  You see

19   what I'm -- that's -- That's where it ties

20   together.  Your parole plans, excellent.  You've

21   got wonderful letters from your family.  Sounds

22   like you've got just a great family and it

23   sounds like they're very interested in taking

24   care of you.  Sounds like they're loving.

25   Sounds like they'd be a good -- good support --

26   support.  And not just using that word

27   **CLEVE HULSEY   E-53226   DECISION PAGE 11   5/9/06**

77

1   willy-nilly.  I'm talking about support when --
2   You know, if you don't have the stresses of
3   finances, a place to live or you know -- You may
4   get a job initially that doesn't pay a lot and
5   you couldn't survive on your own because the
6   price of housing is nuts even in the valley now.
7         **INMATE HULSEY:**  Yeah.
8         **PRESIDING COMMISSIONER SAWYER:**  It's just
9   going -- It's getting wild.  So you know, you
10  look ahead and you say I don't think I could
11  ever, you know, take care of myself.  You've got
12  your -- You got your family there and your
13  friends that -- that -- that you can confide in.
14  I mean, your whole life's on this table at this
15  point in time of your life and you know
16  everybody knows about you and -- inside and out.
17  There's no -- hopefully no secrets.  But you
18  know, you've got to have people out there
19  that'll be -- that'll be on your side.  And this
20  certainly looks like -- based on the letters
21  that were written and that we went through
22  today.  As far as employment's concern, that's
23  yet to come.  I do believe you have a marketable
24  skill clearly in your artwork.  Your artwork was
25  fabulous.
26        **INMATE HULSEY:**  Thank you.
27  **CLEVE HULSEY   E-53226   DECISION PAGE 12   5/9/06**

78

1      **PRESIDING COMMISSIONER SAWYER:**  And

2  thanks for bringing it in and sharing it with

3  us.  It shows a tremendous amount of talent

4  there.  But you know the old story on artists.

5  They're starving.

6      **INMATE HULSEY:**  Yeah.

7      **PRESIDING COMMISSIONER SAWYER:**  Okay.

8  You know, there are artists and there's actors

9  and there's -- You know there's people out there

10  that have a lot of talent but there's a lot of

11  competition.

12      **INMATE HULSEY:**  Yes.

13      **PRESIDING COMMISSIONER SAWYER:**  But I --

14  In looking at your work, it's -- it's quite --

15  quite beautiful and -- and you certainly have --

16  you certainly have a talent there and very

17  marketable skill.  But I would -- We would

18  encourage you to continue to get vocational

19  skills that you possibly can, whether it's

20  dental lab or whatever else you can get into.

21  Encourage you maybe to stay away from some of

22  the things that -- that -- You want to evaluate

23  the particular vocation.  Like upholstery.

24  There's lots of upholsterers out there.  And

25  that's a pretty competitive market and you don't

26  make a lot of money, not that it's not

27  **CLEVE HULSEY   E-53226   DECISION PAGE 13   5/9/06**

```
 1   necessary.  I mean we're all sitting on soft
 2   seats because of PIA.  But still some of the
 3   manufacturing jobs that are in the institutions
 4   are offshore, you know, textiles and things like
 5   that.  They're -- they're -- While they're
 6   self-serving while they're in -- in -- in the
 7   institution and you get good -- good job skills,
 8   the question is where am I going to use it, you
 9   know.  If you're a (indiscernible) that in
10   quality control on t-shirts, you have to go to
11   Bangladesh or Malaysia or someplace because
12   that's where all the stuff is made --
13           INMATE HULSEY:  Yeah.
14           PRESIDING COMMISSIONER SAWYER:  --
15   anymore.  Very little textile going on in -- in
16   the -- in the United States.  So continue to
17   keep those parole plans fresh.  We did have a
18   response from Tulare County in opposition to a
19   parole date being set for you today.  And I
20   again want to commend you for your behavior, for
21   your self-help that you've been doing, for all
22   the work that you've -- that you've done even
23   though they've been pretty low-level jobs.  We
24   understand.  And you continue to get your
25   classification -- and put yourself in a position
26   where you can get better -- better and better
27   CLEVE HULSEY   E-53226   DECISION PAGE 14   5/9/06
```

1   jobs, continue, you know -- Get those better
2   jobs so that you can pay off that restitution
3   that you owe or try to seek some outside --
4   outside help with that.  And so we want to
5   commend you for that.  However, these positive
6   aspects of your behavior doesn't outweigh the
7   crime that you were committed for.  In a
8   separate decision, the hearing Panel finds the
9   prisoner has been convicted of murder and
10   robbery to run concurrent.  It's not reasonable
11   to expect parole would be granted in the next
12   three years.  So you're getting a three year
13   denial here based on the crime, based on your
14   alcohol and you need programming, continue
15   programming, and you've -- you've got the
16   longest stint in AA from '01 to now.  You need
17   longer.  You need three more years on top of
18   that.  You need to get some marketable skills
19   under your belt so that you've got options when
20   you do get released.  I'm confident -- We're
21   confident, and we talked about this during our
22   deliberations, how -- how well you interview,
23   how -- what a pleasant guy you are in terms of
24   your presentation today.  And for the -- for the
25   first hearing normally -- not normally,
26   sometimes we see four and five years, and I'm
27   **CLEVE HULSEY   E-53226   DECISION PAGE 15   5/9/06**

81

1    sure your attorney mentioned that, denial.  We

2    want to keep -- We want to keep you encouraged.

3    We don't again believe that you'll be paroled

4    within the next three years.  There's no

5    possibility that you'll be paroled in the next

6    three years.  So let's take this time to bolster

7    up your -- your preparations for that parole.

8    And I can't guarantee you what's going to happen

9    in three years.  But I can say that you need --

10   you need -- we say that you need these three

11   years to -- to get yourself in a better position

12   for parole.  So our recommendations to you,

13   continue your self-help, stay discipline-free,

14   learn a trade and earn those positive chronos.

15   Okay.  Do you understand?

16          **INMATE HULSEY:**  Yes.

17          **PRESIDING COMMISSIONER SAWYER:**  Do you

18   have any questions?  I don't normally let the

19   inmate talk during this period of time, during

20   our decision.  But I want you to be perfectly

21   clear because this is your initial hearing.  Do

22   you have any questions for us?

23          **INMATE HULSEY:**  No, actually I don't.

24          **PRESIDING COMMISSIONER SAWYER:**  Okay.

25   Very good.  Do you have anything you'd like to

26   say, Commissioner?

27   **CLEVE HULSEY   E-53226   DECISION PAGE 16   5/9/06**

82

1      **DEPUTY COMMISSIONER YACONO:**  No, you've

2   covered it all.  Thank you.

3      **PRESIDING COMMISSIONER SAWYER:**  Very

4   good.  Good luck to you, sir.

5      **INMATE HULSEY:**  Okay.

6      **PRESIDING COMMISSIONER SAWYER:**  Okay.

7      **INMATE HULSEY:**  Thank you.

8      **PRESIDING COMMISSIONER SAWYER:**  Thank

9   you.

10                    --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED THREE YEARS**          SEP **6** 2006

24   **THIS DECISION WILL BE FINAL ON** _____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   **CLEVE HULSEY   E-53226   DECISION PAGE 17   5/9/06**

83

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that
I have transcribed tape(s) which total two in
number and cover a total of pages numbered 1 - 82,
and which recording was duly recorded at
CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the INITIAL PAROLE
CONSIDERATION HEARING of CLEVE HULSEY,
CDC No. E-53226 on MAY 9, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated July 12, 2006 at Sacramento County,
California.

Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

**E X H I B I T**

**2**

Probation Officer's Report
March 26, 1990

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA    FILED
IN AND FOR THE COUNTY OF TULARE    TULARE COUNTY

MAR 23 1990

JAY _____ BAY ESS, CLERK
_____ DEPUTY

The People of the State of California, )
                            Plaintiff, )

               vs. )

CLEVE OTIS HULSEY, )

               Defendant. )
)

COURT NUMBER: 27850

HEARING DATE: 3-26-90
REPORT AND RECOMMENDATION
OF THE PROBATION OFFICER

Probation No: A-18731
SO ID No: 176673
CII No:   None
FBI No:   None
SS No:    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

Judge:       ROBERT C. VAN AUKEN
Department:  No. 2
Attorney:    James Wilson
Address:     3714 West Mineral King Avenue
            Visalia, CA

Defendant's Address:  1176 West Maple, Exeter, CA

DOB: 5-20-71    AGE: 18                  Marital Status: Single

Birthplace:   Tulare, CA                 Spouse:   N/A

Citizenship:  United States             Children:  None

Education:    12 Years                   Ages:     N/A

COURT PROCEEDINGS:

| CASE # | PLEA DATE | COUNT | OFFENSE | ACTION | INDICATED SENTENCE |
|--------|-----------|-------|---------|--------|--------------------|
| 27850 | 2-28-90 | 1 | Fel 187 P.C., 1st Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |
| | | 2 | Fel 211 P.C., 1st Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |
| | | 3 | Fel 459 P.C., 2nd Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |

1

REPORT OF THE PROBATION ... FICER
CLEVE OTIS HULSEY

## BRIEF SUMMARY OF FACTS:

In the commission of a robbery of a Woodlake convenience store on June 26, 1989, the
defendant shot and killed a 17-year-old store clerk, Amed Al-Kobadi.

### OFFENSE:

Testimony presented during the course of a two week trial indicates that the defendant
and alleged co-participant, Charles Abele, to be tried separately in September,
formulated a plan to rob the A & H Market located in the rural Tulare County community
of Woodlake for the purpose of obtaining money with which to buy beer.  The pair
obtained a .22 caliber semi-automatic bolt action rifle and ammunition and drove to
the small family-owned business which they had targeted in advance.

Accounts of eyewitnesses and the confession by the defendant provided subsequent to
his arrest concur that while the defendant waited in the car with the motor running,
Abele, wearing a ski mask, entered the store displaying the firearm and demanded
money.  Store clerk Amed Al-Kobadi, 17, produced several bills from the cash register
while Abele allegedly maintained the rifle pointed at him in a ready-to-fire position
with his finger inside the trigger guard.  Reportedly, the youthful clerk grabbed the
rifle at the front site, causing the firearm to discharge.  Al-Kobadi suffered a
single gunshot wound in the right side of his chest.  The bullet reportedly perforated
his lung and he expired within minutes due to exsanguination.

The crime netted the perpetrators $5.  According to accounts, before leaving Woodlake
the defendant drove to another convenience store and with the proceeds from the
robbery the co-participant purchased a quantity of gas, a pack of cigarettes and a
quart of beer.

The series of events which subsequently unfolded linking the defendant with the crime
were as follows:

A Woodlake resident reported observing a male subject wearing a black ski mask and
carrying a rifle run from the store and enter the front passenger side of a waiting
vehicle bearing California license No. 1GOP367.  She reported that the vehicle was
parked on the north side of the store and that she also observed "some kids" in the
rear seat of the car.  Investigation revealed the vehicle was registered to Neal Cave
of 711 West Maple Avenue.  Cave reported to authorities that he lent his automobile on
June 26, 1989, to Charles Abele.  Cave said that Abele was in possession of the car
most of the day and upon returning the vehicle to him made statements concerning a
"stick up" of a store located in the Woodlake area.

On June 27, 1989, Charles Abele provided investigating officers a voluntary statement
in which he admitted involvement in the robbery and shooting death of the store clerk.

The following day investigating officers were contacted by the brother of the
defendant, Marvin Hulsey, who reported that he had been reading a newspaper account of
the incident.  He testified that the defendant came to his house together with Abele
and asked to borrow his father's rifle.  As they were borrowing the weapon, they
explained that they wanted to use it for shooting bottles at a canal.  He reported
that he told the defendant he did not have any bullets, but in fact had removed
cartridges from the clip because he felt both defendants had been drinking.  He stated
that both defendants returned to his home later in the day and returned the rifle.

2

Cody Grim testified that on June 26, 1989, he was contacted by Abele who asked him for some .22 caliber ammunition, and specifically asked for three bullets. About the time that Grim handed Abele the bullets, Hulsey approached and stated that the pair was planning to go to the canal and do some target shooting. Grim also observed that at the time Anthony Chavira was in the back seat of the car with another young man whose name he did not recall. Through investigation, officers eventually obtained statements from teenagers Anthony Chavira, 16, Darren Stephens, 17, and Chad Stephens, 15, all of Exeter. In essence, they reported that while at the R & N Market in Exeter cashing in aluminum cans, they were invited to go swimming in the area of Slick Rock on Kaweah Lake. The teenagers agreed to give the $6.00 which they had earned from the cans to the defendants for the purchase of beer. After leaving Slick Rock, about an hour and a half later, that Abele was overheard discussing the possibility of committing a robbery "for booze and stuff".

Abele reportedly bragged that he knew of a store which would be easy to knock off. The teenagers requested to be let go, however, Abele refused.

Reports indicate that prior to the commission of the robbery, Abele pulled over and switched seats with Hulsey. Hulsey pulled up to the north side of the store, but then drove away because there were people in the area. He drove down the street, turned around and returned to the same location. Abele inserted the clip into the chamber of the rifle and positioned the bolt forward before exiting the car. While the teenagers were laying down on the back seat, scared, Abele exited the store and Hulsey kept the motor running. A short time later, he returned to the vehicle, made a statement to the effect that he shot someone for $5. After Abele reentered the car, Hulsey checked the rifle to see how many bullets were left.

The defendant provided a voluntary statement on June 28, 1989. Initially he claimed that he had suffered an alcohol blackout and was unable to recall his activities. He subsequently admitted that talk about committing a robbery began while they were at the river. He acknowledged that it was his idea to attempt to obtain a weapon from his brother. He contended that he was extremely intoxicated at the time and that the amount of alcohol consumed impaired his judgment. He told authorities, "I was drunk out of my mind."

## DEFENDANT'S STATEMENT:

Interviewed by the undersigned writer on March 19, 1990, the defendant declined a full disclosure outlining his involvement in the crime.

He stated, "It's real terrible that someone died. It shouldn't have happened and had I been sober it wouldn't have. That's all I can say."

Regarding his confession to authorities, the defendant stated, "I told them what they wanted to hear. I was so damned scared. I felt they would let me go if I told them what they wanted to hear, but they didn't. I really don't have anything else to say."

## INVESTIGATION:

As of this dictation, a statement regarding the crime and restitution has not been received from the family of the victim.

REPORT OF THE PROBATION ' .ñICER
CLEVE OTIS HULSEY

### PRIOR RECORD:

A check of the usual sources revealed no prior arrest record.

### SOCIAL AND FAMILY HISTORY:

The defendant is a native and lifelong county resident with significant family ties. He is youthful, in satisfactory physical and mental health and has lived in the home of his parents all of his life.

The defendant is a graduate of Kaweah High School in Exeter. He reportedly enlisted in the Navy following graduation in June, 1989, but was discharged as a consequence of arrest on the present case. The defendant reported it was his plan to further his education following tenure with the service. "I figured I'd be doing something right for myself. I planned to go to college on the G.I. Bill and with a good education I'd be able to make a place for myself, you know, get a good job, settle down with a wife and a few kids."

The defendant is the seventh of eight children born to his parents, Coy and Martha Hulsey of 1176 West Maple in Exeter. The defendant's father reportedly is employed as a heavy equipment mechanic by Ditch Witch of Central California. The defendant's mother, currently unemployed, previously worked as a shortorder cook. The defendant's siblings include four brothers and three sisters, ranging in age 15 to 35 years. The defendant described his family as a very close and supportive one. "We've always been very close and looked out for each other," he stated.

The defendant has previously never married nor fathered any children. He reportedly is not affiliated with any social or religious organizations.

### EMPLOYMENT HISTORY:

The defendant's employment history is limited, for the most part due to his age and previous status as a student. He reported having worked as a clerk at Mountain Mike's Pizza and as a dishwasher at Carroll's Restaurant, both in Exeter, for brief durations.

### FINANCIAL STATUS:

The defendant's assets and liabilities are negligible.

### ALCOHOL/DRUG USE:

The defendant acknowledged a problem with alcohol abuse. He reported that he began consuming intoxicants about four years ago and that until his arrest on the instant matter, he consumed alcoholic beverages on a daily basis, frequently "just to get drunk". The defendant indicated previous participation in alcohol abuse counseling. He reported that at age 15 and again at age 17, he attended meetings of Narcotics Anonymous following arrests for minor in possession of alcohol and public intoxication. He indicated that participation in NA sessions did not ameliorate his drinking pattern except for a short time.

4

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

Regarding the use of controlled substances, the defendant acknowledged prior experimentation with marijuana. He indicated that he had used the substance infrequently, claiming that he had "tried it once when I was 15 years old" and on the date of the offense now before the court.

## PROBATION FACTORS:

Penal Code Section 1203.06 prohibits the grant of probation in this case. (Rule 414(a))

## MITIGATING FACTORS:

The defendant has no known prior record of criminal conduct. (Rule 423(b)(1))

At the time of the commission of the crime, the defendant claims that he was highly intoxicated which significantly reduced his culpability for the crime. (Rule 423(b)(2)

## CIRCUMSTANCES IN AGGRAVATION:

The defendant was armed with or used a weapon at the time of the commission of the crime, charged and found true as an enhancement under Section 12022. (Rule 421(a)(2))

The victim was particularly vulnerable. (Rule 421(a)(3))

The crime was preplanned. (Rule 421(a)(8))

The defendant engaged in conduct indicating a danger to society. (Rule 408)

## CRITERIA AFFECTING CONCURRENT/CONSECUTIVE SENTENCES:

The crimes (Counts 1 and 2) and their objectives were predominantly independent of each other. (Rule 425(b))

The crimes (Counts 1 and 2) involved separate acts of violence or threats of violence. (Rule 425(c))

## ANALYSIS:

Before the Court for a sentencing is 18-year-old Cleve Otis Hulsey, convicted of murder in the first degree, robbery in the first degree and burglary in the second degree. Also found true were special allegations, attendant to each offense respectively that the defendant was armed with a firearm.

Circumstances in the presenting matter indicate that the defendant and an alleged co-participant preplanned a robbery at a rural Woodlake convenience store in order to

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

obtain money with which to buy beer.  The defendant was instrumental in obtaining a
firearm for that purpose and drove to said location to accomplish the act.  During the
commission of the crime on June 26, 1989, a 17-year-old store clerk was fatally shot
in the chest.  The defendant confessed his involvement in the crime, but claims that
his judgment was impaired due to the amount of alcoholic beverage he had consumed that
date.

Statutory provisions prohibit the grant of probation in this case.  In the present
case, the defendant was convicted of two crimes for which three terms of imprisonment
are specified and also for a crime with an indeterminate term.  Inasmuch as the
killing was unnecessary to accomplish Counts 2 and 3, consecutive terms appear
warranted.  Section 669 of the Penal Code specifies when both types of terms are being
considered for sentencing purposes, the determinate term of imprisonment shall be
served first.  Therefore, Count 2 should be deemed the principal determinate term.  It
is recommended that the term of imprisonment for Count 3 be stayed pursuant to Section
654 of the Penal Code, and that Count 1 be served consecutively to Count 2.

CUSTODY:

| FACILITY | DATES | ACTUAL TIME SERVED | 4019 CREDITS | TOTAL |
|----------|-------|--------------------|--------------|-------|
| Tul Co Jail | 6-28-89 to<br>3-26-90 | 272 Days | 68 Days Good Time<br>68 Days Work Time | 408 Days |

TERM:

| CASE NO. | COUNT | OFFENSE | RANGE | BASE | ENHANCEMENTS | TOTAL |
|----------|-------|---------|-------|------|--------------|-------|
| 27850 | 1 | Fel 187 P.C.,<br>1st Degree w/<br>s/a 12022(a)PC | 25 Yrs to Life | N/A | 1 Year | 25 Yrs<br>to life<br>+ 1 Yr |
| | 2 | Fel 211 P.C.,<br>1st Degree w/<br>s/a 12022(a)PC | 2,3,5 Years | 3 Yrs | 1 Year | 4 Yrs |
| | 3 | Fel 459 P.C.,<br>2nd Degree w/<br>s/a 12022(a)PC | 16 Mos, 2, 3<br>Yrs | 2 Yrs | 1 Year | 3 Yrs |

IT IS THEREFORE RESPECTFULLY RECOMMENDED:

1.  That the defendant's application for probation be DENIED.

2.  That in Count 2, the defendant be committed to state prison for the total term of
    FOUR (4) YEARS; that he receive credit for 272 days spent in custody awaiting
    sentence plus 68 days good conduct credit and 68 days work time credit.



6

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

3.  That in Count 3, the defendant be committed to state prison for the total term of THREE (3) YEARS. It is recommended this term be stayed pursuant to Section 654 of the Penal Code.

4.  That in Count 1, the defendant be committed to state prison for TWENTY-FIVE (25) YEARS TO LIFE. Regarding the enhancement of Section 12022(a) of the Penal Code, it is recommended that this one year term be served consecutive to any other term imposed. Further, it is recommended that this term run consecutively to the term imposed in Count 2. Further, pursuant to the rules of the state Board of Prison Terms, it is recommended the court direct the clerk to prepare two abstracts of judgment in this case; one to delineate the determinate sentence and the other to delineate the indeterminate sentence.

Further, it is recommended the defendant be advised pursuant to Section 1170(c) and 3000 of the California Penal Code that he may be placed on parole for a period not to exceed five (5) years.

It is further recommended the defendant pay a restitution fine pursuant to Section 13967 of the Government Code in the amount of $10,000.

                              Respectfully submitted,

                              LARRY R. PRICE
                              CHIEF PROBATION OFFICER

DATED: March 26, 1990         By
EAS:sc                           EVA A. SMITH
3-22-90                          PROBATION OFFICER II


                              Read and Approved:

                              By
                                 RICHARD W. HOUTS
                                 SUPERVISING PROBATION OFFICER


Pursuant to the provisions of Section 1203 of the Penal Code, I have read and considered the Report and Recommendation of the Probation Officer on file.

                       ROBERT C. VAN AUKEN

                       JUDGE OF THE SUPERIOR COURT

7

**E X H I B I T**

**3**

Abstract of Judgment
April 19, 1990
(Amendment to Abstract of Judgment, August 1, 1991)

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF TULARE

| | |
|---|---|
| The People of the State of California )<br>　　　　　　　　　　　　Plaintiff )<br>　　　　　　　　　　　　　　　　　)<br>　　　　　vs　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>Cleve Otis Hulsey　　Defendant )<br>　　　　　　　　　　　　　　　　　) | Visalia, California　April 19, 1990<br>No. 27850　　Dept. 2<br>Judge, Hon.　ROBERT C. VAN AUKEN<br>Clerk　　　　Bobbye Comer<br>Bailiff　　　Daniel Fernandez<br>Reporter　　Susan Nelson<br>Interpreter |

Nature of Hearing: JUDGMENT PROCEEDINGS

Counsel for the People: James Kordell, Deputy District Attorney

Counsel for the Defendant: James Wilson

Defendant (✓) present ( ) not present ( ) formal arraignment for judgment waived
OR R: The motion for reduction of the conviction is denied.
Court finds offense to be:

      Count 1 - Felony violation §187 PC, 1st degree w/SA 12022(a) PC
      Count 2 - Felony violation §211 PC, 1st degree w/SA 12022(a) PC
      Count 3 - Felony violation §459 PC, 2nd degree w/Sa 12022(a) PC

ORDER: Probation (✓) denied ( ) granted for a period of _____subject to
      the following terms and conditions ( ) additional terms and conditions on page two
      (Imposition of sentence suspended during this term)

      Defendant committed to (✓) State Prison ( )California Youth Authority;
      ( ) Tulare County Jail for the term as follows:
            Count 1 - 25 years to life with 1 year for the enhancement for a total of
                26 years to life
            Count 2 - 3 years plus 1 year for the enhancement; total 4 years; concurrent
                to Count 1
            Count 3 - 2 years plus 1 year for the enhancement; total 3 years; stayed pursuant
                to 654 PC

      Defendant given credit for 296 days actual time plus 148 days conduct
      credit for a total of 444 days served awaiting sentence: as to counts 2 and 3.

      Defendant shall pay a restitution fine in the sum of $ 10,000.00 pursuant
      to Government Code §13967 ( ) stayed during term of probation after which time
      it shall become permanent.

(✓)    Defendant advised of ( ) appeal rights; (✓) parole obligation upon release
      from prison; ( ) consequences of violation of probation.

( )    Court finds the defendant ( ) does not have the ability to pay attorney fees;
      ( ) has the ability to pay attorney fees in the sum of $_____.

otice of appeal filed with the court.

( ) Remaining counts dismissed
(✓) Defendant remanded
( ) Bail Bond ( ) Cash Bail Exonerated
( ) Defendant released on probation

                                                    Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF TULARE

|  |  |
|---|---|
| | Visalia, California  August 1, 1991 |
| The People of the State of California | No.  27850      Dept. No.   4 |
| | Judge, Honorable   ROBERT C. VAN AUKEN |
| vs. | Clerk         Bobbye Comer |
| Cleve Otis Hulsey | Bailiff |
| | Reporter |

lature of Hearing _____ AMENDMENT TO ABSTRACT OF JUDGMENT

Pursuant to instructions from the Fifth District

Court of Appeal and good cause appearing therefor,

it is hereby ordered that the abstract of judgment

dated April 19, 1990 be amended as follows:

The sentence imposed as to Count 2, robbery
and the use of a gun, are stayed, said stay
to become permanent upon the completion of
serving the sentence imposed in Count 1.

The document to which this certificate is affixed is a full,
true and correct copy of the original on file and of record
in my office.
Attest: _____ 8 —/ - 9 / _____ 19 __
NADINE _____, County Clerk are _____ of the
Superior Court of the State of California n  r ..  or the
County of Tulare
By _____

Copy to Department of Corrections.

Clerk

ENDORSED

# In the Superior Court of the State of California

in and for the County of _____Tulare_____

FILED
TULARE COUNTY

# Abstract of Judgment

Commitment to State Prison

APR 1 9 1990

JAY C. BAYLESS, CLERK
BY  BOBBYE COMER    DEPUTY

Dept. No. ........2........ Case No. ...27850........

The People of the State of California

vs.

Cleve Otis Hulsey

Defendant.

Present:

Hon. ...Robert C. Van Auken...
Judge of the Superior Court

James Kordell, Deputy DA
Prosecuting Attorney

James Wilson
Counsel for Defendant

This certifies that on the ...19... day of ...April..., 19 ...90, judgment of conviction of the above-named defendant was entered as follows:

1) In Case No. ...27850... Count No. ...1... he was convicted by ...Court...; on his plea of ...............................
(court or jury)

...Not Guilty...
(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of ......murder, first degree.................................................................................

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of ............187 of the Penal Code.............................................................
(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|-----------------|-------|-------------|
|      |                 |       |             |
|      |                 |       |             |
|      |                 |       |             |
|      |                 |       |             |
|      |                 |       |             |

Defendant has been held in jail custody for ............0............ days as a result of the same criminal act or acts for which he has been convicted.

Defendant was not armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weap-
(was or was not)
on at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code.

Defendant was not armed with a deadly weapon at the time of his commission of the offense within the meaning of Sec-
(was or was not)
tions 969c and 12022 of the Penal Code.

Defendant did not a firearm in his commission of the offense within the meaning of Sections 969d and 12022.5 of
(used or did not use)
the Penal Code.

(Repeat foregoing with respect to each count of which defendant was convicted.)

(2) Defendant __was not__ adjudged __.bitual criminal within the meaning of Subd'__ .1 __a/b__ of Section 644 of the Penal
(was or was not)                                                                          (a or b)

Code; and the defendant __is not__ a habitual criminal in accordance with Subdivision (c) of that Section.
(is or is not)

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in
the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County
of __Tularfe__ and by him delivered to the Director of Corrections of the State of California at _____

__Duel Vocational Facility, Tracy__

It is ordered that sentences shall be served in respect to one another as follows (concurrently or consecutively as to each count):

and in respect to any prior incompleted sentence(s) as follows (concurrently or consecutively as to all incomplete sentences
from other jurisdictions):

(4) To the Sheriff of the County of __Tulare__ and to the Director of Corrections at the _____

__Duel Vocational Facility, Tracy__

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at __Duel Vocational Facility, Tracy__

California, at your earliest convenience.

Witness my hand and seal of said court

this __19th__ day of __April, 1990__

__Jay C. Bayless__ ................................................. Clerk,

by ..................................................................... Deputy

State of California,
County of __Tulare__      ss.

I do hereby certify the foregoing to be a true and correct abstract of judgment duly
made and entered on the minutes of the Superior Court in the above entitled action as
provided by Penal Code Section 1213.

SEAL

Attest my hand and seal of the said Superior Court this __19__ day of __April__,
19 __90__

__Jay C. Bayless__ By: ............................................ Deputy

County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of —
__Tulare__

The Honorable ................................................
__Robert C. Van Aiken__

Judge of the Superior Court of the State of California, in and for the County of _____

__Tulare__

NOTE: If probation was granted in any sentence of which abstract of judgment is certified, attach
a minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

## ABSTRACT OF JUDGMENT – PRISON COMMITMENT

FORM DSL 290

ENDORSED
FILED
TULARE COUNTY

APR 19 1990

JAY C. BAYLESS, CLERK
BY BOBBYE COMER    DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    Tulare
COURT I.D. |    BRANCH

CASE NUMBER (S)

PEOPLE OF THE STATE OF CALIFORNIA versus    [X] PRESENT    27850    - A
DEFENDANT:    Cleve Otis Hulsey    - B
AKA:    [ ] NOT PRESENT    - C
COMMITMENT TO STATE PRISON    AMENDED    - D
ABSTRACT OF JUDGMENT    ABSTRACT [ ]    - E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| April 19, 1990 | 2 | Robert C. Van Auken | Bobbye Comer |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| Susan Nelson | James Kordell | James Wilson | Eva Smith |

DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS):

[ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY JURY/COURT/TRIAL | PLEA | TRIAL (JURY) | CONCURRENT | CONSECUTIVE MIDDLE TERM | CONSECUTIVE UPPER TERM | INCOMPLETE SENTENCE CONSECUTIVE 1/3 RULE | STAYED PC 654 | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS | MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 211* | Robbery | 89 | 02 | 28 | 90 | X | M | X | | | | | | (3) | |
| 3 | PC | 459** | Burglary | 89 | 02 | 28 | 90 | X | M/N | | | | | | X | | |

ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.: List each—or list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter the total in right-hand column.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022(a) | 1 | | | | | | | | | 1 |
| 2 | 12022(a) | (1) | Concurrent to Count 1 | | | | | | | | |

ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER. List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b) list § 667.5(b) 2 times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |

INCOMPLETED SENTENCE(S) CONSECUTIVE:    5. OTHER ORDERS:

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

Use additional sheets of plain paper if necessary.

TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FROM DSL 290-A):

TIME STAYED TO COMPLY WITH 5-YEAR OR 10-YEAR LIMIT ON SUBORDINATE TERMS, DOUBLE-BASED-TERM LIMIT, ETC. (Do not include § 654 stays or discretionary stays of term for enhancements.)

TOTAL TERM IMPOSED:    1

EXECUTION OF SENTENCE IMPOSED:

A. [X] AT INITIAL SENTENCING HEARING    B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL    C. [ ] AFTER REVOCATION OF PROBATION    D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))    E. [ ] OTHER _____

| DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| April 19, 1990 | XX866 444 INCLUDING: | | 296 | 148 | [ ] DMH  [ ] CDC |

DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

[X] FORTHWITH    [ ] INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:    [ ] CALIF. INSTITUTION FOR WOMEN – FRONTERA    [ ] CALIF. MEDICAL FACILITY – VACAVILLE    [ ] CALIF. INSTITUTION FOR MEN – CHINO    [X] DEUEL VOC. INST.
[ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS    [ ] OTHER (SPECIFY):    [ ] SAN QUENTIN

CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE _____    DATE _____    April 19, 1990

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Form Adopted by the Judicial Council of California Effective April 1, 1990

ABSTRACT OF JUDGMENT – PRISON COMMITMENT
FORM DSL 290    Pen. C. 1213.5

DISTRIBUTION:    PINK COPY – COURT FILE    YELLOW COPY – DEPARTMENT OF CORRECTIONS    WHITE COPY – ADMINISTRATIVE OFFICE OF THE COURTS

## E X H I B I T

**4**

Psychological Evaluation
February 25, 1993

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
APRIL, 1993, CALENDAR
DOCUMENTATION HEARING
FOLSOM STATE PRISON

HULSEY, E-53226

Cleve Otis Hulsey is a 21-year-old White inmate who was committed
to the Department of Corrections from Tulare County on April 23,
1990, for the First Degree Murder of a convenience store clerk and
for the Robbery of that store. According to the record, his code-
fendant shot the clerk. At the time of incarceration, the defen-
dant's statement included, "It's real terrible that someone died.
It shouldn't have happened, and had I been sober, it would not
have." At the time of the current evaluation he stated, "I had
just turned 18. I was drunk as a skunk, I was an alcoholic for a
while. I was involved in a robbery and the store clerk was mur-
dered. I did not shoot the clerk, I drove the car. It was the
codefendant's idea, and I did not know until the crime was commit-
ted. My need was to be in bed." He had an apparent partial black-
out for the incident.

He denies any past psychiatric illness. He completed high school.
He has no disciplinary reports. A chrono in his record dated
May 29, 1992, includes a recommendation for a transfer to Calipat-
ria IV. His extensive drug record began at age 13, and he indi-
cates he began having blackouts regularly at age 14. He used alco-
hol, "just to get drunk." Though he had attended Narcotics Anony-
mous meetings at age 15 and at age 17, they seemed to have had no
major impact on him. Since his incarceration, he feels that his
attitude in general has changed, and then adds, "I do feel bitter
at times."

He was cooperative throughout the evaluation, demonstrates good
abstract thinking abilities, and appears to have an intelligence
that is above average. There are no signs or symptoms of psychotic
nor of neurotic illness. His regret for the instant offense appears
authentic. The most appropriate psychiatric diagnosis would be
that of **Alcohol Dependence, in institutional remission**. His
expressed interest in college as well as in Alcoholics Anonymous
appears sincere. He hopes to major in psychology, though expresses
an interest in physical sciences, such as chemistry. His violence
potential appears to be considerably less than that of the average
inmate population. To this evaluator, he appears to be an individ-
ual who should, when it is administratively possible, do as much of
his programming as possible at CMC, eventually entering into a Cat-
egory "T" program. College is encouraged, if available.

E. A. LARSON, M.D.
Staff, Psychiatrist

Noted:

G. HOLLINGSWORTH, M.D.
Chief Psychiatrist

HULSEY, E-53226    FOLSOM STATE PRISON    2-25-93    EAL:mh

**E X H I B I T**

**5**

Psychological Evaluation
April 25, 2006

## PSYCHOLOGICAL EVALUATION FOR
## THE BOARD OF PRISON TERMS UPDATE CLINICAL EVALUATION
## April 2006

### CORRECTIONAL TRAINING FACILITY SOLEDAD
### APRIL 25, 2006

### I.   IDENTIFYING INFORMATION:

This is the second BPH psychological evaluation of Cleve Hulsey, CDC# E53226. However, it is the first time he has actually appeared before the Board. Hulsey is a single, 34-year-old Caucasian male. He has no unusual physical characteristics. He was convicted of Murder in the First Degree, Robbery in the First Degree and Burglary in the Second Degree.

### SOURCES OF INFORMATION:

This is a psychological evaluation for the Board of Parole Hearings on inmate Hulsey. This report is the product of a personal interview of his central file and unit health record. This interview was a single contact for the purpose of preparing this report.

### II.   DEVELOPMENTAL HISTORY:

He had no known prenatal or perinatal concerns or birth defects. He had no abnormalities of speech, language or motor development. His peer interactions and socialization skills were normal. He had no history of cruelty to animals or arson. His childhood medical history was normal. He had no history of physical or sexual abuse, either as a perpetrator or victim.

### III.   EDUCATION:

He is a high school graduate with at least average intelligence. He took some college courses at Old Folsom before they discontinued that program.

### IV.   FAMILY HISTORY:

Hulsey is the seventh of eight children born to his parents. His siblings include four brothers and three sisters. He described his family as being very close and supportive. He reportedly enlisted in the U.S. Navy following his high school graduation but never made it to boot camp, due to being discharged as a result of the instant conviction.

HULSEY, CLEVE
CDC # E-53226
PAGE 2

## V.    PSYCHOSEXUAL DEVELOPMENT / SEXUAL ORIENTATION:

Hulsey describes a normal psychosexual development and says he is heterosexual in orientation.

## VI.    MARITAL HISTORY:

Hulsey has never been married.

## VII.    MILITARY HISTORY:

Hulsey enlisted in the Navy to become a Machinist's Mate.

## VIII.    EMPLOYMENT / INCOME HISTORY:

His employment history is limited due to his age at the time of arrest and his previous status as a student. He had jobs in the service industry, prior to his arrest. His work reports at CTF Soledad have been "above average."

## IX.    SUBSTANCE ABUSE HISTORY:

Hulsey has a history of alcohol and minimal marijuana use. His alcohol use at the time of his arrest was obviously heavy, as he said he was "drunk out of his mind", the night of the offense. His prior criminal activities are for Minor in Possession of Alcohol and Public Intoxication.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Hulsey has no identified psychiatric or psychological history. His medical health is "good."

## XI.    PLANS IF GRANTED RELEASE:

If granted parole, Hulsey plans to live with his parents. He has other family members who would help him keep on the "straight and narrow". He plans to work in construction as he says he is able to do "anything in construction." He would like to go to night school, obtain a degree in Computers and "better my living conditions."

HULSEY, CLEVE
CDC # E-53226
PAGE 3

## CLINICAL ASSESSMENT

**XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS**

Hulsey is currently in no psychological distress and requires no psychological or psychiatric intervention or treatment. He has been attending AA and should continue alcohol programming, if released.

### CURRENT DIAGNOSTIC IMPRESSIONS:

Axis I:       Alcohol Dependence, in institutional remission
Axis II:     None
Axis III:    Back problems
Axis IV:    Incarceration
Axis V:     GAF: 90

**XIII.    REVIEW OF LIFE CRIME**

A co-defendant in a car that Hulsey was driving shot and killed a store clerk during a robbery of the store. According to Hulsey's file, it was his idea to obtain a weapon from his brother to rob the store. Hulsey said he was extremely intoxicated at the time and that the amount of alcohol he consumed impaired his judgment. He regrets his involvement in the committed offense and "wishes it had never happened." He has resolved to ensure nothing like it occurs again.

**XIV.    ASSESSMENT OF DANGEROUSNESS**

For the past six years, Hulsey has remained disciplinary-action free and has been able to follow rules in an institutional setting and, therefore, his dangerousness within a controlled setting is lower than the inmate population.

If released to the community, it appears he would be able to maintain his current sobriety and commitment to remaining abstinent. His assessment of dangerousness in the community is no more than the average person in a non-prison population.

A significant risk factor or precursor to violence for Hulsey would be a return to alcohol use. He should be periodically tested and attendance at Alcoholic Anonymous (or some other alcohol treatment modality) should be a mandatory requirement of parole.

**HULSEY, CLEVE**
**CDC # E-53226**
**PAGE 4**

## XV.     CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

Hulsey is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has done so since 2000. Hulsey should do well in the future, as long as he remains drug and alcohol free. Any treatment program is recommended that will help him maintain long-term sobriety. He does not have a mental health disorder which would necessitate treatment either during his incarceration or on parole.

W.K. Marek, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**WM/kb**

**D:     4/25/06**
**T:     4/25/06**

**E X H I B I T**

**6**

Proceedings On Sentencing Transcript
April 19, 1990, pages 1 and 14

1

1         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             IN AND FOR THE COUNTY OF TULARE

3      DEPARTMENT 2   HONORABLE ROBERT C. VAN AUKEN, JUDGE

4

5    THE PEOPLE OF THE STATE OF     )
     CALIFORNIA,                    )
6                                   )
                                    )
7                     Plaintiff,    )
                                    )
     vs.                            )    CASE NO. 27850
8                                   )
     CLEVE OTIS HULSEY,             )    PROCEEDINGS ON SENTENCE
9                                   )
                      Defendant.    )
10   _____)

11   Visalia, California              April 19, 1990

12

13

14                                     **FILED**
                                       **TULARE COUNTY**
15             REPORTER'S TRANSCRIPT      JUN 1 4 1990

16                                     JAY C. BAYLESS, CLERK
                                       BY_____
17

18

19   APPEARANCES:

20     For the Plaintiff:   GERALD SEVIER,
                            District Attorney
21                          224 County Civic Center
                            Visalia, California 93291
22                          BY:  JAMES KORDELL

23     For the Defendant:   JAMES T. WILSON,
                            Attorney at Law
24                          3714 W. Mineral King Avenue
                            Visalia, California 93291

25                                              4/27/90

26

1    court that as long as they have no prior record and

2    are youthful that they can go out and commit a

3    homicide?

4              And I realize that Mr. Hulsey was a

5    participant by reason of the aider and abettor rule,

6    and that he was outside of the particular store in

7    question, and there was a young man, 17 years of age,

8    behind a counter who's no longer on earth because of

9    the fact that Mr. Hulsey's cohort -- however that

10   occurred, we don't know how that occurred, but

11   apparently the gun went off and killed that

12   individual.

13             And I am well aware of the particular

14   problems that all of us face with the felony murder

15   rule.  And there have been other cases in this

16   courthouse where other individuals were outside a

17   particular residence and/or commercial establishments

18   where homicides occurred and they too suffered the

19   consequences of the main principal in the action.

20             And I am afraid that in Mr. Hulsey's

21   circumstance, because of the fact perhaps that he was

22   drinking alcohol that day or because of the other

23   factors that were mentioned in the 25-page report

24   supplied by defense counsel, he found himself in a

25   situation that he now has to pay his debt to

26   society.

## DECLARATION OF SERVICE

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-350L, Soledad, CA 93960-0705; I served the attached document entitled:

**PETITION FOR WRIT OF HABEAS CORPUS**

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as followed:

**Superior Court of California**
**County of Tulare**
**County Civic Center, Room 303**
**Visalia, CA 93291-1228**

**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 11th day of March, 2007, at the Correctional Training Facility in Soledad, California.

Cleve Hulsey

EXHIBIT

B

FILED
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

MAR 2 6 2007

LARAYNE CLEEK, CLERK
BY: _____

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF TULARE

1

2

3

4

5

6

7   In Re                                          )     Case      No180809
                                                   )
8       CLEVE HULSEY                                )
                                                   )     **RULING RE: PETITION**
9                                                   )     **FOR WRIT OF HABEAS**
                                                   )     **CORPUS**
10  For Writ of Habeas Corpus                       )
                                                   )
11                                                  )
                                                   )
12  _____)

13  Petitioner has failed to state a basis for relief.

14      The Court applies the "some evidence" standard of review to the denial of a parole release date

15  by the Board of Prison Terms: *In Re Michael Lowe (2005) 130 Cal.App.4th; 31 Cal Rptr. 3d 1; In re*

16  *Ramirez (2001) 94 Cal.4th 549, 563; In re Rosenkrantz (2000) 80 Cal. App.4th 409, 423, In re Powell*

17  *(1988) 45 Cal.3d 894, 904.* Under the "some evidence" standard the Board of Prison term's decision will

18  be upheld as long as there is "some basis in fact" for the decision.

19      In the case of *Irons v Carey (2007) 2007 DJDAR 3072*, the court stated as follows:

20      *"The Board must determine whether a prisoner is presently too dangerous to be deemed suitable*

21  *for parole based on the "circumstances tending to show unsuitability" and the "circumstances tending*

22  *to show suitability" set forth in **Cal. Code. Regs., tit. 15 Paragraph 2402(c)(d)**. A prisoner's*

23  *commitment offense may constitute a circumstance tending to show that a prisoner is presently too*

24  *dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's*

25  *commitment offense only where the Board can "point to factors beyond the minimum elements of the*

26  *crime for which the inmate was committed" that demonstrate the inmate will, at the time of the*

27  *suitability hearing, present*

28                                          -1-

1

2

3   *a danger to society if released.* ***In Re Dannenburg (2005) 34 Cal.4th 1061, 1071.*** *Factors beyond the*
4   *minimum elements of the crime include, inter alia, that 'the offense was carried out in a dispassionate*
5   *and calculated manner," that "the offense was carried out in a manner which demonstrates an*
6   *exceptionally callous disregard for human suffering" and that "the motive for the crime is inexplicable*
7   *or very trivial in relation to the offense." **Cal. Code. Regs., tit. 15 Paragraph 2402(c)(B), (D)(E).***

8

9      The record shows that there were relevant facts upon which the Board of Prison Terms could and
10  did base their decisions. In arriving at their decision of May 9, 2006 the Board of Prison Terms used the
11  following in denying the petitioner parole in finding he poses an unreasonable risk of danger to society:
12  1:     (Decision Page 1, Lines 14-18 "First of all we'll talk about the commitment offense. It was
13         carried out in a very dispassionate and calculated manner such as an execution style murder. The
14         offense was carried out in a manner an especially cruel and callous manner." (Line 20-26) His
15         crime partner Mr. Abele, ultimately after spending the time with Mr. Hulsey and three juveniles
16         went into a store and robbed it with Mr. Hulsey's brother's 22 rifle with three rounds in it. The
17         storekeeper was ultimately murdered in this particular crime. (Page 2, Lines 1-5) ...Five dollars
18         in this robbery. While Mr. Hulsey did not do the robbery himself, he was in the car. He was a
19         participant and was found guilty of murder in the first degree."

20  2.     (Decision Page 2, Line 15-18) "He had a brief history, three years of history of alcohol abuse"
21         He was 18 at the time of the crime.

22  3.     The BPT found that the petitioner needed further time to address his alcohol issues. Alcohol was
23         a prime factor in the commitment crime.

24  4.     The BPT found that the petitioner has incurred additional disciplinary 115s which concerned the
25         petitioner's ability to stay out of trouble.

26         It is clear from the record that there was more than enough evidence to justify the denial of
27  petitioner's parole.

28                                                -2-

1

2  Petitioner's Petition for Writ of Habeas Corpus is denied.

3

4  Date received by judge: ___3-24-07___

5  Dated: _3-26-07_          _[signature]_

6                            Darryl B. Ferguson
                             Judge of the Superior Court
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF TULARE**
**Visalia Division**
**County Civic Center, Room 303**
**Visalia, CA 93291-4593**

**People**
    Plaintiff/Petitioner,

vs.

**Hulsey, Cleve**
    Defendant/Respondent.

Case No. **VHC180809**

### CLERK'S CERTIFICATE OF MAILING (CCP 1013a(4))

I certify that I am not a party to this action.

The Ruling Re: Writ of Habeas Corpus was mailed first class, in a sealed envelope, postage prepaid, to the

parties at the addresses shown. The mailing and this certification occurred at the place and on the date

shown.

Dated: March 26, 2007 at Visalia, California.

                            **LARAYNE CLEEK, CLERK OF THE**
                            **SUPERIOR COURT, COUNTY OF TULARE**

                          By _____
                             Deputy Clerk

Cleve Hulsey
P.O. Box 705, WA-35OL
Soledad, Ca. 93960-0705

EXHIBIT

C

Name   Cleve Otis Hulsey

Address   P. O. Box 705, WA-350L

_____Soledad, CA 93960-0705_____

_____

CDC or ID Number   E-53226

**MC-275**

## IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT
(Court)

Cleve Otis Hulsey
Petitioner
                    vs.

Board of Parole Hearings, et al
Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | | |
|---|---|---|
| ☐ A conviction | ☒ Parole | |
| ☐ A sentence | ☐ Credits | |
| ☐ Jail or prison conditions | ☐ Prison discipline | |
| ☐ Other *(specify):* _____ | | |

1. Your name:  **Cleve Otis Hulsey**

2. Where are you incarcerated?  **Correctional Training Facility, Soledad, CA**

3. Why are you in custody?  ☒ Criminal Conviction   ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

     **Murder, First Degree**

   b. Penal or other code sections:  **187**

   c. Name and location of sentencing or committing court:  **Superior Court of California, County of Tulare**

   d. Case number:  **27850**

   e. Date convicted or committed:  **March 28, 1990**

   f. Date sentenced:  **April 19, 1990**

   g. Length of sentence:  **25 years to life**

   h. When do you expect to be released?  **Unknown**

   i. Were you represented by counsel in the trial court?  ☒ Yes.   ☐ No. If yes, state the attorney's name and address:

     **James T. Wilson, Attorney At Law, 3714 W. Mineral King Ave., Visalia, CA 93291**

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☒ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

---

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

MC-275 [Rev. July 1, 2005]  **PETITION FOR WRIT OF HABEAS CORPUS**  Page three of six

7. **Ground 2 or Ground** _____ *(if applicable):*

See attached petition

a. Supporting facts:

b. Supporting cases, rules, or other authority:

**PETITION FOR WRIT OF HABEAS CORPUS**

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☒ No.  If yes, give the following information:

  a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

  b.  Result _____  c.  Date of decision: _____

  d.  Case number or citation of opinion, if known: _____

  e.  Issues raised:  (1) _____

      (2) _____

      (3) _____

  f.  Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☒ No.  If yes, give the following information:

  a.  Result _____  b.  Date of decision: _____

  c.  Case number or citation of opinion, if known: _____

  d.  Issues raised:  (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    N/A

11. Administrative Review:

  a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

    N/A

  b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    N/A _____

_____

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    N/A _____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: APRIL 29, 2007

                                 (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]                **PETITION FOR WRIT OF HABEAS CORPUS**                Page six of six

**IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA**
**FIFTH APPELLATE DISTRICT**

In re Cleve Otis Hulsey,               )     Case No.
                                       )
            Petitioner,                )
                                       )     Tulare County Superior Court
On Habeas Corpus.                      )     Case No. 180809
                                       )
_____)

---

**PETITION FOR WRIT OF HABEAS CORPUS**

---

Petitioner In Pro Per


Cleve Hulsey   E-53226
P.O. Box 705, WA-350L
Soledad, Ca   93960-0705

**TABLE OF CONTENTS**

Table of Authorities                                    ii

Petition for Writ of Habeas Corpus                       1

Introduction                                             1

Conclusion                                               9

Verification                                            11

List of Exhibits                                        12

Proof of Service                                  Last Page

## TABLE OF AUTHORITIES

### CASES

### STATE

In re Dannenberg (2005) 34 Cal.4th 1061                    2,3,5

In re Lee (2006) 49 Cal.Rptr.3d 931                        7

In re Ramirez (2001) 94 Cal.App.4th 549                   2,5

In re Rosenkrantz (2002) 29 Cal.4th 616          2,3,4,5,6,9

In re Scott (2004) 119 Cal.App.4th 871                    9

In re Scott (2005) 133 Cal.App.4th 573                    7

### FEDERAL

Apprendi v. New Jersey, 530 U.S. 466 (2000)              8

Blakley v. Washington, 542 U.S. 296 (2004)              8

Cummingham v. California, ___ U.S. ___ (2007)           7

Jones v. United States, 526 U.S. 227 (1999)             8

### STATUTES

Penal Code
    § 3041 (a)                                            9
    § 3041 (b)                                          3,4,9

### CONSTITUTIONS

United States Constitution                             4,7,8
California Constitution                                  4

### MISCELLANEOUS

California Code of Regulations
    Division 2, Title 15
    § 2402                                              3,4,9
    § 2402 (a)                                           7
    § 2402 (c)                                           9

1    **IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA**
     **FIFTH APPELLATE DISTRICT**

2

3

4

5

6  In re Cleve Otis Hulsey,    )    Case No.
                               )
7           Petitioner,        )
                               )    Tulare County Superior Court
8  On Habeas Corpus            )    Case No. 180809
                               )
9  _____)

10

11

12              **PETITION FOR WRIT OF HABEAS CORPUS**

13       Petitioner, Cleve Otis Hulsey, in pro per, petitions for a

14  Writ of Habeas Corpus, and by this verified petition states as

15  follows:

16                              **I**

17                       **INTRODUCTION**

18       Thirty-five-year-old state prisoner Cleve Otis Hulsey is

19  petitioning this Court for a writ of habeas corpus seeking to

20  overturn the Board of Parole Hearings' [hereinafter Board]

21  denial of parole on the grounds that his rights secured under

22  the State and Federal Constitutions, and various provisions of

23  the California Penal Code and Division 2, Title 15 of the

24  California Code of Regulations [hereinafter CCR], were violated

25  by agents of the California Board of Parole Hearings.

26       At the May 9, 2006 parole hearing, the Board determined that

27  petitioner, who was sentenced to 25 years to life for first

28  degree murder in 1990, should remain in prison on three

                              1

1   purported grounds: the crime was perpetrated in a dispassionate
2   and calculated manner, the crime demonstrated an exceptionally
3   callous disregard for human suffering and the motive for the
4   crime was inexplicable.

5       Our Supreme Court's decision in *Rosenkrantz* holds that a
6   Board parole decision violates due process and must be reversed
7   if there is not "some evidence" in the record to support it.
8   Also, although parole may in some cases be denied on the basis
9   of the crime, there must be evidence to support a finding that
10  the crime was particularly egregious. (*In re Rosenkrantz* (2002)
11  29 Cal.4th 616, 683.)

12      In *Dannenberg* our Supreme Court held "[S]ole reliance on
13  the commitment offense might, in particular cases, violate
14  section 3041, subdivision (a)'s provision that a parole date
15  'shall normally be set' under 'uniform term' principles, and
16  might thus also contravene the inmate's constitutionally
17  protected expectation of parole. We explained that such a
18  violation could occur, 'for example[,] where no circumstances of
19  the offense reasonable could be considered more aggravated or
20  violent than the minimum necessary to sustain a conviction for
21  that offense.' (*Rosenkrantz, supra*, 29 Cal,4th 616, 683.)
22  Quoting *Ramirez, supra*, 94 Cal.App.4th 549, 570, we suggested
23  that, in order to prevent that parole authority's case-by-case
24  suitability determination from swallowing the rule that parole
25  should 'normally' be granted, an offense must be '*particularly*
26  *egregious*' to justify the denial of parole. *(Rosenkrantz, supra*,
27  at 683.)" *(In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095.)
28  The Supreme Court then held "As we have explained, however,

2

1   the Board must apply detailed standards when evaluating whether
2   an individual inmate is unsuitable for parole on public safety
3   grounds.  (See § 3041, subd. (b); CCR § 2402.)  When the Board
4   bases unsuitability on the circumstances of the commitment
5   offense, it must cite 'some evidence' of aggravating facts
6   *beyond the minimum elements of that offense.  (Rosenkrantz,*
7   *supra,* 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg, supra,* 34
8   Cal.4th 1061, 1095.)

9       Therefore, the Board must follow and apply the standards
10  articulated and set forth by our Supreme Court in determining
11  that the circumstances of the commitment offense were
12  "particularly egregious" and that there existed aggravating
13  facts "beyond the minimum elements of that offense" and support
14  that determination with "some evidence" in the record.  As will
15  be shown below, the Board failed to meet these requirements
16  resulting in the violation of petitioner's due process rights
17  and the Superior Court of Tulare County failed to apply
18  controlling legal precedent to the facts that were before it.

                                II

20      This petition is addressed to this court's jurisdiction in
21  the second instance and based on the material herein and the
22  full record that was before the Superior Court of Tulare County,
23  Case No. 180809.  (See Attachment One, Petition for Writ of
24  Habeas Corpus)

                                III

26      Petitioner would incorporate the grounds, claims, facts and
27  legal arguments in the attached petition and memorandum by
28  reference herein.

                                3

1

**IV**

2       *Claim*:   The Board failed to follow or apply the controlling
3   legal principles, the decision was devoid of the "some evidence"
4   required by law and was arbitrary and capricious, resulting in a
5   due process violation of Article I, § 7 of the California
6   constitution and the Fifth, Sixth and Fourteenth Amendment to
7   the United States Constitution.

8       *Argument*:   Our Supreme Court has held "that the judicial
9   branch is authorized to review the factual basis of a decision
10  of the Board denying parole in order to ensure that the decision
11  comports with the requirements of due process of law, but that
12  in conducting such review, the court may inquire only whether
13  *some evidence* in the record before the Board supports the
14  decision to deny parole, based upon *the factors specified by*
15  *statute and regulation.*   If the decision's consideration of the
16  specified factors is not supported by some evidence in the
17  record and thus is devoid of a factual basis, the court should
18  grant the prisoner's petition for writ of habeas corpus and
19  should order the board to vacate its decision denying parole and
20  therefore to proceed in accordance with due process of law."
21  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658, emphasis added.)

22      The Supreme Court held "As we have explained, however, the
23  Board must apply detailed standards when evaluating whether an
24  individual inmate is unsuitable for parole on public safety
25  grounds.   (See § 3041, subd. (b); CCR § 2402.)   When the Board
26  bases unsuitability on the circumstances of the commitment
27  offense, it must cite 'some evidence' of aggravating facts
28  *beyond the minimum elements of that offense.   (Rosenkrantz,*

4

1  *supra,* 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg* (2005), 34
2  Cal.4th 1061, 1095, emphasis in original.)

3      For the Board's, and lower Court's, decision to withstand
4  judicial review it must have cited some evidence, from the
5  record, that petitioner's commitment offense: 1) Was committed
6  in an especially egregious manner; and 2) Contained aggravating
7  facts beyond the minimum elements of that offense.  Also, the
8  evidence cited by the Board must rationally indicate that the
9  prisoner currently presents an unreasonable public safety risk
10 if released from prison.  ("[A] life term offense or any other
11 offenses underlying an indeterminate sentence must be
12 particularly egregious to justify the denial of parole date."
13 (*In re Ramirez* (2001) 94 Cal.App.4th 549, 570; disapproved on
14 other grounds in *In re Dannenberg, supra,* 34 Cal.4th 1061.)
15 When the Board bases unsuitability on the circumstances of the
16 commitment offense, it must cite "some evidence" of aggravating
17 facts *beyond the minimum elements of that offense.*
18 *(Rosenkrantz, supra*, at 658, 683; *In re Dannenberg, supra,* 34
19 Cal.4th 1061, 1095, emphasis in original.)

20     The Superior Court of Tulare County denied the petition for
21 writ of habeas corpus on the grounds that there were relevant
22 facts supporting the Board's decision.  However, none of the
23 facts cited by the lower Court in support of the denial complied
24 with either the regulations, statutes or California Supreme
25 Court precedence.  The Superior Court, referencing the hearing
26 transcript, stated "1: (Decision Page 1, Lines 14-18 'First of
27 all we'll talk about the commitment offense.  It was carried out
28 in a very dispassionate and calculated manner such as an

1  execution style murder.  The offense was carried out in a manner
2  an especially cruel and callous manner."  (Attachment Two, p. 2,
3  L 12-14.).  The actual hearing transcript states, "First of all
4  we'll talk about the commitment offense.  It was carried out in
5  an especially cruel and callous manner in that his crime
6  partner, who I read in the legal documents got life without the
7  possibility of parole." (Attachment One, Exhibit 1, Initial
8  Parole Consideration Hearing Transcript, p. 66, L 14-18.)  There
9  is absolutely no evidence in the record of this case that
10  supports the allegation that the commitment offense was an
11  execution-style murder.  The fact that petitioner's crime
12  partner received a term of life without the possibility of
13  parole is not "some evidence" that petitioner committed an
14  especially egregious crime.  "[Petitioner] is entitled to have
15  his application for these benefits [parole] 'duly considered'
16  based upon an *individualized consideration* of all relevant
17  factors."  *(Rosenkrantz, supra*, 29 Cal.4th at p. 655, emphasis
18  added.)  Neither the Board nor the Superior Court can ascribe
19  acts committed by one party to another.  To assign to petitioner
20  the act committed by his crime partner, and then rely upon this
21  "fact" as "some evidence" that petitioner's release unreasonably
22  endangers public safety, is untenable.  Petitioner willingly
23  participated in a robbery.  While petitioner sat in the getaway
24  car, his crime partner entered the store and during the robbery
25  an innocent victim was killed.  Petitioner was convicted under
26  the felony murder rule.  Petitioner did not shoot or murder
27  anyone.

28      "The test is not whether some evidence supports the *reasons*

6

1   the [Board] cites for denying parole, but whether some evidence
2   indicates a parolee's release *unreasonably endangers public*
3   *safety.* (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole
4   denied if prisoner 'will pose an unreasonable risk of danger to
5   society if released from prison']; see e.g. *In re Scott* (2005)
6   133 Cal.App.4th 573, 595 ['The commitment offense can negate
7   suitability [for parole] only if circumstances of the crime...
8   rationally indicate the offender will present an unreasonable
9   public safety risk if released from prison'].) Some evidence of
10  the existence of a particular factor does not necessarily equate
11  to some evidence the parolee's release unreasonably endangers
12  public safety." (*In re Lee* (2006) 49 Cal.Rptr.3d 931, 936-937.)

13      The Board, and the Superior Court, failed to demonstrate or
14  cite any reliable evidence which would indicate that
15  petitioner's release would unreasonably endanger public safety
16  as required by statute. Based on California law the Board's
17  decision resulted in a violation of petitioner's due process
18  rights. (Petitioner would respectfully request that this court
19  take judicial notice of Argument I in the original petition for
20  writ of habeas corpus, Amendment One, pp. 11-20.)

21                                  V

22      *Claim*: The Board violated the Due Process Clause of the
23  Fifth Amendment and the notice and jury trial guarantees of the
24  Sixth and Fourteenth Amendments of the United States
25  Constitution.

26      *Argument*: The United States Supreme Court held in
27  *Cunningham v. California,* ___ U.S. ___ (2007), "[P]lacing
28  sentence-elevating fact-finding within the judge's [or Board's]

                                    7

1   province, violate[d] a defendant's right to trial by jury
2   safeguarded by the Sixth and Fourteenth Amendments."   In
3   *Apprendi v. New Jersey*, 530 U.S. 466, 490, the United States
4   Supreme Court held that, under the Sixth Amendment, "[A]ny fact
5   (other than a prior conviction) that exposes a defendant to a
6   sentence in excess of the relevant statutory maximum must be
7   found by a jury, not a judge, and established beyond a
8   reasonable doubt, not merely by a preponderance of the
9   evidence." (See also *Jones v. United States*, 526 U.S. 227, 244
10   (1999).) The "statutory maximum" in this case is 25 years.
11   The Board relied on facts and elements of the crime that
12   were neither charged in the original indictment nor admitted by
13   petitioner. (i.e., That the crime was an execution-style
14   murder.)  This is a violation of the Due Process Clause of the
15   Fifth Amendment as well as the Sixth and Fourteenth Amendments
16   to the Unite States Constitution.

17   The United States Supreme court held that "[T]he relevant
18   'statutory maximum,' is not the maximum sentence a judge may
19   impose after finding additional facts, but the maximum he may
20   impose *without* any additional findings." (*Blakley v.
21   Washington*, 542 U.S. 296, 303-304, emphasis in original.)
22   (Petitioner would respectfully request that this court take
23   judicial notice of Argument II in the original writ of habeas
24   corpus, Attachment One, pp. 20-23.)

25   The Board's reliance on facts not charged in the indictment,
26   proven beyond a reasonable doubt to a judge or jury, or admitted
27   by petitioner, resulted in a constitutional violation of his
28   Fifth, Sixth and Fourteenth Amendment rights.  The Judge of the

8

1 Superior Court for the County of Tulare failed to address the
2 merits of this issue.

3 Therefore, the decision of unsuitability should be reversed
4 and the Board should be ordered to schedule a new hearing at
5 which a parole release date will be set in accordance with the
6 law.

7 **CONCLUSION**

8 The California rules governing parole in murder cases, for
9 which parole eligibility is provided by statute, [See CCR §
10 2402] are as follows: "[P]arole eligibility is the rule, rather
11 than the exception." (*In re Scott, (2004)* 119 Cal.App.4th at p.
12 891.) "[P]arole is 'normally' to be granted." (*Id.* [quoting
13 Penal Code § 3041 (a)].) The murder giving rise to the
14 prisoner's incarceration must be "particularly egregious" for
15 parole to be denied. (*In re Rosenkrantz, supra*, 29 Cal.4th at
16 p. 683.) Indeed, a murder must be "heinous, atrocious or cruel"
17 if, as here, the offense is to serve as the basis for parole
18 denial. (CCR § 2402 (c)(1).) In addition, in such cases, the
19 prisoner must *presently* present a danger to society. (Penal
20 Code § 3401 (b).) In short, in petitioner's case, the
21 circumstances surrounding the crime or the manner in which it
22 was committed must show not only that the first degree murder at
23 issue was more cruel or vicious than the ordinary first degree
24 murder, but also that petitioner would likely pose a current
25 risk to public safety if released. The record in this case
26 contains absolutely *no* evidence that would meet *either* of the
27 two requirements. The record establishes that petitioner does
28 not pose an unreasonable risk to public safety. Any contrary

9

1   conclusion lacks any evidentiary support.  Thus, there can be
2   little doubt that the Board violated the applicable laws and
3   regulations when it found petitioner unsuitable for parole.

4

5       WHEREFORE, petitioner respectfully requests that this court:
6       1.   Take judicial notice of the full record;
7       2.   Issue a Writ of Habeas Corpus or Order to Show Cause to
8   the Director of Corrections and the Chairperson, Board of Parole
9   Hearings, to inquire into the illegal and unconstitutional
10  actions stated in the petition;
11      3.   Appoint counsel;
12      4.   Declare the rights of the parties;
13      5.   Not allow intuitional transfer until the full outcome of
14  this case; and
15      6.   Grant any other and further relief the court deems just.

16

17  DATED:   April 29, 2007                Respectfully submitted,

18

19                                         Cleve Otis Hulsey
20                                         Petitioner, In Pro Per

21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

10

## VERIFICATION

I, Cleve Otis Hulsey, state:

I am the petitioner in this action. All the facts in the above document, not otherwise supported by citations to the record, attachments, or other documents, are true of my own personal knowledge, except as to matters that are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 29, 2007, at the Correctional Training Facility, Soledad, California.

Cleve Otis Hulsey

11

**LIST OF EXHIBITS**

Attachment One
> Petition for Writ of Habeas Corpus (Case No. 180809),
> Superior Court of Tulare County

Attachment Two
> Order Denying Petition for Writ of Habeas Corpus
> Superior Court of Tulare County

## **DECLARATION OF SERVICE**

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-350L, Soledad, CA 93960-0705; I served the attached document entitled:

### **PETITION FOR WRIT OF HABEAS CORPUS**

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

**State of California**
**Court of Appeals**
**Fifth Appellate District**
**2525 Capitol Street**
**Fresno, CA 93721-2227**

**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 29th day of April, 2007, at the Correctional Training Facility in Soledad, California.

Cleve Otis Hulsey

**EXHIBIT**

**D**

**IN THE**

# Court of Appeal of the State of California

COURT OF APPEAL
APPELLATE DISTRICT
FILED

**IN AND FOR THE**

OCT 2 5 2007

# Fifth Appellate District

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

|  |  |
|---|---|
| In re<br>CLEVE OTIS HULSEY,<br><br>On Habeas Corpus. | F052769<br>(Tulare County Sup. Ct. No. 27850) |

BY THE COURT:*

The petition for writ of habeas corpus filed in this court on May 2, 2007, is denied.

_____  Acting Presiding Justice

*Before Vartabedian, Acting P.J., Dawson, J. and Kane, J.

**EXHIBIT**

E

Cleve O. Hulsey, E-53226
P. O. Box 705, WA-350L
Soledad, CA 93960-0705


**IN THE SUPREME COURT OF CALIFORNIA**


| | |
|---|---|
| In the matter of ) | Case No. |
| ) | |
| CLEVE O. HULSEY ) | **REQUEST FOR REVIEW** |
| ) | |
| On Habeas Corpus. ) | (Fifth App. Ct. No.F052769) |
| ) | (Tulare Sup. Ct. No.180809) |


TO THE HONORABLE CHIEF JUSTICE OF THE CALIFORNIA SUPREME
COURT AND THE ASSOCIATE JUSTICES OF THE COURT:

Cleve O. Hulsey, petitioner herein, respectfully requests
review following the decision of the Court of Appeal, Fifth
Appellate District, filed on October 25, 2007 and received on
October 29, 2007, denying his petition for writ of habeas
corpus. A copy of the denial from the court of appeal is
attached hereto as Exhibit A.

1

I

## QUESTIONS FOR REVIEW

This case presents the following questions for review:

1.  **Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner's offense was particularly egregious?**

2.  **Is it a due process violation for the Board to deny parole without supporting evidence that the offense contained elements or aggravating facts beyond the minimum necessary to sustain a conviction for first degree murder?**

3.  **Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner currently poses an unreasonable risk of danger or poses a threat to public safety?**

4.  **Is it a due process violation for the Board to rely on unchanging factors to deny a prisoner parole?**

### II

## NECESSITY FOR REVIEW

This case presents questions of law of first impression that are of statewide importance.

This court's decision in *In re Rosenkrantz* (2002) 29 Cal.4th 616, holds that a Board of Parole Hearings decision violates due process and must be reversed if there is not "some evidence" in the record to support it. This court's decision in *In re Dannenburg* (2005) 34 Cal.4th 1061, holds that although parole may in some cases be denied on the basis of the crime, the Board must cite some evidence to support a finding that there were aggravating facts beyond the minimum necessary to sustain a conviction of first degree murder. The Board must also cite some evidence that indicates a parolee's release unreasonably

2

endangers public safety.

The Board of Parole Hearings [hereafter Board] has totally ignored the mandates of this Court and the laws and regulations that govern it. The Courts in this state have allowed this abrogation of the law to go unchallenged. Petitioner would ask "What good are the California Supreme Court decisions if the courts in this state ignore or refuse to abide or enforce the precedents?"

### III

### JURISDICTION OF THE COURT

Petitioner has exhausted all lower court remedies. Thus, petitioner having been placed in jeopardy and danger of irreparable harm, this court has jurisdiction. (*Employees Association v. City of Glendale,* 15 Cal.3d 328, 342 (1975).)

There is no issue of "comity" since both state and federal due process standards are offended. This is particularly true since the California standard of due process is more stringently protective of the individual. (*People v. Ramirez,* 25 Cal.3d 260 (1979).)

### IV

### HISTORY OF THE CASE

Petitioner was convicted of first degree murder on March 28, 1990 and was sentenced to a term of 25 years-to-life on April 19, 1990. On May 9, 2006, petitioner's initial parole suitability hearing was conducted and he was found unsuitable and denied parole for a period of three years. On March 11, 2007, petitioner filed a petition for Writ of Habeas Corpus in

3

the Superior Court for the County of Tulare.  On March 26, 2007,

the petition was denied.  On April 26, 2007, petitioner filed a

petition for Writ of Habeas Corpus in the Court of Appeal, Fifth

Appellate District.  On October 29, 2007 petitioner received the

denial from the Fifth Appellate District.

## V

### ARGUMENT

### 1.   Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner's offense was particularly egregious?

The Court's decision in *Rosenkrantz* holds that a Board's

parole decision violates due process and must be reversed if

there is not "some evidence" in the record to support it.  Also,

although parole may in some cases be denied on the basis of the

crime, there must be evidence to support a finding that the

crime was particularly egregious.  (*In re Rosenkrantz* (2002) 29

Cal.4th 616, 683.)

In petitioner's case, as in all Boards decisions, the

commitment offense is the evidence relied on by the Board to

support a finding that the crime was particularly egregious.

That is to say in the eyes of the Board all indeterminate

sentenced prisoner's committed particularly egregious crimes.

Petitioner would submit that all indeterminate offenses could be

considered egregious, yet not all of them could be classified as

"particularly" so.  But that is precisely what the Board has

done.  Petitioner would contend that if all indeterminate

offenses are particularly egregious, then none are particularly

egregious.

4

This Court has held "[S]ole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date 'shall normally be set' under 'uniform term' principles, and might thus also contravene the inmate's constitutionally protected expectation of parole. We explained that such a violation could occur, 'for example[,] where no circumstances of the offense reasonable could be considered more aggravated or violent that the minimum necessary to sustain a conviction for that offense.' (*Rosenkrantz, supra,* 29 Cal.4th 616, 683.) Quoting *Ramirez, supra,* 94 Cal.App.4th 549, 570, we suggested that, in order to prevent that parole authority's case-by-case suitability determination from swallowing the rule that parole should 'normally' be granted, an offense must be '*particularly egregious*' to justify the denial of parole. (*Rosenkrantz, supra,* at 683.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095, italics added.)

The Board may deny parole if a defendant committed his crime "in an *especially* heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1), italics added.) The measure of atrociousness is not general notions of common decency or society norms, for by that yardstick all murders are atrocious. (See *In re Scott,* (2004) 119 Cal.4th 871, 891 ["'[A]ll second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others'"].) Rather, the inquiry is whether among murders the

5

one committed by petitioner was particularly heinous, atrocious
or cruel.   (*In re Ramirez, supra,* 94 Cal.App.4th at 570,
disapproved on another point by *In re Dannenberg, supra,* 34
Cal.4th at 1082-1083, 1100.)  By that measure, petitioner's
crime was more commonplace than egregious.

**2.   Is it a due process violation for the Board to deny parole
     without supporting evidence that the offense contained
     elements or aggravating facts beyond the minimum necessary
     to sustain a conviction for first degree murder?**

     This Court has stated "When the Board bases unsuitability on
the circumstances of the commitment offense, it must cite 'some
evidence' of aggravating facts *beyond the minimum elements of
that offense.  (In re Rosenkrantz, supra,* 29 Cal.4th 1061, 1095,
italics in original.)

     It is therefore axiomatic that the absence of such a citing
would rise to the level of a due process violation.   In
petitioner's case, and in almost every other parole
consideration hearing, the Board merely recites the
circumstances of the commitment offence to satisfy the
aggravating facts requirement.   That the Board is allowed to
propagate such a miscarriage of justice is beyond rational
explanation.  Petitioner would contend that at some point the
Board, or the Courts, will have to clarify this constitutional
vague requirement by establishing exactly what constitutes
aggravating facts.  Until then surely the Board must be required
to pay more than lip service to this Court's holding in
*Dannenberg.*

**3.   Is it a due process violation for the Board to deny parole
     without supporting evidence that the prisoner currently**

6

**poses an unreasonable risk of danger or poses a threat to public safety?**

This court has held that "[T]he Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See § 3041, subd. (b); CCR § 2402.) A prisoner may be found unsuitable for parole so long as "some evidence," which may be as little as a "modicum," supports the Board's decision. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676-677; *In re Smith*, (2003) 114 Cal.App.4th 343, 361; *In re McClendon* (2003) 113 Cal.App.4th 315, 321.)

However, as the *Lee* court held, "The test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety.* (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole denied if prisoner 'will pose an unreasonable risk of danger to society if released from prison']; see *In re Scott* (2005) 133 Cal.App.4th 573, 595 ['The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicates that the offender will present an unreasonable public safety risk if released from prison']); ... Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*In re Lee*, (2006) 49 Cal.Rptr.3d 931, 936-937, italics in original.) Thus a finding that a particular unsuitability factor applies to a prisoner does not automatically establish that he poses an unreasonable risk to public safety if released on parole.

Therefore, absent a rational indication that the
unsuitability factors proves or demonstrates that a prisoner is
a threat to public safety the unsuitability factors fail to meet
the "modicum" requirement of the "some evidence" standard.

The Board illegally concludes that if an unsuitability
factor can be applied to a prisoner then this factor alone
establishes proof of an unreasonable risk to public safety if
he/she is released on parole.  This is not what the Legislature
intended when it enacted Penal Code section 3041 (a) and (b).

The record in this case establishes that petitioner does not
pose an unreasonable risk to public safety.  Any contrary
conclusion lacks any evidentiary support.

## 4.   Is it a due process violation for the Board to rely on unchanging factors to deny a prisoner parole?

In the circumstances of this case, the Board's continued
reliance upon the nature of petitioner's crime to deny him
parole in 2006 violates due process.

In finding petitioner unsuitable at his initial parole
suitability hearing, the panel relied exclusively on an
unchanging factor: the commitment offense.  In *Biggs*, the Ninth
Circuit stated that the Board was "*initially* justified" in
finding Mr. Biggs unsuitable based on the circumstances of the
offense and his conduct prior to imprisonment.  The Ninth
Circuit added that "[a] continued reliance in the future on an
unchanging factor, the circumstances of the offense and conduct
prior to imprisonment, runs contrary to the rehabilitation goals
espoused by the prison system and could result in a due process

8

violation." (*Biggs v. Turhune,* 334 F.3d 910, 917 (9th Cir. 2003).)

The Ninth Circuit Court of Appeals has articulated when the reliance on unchanging factors, i.e. the reliance on the commitment offense to deny parole, triggers a violation of the Due Process Clause of the Fifth Amendment of the United States Constitution. The Ninth Circuit held, "We note that in all the cases in which we have held that a parole Board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum numbers of years to which they have been sentenced at the time of the challenged parole denial by the Board. *Biggs, Sass,* and here, the petitioners had not served the minimum numbers of years to which they had been sentenced at the time of the challenged parole denial by the Board. *Biggs,* 334 F.3d at 912; *Sass,* 461 F.3d 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." (*Irons v. Carey,* 479 F.3d 658 (9th Cir. 2007).)

This decision by the Ninth Circuit in *Irons* failed to consider that the State, in an effort to entice prisoners to behave well and participate in work, education or vocational programs, has offered a reduction in the minimum term if the prisoner meets certain conditions. The Legislature established

9

guidelines under which an inmate can receive a reduction in his term.   Penal Code § 2931 allows for a four month term reduction for every eight months of good behavior and participation in an appropriate program.   The Board has established that a life prisoner may earn four months of term reduction credits for each year of good behavior and program participation.   These credits are to be applied after a parole release date has been established.   (Cal. Code Regs., tit. 15, § 2401, subd. (a) and (b).)

Therefore, based on the above, an inmate with a first degree murder conviction who did not actually kill anyone, whether by the felony murder rule or a conspiracy, is entitled to a maximum term of 25 years once found suitable for parole.   (Cal. Code Regs., tit. 15, § 2403, subd. (b).)   If the prisoner has served the minimum term of 25 years when the release date is established, then the total time served on the sentence will be 25 years plus 8.25 years of earned credit for a total term served of 33.25 years.   The State currently requires every life prisoner to serve a period on parole.   The actual parole period differs based upon the law in effect at the time the crime was committed.   In petitioner's case the parole period is five years.   If the reduction credits are applied only against the base term then an inmate assessed a base term of 25 years, who has served 25 years, would have his term set at 16 years 9 months.   What happens to the 8.25 years earned credit?   The State discards the credits.   The State's promise of a reduction in the minimum term for life prisoners who qualify becomes

10

nothing more than a sham. The Ninth Circuit's ruling in *Irons* allows the State to further this injustice. The Board denies all life prisoners a parole date until they have reached or surpassed their minimum term and then requires the prisoner to forfeit all earned credits the Legislature has authorized by law for life prisoners to receive. This is a gross miscarriage of justice and violates a prisoner's due process rights.

Because there is no reliable evidence supporting the conclusion that petitioner is unsuitable for parole, the Board's determination of unsuitability violated petitioner's due process rights. (*Hill,* 472 U.S. at 455.)

Therefore, according to this Court, the Board must follow and apply the factors specified by statute and regulation in determining that the circumstances of the commitment offense were "particularly egregious" and cite aggravating facts that were beyond the minimum elements of the offense and support these determinations with "some evidence" in the record. The Board must also cite "some evidence" that reliably and rationally indicates a prisoner's release would unreasonably endanger public safety.

A cursory review of the record in this case demonstrates that the Board's decision was unreasonable under the applicable "some evidence" rule. The record simply does not contain *any* evidence that petitioner's first degree murder was *particularly* egregious. Nor does the record contain *any* evidence that petitioner is currently a threat to society. Given that both findings are required by California law, there is *zero* evidence

11

in the record to support the Board's decision.

## CONCLUSION

All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws.    The record establishes that petitioner does not pose an unreasonable risk of danger or poses a threat to public safety.    Any contrary conclusion lacks any evidentiary support.

For the foregoing reasons, it is respectfully requested that this petition for review be granted in the interest of justice to address the important questions of law of a statewide importance.

DATE:    October 31, 2007                    Respectfully submitted,


                                              Cleve Otis Hulsey
                                              Petitioner, In Pro Per

12

## DECLARATION OF SERVICE

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-350L, Soledad, CA 93960-0705; I served the attached document entitled:

### REQUEST FOR REVIEW

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

**California State Supreme Court**
**350 McAllister Street**
**San Francisco, CA 94102**

**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 31st day of October, 2007, at the Correctional Training Facility in Soledad, California.

Cleve Otis Hulsey

**EXHIBIT**

**F**

Court of Appeal, Fifth Appellate District - No. F052769
**S157961**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CLEVE OTIS HULSEY on Habeas Corpus

The petition for review is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JAN - 3 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

## DECLARATION OF SERVICE

I, Cleve Otis Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over eighteen (18) years of age; my address is P. O. Box 689 FW-235, Soledad, CA 93960-0689; I am a party to the attached action; I served the attached documents entitled:

### PETITION FOR WRIT OF HABEAS CORPUS

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

**Clerk of the United State District Court for the Northern District of California 450 Golden Gate Avenue, Box 36060 San Francisco, CA 94102**

**State of California Office of the Attorney General Department of Justice 455 Golden Gate Avenue, Suite 11000 San Francisco, CA 94102-7004**

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 15th day of February, 2008, at the Correctional Training Facility in Soledad, California.

Cleve Otis Hulsey