1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JENNIFER A. NEILL
   Supervising Deputy Attorney General
5  STEVEN G. WARNER, State Bar No. 239269
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5747
    Fax: (415) 703-5843
8   Email: Steven.Warner@doj.ca.gov

9  Attorneys for Respondent Warden Ben Curry
   SF2008401505

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14

15  **CLEVE OTIS HULSEY,**                    Case No. C 08-1009 JSW

16                          Petitioner,       **ANSWER TO ORDER TO SHOW
                                              CAUSE; MEMORANDUM OF**
17            v.                              **POINTS AND AUTHORITIES**

18  **BEN CURRY, Warden,**

19                          Respondent.       Judge: The Honorable Jeffrey S. White

20

21       As an Answer to the Petition for Writ of Habeas Corpus filed by inmate Cleve Otis Hulsey,

22  Respondent admits, alleges, and denies that:

23       1.   Hulsey is in the lawful custody of the California Department of Corrections and

24  Rehabilitation following his 1990 conviction of first-degree murder. (Pet. at 3.) Hulsey is

25  serving a life sentence with the possibility of parole. (*Id.*)

26       2.   In 2007, Hulsey filed a petition for writ of habeas corpus in Tulare County Superior

27  Court, alleging that the Board of Parole Hearings' 2006 decision denying him parole violated his

28  due process rights. (Ex. 1, Super. Ct. Pet.; Ex. 2, [Super. Ct.] Ruling Re: Pet. for Writ of Habeas

1  Corpus.) The superior court denied the petition, finding that "[i]t is clear from the record that

2  there was more than enough evidence to justify the denial of petitioner's parole." (Ex. 2 at 2.)

3      3.   Hulsey then filed petitions in the California Court of Appeal and the California

4  Supreme Court. (Ex. 3, Ct. App. Pet.; Ex. 4, Sup. Ct. Pet.) Both courts summarily denied the

5  petitions. (Ex. 5, Ct. App. Order; Ex. 6, Cal. Appellate Cts. Case Information at 2.)

6      4.   Respondent admits that Hulsey exhausted his state court remedies regarding the claim

7  that the Board's 2006 decision was not supported by some evidence and violated due process.

8  Respondent denies that Hulsey has exhausted his claims to the extent they are interpreted more

9  broadly to encompass any systematic issues beyond this claim.

10     5.   Respondent admits that the Petition is timely under 28 U.S.C. § 2244(d)(1).

11  Respondent admits that the Petition is not subject to any other procedural bar.

12     6.   Respondent denies that Hulsey is entitled to federal habeas relief under 28 U.S.C. §

13  2254 because the state court decisions were not contrary to, or an unreasonable application of

14  clearly established federal law as determined by the United States Supreme Court, or based on an

15  unreasonable determination of the facts.

16     7.   Respondent denies that Hulsey has a federally protected liberty interest in parole and,

17  therefore, alleges that he has not a stated a federal question invoking this court's jurisdiction.

18  The Supreme Court has not clarified the methodology for determining whether a state has created

19  a federally protected liberty interest in parole. *See Greenholtz v. Inmates of Neb. Penal & Corr.*

20  *Complex*, 442 U.S. 1, 12 (1979) (liberty interest in conditional parole release date created by

21  unique structure and language of state parole statute); *Sandin v. Connor*, 515 U.S. 472, 484

22  (1995) (federal liberty interest in correctional setting created only when issue creates an "atypical

23  or significant hardship" compared with ordinary prison life); *Wilkinson v. Austin*, 545 U.S. 209,

24  229 (2005) (*Sandin* abrogated *Greenholtz's* methodology for establishing the liberty interest).

25  Continued confinement under an indeterminate life sentence does not impose an "atypical or

26  significant hardship" under *Sandin* since a parole denial does not alter an inmate's sentence,

27  impose a new condition of confinement, or otherwise restrict his liberty while he serves his

28  sentence. Thus, Respondent asserts that Hulsey does not have a federal liberty interest in parole.

Answer to Order to Show Cause; Mem. of P. & A.                                    *Hulsey v. Curry*
                                                                        Case No. C 08-1009 JSW

2

1  Respondent acknowledges that in *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th

2  Cir. 2006) the Ninth Circuit held that California's parole statute creates a federal liberty interest

3  in parole under the mandatory-language analysis of *Greenholtz*, but preserves the argument,

4  which is pending en banc review in *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).

5      8.   Even if Hulsey has a federal liberty interest in parole, he received all due process to

6  which he is entitled under clearly established federal law because he was provided with an

7  opportunity to be heard and a statement of reasons for the Board's decision. *Greenholtz*, 442

8  U.S. at 16.

9      9.   Respondent denies that the some-evidence standard is clearly established federal law in

10  the parole context. Respondent affirmatively alleges that Hulsey's contentions about the proper

11  some-evidence standard rely on regulations and *In re Scott*, 133 Cal. App. 4th 573 (2005),

12  instead of clearly established federal law, and thus are state law claims not properly before this

13  Court.

14      10.  Respondent denies that the Board's 2006 decision violated Hulsey's federal due

15  process rights, was arbitrary, or was unsupported by any evidence.

16      11.  Respondent affirmatively alleges that Hulsey makes state law claims not properly

17  before this Court when he contends that the Board failed to follow regulations, that he has served

18  beyond his minimum term because credits should apply to his sentence, and that there is no

19  evidence his commitment offense was particularly egregious. Respondent further affirmatively

20  alleges that Hulsey cites no clearly established United State Supreme Court law in support of

21  these contentions.

22      12.  Respondent affirmatively alleges that the Board may deny parole based on unchanging

23  factors, and denies that such reliance violates due process. Respondent further affirmatively

24  alleges that the commitment offense is some evidence of unsuitability. Respondent also

25  affirmatively alleges that there is no clearly established federal law precluding a denial based on

26  unchanging factors.

27      13.  Respondent affirmatively alleges that there is no clearly established federal law

28  requiring the Board to show that Hulsey is a current risk of danger to society. Respondent further

Answer to Order to Show Cause; Mem. of P. & A.

*Hulsey v. Curry*
Case No. C 08-1009 JSW

1 affirmatively alleges that the some-evidence standard is a judicial standard of review, not a

2 standard that the Board must apply to Hulsey's hearing.

3     14. Respondent denies that an evidentiary hearing is necessary. Hulsey's claims

4 can be resolved on the existing state court record. *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th

5 Cir. 1999).

6     15. Respondent denies that Hulsey is entitled to an order reversing his 2006 hearing or

7 requiring the Board to follow the letter and spirit of applicable law, regulations, and precedent, or

8 specifically limiting a re-hearing in any way. The remedy is limited to the process that is due,

9 which is a new Board hearing comporting with due process. *See, e.g., Benny v. U.S. Parole*

10 *Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (a liberty interest in parole is limited by the

11 Board's exercise of discretion, and a due process error does not entitle an inmate to a favorable

12 parole decision).

13     16. Hulsey fails to state or establish any grounds for habeas corpus relief.

14     17. Except as expressly admitted in this Answer, Respondent denies the allegations of the

15 Petition.

16 **MEMORANDUM OF POINTS AND AUTHORITIES**

17 **INTRODUCTION**

18     Hulsey claims that the Board's 2006 decision finding him unsuitable for parole violated his

19 due process rights. But Hulsey merely alleges a disagreement with the Board's decision, and

20 fails to establish that the state court decisions denying his due process claims were contrary to, or

21 an unreasonable application of clearly established federal law as determined by the United States

22 Supreme Court, or were based on an unreasonable determination of the facts. Thus, there are no

23 grounds for federal habeas relief.

24 **ARGUMENT**

25 **I.**

26 **HULSEY HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF UNDER AEDPA.**

27

28     Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court

1    may not grant a writ of habeas corpus unless the state court's adjudication was either:  1)

2    "contrary to, or involved an unreasonable application of, clearly established Federal law, as

3    determined by the Supreme Court of the United States;" or 2) "based on an unreasonable

4    determination of the facts in light of the evidence presented at the State Court proceeding."

5    28 U.S.C. § 2254(d)(1-2) (2000).  Hulsey has not demonstrated that he is entitled to relief under

6    this standard.

7    **A.   Hulsey Has Not Shown that the State Court Decisions Were Contrary to Clearly Established Federal Law.**

8

9    As a threshold matter, the Court must decide what, if any, "clearly established Federal law"

10    applies. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  In making this determination, the Court

11    may look only to the holdings of the United States Supreme Court governing at the time of the

12    state court's adjudication.  *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653 (quoting

13    *Williams v. Taylor*, 529 U.S. 362 (2000)).  The only case in which the Supreme Court has

14    addressed the process due in state parole proceedings is *Greenholtz*.  *Greenholtz*, 442 U.S. 1.

15    The Supreme Court there held that due process is satisfied when the state provides an inmate an

16    opportunity to be heard and a statement of the reasons for the parole decision.  *Id.* at 16.  "The

17    Constitution does not require more."  *Id.*[1]  No other Supreme Court holdings require more at a

18    parole hearing.

19    Hulsey does not contest that he received the *Greenholtz* protections.  (*See generally* Pet.)

20    Because *Greenholtz* was satisfied and *Greenholtz* is the only Supreme Court authority regarding

21    an inmate's due process rights during parole proceedings, the state court decisions upholding the

22    Board's denial were not contrary to clearly established federal law.  Thus, the Petition should be

23    denied.

24    Although Hulsey contends that some evidence must support the Board's decision, there is

25

26    1. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level

27    of process due for inmates being considered for release on parole includes an opportunity to be heard and notice of any adverse decision" and noted that, although *Sandin* abrogated *Greenholtz's* methodology for establishing the liberty interest, *Greenholtz* remained "instructive for [its]

28    discussion of the appropriate level of procedural safeguards."  *Austin*, 545 U.S. at 229.

Answer to Order to Show Cause; Mem. of P. & A.        *Hulsey v. Curry*
Case No. C 08-1009 JSW

1  no clearly established federal law applying the some-evidence standard to parole decisions. The

2  Supreme Court has held that under AEDPA a test announced in one context is not clearly

3  established federal law when applied to another context. *Wright v. Van Patten*, ___U.S.___ 128

4  S. Ct. 743, 746-47 (2008); *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007); *Musladin*,

5  127 S. Ct. at 652-54; *see also, Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007); *Nguyen*

6  *v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007); *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th

7  Cir. 2007). The Supreme Court developed the some-evidence standard in the context of a prison

8  disciplinary hearing, *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), which is a fundamentally

9  different context than a parole proceeding. Because the tests and standards developed by the

10  Supreme Court in one context cannot be transferred to distinguishable factual circumstances for

11  AEDPA purposes, it is not appropriate to apply the some-evidence standard of judicial review to

12  parole decisions.

13  While the Ninth Circuit has applied the some-evidence standard to parole decisions, this is

14  improper under AEDPA, and the issue is currently pending before an en banc panel of the Ninth

15  Circuit. *Hayward*, 527 F.3d 797. AEDPA does not permit relief based on circuit case law.

16  *Crater*, 491 F.3d at 1123, 1126 (§ 2254(d)(1) renders decisions by lower courts non-dispositive

17  for habeas appeals); *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) ("Circuit court

18  precedent is relevant only to the extent it clarifies what constitutes clearly established law." . . .

19  "Circuit precedent derived from an extension of a Supreme Court decision is not clearly

20  established federal law as determined by the Supreme Court."); *Duhaime v. Ducharme*, 200 F.3d

21  597, 600-01 (9th Cir. 2000). Therefore, the Ninth Circuit's use of the some-evidence standard is

22  not clearly established federal law and is not binding on this Court. *See, e.g., Biggs v. Terhune*,

23  334 F.3d 910 (9th Cir. 2003); *Sass*, 461 F.3d at 1128; *Irons v. Carey*, 505 F.3d 846, 851 (9th

24  Cir. 2007).

25  Hulsey contends that the state court's decision was arbitrary. (Mem. of Law at 13.) To

26  the extent that this Court interprets this contention as meaning the that Board'd denial was

27  arbitrary, the contention lacks merit. The Board's findings and decision would be arbitrary if

28  made seemingly at random without individualized consideration of Hulsey's case. Here, the

Answer to Order to Show Cause; Mem. of P. & A.

1  Board individually considered Hulsey's pre- and post-conviction factors and therefore did not

2  make arbitrary findings or an arbitrary decision.

3       Similarly, Hulsey's additional claim that the Board's reliance on immutable factors

4  violates due process finds no support in Supreme Court precedent.  Although the Ninth Circuit

5  has suggested that this might amount to an additional due process claim, *Biggs*, 334 F.3d at 917,

6  because there is no clearly established federal law precluding reliance on unchanging factors

7  federal habeas relief is not available.  28 U.S.C. § 2254(d).

8       In sum, the only clearly established federal law setting forth the process due in the parole

9  context is *Greenholtz*.  Hulsey does not allege that he failed to receive these protections.

10  Therefore Hulsey has not shown that the state court decisions denying habeas relief were contrary

11  to clearly established federal law.

12      **B.     Hulsey Has Not Shown that the State Courts Unreasonably**
                **Applied Clearly Established Federal Law.**

13

14       Habeas relief may only be granted based on AEDPA's unreasonable-application clause

15  where the state court identifies the correct governing legal rule from Supreme Court cases but

16  unreasonably applies it to the facts of the particular state case.  *Williams*, 529 U.S. at 406.  The

17  petitioner must do more than merely establish that the state court was wrong or erroneous.  *Id.* at

18  410; *Lockyer*, 538 U.S. at 75.  Respondent recognizes that the Ninth Circuit applies the some-

19  evidence standard as clearly established federal law, but even accepting that premise, Hulsey is

20  not entitled to federal habeas relief.  Indeed, the California Supreme Court has adopted *Hill*'s

21  some-evidence standard as the judicial standard to be used in evaluating parole decisions, *In re*

22  *Rosenkrantz*, 29 Cal. 4th 616 (2002), and Hulsey has not shown that the state courts

23  unreasonably applied the standard.

24       When, as here, the California Supreme Court denies a petition for review without

25  comment, the federal court will look to the last reasoned decision as the basis for the state court's

26  judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).  In this case, the last reasoned

27  decision is the Tulare County Superior Court's order denying Hulsey's habeas petition.  (Ex. 2.)

28  The superior court denied the petition, finding that "Petitioner has failed to state a basis for

1  relief" and "[i]t is clear from the record that there was more than enough evidence to justify the

2  denial of petitioner's parole." (Ex. 2 at 1, 2.) Hulsey's claim fails: he has not shown that the

3  superior court unreasonably applied *Hill*, but rather asks this Court to re-weigh his suitability.

4  Such a re-weighing has no basis in United States Supreme Court law.

5       **C.    Hulsey Has Not Shown that the State Court Decisions Were**
       **Based on an Unreasonable Determination of the Facts.**

6

7       Under § 2254(d)(2), habeas corpus can not be granted unless the state courts' decisions

8  were based on an unreasonable determination of the facts in light of the evidence presented in the

9  state court. The state courts' factual determinations are presumed to be correct, and the petitioner

10 has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §

11 2254(e)(1).

12      Although Hulsey alleges that the Board's decision is not supported by the evidence, he

13 does not show that the state court made factual errors. Here the Tulare County Superior Court

14 found that "[t]he record shows that there were relevant facts upon which the Board . . . could and

15 did base their decision[]," and then listed facts relied on by the Board, including Hulsey's

16 commitment offense, history of alcohol abuse, and disciplinary history. (Ex. 2 at 2.) Hulsey has

17 not alleged by clear and convincing evidence that the factual determinations are incorrect. He

18 disagrees with the weight the Board assigned to the evidence. This disagreement does not entitle

19 Hulsey to federal habeas relief.

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

Answer to Order to Show Cause; Mem. of P. & A.

1
## CONCLUSION

2      Hulsey has not demonstrated that the state court decisions denying habeas relief were

3 contrary to, or an unreasonable application of, United States Supreme Court authority, or based

4 on an unreasonable determination of the facts.  Thus, the Petition should be denied.

5      Dated:  September 2, 2008

6                          Respectfully submitted,

7                          EDMUND G. BROWN JR.
                           Attorney General of the State of California

8                          DANE R. GILLETTE
                           Chief Assistant Attorney General
9
                           JULIE L. GARLAND
10                         Senior Assistant Attorney General

11                         JENNIFER A. NEILL
                           Supervising Deputy Attorney General

12

13

14                         STEVEN G. WARNER
                           Deputy Attorney General
                           Attorneys for Respondent

15

16

17

18

19

20

21

22

23

24

25

26

27

28    20133986.wpd

Answer to Order to Show Cause; Mem. of P. & A.                    *Hulsey v. Curry*
                                                                   Case No. C 08-1009 JSW

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    *Cleve Otis Hulsey v. Ben Curry, Warden*

Case No.:    **U. S. D. C., N. D., San Francisco Div., C 08-1009 JSW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **September 2, 2008**, I served the attached

**ANSWER TO ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES WITH EXHIBITS 1 - 6**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Cleve Otis Hulsey, E-53226**
**Correctional Training Facility**
**FW-235**
**P.O. Box 689**
**Soledad, CA 93960-0686**
*In Pro Per*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **September 2, 2008**, at San Francisco, California.

| | |
|---|---|
| J. Baker | Signature |
| Declarant | |

20138407.wpd

# EXHIBIT 1
# Part 1 of 2

Name ~~Cleve Hulsey~~

Address  P. O. Box 705, WA-350L

_____ Soledad, CA 93960-0705

CDC or ID Number  E-53226

FILED
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

MAR 21 2007

LARAYNE CLERK, CLERK
BY:_____

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF TULARE

(Court)

| | |
|---|---|
| **Cleve Hulsey** | |
| Petitioner | |
| vs. | |
| **Board of Parole Hearings, et. al** | |
| Respondent | |

PETITION FOR WRIT OF HABEAS CORPUS

No. ___VHC 180809___

*(To be supplied by the Clerk of the Court)*

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule.60(a)

American LegalNet, Inc.
www.USCourtForms.com

☐ A conviction                    ☐ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify)*: _____

1. Your name:    **Cleve Hulsey**

2. Where are you incarcerated?   **Correctional Training Facility, Soledad, CA**

3. Why are you in custody?   ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      **Murder, First Degree**

   b. Penal or other code sections:    **187**

   c. Name and location of sentencing or committing court: **Superior Court of California, County of Tulare**

   d. Case number:   **27850**

   e. Date convicted or committed: **March 28, 1990**

   f. Date sentenced:  **April 19, 1990**

   g. Length of sentence:  **25 years to life**

   h. When do you expect to be released?   **unknown**

   i. Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

      **James T. Wilson, Attorney At Law, 3714 W. Mineral King Ave.**

      **Visalia, CA 93291**

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☒ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

_____

_____

_____

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

_____

_____

_____

See attached petition

a. Supporting facts:

b. Supporting cases, rules, or other authority:

PETITION FOR WRIT OF HABEAS CORPUS

b.  Result: _____    c.  Date of decision: _____

d.  Case number or citation of opinion, if known: _____

e.  Issues raised:  (1) _____

(2) _____

(3) _____

f.  Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

_____

9.  Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.    If yes, give the following information:

a.  Result: _____    b.  Date of decision: _____

c.  Case number or citation of opinion, if known: _____

d.  Issues raised:  (1) _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
N/A

_____

11. Administrative Review:
a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
N/A

_____

_____

_____

_____

_____

_____

b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

commitment, or issue in any court?    ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result *(Attach order or explain why unavailable)*: _____

(5) Date of decision: _____

b.  (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result *(Attach order or explain why unavailable)*: _____

(5) Date of decision: _____

c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
N/A

_____

_____

16. Are you presently represented by counsel?    ☐ Yes.    ☒ No.  If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes.    ☒ No.  If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
N/A

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: March 11, 2007

▶ _____
(SIGNATURE OF PETITIONER)

1  Cleve Hulsey, E-53226
   P. O. Box 705, WA-350L
2  Soledad, CA 93960-0705

3  Petitioner, In Pro Per

4

5

6

7

8

9

10                SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                          COUNTY OF TULARE

12

13

14  _____
                                    )
15  Cleve Hulsey,                   )
                                    )    Case No.
16              Petitioner,         )
                                    )
17         v.                       )    PETITION FOR WRIT OF
                                    )    HABEAS CORPUS
18  Board of Parole Hearings, et al.,)
                                    )
19              Respondent.         )
    _____)

20

21         TO THE HONORABLE JUDGE OF THE SUPERIOR COURT OF
               CALIFORNIA, IN AND FOR THE COUNTY OF TULARE
22

23      Petitioner hereby petitions for a Writ of Habeas Corpus and

24  by this verified petition states as follows:

25                               I

26                          INTRODUCTION

27      1.  The Board of Parole Hearings [hereinafter Board] failed

28  to make its suitability determination in a manner consistent

                                 1

1    with its obligation under the California Penal Code, California

2    Code of Regulations and settled California law.  The Board's

3    decision failed to follow or apply controlling legal principles

4    and its own regulations in finding petitioner unsuitable for

5    parole, the decision was devoid of the "some evidence" required

6    by law, and was arbitrary and capricious resulting in a due

7    process violation of Article 1, §.7 of the California

8    Constitution and the Fifth and Fourteenth Amendments to the

9    United States Constitution.  The Board violated the Due Process

10   Clause of the Fifth Amendment and the notice and jury trial

11   guarantees of the Sixth Amendment of the United States

12   Constitution.  For these reasons the Board's finding that

13   petitioner is unsuitable for parole should be reversed.

**II**

**PARTIES**

16   2.  Petitioner Cleve Hulsey is a prisoner of the State of

17   California and is currently incarcerated at the Correctional

18   Training Facility in Soledad, California.

19   3.  Respondent Ben Curry is the Acting Warden of the

20   Correctional Training Facility, Soledad, California.

21   4.  Respondent J. Dovey is the Director of the California

22   Department of Corrections and Rehabilitations.

23   5.  Respondent James Davis is the Chairperson of the Board

24   of Parole Hearings and is responsible for its operations.

25   (Penal Code § 5075.)

26   6.  Respondent Arnold Schwarzenegger is the Governor of the

27   State of California and is responsible for the Board's

28   operation.  (Penal Code §§ 5075, 3041.1 and 3041.2.)

2

1

### III

2

### STATEMENT OF FACTS

3    7.  Petitioner was convicted of first degree murder on March

4  28, 1990, and sentenced to 25 years-to-life on April 19,1990.

5    8.  On May 9, 2006, Petitioner's Initial Parole

6  Consideration Hearing was held before the Board.  Petitioner was

7  found unsuitable and denied parole for a period of three years.

8    9.  Petitioner has no other plain or adequate remedy in the

9  ordinary course of the law.  This petition is addressed to this

10  courts original habeas corpus jurisdiction because the issues

11  raised are of constitutional dimension, questioning the legality

12  of petitioner's confinement.  A petition for a Writ of Habeas

13  Corpus based upon factual allegations to be determined by

14  reviewing court is generally first brought in the Superior

15  Court.  (*In re Hillery* (1972) 202 Cal.App.2nd 293.)  Petitioner

16  alleges that the Board violated his due process rights by

17  failing to find him suitable for parole, thus depriving him of a

18  liberty interest.  The Fifth and Fourteenth Amendments of the

19  United States Constitution and the California Constitution,

20  Article I, section 7, subdivision (a), prohibit the government

21  from depriving an inmate of life, liberty, or property without

22  due process of law.  Petitioner has been denied due process of

23  law in violation of not only the United States Constitution but

24  also the Constitution of the State of California, the California

25  Penal Code, the California Code of Regulations, and established

26  law.  This is petitioner's first request for habeas relief, and

27  thus is properly filed in this court.

28    10.  The accompanying Memorandum of Points and Authorities

1   and factual allegations contained herein, as well as the exhibits

2   appended to this petition are incorporated herein by reference.

3       WHEREFORE, petitioner respectfully prays that this Court:

4       A.   Issue a Writ of Habeas Corpus directing the Director of

5   the Department of Corrections and Rehabilitation to inquire into

6   the legality of petitioner's incarceration;

7       B.   Order the immediate release of the petitioner; or

8       C.   Order the Board to schedule and commence a new term-

9   fixing hearing within thirty days, and to render a new

10  determination in strict accordance with both the letter and

11  spirit of the regulations and law;

12      D.   Conduct an evidentiary hearing;

13      E.   Appoint counsel;

14      F.   Declare the rights of the parties; and

15      G.   Grant any and all relief the court deems appropriate.

16

17  DATED:   March 11, 2007                    Respectfully submitted,

18

19

20                                             Cleve Hulsey
                                               Petitioner, In Pro Per
21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

4

## VERIFICATION

I, Cleve Hulsey, state:

I am the petitioner in this action. I have read the foregoing petition for writ of habeas corpus and the attached memorandum of points of authority, and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on March 11, 2007.

Cleve Hulsey
Petitioner, In Pro Per

5

1              **MEMORANDUM AND POINTS OF AUTHORITY**

2                      **INTRODUCTION**

3      "The Board of Prison Terms is authorized by statute to

4 determine parole suitability, and to exercise its discretion in

5 deciding whether to grant or deny parole." (*In re Rosenkrantz*

6 (2000) 80 Cal.App.4th 409, 423; Penal Code, § 3040.)

7      Penal Code section 3041 sets forth criteria for determining

8 parole and provides in pertinent part: "(a) ... One year prior

9 to the inmate's minimum eligible release date a panel consisting

10 of at least two commissioners on the Board of Prison Terms shall

11 ... meet with the inmate and shall normally set a parole release

12 date.... The release date shall be set in a manner that will

13 provide uniform terms for offenses of similar gravity and

14 magnitude in respect to their threat to the public, and that

15 will comply with the sentencing rules that the Judicial Council

16 may issue and any sentencing information relevant to the setting

17 of parole release dates. The Board shall establish criteria for

18 setting of parole release dates and in doing so shall consider

19 the number of victims of the crime for which the prisoner was

20 sentenced and other factors in mitigation or aggravation of the

21 crime ... [¶] (b) The panel or board shall set a release date

22 unless it determines that the gravity of the current convicted

23 offenses, or the timing and gravity of current or past convicted

24 offense, or offenses, is such that consideration of the public

25 safety requires a more lengthy period of incarceration for this

26 individual, and that a parole date, therefore, cannot be fixed

27 at this meeting."

28      The California Code of Regulations (hereinafter CCR), title

1  15, division 2, chapter 3, article 11, section 2400 et seq. set

2  forth additional criteria for determining parole suitability for

3  persons found guilty of murders committed after November 7,

4  1978.  Subdivision (a) of section 2402 provides: "The panel

5  shall first determine whether the life prisoner is suitable for

6  release on parole.  Regardless of the length of time served, a

7  life prisoner shall be found unsuitable for and denied parole if

8  in the judgment of the panel the prisoner will pose an

9  unreasonable risk of danger to society if released from prison."

10  Subdivision (b) of section 2402 directs the Board to

11  consider "[a]ll relevant, reliable information available to the

12  panel ... in determining suitability for parole.  Such

13  information shall include [(1)] the circumstances of the

14  prisoner's social history; [(2)] past and present mental state;

15  [(3)] past criminal history; including involvement in other

16  criminal misconduct which is reliable documented; [(4)] the base

17  and other commitment offenses, including behavior before, during

18  and after the crime; [(5)] past and present attitude towards the

19  crime; [(6)] any conditions of treatment or control, including

20  the use of special conditions under which the prisoner may

21  safely be released to the community; and [(7)] any other

22  information which bears on the prisoner's suitability for

23  release.  Circumstances which taken alone may not firmly

24  establish unsuitability for parole may contribute to a pattern

25  which results in a finding of unsuitability."

26  Subdivision (c) of section 2402 sets forth the

27  "circumstances tending to show unsuitability" for parole, which

28  "include: [¶] (1) Commitment Offense.  The prisoner committed

7

1  the offense in an especially heinous, atrocious or cruel manner.

2  The factors to be considered include: [¶] (A) Multiple victims

3  were attacked, injured or killed in the same or separate

4  incidents.   [¶] (B) the offense was carried out in a

5  dispassionate and calculated manner, such as an execution-style

6  murder.   [¶] (C) The victim was abused, defiled or mutilated

7  during or after the offense.   [¶] (D) The offense was carried

8  out in a manner which demonstrates an exceptionally callous

9  disregard for human suffering.   [¶] (E) The motive for the crime

10  is inexplicable or very trivial in relation to the offense.   [¶]

11  (2) Previous Record of Violence.  The prisoner on previous

12  occasions inflicted or attempted to inflict serious injury on a

13  victim, particularly if the prisoner demonstrated serious

14  assaultive behavior at an early age.   [¶] (3) Unstable Social

15  History.  The prisoner has a history of unstable or tumultuous

16  relationships with others.   [¶] (4) Sadistic Sexual Offenses.

17  The prisoner has previously sexually assaulted another in a

18  manner calculated to inflict unusual pain or fear upon the

19  victim.   [¶] (5) Psychological Factors.  The prisoner has a

20  lengthy history of severe mental problems related to the

21  offense.   [¶] (6) Institutional Behavior.  The prisoner has

22  engaged in serious misconduct in prison or jail."

23      Subdivision (d) of section 2402 sets forth the

24  "circumstances tending to show suitability" for parole, which

25  "include: [¶] (1) No Juvenile record.  The prisoner does not have

26  a record of assaulting others as a juvenile or committing crimes

27  with a potential of personal harm to victims.   [¶] (2) Stable

28  Social History.  The prisoner has experienced reasonable stable

1   relationships with others.  [¶] (3) Signs of Remorse.  The
2   prisoner performed acts which tends to indicate the presence of
3   remorse, such as attempting to repair the damage, seeking help
4   for or relieving suffering of the victim, or indicating that he
5   understands the nature and magnitude of the offense.  [¶] (4)
6   Motivation for Crime.  The prisoner committed his crime as the
7   result of significant stress in his life, especially if the
8   stress has built over a long period of time. ... [¶] (6) Lack of
9   Criminal History.  The prisoner lacks any significant history of
10  violent crime.  [¶] (7) Age.  The prisoner's present age reduces
11  the probability of recidivism.  [¶] (8) Understanding and Plans
12  for Future.  The prisoner has made realistic plans for release
13  or has developed marketable skills that can be put to use upon
14  release.  [¶] (9) Institutional Behavior.  Institutional
15  activities indicate an enhanced ability to function within the
16  law upon release."

17      In *Rosenkrantz*, our Supreme Court held "that the judicial
18  branch is authorized to review the factual basis of a decision
19  of the Board denying parole in order to ensure that the decision
20  comports with the requirements of due process of law, but that
21  in conducting such a review, the court may inquire only whether
22  *some evidence* in the record before the Board supports the
23  decision to deny parole, based upon *the factors specified by*
24  *statute and regulation*.  If the decision's consideration of the
25  specified factors is not supported by some evidence in the record
26  and thus is devoid of a factual basis, the court should grant
27  the prisoner's petition for writ of habeas corpus and should
28  order the Board to vacate its decision denying parole and

1  therefore to proceed in accordance with due process of law."
2  (*In re Rosenkrantz (2002)* 29 Cal.4th 616, 658, emphasis added.)
3  In *Dannenberg* the Supreme Court held "In that regard, we
4  noted that 'the nature of the prisoner's offense, alone, can
5  constitute a sufficient basis for denying parole. [Citations.]'
6  (*Rosenkrantz, supra*, 29 Cal.4th 616, 682.)  While neither the
7  board nor the Governor may adopt a blanket no-parole policy for
8  particular offenses, we said, 'the [parole] authority properly
9  may weigh heavily the degree of violence used and the amount of
10 viciousness shown by a defendant.' (*Id.*, at p. 683.) [¶]
11 However, we cautioned, sole reliance on the commitment offense
12 might, in particular cases, violate section 3041, subdivision
13 (a)'s provision that a parole date 'shall normally be set' under
14 'uniform term' principles, and might thus also contravene the
15 inmate's constitutionally protected expectation of parole.  We
16 explained that such a violation could occur, 'for example[,]
17 where no circumstances of the offense reasonable could be
18 considered more aggravated or violent than the minimum necessary
19 to sustain a conviction for that offense.' (*Rosenkrantz, supra*,
20 29 Cal.4th 616, 683.)  Quoting *Ramirez, supra*, 94 Cal.App.4th
21 549, 570, we suggested that, in order to prevent the parole
22 authority's case-by-case suitability determinations from
23 swallowing the rule that parole should 'normally' be granted, an
24 offense must be '*particularly egregious*' to justify the denial
25 of parole. (*Rosenkrantz, supra*, at 683.)" (*In re Dannenberg*,
26 (2005) 34 Cal.4th 1061, 1094-1095.)
27 The Supreme Court then held "As we have explained, however,
28 the Board must apply detailed standards when evaluating whether

10

1   an individual inmate is unsuitable for parole on public safety

2   grounds.   (See § 3041, subd. (b); CCR § 2402.)   When the Board

3   bases unsuitability on the circumstances of the commitment

4   offense, it must cite 'some evidence' of aggravating facts

5   *beyond the minimum elements of that offense.   (Rosenkrantz,*

6   *supra*, 29 Cal.4th 616, 658, 683.)"   (*In re Dannenberg, supra*, 34

7   Cal.4th 1061, 1095.)

8       Therefore, the Board must follow and apply the standards

9   set forth above in determining that the circumstances of the

10  commitment offense were "particularly egregious" and support

11  that determination with "some evidence" in the record.   As will

12  be shown below, the Board failed to meet this requirement, as

13  well as controlling legal principles, which resulted in a

14  violation of petitioner's due process rights and other state and

15  federal constitutional rights.

16                                I

17      *Claim*:   The Board failed to follow or apply the controlling

18  legal principles, the decision was devoid of the "some evidence"

19  required by law and was arbitrary and capricious, resulting in a

20  due process violation of Article I, § 7 of the California

21  Constitution and the Fifth and Fourteenth Amendment to the

22  United States Constitution.

23      *Argument*:   In finding petitioner unsuitable for parole the

24  Board relied on CCR, § 2402, subdivisions (c)(1)(B), (c)(1)(D),

25  and (c)(1)(E), as "some evidence" that petitioner's crime was

26  "particularly egregious," making him unsuitable for parole, and

27  that he *currently* poses a threat to public safety if released at

28  this time.

1       First, a cursory review of the record in this case

2   demonstrates that the Board's decision was unreasonable under

3   the applicable "some evidence" rule.  The record simply does not

4   contain *any* evidence that petitioner's first degree murder was

5   *particularly* egregious.  Nor does the record contain *any*

6   evidence that petitioner is currently a threat to society.

7   Given that both findings are required by California Law, there

8   is *zero* evidence in the record to support the Board's decision.

9       Second, the nature of the offense may justify a denial of

10  parole if the crime was committed in an "especially heinous,

11  atrocious or cruel manner."  An offense that was "no more

12  aggravated or violent than the minimum necessary to sustain a

13  conviction" for first degree murder does not justify a finding

14  of unsuitability for parole.  (*Rosenkrantz* at p. 682.)

15      To guide this determination, CCR, § 2402, subd. (c)(1)(A)-

16  (E) establishes the specified criteria the Board must rely on to

17  demonstrate that a prisoner committed his offense in an

18  "especially heinous, atrocious or cruel manner."  It is

19  axiomatic that absent the required "some evidence" supporting

20  any of the specified factors that decision would be arbitrary

21  and capricious and result in a due process violation.

22      Petitioner will demonstrate that each of the Board's

23  unsuitability findings failed to meet the specified regulatory

24  requirements.

25  A.   The Board's finding that petitioner's crime was perpetrated
         in a dispassionate and calculated manner, such as an
26       execution-style murder, lacks any supporting evidence.

27       CCR, § 2402 (c)(1)(B) states, "The offense was carried out

28  in a dispassionate and calculated manner, such as an execution-

12

1  style murder."

2      In support of this factor the Board found, "It [the

3  commitment offense] was carried out in an especially cruel and

4  callous manner in that his crime partner, who I read in the

5  legal documents got life without the possibility of parole."

6  (Exhibit 1, Initial Parole Consideration Hearing Transcript, May

7  9, 2006 [hereinafter HT], p. 66, L 15:18.)

8      The relevant evidence does not merely fail to support but

9  refutes the conclusion that petitioner committed his offense in

10  a dispassionate and calculated manner, such as an execution-

11  style murder.

12      The Probation Officer's Report [hereinafter POR] states,

13  "Circumstances in the presenting matter indicates that the

14  defendant and an alleged co-participant preplanned a robbery at

15  a rural Woodlake convenience store in order to obtain money with

16  which to buy beer." (Exhibit 2, POR, pp. 5-6.)

17      The circumstances of the offense, as noted by the Board,

18  were, "At some point Abele [the co-defendant] had began – had

19  begun to talk about robbing a store in Woodlake." (Exhibit 1,

20  HT, p. 16, L 11:14.)

21      During the Proceedings On Sentencing hearing, held on April

22  19, 1990, the Honorable Robert C. Van Auken, Judge, stated, "And

23  I realize that Mr. Hulsey was a participant by reason of the

24  aider and abettor rule, and that he was outside of the

25  particular store in question, and there was a young man, 17

26  years of age, behind a counter who's no longer on earth because

27  of the fact that Mr. Hulsey's cohort – however that occurred,

28  but apparently the gun went off and killed that individual."

13

1   (Exhibit 6, Proceedings On Sentencing, p. 14, L 4:12.)

2      To sum up the evidence and the circumstances of the offense

3   as reported in the record: 1) Petitioner, at worst, aided and

4   abetted a plan to commit an armed robbery; and 2) Petitioner was

5   found guilty of first degree murder based on the felony-murder

6   rule in that a person died during the commission of a robbery.

7   There is absolutely no evidence that petitioner premeditated or

8   planned to commit a murder.  Was the *robbery* calculated?  Yes.

9   Was the murder committed in an execution-style manner?  No.  Was

10   petitioner found guilty of special circumstances that could have

11   resulted in either life without the possibility of parole or the

12   death penalty?  No.  The judge convicted petitioner on the

13   felony-murder rule, which does not require malice or

14   premeditation.

15      The Board's finding that petitioner acted "in a

16   dispassionate and calculated manner, such as an execution-style

17   murder" was wholly inconsistent for the record provides not a

18   scintilla of evidence in support.  Because the record lacks even

19   the "modicum" of evidence required by law, the Board's decision

20   is arbitrary and capricious and resulted in a due process

21   violation.

22   B.    The Board's finding that petitioner demonstrated an
       exceptionally callous disregard for human suffering is not
23        supported by any evidence.

24      CCR, § 2402 (c)(1)(D) states, "The offense was carried out

25   in a manner which demonstrates an exceptionally callous

26   disregard for human suffering."

27      The Board stated, "The way it was carried out demonstrated

28   an exceptional callous disregard for human suffering in that a

1  life was taken for five dollars..."  (HT, p. 67, L 22:25.)

2  All first degree murders by definition involve some

3  callousness – i.e., lack of emotion or sympathy, emotional

4  insensitivity, indifference to the feelings and suffering of

5  others.  As noted, however, parole is the rule, rather than the

6  exception, and a conviction for first degree murder does not

7  automatically render one unsuitable."  (*In re Smith* (2003) 114

8  Cal.App.4th 343, 366.)  In *In re Ramirez* (2001) 94 Cal.App.4th

9  549, as in this case, the Board denied a parole release date on

10  the basis of a finding that the nature of the inmate's offense

11  displayed a "callous disregard for human suffering."  (*Id.* at pp.

12  558, 568.)  Setting aside that determination, the court agreed

13  that "the gravity of the commitment offense or offenses alone

14  *may* be a sufficient basis for denying a parole application, so

15  long as the board does not fail to consider all other relevant

16  factors," *Id.* at p. 569, but attached an important caveat.  As

17  the court explained, "[a]ll violent crime demonstrates the

18  perpetrator's potential for posing a grave risk to public

19  safety, yet parole is mandatory for violent felons serving

20  determinate sentences.  (Pen. Code, § 3000, subd. (b)(1).)  And

21  the Legislature has clearly expressed its intent that when

22  murderers – who are the great majority of inmates serving

23  indeterminate sentences – approach their minimum eligible parole

24  date, the Board 'shall normally set a parole release date.'

25  (Pen. Code, § 3041, subd. (a).)  The Board's authority to make

26  an exception based on the gravity of a life term inmate's

27  current or past offenses should not operate so as to swallow the

28  rule that parole is 'normally' to be granted.  Otherwise, the

15

1   Board's case-by-case rulings would destroy the proportionality

2   contemplated by Penal Code section 3041, subdivision (a), and

3   also the murder statutes, which provide distinct terms of life

4   without possibility of parole, 25 years to life, and 15 years to

5   life for various degrees and kinds of murder. (Pen. Code, § 190

6   et seq.)." (*Ramirez*, at p. 570.)  Therefore, to demonstrate "an

7   exceptionally callous disregard for human suffering" (§ 2402,

8   subd. (c)(1)(D)) the offense in question must have been

9   committed in a more aggravated or violent manner than that

10  ordinarily shown in the commission of first degree murder.

11      *In re Van Houten* (2004) 116 Cal.App.4th 339 illustrates the

12  sort of gratuitous cruelty required.  The prisoner in that case

13  was involved in multiple stabbings of a woman with a knife and

14  bayonet.  While she was dying, the victim was made aware her

15  husband was suffering a similarly gruesome fate.  As stated by

16  the court, "[t]hese acts of cruelty far exceeded the minimum

17  necessary to stab a victim to death." (*Id.* at p. 351.)  Other

18  examples of aggravated conduct reflecting an "exceptionally

19  callous disregard for human suffering," are set forth in Board

20  regulations relating to the matrix used to set base terms for

21  life prisoners (§ 2282, subd. (b)); namely, "torture," as where

22  the "[v]ictim was subjected to the prolonged infliction of

23  physical pain through the use of non-deadly force prior to act

24  resulting in death," and "severe trauma," as where "[d]eath

25  resulted from severe trauma inflicted with deadly intensity;

26  e.g., beating, clubbing, stabbing, strangulation, suffocation,

27  burning, multiple wounds inflicted with a weapon not resulting

28  in immediate death or actions calculated to induce terror in the

16

1 victim." (*Ibid.*)  No such facts or anything remotely similar
2 are present in this case.  As in *In re Smith, supra*, 114
3 Cal.App.4th 343, there is no evidence petitioner "tormented,
4 terrorized, or injured the victim before his crime partner shot
5 the victim, or that he gratuitously increased or unnecessarily
6 prolonged the victim's pain and suffering.  As the *Scott* court
7 stated, "Was the crime callous? Yes.  However, are the facts of
8 the crime some evidence that [he] acted with exceptionally
9 callous disregard for [the victim's] suffering; or do the facts
10 distinguished this crime from other [first] degree murders as
11 exceptionally callous? No.  (*Id.* at p. 367.)" (*In re Scott*,
12 (2004) 119 Cal.App.4th 871, 891-892.)

13    Because the relevant evidence shows no more callous
14 disregard for human suffering than is shown by most first degree
15 murder offenses, the Board's use of this factor to conclude that
16 petitioner committed his offense "in an especially cruel and
17 callous manner" was arbitrary and capricious.

18 C.    The Board's finding that petitioner's motive for the crime
      was inexplicable lacks evidentiary support.
19

20    CCR, § 2402 (c)(1)(E) states, "The motive for the crime is
21 inexplicable or very trivial in relation to the offense."

22    The final factor relied upon by the Board was the motive
23 for the crime.  The Board stated, "The way it was carried out
24 demonstrated an exceptional callous disregard for human
25 suffering in that a life was taken for five dollars, which the
26 motive for this crime is certainly inexplicable." (HT, p. 67, L
27 22:26.)

28    "The epistemological and ethical problems involved in the

17

1  ascertainment and evaluation of motive are among the reasons the
2  law has sought to avoid the subject.  As one authority has
3  stated, '[h]ardly any part of penal law is more definitely
4  settled than that motive is irrelevant.'  (Hall, General
5  Principles of Criminal Law (2d ed. 1960) at p. 88; see also
6  Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.
7  Justice Ethics 3.)  An 'inexplicable' motive is one that is
8  unexplained or unintelligible, as where the commitment offense
9  does not appear to be related to the conduct of the victim and
10  has no other discernible purpose.  A person whose motive for a
11  criminal act cannot be explained or is unintelligible is
12  therefore unusually unpredictable and dangerous."  (*Scott* at pp.
13  892-893.)  The finding that petitioner's motive was
14  "inexplicable" ignores the evidence.  Not even a "modicum of
15  evidence" shows petitioner's motive was anything other than to
16  commit a robbery, not a murder, and that his release would
17  therefore pose a greater threat to society than the release of
18  most life prisoners.  To permit petitioner's motive to be used
19  to deny him release would allow almost any motive to be used to
20  deny a prisoner release, making a mockery of the legislative
21  declaration that life prisoner are "normally" entitled to
22  receive a release date shortly before they first become eligible
23  for parole.  (Penal Code, § 3041, subd. (a).)

24      As it was required to do, the Board considered whether
25  petitioner was suitable for parole — that is, whether he
26  presented an unreasonable risk of danger to society if released.
27  (See Penal Code § 3041 (b); CCR, § 2402.)  It decided that
28  petitioner posed an unreasonable risk of danger (and, therefore,

1   was unsuitable for parole) because his crime was especially

2   heinous.  While relying upon the nature of petitioner's crime as

3   an indicator of his dangerousness -- after nearly two decades of

4   incarceration -- violates due process because petitioner's

5   commitment offense has become such an unreliable predictor of

6   his present and future dangerousness that it does not satisfy

7   the "some evidence" standard.  After nearly twenty years of

8   rehabilitation, the ability to predict a prisoner's future

9   dangerousness based simply on the circumstances of his or her

10  crime is nil.  (See *Irons v. Warden of California State Prison -*

11  *Solano*, 358 F.Supp.2d 936, 947 n1 ["To a point, it is true, the

12  circumstances of the crime and motivation for it may indicate a

13  petitioner's instability, cruelty, impulsiveness, violent

14  tendencies and the like.  However, after fifteen or so years in

15  the caldron of prison life, not exactly an ideal therapeutic

16. environment to say the least, and after repeated demonstrations

17  that despite the recognized hardships of prison, this petitioner

18  does not possess those attributes, the predictive ability of the

19  circumstances of the crime is near zero."]  Even California

20  courts have said as much.  (*In re Scott* (2005) 133 Cal.App.4th

21  573, 595 ["The commitment offense can negate suitability only if

22  circumstances of the crime reliably established by evidence in

23  the record rationally indicate that the offender will present an

24  unreasonable public safety risk if released from prison.  Yet,

25  the predictive value of the commitment offense may be very

26  questionable after a long period of time."].)

27      Regardless of whether the Board ever was entitled to rely

28  upon the commitment offense to find that petitioner posed an

19

1   unreasonable risk of danger and was unsuitable for parole, in

2   the exceptional circumstances presented by this case, the

3   Board's reliance on the commitment offense violates due process

4   because it resulted in an arbitrary decision and because the

5   facts surrounding the offense do not now constitute "some

6   evidence" possessing "some indicia of reliability" that

7   petitioner poses a danger to the community.

8       Because there is no reliable evidence supporting the

9   Board's conclusion that petitioner is unsuitable for parole,

10  that determination violates due process.

11                                  II

12      *Claim:*  The Board violated the Due Process Clause of the

13  Fifth Amendment and the notice and jury trial guarantees of the

14  Sixth Amendment of the United States Constitution.

15      *Argument:*  The Board, in finding petitioner unsuitable for

16  parole, relied on facts and elements of the crime that were

17  neither charged in the original indictment nor admitted by

18  petitioner.  This is a violation of the Due Process Clause of

19  the Fifth Amendment and of petitioner's right to trial by jury

20  which offended the Sixth Amendment to the United States

21  Constitution.  "Under the Due Process Clause of the Fifth

22  Amendment and the notice and jury trial guarantees of the Sixth

23  Amendment, any fact (other than prior conviction) that increases

24  the maximum penalty for a crime must be charged in an

25  indictment, submitted to a jury, and proven beyond a reasonable

26  doubt."  (*Jones v. United States*, 526 U.S. 227, 244 (1999).)  As

27  Justice Stevens, in his concurring opinion, stated, "I am

28  convinced that it is unconstitutional for a legislature to

1    remove from the jury the assessment of facts that increase the

2    prescribed range of penalties to which a criminal defendant is

3    exposed.   It is equally clear that such facts must be

4    established by proof beyond a reasonable doubt." (*Id.* at pp.

5    252-253.)

6        The Board found that petitioner was unsuitable for parole

7    because it found the following "facts" proved that he posed an

8    unreasonable risk of danger to society if granted a parole

9    release date, and this increased the prescribed range of his

10   sentence.

11       The Board found that: 1) "The offense was carried out in

12   dispassionate and calculated manner, such as an execution-style

13   murder" (Exhibit 1, HT, p. 66, L 15:18); 2)  "The offense was

14   carried out in a manner which demonstrated an exceptional

15   callous disregard for human suffering" (Exhibit 1, HT, p. 67, L

16   22:25); and 3)  "The motive for the crime is inexplicable or

17   very trivial in relation to the offense."  (Exhibit 1, HT, p.

18   64, L 22:26.)  The Board then extended petitioner's

19   incarceration period for at least another three years.  (Exhibit

20   1, HT p. 81, L 3:4.)

21       "The Sixth Amendment by its terms is not a limitation on

22   judicial power, but a reservation of jury power.  It limits

23   judicial power only to the extent that the claimed judicial

24   power infringes on the province of the jury.  Indeterminate

25   sentencing does not do so.  It increases judicial discretion, to

26   be sure, but not at the expense of the jury's traditional

27   function of finding the facts essential to lawful imposition of

28   the penalty.  Of course indeterminate schemes involve judicial

21

1  factfinding, in that a judge (like a parole board) may

2  implicitly rule on those facts he deems important to the

3  exercise of his discretion.  But the facts do not pertain to

4  whether the defendant has a legal *right* to a lesser sentence –

5  and that makes all the difference insofar as judicial

6  impingement upon the traditional role of the jury is concerned."

7  (*Blakely v. Washington*, 542 U.S. 206, 308-309 (2004).)

8      "The governing rule in this area was articulated by the

9  Supreme Court in *Greenholtz v. Inmates of Nebraska Penal*, 442

10  U.S. 1 (1979), and *Board of Pardons v. Allen*, 482, U.S. 369

11  (1987).  *Greenholtz* and *Allen* established that, while '[t]here

12  is no constitutional or inherent right of a convicted person to

13  be conditionally released before the expiration of a valid

14  sentence[,]' *Greenholtz*, 442 U.S. at 7, a state's statutory

15  scheme, if it uses mandatory language, 'creates a presumption

16  that parole release will be granted' when or unless certain

17  designated findings are made, and thereby gives rise to a

18  constitutional liberty interest.  *Id* at 12; *Allen*, 482 U.S. at

19  377-78.  The California parole scheme uses mandatory language

20  and is largely parallel to the schemes found in *Greenholtz* and

21  *Allen* to give rise to such an interest."  (*McQuillon v. Duncan*,

22  306 F.3d 895, 901 (2002).)

23      "Under the 'clearly established' framework of *Greenholtz*

24  and *Allen*, we hold that California's parole scheme gives rise to

25  a cognizable liberty interest in release on parole.  The scheme

26  'creates a presumption that parole release will be granted'

27  unless the statutorily defined determinations are made.  *Allen*,

28  482 U.S. at 378 (quoting *Greenholtz*, 442 U.S. at 12.)" (*Id*. at

22

1  902.)

2      Petitioner would contend that his "statutory maximum"
3  period of confinement is 25 years based on the finding of facts
4  at the time of his trial.  Petitioner has a legal right to a
5  sentence of less that life.  The Board's reliance on facts not
6  charged in the indictment, proven beyond a reasonable doubt to a
7  judge or jury, or admitted by petitioner, resulted in a
8  constitutional violation of his Fifth and Sixth Amendment
9  rights.  (See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)
10 ["Other than the fact of a prior conviction, any fact that
11 increases the penalty for a crime beyond the prescribed
12 statutory maximum must be submitted to a jury, and proved beyond
13 a reasonable doubt"; see also *Ring v. Arizona*, 536 U.S. 584, 602
14 ["`the maximum he would receive if punished according to the
15 facts reflected in the jury verdict alone'" )quoting *Apprendi,
16 supra*, at 483).)

17     The facts relied on by the Board, had they been found
18 beyond a reasonable doubt by the judge, would have resulted in a
19 sentence of death or life without the possibility of parole.  As
20 this was not the case, the Board's increase of petitioner's
21 sentence beyond the legally defined 25 years is a clear
22 violation of the United States Constitution.

23     Therefore, the decision of unsuitability should be reversed
24 and the Board should be ordered to schedule a new hearing at
25 which a parole release date will be set.

26                                   CONCLUSION

27     The California rules governing parole in murder cases, for
28 which parole eligibility is provided by statute, [See CCR §

1  2402] are as follows: "[P]arole eligibility is the rule, rather
2  than the exception." (*In re Scott, supra,* 119 Cal.App.4th at p.
3  891.) "[P]arole is 'normally' to be granted." (*Id.* [quoting
4  Penal Code § 3041 (a)].) The murder giving rise to the
5  prisoner's incarceration must be "particularly egregious" for
6  parole to be denied. (*In re Rosenkrantz, supra,* 29 Cal.4th at p.
7  683.) Indeed, a murder must be "heinous, atrocious or cruel"
8  if, as here, the offense is to serve as the basis for parole
9  denial. (CCR, § 2402 (c)(1).) In addition, in such cases, the
10  prisoner must *presently* present a danger to society. (Penal
11  Code § 3401 (b).) In short, in petitioner's case, the
12  circumstances surrounding the crime or the manner in which it
13  was committed must show not only that the first degree murder at
14  issue was more cruel or vicious than the ordinary first degree
15  murder, but also that petitioner would likely pose a current
16  risk to public safety if released. The record in this case
17  contains absolutely *no* evidence that would meet *either* of the
18  two requirements. Thus, there can be little doubt that the
19  Board violated the applicable rules when it denied petitioner
20  parole solely on the basis of his commitment offense.
21  All murders represent the basest form of human behavior.
22  Our laws, however, provide for mechanisms by which even
23  murderers, in limited circumstances, are entitled to be paroled.
24  The judiciary has an obligation to execute those laws. The
25  record establishes that petitioner does not pose an unreasonable
26  risk to public safety. Any contrary conclusion lacks any
27  evidentiary support. Therefore, petitioner prays that this
28  court will grant the petition for habeas corpus.

24

| 1 | DATED: March 11, 2007 | Respectfully submitted, |

Cleve Hulsey
Petitioner, In Pro Per

| 4 | /// |
| 5 | /// |
| 6 | /// |
| 7 | /// |
| 8 | /// |
| 9 | /// |
| 10 | /// |
| 11 | /// |
| 12 | /// |
| 13 | /// |
| 14 | /// |
| 15 | /// |
| 16 | /// |
| 17 | /// |
| 18 | /// |
| 19 | /// |
| 20 | /// |
| 21 | /// |
| 22 | /// |
| 23 | /// |
| 24 | /// |
| 25 | /// |
| 26 | /// |
| 27 | /// |
| 28 | /// |

TABLE OF EXHIBITS

EXHIBIT 1
    Initial Parole Consideration Hearing Transcript
    May 9, 2006

EXHIBIT 2
    Probation Officer's Report
    March 26, 1990

EXHIBIT 3
    Abstract of Judgment
    April 19, 1990
    (Amendment to Abstract of Judgment, August 1, 1991)

EXHIBIT 4
    Psychological Evaluation
    February 25, 1993

EXHIBIT 5
    Psychological Evaluation
    April 25, 2006

EXHIBIT 6
    Proceedings On Sentencing Transcript
    April 19, 1990, pages 1 and 14

**E X H I B I T**

1

Initial Parole Consideration Hearing Transcript
May 9, 2005

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )     CDC Number E-53226
Hearing of: )
                       )
CLEVE HULSEY )

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2006

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DAVID YACONO, Deputy Commissioner

OTHERS PRESENT:

CLEVE HULSEY, Inmate
MARY ANN TARDIFF, Attorney for Inmate
DANIEL UNDERWOOD, Deputy District Attorney
CORRECTIONAL OFFICER, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No       See Review of Hearing
_____ Yes      Transcript Memorandum

Marsha Mees, Peters Shorthand Reporting

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 14 |
| Pre-Commitment Factors | 22 |
| Post-Commitment Factors | 37 |
| Parole Plans | 27 |
| Closing Statements | 55 |
| Recess | 65 |
| Decision | 66 |
| Adjournment | 82 |
| Transcriber Certification | 83 |

--oOo--

1

1          P R O C E E D I N G S

2          DEPUTY COMMISSIONER YACONO:  And our tape

3    is rolling.

4          PRESIDING COMMISSIONER SAWYER:  Very

5    good.  This is an initial hearing for Mr. Cleve,

6    C-L-E-V-E, Hulsey, H-U-L-S-E-Y, CDC number E as

7    in Edward 53226.  Today's date is Tuesday, May 9

8    and it's 2006.  We're located at the

9    Correctional Training Facility in Soledad.  Date

10   received was 4-23-1990 from the County of

11   Tulare.  The offense is murder in the first

12   degree with armed with a firearm, case number

13   27850.  Count number one is 187 and 12022(a) PC.

14   The term is 25 plus one to life.  Minimum

15   eligible parole date was 11-27-2000.  And we

16   have some other commitment offenses.  In count

17   two is robbery, first degree, 211 PC, Tulare

18   County, same case number.  Also an enhancement

19   on that, armed with a firearm, 12022(a).  And

20   count three a burglary, 459 PC, Tulare County,

21   same case in all those case numbers.

22         DEPUTY COMMISSIONER YACONO:  Excuse me,

23   Commissioner, I think the minimum date is 2006.

24   My handwriting version didn't but

25   (indiscernible).

26         PRESIDING COMMISSIONER SAWYER:  Is that

27   what they're saying.  Okay.  We're going to --

2

1    Let's verify that first of all.

2          ATTORNEY TARDIFF:  What is it?

3          PRESIDING COMMISSIONER SAWYER:  Minimum

4    eligible parole date is 2006.  I misstated that,

5    yes, thank you.  Because on my legal status

6    report it says the year 2000 minimum eligible

7    parole date.  I was going -- The next question I

8    was going to ask is what have you been doing

9    since 2000.  But I've corrected it on my sheet

10   and corrected it in the record.  This hearing is

11   being tape recorded.  And for the purpose of

12   identification we are required to state our

13   first and last name, spelling our last name.

14   When it comes to your turn, after you spell you

15   last name then I want you to also give us your

16   CDC number.  I'll start and go to my left.  Tom

17   Sawyer, S-A-W-Y-E-R, Commissioner.

18         DEPUTY COMMISSIONER YACONO:  David

19   Yacono, that's Y-A-C-O-N-O, Deputy Commissioner.

20         ATTORNEY TARDIFF:  Mary Ann Tardiff,

21   T-A-R-D-I double F, attorney for Mr. Hulsey.

22         INMATE HULSEY:  Cleve Hulsey,

23   H-U-L-S-E-Y, E-53226.

24         PRESIDING COMMISSIONER SAWYER:  Very

25   good.  Thank you.  Mr. Underwood.

26         DEPUTY DISTRICT ATTORNEY UNDERWOOD:

27   Daniel Underwood, U-N-D-E-R-W-O-O-D, Deputy

3.

 1   District Attorney, Tulare County.

 2       PRESIDING COMMISSIONER SAWYER:   Thank

 3   you.   We also have two correctional peace

 4   officers in the room for security purposes.

 5   Mr. Hulsey, before you taped to the table

 6   underneath your file there is an ADA

 7   self-identification statement which I'll ask you

 8   to read out loud and then I'll ask you what it

 9   means.   Could you read that for us into the

10   record.

11           INMATE HULSEY:

12           "ADA, Americans With Disabilities

13           Act.   The Americans With

14           Disabilities Act, ADA, is a law to

15           help people with disabilities.

16           Disabilities are problems that

17           make it harder for some people to

18           see, hear, breathe, talk, walk,

19           learn, think, work or take care of

20           themselves than it is for others.

21           Nobody can be kept out of public

22           places or activities because of a

23           disability.   If you have a

24           disability, you have the right to

25           ask for help to get ready for your

26           BPT hearing, get to the hearing,

27           talk, read forms and papers and

4

```
 1          understand the hearing process.

 2          BPT will look at what you asked

 3          for to make sure that you have a

 4          disability that is covered by the

 5          ADA and that you have asked for

 6          the right kind of help.  If you do

 7          not get help or if you don't think

 8          you got the kind of help you need,

 9          ask for a BPT 1074 Grievance Form.

10          You can also get help to fill it

11          out."

12          PRESIDING COMMISSIONER SAWYER:  Okay.

13   What does that mean to you, sir?

14          INMATE HULSEY:  It means if I got

15   problems understanding what's going on or

16   participating in the hearing then I can get

17   help.

18          PRESIDING COMMISSIONER SAWYER:  That's

19   correct.  Okay.  I have a form, BPT Form 1073

20   which was signed by you on October -- looks

21   like, yeah, 30, 2002.  And you indicate on here

22   you do not have a disability.  Is that correct,

23   sir?

24          INMATE HULSEY:  Yeah.

25          PRESIDING COMMISSIONER SAWYER:  Okay.

26   Tell me about your glasses.

27          INMATE HULSEY:  I'm nearsighted.
```

5

1          PRESIDING COMMISSIONER SAWYER:    Okay.    So

2    you need those to see me or to read?

3          INMATE HULSEY:    To see you.

4          PRESIDING COMMISSIONER SAWYER:    Okay.

5          INMATE HULSEY:    I can up close just fine.

6          PRESIDING COMMISSIONER SAWYER:    Okay.

7    Very good.    That would -- we would -- If you

8    didn't have those glasses, we may have to -- we

9    may have -- have to accommodate you.    Okay.    So

10   that is --

11          INMATE HULSEY:    Yeah.

12          PRESIDING COMMISSIONER SAWYER:    --

13   essentially -- disability.    Okay.    That's fine.

14   The information on this form is current and

15   correct?

16          INMATE HULSEY:    As far as I can tell,

17   yes.

18          PRESIDING COMMISSIONER SAWYER:    As far as

19   you know, okay.    I'm going to ask you some

20   questions.    Do you have any problems walking up

21   and down stairs or for distances of 100 yards or

22   more?

23          INMATE HULSEY:    No.

24          PRESIDING COMMISSIONER SAWYER:    Do you

25   have any hearing impairments?

26          INMATE HULSEY:    No.

27          PRESIDING COMMISSIONER SAWYER:    Have you

6

1    ever been included in Triple CMS or EOP

2    programs?

3          INMATE HULSEY:  No.

4          PRESIDING COMMISSIONER SAWYER:  How far

5    did you get through school?

6          INMATE HULSEY:  Graduated high school and

7    took some college courses at Old Folsom when

8    they were available.

9          PRESIDING COMMISSIONER SAWYER:  Okay.

10   Graduated high school outside?

11         INMATE HULSEY:  Yeah.

12         PRESIDING COMMISSIONER SAWYER:  Did you

13   take any special education while you were

14   growing up?

15         INMATE HULSEY:  No.

16         PRESIDING COMMISSIONER SAWYER:  Suffer

17   from any disability that would prevent you from

18   participating in today's hearing?

19         INMATE HULSEY:  No.

20         PRESIDING COMMISSIONER SAWYER:  Very

21   good.  Okay.  I'm going to read the outline of

22   the hearing procedure.  And as I read along

23   here, I'll be asking you if you understand some

24   of the critical areas.  Okay.

25         INMATE HULSEY:  Okay.

26         PRESIDING COMMISSIONER SAWYER:  This

27   hearing is being conducted pursuant to Penal

1    Code Sections 3041 and 3042 and the rules and

2    regulations of the Board of Prison Terms

3    governing parole consideration hearings for life

4    inmates.  The purpose of the hearing today is to

5    consider your suitability for parole.  In doing

6    so we'll consider the number and the nature of

7    the crimes you were committed for, your prior

8    criminal and social behavior and your behavior

9    and programming since your commitment.  We've

10    had an opportunity to review your Central File

11    and you'll be given the opportunity to correct

12    or clarify the record.  We'll consider your

13    progress since your commitment, your counselor's

14    report and your psychological report.  Any

15    change in parole plans should be brought to our

16    attention.  We'll reach a decision today and

17    inform you whether or not we find you suitable

18    for parole and the reasons for our decision.  If

19    you are found suitable for parole, the length of

20    your confinement will be explained to you.

21    Before we go any further we want to advise you

22    that we expect you to be totally honest with us

23    today.  You understand?

24         **INMATE HULSEY:**  Yes.

25         **PRESIDING COMMISSIONER SAWYER:**  If you do

26    not get a date today, the hearing will form a

27    foundation for all future hearings.  If you do

8

1    not get a date today, any false statements that

2    you make could have an adverse effect on your

3    ability to get a date in the future.  Do you

4    understand?

5         INMATE HULSEY:  Yes.

6         PRESIDING COMMISSIONER SAWYER:  Nothing

7    that happens here today will change the findings

8    of the court.  We are not here to retry your

9    case.  We're here for the sole purpose of

10   determining your suitability for parole.  This

11   hearing will be conducted in two phases.  I'll

12   discuss with you the crime that you're committed

13   for, your prior criminal and social history,

14   your parole plans and any letters of support or

15   opposition that may be in your file.

16   Commissioner Yacono will discuss with you your

17   progress since your commitment, your counselor's

18   report and your psychological evaluation.  Once

19   that's concluded, the District Attorney and the

20   --' and your attorney will be given the

21   opportunity to ask you questions.  Questions

22   from the District Attorney will be -- actually

23   he'll ask the Board to ask -- ask you if he has

24   any questions.  And your response then would be

25   to hear his questions so I don't have to repeat

26   it and then you respond back to us.  Okay?

27        INMATE HULSEY:  All right.

9

1          PRESIDING COMMISSIONER SAWYER:  Okay.  So

2     we're acting as his questioner.  Before we

3     recess for deliberations, the District Attorney,

4     your attorney and you will be given an

5     opportunity to make a final statement regarding

6     your suitability for parole.  We'll then recess,

7     clear the room and deliberate.  Once we've

8     completed our deliberation, we'll resume the

9     hearing and announce our decision.  California

10    Code of Regulations states that regardless of

11    time served a life inmate shall be found

12    unsuitable and denied parole if in the judgment

13    of the Panel the inmate would pose an

14    unreasonable risk of danger to society if

15    released from prison.  You have certain rights.

16    These rights include the right to a timely

17    notice of this hearing, the right to review your

18    Central File and the right to present relevant

19    documents.  Ms. Tardiff, has the inmate's rights

20    been met?

21          ATTORNEY TARDIFF:  They have.

22          PRESIDING COMMISSIONER SAWYER:  You also

23    have the right to be heard by an impartial

24    Panel.  Is there any objection to this Panel?

25          INMATE HULSEY:  No.

26          PRESIDING COMMISSIONER SAWYER:  Thank

27    you.  You'll receive a copy of our written

10

1    tentative decision today.   The decision is

2    subject to review by the Decision Review Unit

3    and by the entire Board meeting as a body.   It

4    will become effective within 120 days.   It's

5    also subject to review by the Governor.   A copy

6    of the tentative decision and a copy of the

7    transcript will be sent to you.   As of May 1,

8    2004 there were major changes limiting your

9    former rights to appeal Board decisions or

10   actions directly to the Board.   Old Board

11   regulations were repealed.   The current policy's

12   entitled Administrative Appeals, Correspondence

13   And Grievances Concerning Board Of Prison Terms

14   Decisions and it's available at the prison

15   library.   The real important here, you are not

16   required to admit your offense or discuss your

17   offense if you do not wish to do so.   However,

18   this Panel does accept as true the finding of

19   the court and you're invited to discuss the

20   facts and circumstances of the offenses if you

21   desire.   The Board will review and consider your

22   prior statements you have made regarding the

23   offense in determining your suitability for

24   parole.   Commissioner Yacono, is there any

25   confidential material?

26          DEPUTY COMMISSIONER YACONO:   No, Sir.

27          PRESIDING COMMISSIONER SAWYER:   Thank

11

1   you.  Mr. Underwood, if you'd check your hearing

2   checklist, I'm going to pass mine to -- Exhibit

3   One to Ms. Tardiff.  And I'm going to mark on it

4   that we do have a new psychiatric report.

5        **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  I do

6   have all the contents including the psychiatric

7   report which was faxed to me this afternoon.

8        **PRESIDING COMMISSIONER SAWYER:**  Thank

9   you.

10        **ATTORNEY TARDIFF:**  I have these documents

11   as well.  I have nothing further to submit.

12        **PRESIDING COMMISSIONER SAWYER:**  Okay.

13   Let the record reflect that you did bring in --

14   before we started the hearing today you did

15   bring in six pages of artwork.

16        **ATTORNEY TARDIFF:**  Correct.

17        **PRESIDING COMMISSIONER SAWYER:**  That

18   Mr. Hulsey sells, you sell these?

19        **INMATE HULSEY:**  I try.

20        **PRESIDING COMMISSIONER SAWYER:**  You try.

21        **INMATE HULSEY:**  Yeah.

22        **PRESIDING COMMISSIONER SAWYER:**  But

23   you're not starving.

24        **INMATE HULSEY:**  No.

25        **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

26   think I'll mention them right -- just right now

27   because I'm not sure where to put them.  And I

12

1    don't want -- certainly don't want to lose them.

2    He's got -- He's got his name, address and CDC

3    number and where he lives.  And it says

4    Mr. Cleve Hulsey has sent us two magnificent

5    drawings which are able -- which are please --

6    which we are pleased to post.  Who's posting

7    these?

8          INMATE HULSEY:  It's a website,

9    prisoners.com.  I'm not even sure if it's still

10   up and running.  I haven't had any contact with

11   the person that runs it in almost a year.

12          PRESIDING COMMISSIONER SAWYER:  I see.

13          INMATE HULSEY:  Yeah.

14          PRESIDING COMMISSIONER SAWYER:  We need

15   to take a short recess.

16                   [Off the record]

17          ATTORNEY TARDIFF:  It's not a good way to

18   start out your initial hearing.

19          PRESIDING COMMISSIONER SAWYER:  Okay.

20   We're back on tape.  The reason we stopped the

21   tape and took about a five minute recess to talk

22   about a potential legal conflict or discipline

23   conflict.  But for the purpose of this hearing

24   we're not going to expand on that.  I do want to

25   recognize the fact that I do have the six pages

26   of six different drawings.  You drew all of

27   these?

13

1     INMATE HULSEY:  Yes.

2     PRESIDING COMMISSIONER SAWYER:  And

3  what's the medium?

4     INMATE HULSEY:  Some of them -- Three of

5  them are penned in ink and three are pencil.

6     PRESIDING COMMISSIONER SAWYER:  And I

7  think we all were impressed by your artistic

8  ability.  These are dynamite.

9     INMATE HULSEY:  Thank you.

10     PRESIDING COMMISSIONER SAWYER:

11  Absolutely dynamite.  Don't you agree,

12  Commissioner?

13     DEPUTY COMMISSIONER YACONO:  Absolutely.

14     PRESIDING COMMISSIONER SAWYER:  So I

15  guess we can include that in a marketable skill

16  down the road.

17     DEPUTY COMMISSIONER YACONO:  I think

18  definitely graphic arts category.

19     PRESIDING COMMISSIONER SAWYER:  Right.

20  Okay.  Very good.  Do you have any preliminary

21  objections, counsel?

22     ATTORNEY TARDIFF:  I do not.

23     PRESIDING COMMISSIONER SAWYER:  Will the

24  inmate be speaking with the Panel?

25     ATTORNEY TARDIFF:  Yes.

26     PRESIDING COMMISSIONER SAWYER:  On all

27  matters?

14

1          ATTORNEY TARDIFF:  It's my understanding

2    he has no memory of the commitment offense.

3          PRESIDING COMMISSIONER SAWYER:  Okay.

4    Then there you have it.  Would you raise your

5    right hand.  Do you solemnly swear or affirm the

6    testimony you're about to give in this hearing

7    will be the truth, the whole truth and nothing

8    by the truth?

9          INMATE HULSEY:  Yes.

10          PRESIDING COMMISSIONER SAWYER:  Thank

11    you.  I'm going to be reading from the October

12    2005 calendar Board report, commitment offense,

13    summary of the crime, page one.

14          "On the morning of June 26, 1989

15          18-year-old Cleve Hulsey was

16          drinking beer with Charles Abele,

17          A-B-E-L-E, in Exeter.  On the same

18          morning three minors, Michael

19          Darren, D-A-R-R-E-N, and Anthony

20          -- I'm sorry -- Michael and

21          because they're minors we have no

22          last name, Michael S., Darren S.

23          and Anthony C. were collecting

24          cans and had turned them in for

25          seven dollars.  The three minors

26          were walking when Abele drove by

27          with Hulsey in Abele's car.

15

1       Hulsey and Abele stopped and asked

2       them if they would like to go

3       swimming at the lake.  They

4       agreed.  Abele used minors' seven

5       dollars and earnings to buy

6       gasoline and a 12-pack of beer.

7       Once they arrived at the lake,

8       everyone drank beer except

9       Michael.  They swam for about one

10      and a half hours.  Abele then

11      suggested that they go and get a

12      gun so they could target shoot.

13      After Anthony and Michael were

14      unsuccessful in their attempt to

15      get a gun, Hulsey suggested

16      borrowing a gun from his brother

17      Marvin.  After driving to Marvin's

18      house, Hulsey, along with Abele,

19      walked inside.  The three minors

20      remained outside in the car.

21      Abele and Hulsey told Marvin they

22      wanted to borrow the gun so they

23      could go shooting.  Marvin was

24      hesitant to give them the gun

25      because it appeared Abele and

26      Hulsey had been drinking.  Marvin

27      agreed to give them the gun but

16

1    first removed all the live rounds.

2    Hulsey and Abele left, placing the

3    gun in the trunk of the car.   In

4    search of ammunition, the group

5    went to the home of Cody Grim,

6    G-R-I-M.   Abele asked to borrow

7    three bullets from Cody.   Hulsey

8    was present during parts -- during

9    part of this conversation.   The

10   three minors remained in the car.

11   Cody gave Abele three bullets.   At

12   some point Abele had began -- had

13   begun to talk about robbing a

14   store in Woodlake.   Apparently for

15   this purpose Abele who -- was

16   driving headed towards Woodlake.

17   Darren asked Abele to stop so he

18   could relieve his bladder.   Abele

19   pulled to the side of the road.

20   Darren went off into the bushes.

21   While Darren was in the bushes,

22   the gun was retrieved from the

23   trunk.   Hulsey took over as the

24   driver and Abele sat in the front

25   passenger's seat.   The three

26   minors remained in the back.   At

27   this point, the three minors

17

1    became frightened and asked to be

2    let out of the car.  Abele refused

3    and Hulsey said there's not enough

4    gasoline to keep -- and kept

5    driving.  Hulsey stopped the car

6    at the A&H Market to observe the

7    flow of customers at the market.

8    Hulsey waited for all the cars --

9    for all the cars to leave.  Abele

10   went in -- Abele went in quickly

11   and returned to the car saying

12   there was no one in the store.

13   Lorenzo Valencia, V-A-L-E-N-C-I-A,

14   had gone to help his friend Amed,

15   A-M-E-D, last name of A-L dash

16   capital K-A-B-A-B-I, I'll spell it

17   again, A-L dash capital

18   K-A-B-A-D-I, who was working as a

19   clerk in the market.  He was

20   helping Mr. Kabadi, Al-Kabadi in

21   the back of the store when

22   Al-Kabadi thought he saw a masked

23   person run in and out of the

24   store.  The two went outside and

25   looked but saw no one.  After

26   Abele returned to the car, Hulsey

27   drove off and returned to the

1       store -- then returned to the

2       store.  The three minors were

3       crouched down in the backseat and

4       afraid of what might happen.

5       Abele again went into the market

6       armed with a rifle and a ski mask

7       pulled over his face.  At this

8       time, Valencia and Al-Kabadi were

9       in the front of the store.  Abele

10      pointed the gun at Al-Kabadi and

11      demanded money.  Al-Kabadi gave

12      Abele five dollars and Abele shot

13      him in the chest, fatally wounding

14      him.  Reportedly, a youthful --

15      the youthful clerk grabbed the

16      rifle at the front side causing

17      the firearm to discharge.  When

18      Abele left the store, he was seen

19      by Barbara Bidwell, B-I-D-W-E-L-L,

20      and her daughter.  Bidwell wrote

21      down the license plate number of

22      the car.  Abele returned to the

23      car and said he shot someone for

24      five dollars.  Abele told Hulsey

25      to take off.  He did.  The group

26      drove to another store where Abele

27      got out and purchased gas, beer

19

1       and cigarettes.  Hulsey discovered

2       that one of -- discovered that one

3       of the casings in the gun was

4       used.  He chewed on it and spit it

5       out the window.  The group

6       returned to Exeter after dropping

7       off the three minors.  Hulsey and

8       Abele returned the rifle to Marvin

9       Hulsey.  Hulsey provided a

10      voluntary statement on June 28,

11      1989 -- initially claimed that

12      he'd suffered -- alcohol blackout

13      and was unable to recall his

14      activities.  He subsequently

15      admitted that talk about

16      committing a robbery began while

17      they were at the river.  He

18      acknowledged that it was his idea

19      to attempt to obtain a weapon from

20      his brother.  He contended that he

21      was extremely intoxicated at the

22      time and that the amount of

23      alcohol consumed impaired his

24      judgment.  He told authorities, I

25      was drunk out of my mind."

26  In your version it says you stated that you were

27  drunk and doesn't remember anything.  But you do

20

1  remember getting the gun, right?  That's what it

2  says here.

3      INMATE HULSEY:  I don't remember anything

4  after leaving the river.

5      PRESIDING COMMISSIONER SAWYER:  After

6  leaving the river?·

7      INMATE HULSEY:  After leaving the lake,

8  no.

9      PRESIDING COMMISSIONER SAWYER:  Do you

10  remember talking about -- at the lake about

11  getting a gun from your brother to Abele?  Maybe

12  I'll ask this question, what do you remember?

13  You remember -- with other guys at the -- at the

14  river?

15      INMATE HULSEY:  I remember going up there

16  and swimming for a little while.  Then we're all

17  sitting around drinking.  And Charles said it

18  was time to go or something like that, something

19  to that effect.

20      PRESIDING COMMISSIONER SAWYER:  And then

21  you don't remember anymore?

22      INMATE HULSEY:  After that, no, it was

23  all --

24      PRESIDING COMMISSIONER SAWYER:  How much

25  did you have to drink?

26      INMATE HULSEY:  A lot.

27      PRESIDING COMMISSIONER SAWYER:  Well you

21

1    bought a six-pack, right, or a 12-pack?

2              INMATE HULSEY:  That was with him.

3              PRESIDING COMMISSIONER SAWYER:  With the

4    original seven dollars.

5              INMATE HULSEY:  When we met the minors,

6    yeah.

7              PRESIDING COMMISSIONER SAWYER:  Yeah.

8    Okay.  Had you been drinking prior to that?

9              INMATE HULSEY:  Yes.

10             PRESIDING COMMISSIONER SAWYER:  What were

11   you drinking prior?

12             INMATE HULSEY:  Beer.

13             PRESIDING COMMISSIONER SAWYER:  You drink

14   anything else?

15             INMATE HULSEY:  No.

16             PRESIDING COMMISSIONER SAWYER:  Do any

17   dope?

18             INMATE HULSEY:  No, not that I can

19   remember.  I think at some point someone lit up

20   a joint and passed it to me.  And I thought it

21   was a cigarette so I might have took a hit or

22   two off of it.  But I was never really into

23   that.

24             PRESIDING COMMISSIONER SAWYER:  Okay.

25   The aggravating factors in this case, had an

26   opportunity -- "Hulsey had an opportunity to

27   cease by continued with the crime.  The murder

22

1   was senseless, served no purpose in completing

2   the crime and a weapon, the rifle was used.

3   Mitigating factors.  Hulsey has minimal or no

4   history of criminal behavior."  And as I see

5   here, at age 15 and again at 17 attended

6   meetings of Narcotics Anonymous following

7   arrests for minor in possession of alcohol and

8   public intoxication.  When did you start

9   drinking?  What age?

10         INMATE HULSEY:  It was before I started

11   high school.  It was actually the summer between

12   eighth grade and my freshman year in high

13   school.

14         PRESIDING COMMISSIONER SAWYER:  Why was

15   that?

16         INMATE HULSEY:  You know what, I have no

17   idea.

18         PRESIDING COMMISSIONER SAWYER:  You don't

19   know why you were drinking?

20         INMATE HULSEY:  No, none whatsoever.  I

21   don't know why I started.  I claim peer

22   pressure, but that's not a good excuse.  That's

23   terrible.

24         PRESIDING COMMISSIONER SAWYER:  And did

25   you do any drugs during that period of your

26   life?

27         INMATE HULSEY:  No.

23

1          PRESIDING COMMISSIONER SAWYER:  You had

2    to think about it.

3          INMATE HULSEY:  I tried marijuana one

4    before earlier when I was younger and didn't

5    like it.

6          PRESIDING COMMISSIONER SAWYER:  Yeah.

7    Have you tried meth or LSD or --

8          INMATE HULSEY:  No, no.

9          PRESIDING COMMISSIONER SAWYER:  -- coke?

10          INMATE HULSEY:  Nothing like that.

11          PRESIDING COMMISSIONER SAWYER:  PCP?

12          INMATE HULSEY:  No.

13          PRESIDING COMMISSIONER SAWYER:  Okay.

14    You were the seventh of eight children born to

15    your parents Coy and Martha Hulsey.

16          INMATE HULSEY:  Yes.

17          PRESIDING COMMISSIONER SAWYER:  Siblings

18    included four brothers and three sisters.

19    Family is very close and supportive.  Graduated

20    from Kaweath --

21          INMATE HULSEY:  Yeah.

22          PRESIDING COMMISSIONER SAWYER:  --

23    K-A-W-E-A-T-H -- High School in Exeter.

24    Reportedly enlisted in the Navy following

25    graduation in June of 1989 but was discharged as

26    a consequence of the arrest in the present case.

27    His employment history was limited to -- for the

24

1   most part due to his age time of arrest.  You

2   were 18 at the time, right?

3            INMATE HULSEY:  Yes.

4            PRESIDING COMMISSIONER SAWYER:  He

5   acknowledged a problem with alcohol abuse.

6   Reported that he began consuming alcohol,

7   intoxicants about four years before his arrest

8   and then -- and that until his arrest in the

9   instant matter he consumed alcoholic beverages

10  on a daily basis frequently just to get drunk.

11  Indicates previous participation in alcohol

12  abuse counseling.  That didn't do much good

13  then, huh?  He reported that at 15 and 17 he

14  attended Narcotics Anonymous following arrests

15  for possession of alcohol and public

16  intoxication.  Was that a condition of the

17  arrest?

18           INMATE HULSEY:  Sorry, what?

19           PRESIDING COMMISSIONER SAWYER:  Was that

20  a condition of the -- of the probation --

21  probation?

22           INMATE HULSEY:  Yeah.

23           PRESIDING COMMISSIONER SAWYER:  That you

24  -- Did you do any time in juvenile hall?

25           INMATE HULSEY:  Nope.

26           PRESIDING COMMISSIONER SAWYER:  They just

27  took you home?

25

1          INMATE HULSEY:  Yeah, took me back to my

2     parents.

3          PRESIDING COMMISSIONER SAWYER:  All

4     right.  Write you a ticket?

5          INMATE HULSEY:  Yeah, I think so.

6          PRESIDING COMMISSIONER SAWYER:  Regarding

7     the use of controlled substance, acknowledge

8     prior experimentation with marijuana.  Indicated

9     that he's used the substance infrequently,

10    claiming that he tried once when he was 15 and

11    on the date of the offense now before the court.

12    Okay.  Your future plans, well let me ask you

13    this before I get off your personal -- who

14    visits with you?

15         INMATE HULSEY:  At the moment, my mother

16    and my sister.  My oldest sister.

17         PRESIDING COMMISSIONER SAWYER:  And

18    where's your father?

19         INMATE HULSEY:  He's not able to travel

20    as well as he used to.

21         PRESIDING COMMISSIONER SAWYER:  He's

22    infirmed?

23         INMATE HULSEY:  Kind of, yeah.  He's

24    getting up there.

25         PRESIDING COMMISSIONER SAWYER:  How old

26    is he?

27         INMATE HULSEY:  Late 60's.

26

1          PRESIDING COMMISSIONER SAWYER:  Okay.

2    Retired?

3          INMATE HULSEY:  Yes.

4          PRESIDING COMMISSIONER SAWYER:  How's

5    your mom's health?

6          INMATE HULSEY:  It's fair.

7          PRESIDING COMMISSIONER SAWYER:  Okay.

8    And your sister, your oldest sister --

9          INMATE HULSEY:  Yeah.

10          PRESIDING COMMISSIONER SAWYER:  -- visits

11    with you?  How about your other siblings?

12    You've got six other ones.

13          INMATE HULSEY:  Yeah, they have lives.

14    They'd come if they could, but --

15          PRESIDING COMMISSIONER SAWYER:  Do they

16    write?

17          INMATE HULSEY:  Sometimes.  Infrequently.

18          PRESIDING COMMISSIONER SAWYER:  Phone

19    calls?

20          INMATE HULSEY:  Yeah, I call them quite a

21    bit.

22          PRESIDING COMMISSIONER SAWYER:  Are you

23    in touch -- Everybody's okay?  Nobody's in

24    prison?

25          INMATE HULSEY:  No, no one.  I'm the only

26    one.

27          PRESIDING COMMISSIONER SAWYER:  Okay.

27

1    Did you conceive any children?

2         INMATE HULSEY:  No.

3         PRESIDING COMMISSIONER SAWYER:  Okay.  Do

4    you have a girlfriend now?

5         INMATE HULSEY:  No.

6         PRESIDING COMMISSIONER SAWYER:  No.  No

7    wife?

8         INMATE HULSEY:  No.

9         PRESIDING COMMISSIONER SAWYER:  Okay.

10   Your future plans include a primary residence.

11   You plan to live with your mother Coy and your

12   father Coy -- Martha Hulsey in Exeter.  It this

13   the old family home?

14        INMATE HULSEY:  Yep.

15        PRESIDING COMMISSIONER SAWYER:  On West

16   Maple Street?

17        INMATE HULSEY:  Yes, Sir.

18        PRESIDING COMMISSIONER SAWYER:  Also has

19   other family members who'd be willing to help

20   him and keep him on the straight and narrow.

21   Hulsey states he can do practically anything in

22   construction.  His brother Coy Albert Hulsey is

23   an independent contractor who would give me a

24   job.  And you don't have any INS holds on you.

25   Okay.  Let's look at your letters.  I did

26   receive a letter today from the County of

27   Tulare, the Office of the Sheriff/Coroner Bill

28

```
 1   Whitman.
 2              "The Sheriff's Office, citizens of
 3              Tulare County strongly oppose the
 4              release of Cleve Hulsey.  He's
 5              convicted of murder first degree
 6              and justice -- not be served
 7              unless he serves his entire
 8              sentence.  Because of the serious
 9              nature of the crime we
10              respectfully request you keep
11              Hulsey incarcerated for the crime
12              as long as legally possible."
13   Okay.  Then I have a handwritten letter received
14   on November 14, 2005.
15              "I'm writing this for my brother.
16              I'm the oldest brother of four
17              brothers and three sisters.  Large
18              family.  I'm the boss of a
19              construction crew.  I would give
20              my brother a job when he gets out.
21              I also own my own home and Cleve
22              can live with me and my family.
23              If Cleve needs money or help with
24              anything, I can -- I can and will
25              help him.  I know Cleve won't be a
26              threat to anyone.  He will obey
27              the laws.  I know he's learned
```

29

1          from his mistake.  All his family

2          is willing to help any way they

3          can.  We all live close where

4          Cleve was raised.  We would love

5          to have him home.  Cleve will be

6          took care of by all the family."

7     And he gives -- He lives in Farmersville.  How

8     close is that to Exeter?

9          INMATE HULSEY:  I think it's about three

10    miles.

11         PRESIDING COMMISSIONER SAWYER:  Okay.  I

12    have a letter undated, this is Shirley Cotta.

13    This is your -- This is your aunt.  C-O-T-T-A.

14    Says -- Says you're a nephew.

15         INMATE HULSEY:  Yeah.  I never got a copy

16    of this.

17         PRESIDING COMMISSIONER SAWYER:  Aunt

18    Shirley.

19         INMATE HULSEY:  Yeah.

20         PRESIDING COMMISSIONER SAWYER:  Okay.

21    Always been a good person, very decent, law

22    abiding citizen.  If released to the community,

23    his attitude, behavior, maturity is excellent.

24    Very proud of Cleve.  Cleve has wonderful

25    parents.  Stood by him all the way.  Shirley

26    Cotta and she gives a phone number.  And then

27    from Albuquerque, New Mexico dated September 22,

# EXHIBIT 1
# Part 2 of 2

30

1    '05, this is from Margaret Trujillo,

2    T-R-U-J-I-L-L-O. I'm the sister of Cleve

3    Hulsey. We've grown up together. I'm only

4    three years younger than him. She talks about

5    what a great guy you are. He's never been in

6    trouble. I still remember when he came home

7    that afternoon. He'd been drinking. He had a

8    big cut on the bottom of his foot. How did you

9    cut you foot?

10        INMATE HULSEY: I have no idea.

11        PRESIDING COMMISSIONER SAWYER: Okay. Do

12    you remember her cleaning it up and --

13        INMATE HULSEY: Nope.

14        PRESIDING COMMISSIONER SAWYER: Okay. So

15    you felt no pain, huh. Do you remember when you

16    sobered up that you had a cut on your foot?

17        INMATE HULSEY: Yeah, I think so. It was

18    a long time ago.

19        PRESIDING COMMISSIONER SAWYER: Okay.

20    She talks about you. Has always kept a steady

21    job. She feels you've been rehabilitated, speak

22    with him frequently over the phone. Loving and

23    caring, has many job opportunities if given the

24    chance. He's a great artist, a hard worker. "I

25    will help him find a great job or go to school,

26    get his college degree in any field he desires.

27    I know that my children are looking forward to

31

1  meeting their Uncle Cleve outside the prison

2  walls someday." And she's just very, very

3  supportive here. Thank you for taking care of

4  my brother for all these years. You're welcome.

5  The utmost trust and belief in your decision,

6  trust you'll see my brother outside prison soon.

7  It's a very nice letter. She writes a good

8  letter. What does she do for a living?

9        INMATE HULSEY: She is -- I think she's a

10  receptionist at a major hotel, hotel resort in

11  Albuquerque.

12        PRESIDING COMMISSIONER SAWYER: Okay. I

13  have a handwritten letter on 9-2-05 from your

14  mother. Talks about the large family, talks

15  about where you were born. Unfortunately, the

16  copy machine cut off both ends of the sentences

17  so I know -- I have no problems with him. Does

18  anybody have a better copy? Do you have the

19  original letter for this?

20        INMATE HULSEY: No, all I ever get are

21  the photocopies.

22        PRESIDING COMMISSIONER SAWYER: Okay.

23  It's a terrible copy. Let me -- I'm looking for

24  the offer to come home and live with her. I'm

25  sure it's here.

26        INMATE HULSEY: Oddly enough my copy

27  hasn't been cut off.

32

1          ATTORNEY TARDIFF:  He's got --

2          INMATE HULSEY:  I got a copy.

3          PRESIDING COMMISSIONER SAWYER:  You got a

4    better copy?

5          INMATE HULSEY:  This copy's got both

6    sides.

7          PRESIDING COMMISSIONER SAWYER:  Can I

8    borrow that?  Okay.

9          DEPUTY COMMISSIONER YACONO:  I have the

10    original.

11          PRESIDING COMMISSIONER SAWYER:  You have

12    the -- this is -- This is fine.

13          DEPUTY COMMISSIONER YACONO:  Okay.

14          PRESIDING COMMISSIONER SAWYER:  Yeah,

15    it's clearly a bad copy in his file.  Okay.  She

16    talks about your history, no problems with him.

17    That's not entirely true.  She knew about you

18    getting arrested for drinking.  Graduated from

19    -- was speaker of his class.  Were you

20    valedictorian?

21          INMATE HULSEY:  Yeah, but it was a very

22    small class.  There was only like about eight or

23    nine graduating students.

24          PRESIDING COMMISSIONER SAWYER:  You were

25    tops, huh.  You had also joined the Navy as I

26    read before.  Loves to draw.  We know that.

27    He's sold some of his work.  He will be -- This

33

1    is what I'm looking for.  He will be living with

2    myself and his dad and his two twin nephews who

3    are 14-years-old.  She's caring for some

4    nephews?

5        INMATE HULSEY:  Yeah.

6        PRESIDING COMMISSIONER SAWYER:  Why is

7    that?

8        INMATE HULSEY:  Long story.

9        PRESIDING COMMISSIONER SAWYER:  Can you

10   make it like one sentence?  Your sister or your

11   brother?

12       INMATE HULSEY:  Sister got pregnant too

13   early, couldn't take care of them.

14       PRESIDING COMMISSIONER SAWYER:  Okay.

15       INMATE HULSEY:  Gave them to mom and dad

16   to keep them in the family.

17       PRESIDING COMMISSIONER SAWYER:  Okay.

18   Very good.  Certainly commendable from your mom

19   and dad's point of view.  Fourteen-year-olds,

20   she obviously needs you home.  They could be a

21   handful.  They've visited with you?

22       INMATE HULSEY:  Yes.

23       PRESIDING COMMISSIONER SAWYER:  You know

24   them?

25       INMATE HULSEY:  Yes.

26       PRESIDING COMMISSIONER SAWYER:  Okay.

27   Your dad's been sick.  High blood pressure and

34

1    the gout.  Using a breathing machine.  We're

2    getting old.  He's 68, she's 66.  Okay.  Nice

3    letter.  I don't want to lose that

4    (indiscernible).  Okay.  Then I have a letter,

5    two-page letter from Hazel Lopez, Farmersville.

6    Who's Hazel Lopez?  Your sister?

7            INMATE HULSEY:  My sister, yeah.

8            PRESIDING COMMISSIONER SAWYER:  Okay.

9    This is your older sister.  Talks about your

10   history.  He's grown up a lot, understands what

11   happened, was very wrong, feels if he could

12   change it, he would.  He's learned a lot.  And

13   will not break any laws.  Is a very decent

14   person.  He tries to help us with our problems

15   by talking with us.  I know when he gets out, be

16   right there when any of us need him or his help.

17   She thinks you've improved.  Says you're

18   respectful.  Okay.  Here's what I'm looking for.

19           "My husband and I are more than

20            willing to help my brother in any

21            way he needs in housing, money,

22            transportation.  We will help him

23            find work.  My husband's company

24            is always looking for help.  He's

25            willing to give Cleve a job.  My

26            brother means everything to us.

27            Love to have him come home again.

35

1      Family hasn't been complete since

2      this happened.  We miss him

3      badly."

4  And that's signed by Hazel Lopez.  What does her

5  husband do?

6      INMATE HULSEY:  He works for an

7  irrigation company installing pumps, at least

8  that's what he did when I was out there.  I'm

9  pretty sure he's still doing that.  I think he

10  might have moved up.

11      PRESIDING COMMISSIONER SAWYER:  Okay.

12  And I have a letter, another poorly copied

13  letter.  Could you find me a letter that's dated

14  8-23-05 from someone, Lemus.  Is there a Lemus?

15      INMATE HULSEY:  Yes.

16      PRESIDING COMMISSIONER SAWYER:  What's

17  her first name or his first name?

18      INMATE HULSEY:  It's Mark Lemus.

19      PRESIDING COMMISSIONER SAWYER:  Mark

20  Lemus and who's that?

21      INMATE HULSEY:  He's just a friend.

22      PRESIDING COMMISSIONER SAWYER:  Just a

23  friend.

24      INMATE HULSEY:  And about the only one I

25  got left.

26      PRESIDING COMMISSIONER SAWYER:  Yeah,

27  addressed to Studebaker.  Sending this letter on

36

1    behalf of Cleve Hulsey.  Known all of our

2    childhood lives.  I believe he would be a law

3    abiding citizen -- released in the community.

4    Good decent young man.  I'm sure he's learned a

5    very tough lesson.  He's matured and aged

6    (indiscernible) ready to get on with his life.

7    I'm willing to help with transportation when

8    needed.  Also ready to see his friend -- be his

9    friend once -- once again and help him adapt to

10   public work.  Mark Lemus.  Very nice letter.

11   What does Mr. Lemus do for a living?

12        INMATE HULSEY:  Last I heard he was

13   working for a plastics company.  Not exactly

14   sure what he was doing.

15        PRESIDING COMMISSIONER SAWYER:  You were

16   kind of a hippie then, weren't you?

17        INMATE HULSEY:  What's that?

18        PRESIDING COMMISSIONER SAWYER:  You were

19   kind of a hippie.  I'm looking at your pictures

20   in your C-File back in '93.

21        DEPUTY COMMISSIONER YACONO:  This is --

22   he came in.

23        PRESIDING COMMISSIONER SAWYER:  Back in

24   '90 you had semi-long hair but you -- really got

25   long in '93.  Okay.  You have any additional

26   letters that you'd like to share with us?

27        INMATE HULSEY:  No.

37

1        PRESIDING COMMISSIONER SAWYER:  At this

2     time.  None, okay.  Very good.  I'll turn it

3     over to Commissioner Yacono.

4        DEPUTY COMMISSIONER YACONO:  Okay.

5     Because this is the initial hearing we have a

6     lot of ground to cover.  And I'm going to try

7     and make sure that I hit all the points, all the

8     documents but I'm going to also, during this

9     timeframe and before we get done, I'll ask you

10    and your attorney if there's anything additional

11    if some of the facts don't jive quite right.

12    Because I have a couple of question marks on

13    these.  But I'm going to try and run through

14    this as close to chronologically as I can on

15    some of the -- especially on the work and the

16    self-help group area.  You got a lot of material

17    to cover on this one.  So what I'm looking at is

18    the Central File, a life prisoner evaluation

19    report prepared for the October '05 calendar by

20    Correctional Counselor J. Studebaker and signed

21    off on 7-20-2005.  Now, the post-conviction

22    reports, Correctional Counselor (indiscernible)

23    signed off 3-10-93 and covered the period

24    4-23-90 until 3 of '93.  Then Correctional

25    Counselor Jordine (phonetic) signed off 3-14-96

26    for the period of 3-1-93 through 3-3-96.

27    Correctional Counselor Donnelly signed off

38

1   1-27-99 on a report from 3-96 to January of '99.

2   Then E. Washington was the correctional

3   counselor on a report signed 10-29-02 covering

4   the period of 2-99 until 3 of '02. And I have a

5   month break. But from April of '02 until

6   July 20, '05 signature date by Correctional

7   Counselor Studebaker. Looking at psychiatric

8   evaluation prepared by Dr. Merrick, Ph.D., April

9   25, 2006, and I see one prior from a Dr. Larson,

10  M.D., dated 2-25-93. The documentation hearings

11  show me April 27, '93, April 2, '96, April 14,

12  '99, November 7, 2002. Obtain -- The

13  recommendations. Obtain vocational trades, stay

14  disciplinary-free, participate in self-help

15  programs and the '96 specified AA. The records

16  reflect that coming into Department of

17  Corrections on 4-23-90 at DVI reception center,

18  then 5-22-90 to Folsom, 8-3-93 to Lancaster as a

19  Close B. You started off at Close A with 67

20  points. Then 9-14-93, Corcoran, was a Close B.

21  Pleasant Valley, 11-39-93, Close -- Close B.

22  And then here to Soledad on 5-28-93 as a

23  Medium A. Nine one of '98, Close B. Four

24  thirteen of 2000, Medium A where you are today.

25  Your points range from the high 67 when you came

26  in, dropping steadily and then November 16, '99

27  I'm seeing 11 points. It used to be you could

39

1   go to zero but 19 is minimum now.  But it looks

2   like you've been pretty much -- low points since

3   '99.  I see an April 29, '99 at 25 and then by

4   November you're 11.  And from that point on it's

5   been minimal points.  The one thing I don't see

6   is any vocational instruction.  Am I missing

7   something?  Ever done any voc?

8           INMATE HULSEY:  No.

9           DEPUTY COMMISSIONER YACONO:  Okay.  You

10  need to be in graphic arts.  Anyhow, the

11  academic education.  We do have your diploma

12  from your high school and that graduation date

13  was June 9, '89.  In 1990 we did an assessment

14  of you.  Your level at that time was 12.9 which

15  is as high as we do.  There are some other

16  notations in there and I put it under academic.

17  I probably should have put it under laudatory

18  because I read it a couple of times.  But I'd

19  already written it.  Reader I, 7-17-91,

20  satisfactory or exceptional ratings on that.

21  And then what I found later on is basically

22  you're doing like books for the blind.

23          INMATE HULSEY:  Yes.

24          DEPUTY COMMISSIONER YACONO:  So get that

25  on the record even though it's in the wrong

26  category.  I do note college classes.  You got

27  three semester units in English with grades of B

40

1    as of a chrono 6-19-91 and psychology one, three

2    units with A grade and that was 6-10-91.  So you

3    took pretty much six units all at the same time.

4              INMATE HULSEY:  Yeah.

5              DEPUTY COMMISSIONER YACONO:

6    Correspondence?

7              INMATE HULSEY:  No, they actually had

8    college instructors coming into Old Folsom at

9    the time.

10             DEPUTY COMMISSIONER YACONO:  That's

11    right.  You were at Folsom then.  Okay.  All

12    right.  This is where it gets hard.  It's good

13    for you.  It's hard for me.  First entry I show

14    is assignment to the dental lab on 8-11-92

15    showing satisfactory or exceptional ratings.

16    Then I show a Corcoran work crew October '94

17    through November 18, '94 and I show porter and

18    lieutenant's clerk December of '94 with evals

19    continuing January of '95.  Then assignment to

20    the clothing room, January of '95, satisfactory

21    exceptional marks as of 4-17-96.  Then I'm

22    showing a clerk 5-31-95 with exceptional grades;

23    5-15-98 which is -- I don't understand why the

24    dates flip flop but May of '98.  I also found

25    one that I believe was 3-19-98 showing again

26    exceptional marks.  I was a little confused on

27    that one so I put on the clerk.  Then I'm

41

1    showing PIA textiles 6-13-98 through 9-1-98.

2    Reassignment to porter in '99 with evals

3    4-20-2000, 7-6-2000 at satisfactory.  Now, I had

4    one in here as well that show me 11-16-99 you

5    were put out of the assignment based on 128(g)

6    of 4-2-2000.  So I'm confused how you're getting

7    good grades, good marks on your work but it

8    seems like you were put out.  But obviously they

9    must have put you back in again for the porter

10   duties.  Okay.  And this is where I got

11   contradictory.  I'm showing a patio clerk

12   1-12-2001 but I'm showing the date as sergeant's

13   work crew.

14        [Thereupon, the tape was turned over.]

15        DEPUTY COMMISSIONER YACONO:  Okay.  All

16   right.  So again my problem is I got patio

17   clerk, showing me evals and then I've got

18   sergeant's work crew.  And it seems to be kind

19   of the same timeframe for the work crew,

20   3-12-02, above average.  Then I'm showing

21   July 26, August 9 and August 31 for the patio

22   clerk, above average.  Is sergeant's work crew

23   and patio clerk kind of the same?

24        INMATE HULSEY:  Yeah.

25        DEPUTY COMMISSIONER YACONO:  Okay.  So

26   I've got dates from two different sources.  Next

27   I'm showing, confusing again, because I'm

42

1    showing you as watch clerk May 18, 2002 with

2    above average evaluation on 8-6-2002.  Then a

3    movement to statistics clerk, 4-22-04,

4    satisfactory and above, 6-1-2004.  Then the

5    watch commander's clerk, 6-5-04.  Again, how do

6    we get a satisfactory evaluation or you got a

7    satisfactory evaluation or above, noting

8    4-14-05, 4-6-05, 4-20-05 and then 5-31-05

9    exceptional.  And then I got nothing for the

10   last year.  What have you been doing for the

11   last year?

12          INMATE HULSEY:  Up until January of this

13   year I was in the same job.  I was a clerk, the

14   patio clerk or watch commander's clerk.  And as

15   of January of this year, I think it was

16   effective January this year, it might have been

17   late last year, I was put in the dental lab.

18   They have a dental lab here.  A position came

19   open and I went back in there.

20          DEPUTY COMMISSIONER YACONO:  And I'm not

21   seeing any chronos for it, which is a little

22   unfortunate.  This is your initial, but it makes

23   sense.  Will suffice it to say that you have

24   never gotten less than a satisfactory

25   evaluation.  You know what, I did see something

26   for January.

27          ATTORNEY TARDIFF:  There was an AA

43

1  chrono.

2           DEPUTY COMMISSIONER YACONO:  Thank you.

3  For that same timeframe?

4           ATTORNEY TARDIFF:  One three '06.

5           DEPUTY COMMISSIONER YACONO:  All right.

6  Okay.  While we're talking about self-help and

7  specifically AA, I've got one chrono showing me

8  10-4-97, participation, and then a December 31,

9  '97.  From there I've got nothing until July

10  2001.  Is there a break there?  What happened?

11           INMATE HULSEY:  In -- What was it, '97?

12           DEPUTY COMMISSIONER YACONO:  So we're

13  talking '98, '99, 2000 and it looks like

14  probably the first two quarters of 2001 or the

15  first quarter of 2000 --

16           INMATE HULSEY:  That's when I was

17  transferred here from Pleasant Valley.

18           DEPUTY COMMISSIONER YACONO:  Got it.

19  Okay.  Then I'm showing chronos July '01,

20  October, December '01, April '02, July '02,

21  September '02, December '02.  I don't show

22  anything in '03.  There was something 4-03 but

23  it may be a reference but it wasn't specific.

24  And then 7-03, 10-3, January '04, April '04,

25  July, October, December '04.  Then I don't show

26  anything for first and second quarter of 2005.

27  Then I got a January 3, '06 which refers to

44

1    third and fourth quarter for AA.  So we had a

2    break for first and second quarter in 2005?

3         INMATE HULSEY:  I think there might have

4    been in between sponsors.  I'm not sure why I

5    never got a chrono.

6         DEPUTY COMMISSIONER YACONO:  Okay.  And

7    anything since January of this year?

8         INMATE HULSEY:  I haven't been able to

9    go.  Our facility's been locked down since

10   February 7.

11        DEPUTY COMMISSIONER YACONO:  Okay.  Now,

12   I'm out of chronology here, but I want to do all

13   those -- that run.  Pretty consistent AA

14   attendance.  I've got a Men's Advisory Council,

15   March '95.  Then I'm showing Captive Audience

16   Literacy Group, 5-9-98.  The classes for

17   Hepatitis C, July '99, HIV slash AIDS.  I've

18   seen you've taken that April '99 and August '99.

19   And then Arts In Correction for the period of

20   '98 to '99 with a chrono dated 6-24-99.  Under

21   laudatories, although -- should have done the

22   Reader one here, but I'm seeing Literacy Action

23   certificate 3-22-94, 12-hour workshop tutoring.

24   I had Inmate Peer Education program and I

25   crossed it out.

26        ATTORNEY TARDIFF:  He's got some chronos.

27        DEPUTY COMMISSIONER YACONO:  Well I'm

45

1    showing Literacy Group, 5-9-98 and then a

2    12-16-05 Children's Holiday Festival.

3         ATTORNEY TARDIFF:  You should have those.

4    Inmate Peer --

5         INMATE HULSEY:  Yeah, those are --

6         DEPUTY COMMISSIONER YACONO:  Those are --

7         INMATE HULSEY:  -- miscellaneous.

8         DEPUTY COMMISSIONER YACONO:  -- HIV and

9    the Hep C's.

10        ATTORNEY TARDIFF:  Yeah.

11        DEPUTY COMMISSIONER YACONO:  Okay.  I

12   think the Inmate Peer Education program was part

13   and party of the Literacy Action certificate.

14   It was mentioned somewhere else.

15        ATTORNEY TARDIFF:  Okay.

16        DEPUTY COMMISSIONER YACONO:  And that's

17   why I crossed it out.  Okay.  Let's do the

18   psych.  I'm looking at April 25, 2006.  The

19   diagnostic impression shows me Axis I, Alcohol

20   Dependence In Institutional Remission.  Axis II,

21   None.  Axis III, Back Problem.  Axis IV,

22   Incarceration and Axis V shows us a GAF of 90 --

23   of 100.  Assessment of dangerousness is showing

24   past six years disciplinary-free.  Dangerousness

25   within a controlled setting is lower than the

26   inmate population.  Released to the community,

27   it appears he would be able to maintain his

46

1    current sobriety and commitment to remain

2    abstinent.  His assessment of dangerousness in

3    the community is no more than the average person

4    in a non-prison population.  Significant risk

5    factor or precursor to violence for Hulsey would

6    be return to alcohol use.  He should be

7    periodically tested and attendance at Alcoholics

8    Anonymous or some other alcohol treatment

9    modality should be a mandatory requirement of

10   parole.  Hulsey is competent, responsible for

11   his behavior.  Capacity to abide by institution

12   standards.  Should do well in the future as long

13   as he remains drug and alcohol free.  Any

14   treatment program is recommended -- will help

15   him maintain long term sobriety.  Does not have

16   mental health disorder which would necessitate

17   treatment either during his incarceration or on

18   parole.  That was one by Dr. Merrick (phonetic).

19   And I'm showing an April '93 for --

20   documentation hearing, short one-pager by

21   Dr. Larson (phonetic).  My specific note on this

22   was the most appropriate psychiatric diagnosis

23   would be that of alcohol dependence in

24   institutional remission.  Express interest in

25   college as well as Alcoholics Anonymous.

26   Appears sincere.  Hopes to major in psychology,

27   though express an interest in physical sciences

47

```
 1   such as chemistry.  His violence potential

 2   appears to be considerably less than that of the

 3   average inmate population.  "To this evaluator,

 4   he appears to be an individual who should, when

 5   it is administratively possible, do as much of

 6   his programming as possible at CMC, eventually

 7   entering into a Category T program.  College is

 8   encouraged if available."  And that seems to be

 9   February 25, '93 on that.  Okay.  And lastly,

10   115's, 128's.  I'm showing four 128's, 3-24-93,

11   possession of contraband; 8-20-95, unauthorized

12   window covering; 5-17-99, failure to report to

13   work; 11-01-00, failure to report to work.  And

14   115's, 12-8-94 for performance, guilty,

15   counseled and reprimanded.  Eight four '99,

16   refusing to work, guilty, assessed 30 days, 10

17   days loss of privilege, counseled, warned and

18   reprimanded.  Did I miss anything?

19        INMATE HULSEY:  Not that I can tell.

20        DEPUTY COMMISSIONER YACONO:  Counsel, did

21   you have anything else?

22        ATTORNEY TARDIFF:  No.

23        DEPUTY COMMISSIONER YACONO:  Okay.

24   Commissioner.

25        PRESIDING COMMISSIONER SAWYER:  How much

26   of your $10,000 restitution have you paid off?

27        INMATE HULSEY:  I think just under
```

48

```
1    $1,500.

2           PRESIDING COMMISSIONER SAWYER:  Okay.

3    Are you -- Is this current dental lab job of

4    yours a pay number?

5           INMATE HULSEY:  Yes.

6           PRESIDING COMMISSIONER SAWYER:  What are

7    you getting paid there?

8           INMATE HULSEY:  It's 36 a month.

9           PRESIDING COMMISSIONER SAWYER:  Okay.

10   And why no vocation?

11          INMATE HULSEY:  For a great deal of time

12   vocations weren't available to Close Custody

13   inmates.  And I've only been Medium Custody

14   since I think it was 2000, since I've been here.

15          PRESIDING COMMISSIONER SAWYER:  April 13.

16          INMATE HULSEY:  Yeah, of 2000.

17          PRESIDING COMMISSIONER SAWYER:  That's

18   six years.

19          INMATE HULSEY:  Yeah.  Where I was at

20   over at north facility, they don't have any

21   vocations that particularly interest me.  They

22   have a graphic arts program over here, it's the

23   print shop, which I would like to take, and a

24   drafting class, computer aided drafting class at

25   that, here that I would like to take.  But --

26          PRESIDING COMMISSIONER SAWYER:  You on

27   the waiting list?
```

49

1    INMATE HULSEY:  I'm not even on the
2  waiting list.  They won't put me on it because
3  I'm not here in central facility.
4    PRESIDING COMMISSIONER SAWYER:  I see.
5  Okay.  How many college units have you -- six?
6    DEPUTY COMMISSIONER YACONO:  That's what
7  I'm showing.
8    PRESIDING COMMISSIONER SAWYER:  Okay.
9  And those are in English?
10    INMATE HULSEY:  Three in English and I
11  think three in psychology.
12    PRESIDING COMMISSIONER SAWYER:  Yeah,
13  three units so looks like two classes.
14    INMATE HULSEY:  Yeah.
15    PRESIDING COMMISSIONER SAWYER:  Is there
16  anything you can do in terms of vocation or
17  self-help with a correspondence course?
18    INMATE HULSEY:  If I have the means,
19  yeah.  If I can just -- If I know who to write
20  to start, I wouldn't have a problem doing
21  anything like that at all.
22    PRESIDING COMMISSIONER SAWYER:  Do you
23  meet with other lifers?  Is there any kind of
24  lifers group meetings here?
25    INMATE HULSEY:  Not where I'm at.
26    PRESIDING COMMISSIONER SAWYER:  What are
27  you doing now in the dental lab?

50

1     INMATE HULSEY:  Making dentures.

2  Partials and full dentures.  Well, actually I

3  haven't started doing the full's yet.  I just do

4  partial dentures.

5     PRESIDING COMMISSIONER SAWYER:  Are you

6  just learning that?  You've been in the dental

7  lab once before.

8     INMATE HULSEY:  Yeah.

9     PRESIDING COMMISSIONER SAWYER:  Right?

10     INMATE HULSEY:  But that was a long time

11  before.

12     PRESIDING COMMISSIONER SAWYER:  Things

13  change?

14     INMATE HULSEY:  The procedures, no, not

15  really.  It's just getting back in the swing of

16  doing it.

17     PRESIDING COMMISSIONER SAWYER:  Enjoy it?

18     INMATE HULSEY:  Yes, very much so.

19     PRESIDING COMMISSIONER SAWYER:  You see

20  that as a potential vocation?

21     INMATE HULSEY:  Yeah.  I wouldn't mind

22  doing it out on the streets.

23     PRESIDING COMMISSIONER SAWYER:

24  Somebody's got to do it.

25     INMATE HULSEY:  Yeah, everybody needs

26  teeth.

27     PRESIDING COMMISSIONER SAWYER:  Not

51

1 everybody, but most of us do.  What did you

2 learn when you were in PIA in textiles?

3   INMATE HULSEY:  I didn't.

4   PRESIDING COMMISSIONER SAWYER:  You

5 didn't learn?

6   INMATE HULSEY:  I was only there for

7 three months.  And when I was assigned, they

8 were at their -- some kind of break where they

9 do an inventory.  So they had just a minimal

10 crew coming in.  I think it was maybe like eight

11 or nine guys, like a skeleton crew just to keep

12 the sewing machines running so to speak.

13   PRESIDING COMMISSIONER SAWYER:  And what

14 did you learn in Arts In Corrections?

15   INMATE HULSEY:  That was voluntary.  And

16 it was just art classes.  Some of it -- one

17 thing -- Part of it taught me was to loosen up,

18 not try to be so -- it's hard to describe, not

19 try to be so rigid in what I did, loosen up and

20 kind of just do different things.  They had one

21 instructor come in that showed us -- working

22 with ceramics, did a little bit of that.  That's

23 really it.  Just go in there and do artwork.

24   PRESIDING COMMISSIONER SAWYER:  So they

25 taught you how to color outside the lines, huh?

26   INMATE HULSEY:  Basically, yeah.

27   PRESIDING COMMISSIONER SAWYER:  And tell

52

1  me about this reading for the blind, what was
2  that?
3       INMATE HULSEY:  That was the Folsom
4  Project for the Visually Impaired.  And what we
5  do is we'd sit down and we would read books onto
6  tapes.  And it was like a lending library.
7  People that have vision problems would -- it was
8  done through another company, not a company,
9  another organization outside the prison.  The
10  visually impaired people, they would call this
11  organization.  This organization would get a
12  hold of the institution and say, okay, do you
13  have this, do you have that, this book, that
14  book.  If we didn't, if they could provide the
15  book, we'd get the permission to read it on the
16  tape and then loan it them.  Just like a
17  library.
18       PRESIDING COMMISSIONER SAWYER:
19  Interesting.  Did you ever make license plates
20  in Folsom?
21       INMATE HULSEY:  No.  No, never did that.
22       PRESIDING COMMISSIONER SAWYER:  Okay.
23  And you started AA in 1997.  But then got back
24  into in '01?
25       INMATE HULSEY:  Yeah, I think so.
26       PRESIDING COMMISSIONER SAWYER:  How many
27  years did you have in the AA in '97?

53

1          INMATE HULSEY:  Prior to '97?

2          PRESIDING COMMISSIONER SAWYER:  Yeah, did

3     you have some prior to '97?

4          INMATE HULSEY:  No.  Closed Custody, in

5     '97 was when they got a Closed Custody AA

6     program going.

7          PRESIDING COMMISSIONER SAWYER:  And how

8     many years did you do it in '97 until when?

9          INMATE HULSEY:  Well, I'm unsure of when

10    they started it in '97 but it only lasted until

11    like May of '98 when I got transferred here.

12         PRESIDING COMMISSIONER SAWYER:  And then

13    it took you all this time to get it here

14    (indiscernible) --

15         INMATE HULSEY:  (Indiscernible) --

16         PRESIDING COMMISSIONER SAWYER:   --

17    position here?

18         INMATE HULSEY:  Yeah.  Because I was

19    still Closed Custody.  Well, I was Medium

20    Custody and then Closed Custody again.  And they

21    didn't have an AA program for Closed Custody's

22    because Closed Custody's could not leave the

23    cells in the evening.

24         PRESIDING COMMISSIONER SAWYER:  So you've

25    got AA regularly from -- did I read that right,

26    regularly from '01 until now?

27         INMATE HULSEY:  Yeah.

54

1        PRESIDING COMMISSIONER SAWYER:   As

2   regular as it can be?

3        INMATE HULSEY:   Well, yeah, barring any

4   --

5        PRESIDING COMMISSIONER SAWYER:

6   Lockdowns.

7        INMATE HULSEY:   Yeah, lockdowns, lack of

8   program which has been happening a lot since

9   2001.

10        PRESIDING COMMISSIONER SAWYER:   You know

11   your steps?

12        INMATE HULSEY:   I've only gotten -- far

13   as number two and that's the one I have the

14   biggest problem with.

15        PRESIDING COMMISSIONER SAWYER:   What step

16   is that?

17        INMATE HULSEY:   Put myself in the hands

18   of a higher power.   I've always felt I'm

19   responsible for my own actions.

20        PRESIDING COMMISSIONER SAWYER:   Is that

21   -- Is that what that means?

22        INMATE HULSEY:   No, well, to me it kind

23   of does.   To me it's like asking me to say,

24   okay, it's not my fault.   It's asking me to do

25   something that I don't believe in.   I guess you

26   could say, for lack of a better term, I'm an

27   atheist.   And I don't -- By putting myself in

55

1    the hands of a higher power, they're asking me

2    to basically quit taking the blame for my

3    alcoholism.  And I can't do that.  I know I have

4    a problem with alcohol and I'm the only one

5    that's going to be able to solve it.

6         PRESIDING COMMISSIONER SAWYER:  Okay.

7    Very good.  Mr. Underwood, do you have any

8    questions for the inmate?

9         DEPUTY DISTRICT ATTORNEY UNDERWOOD:  No,

10   I don't.  Thank you.

11        PRESIDING COMMISSIONER SAWYER:  Thank

12   you.  Ms. Tardiff?

13        ATTORNEY TARDIFF:  I have none.

14        PRESIDING COMMISSIONER SAWYER:  Okay.

15   Mr. Underwood, would you like to make a closing

16   statement.

17        DEPUTY DISTRICT ATTORNEY UNDERWOOD:  I

18   would.  Thank you.  I see a lot -- a lot of good

19   that I don't (indiscernible) when I come to

20   these hearings of what the inmate's doing to

21   better himself in prison.  But I see some things

22   that are troubling.  And I'm sure the citizens

23   of our community would find them troubling.  And

24   I begin there with the defendant's memory of the

25   crime, what he's told people happened at various

26   stages.  And beginning in the current report the

27   inmate says he was drunk and he doesn't remember

56

1    anything.  Going back to the probation report

2    after the defendant was convicted he made the

3    statement that it's real terrible that someone

4    died, it shouldn't have happened, and had I been

5    sober, it wouldn't have, that's all I can say.

6    Going back before -- That was on March 19, 1990,

7    so about nine months or so after the crime was

8    committed.  Going back to two days after the

9    crime was committed, on page three of the

10   probation report he initially said he had a

11   blackout and was unable to recall his

12   activities.  He subsequently admitted that talk

13   about committing -- robbery began while they

14   were at the river.  He acknowledged that it was

15   his idea to attempt to obtain a weapon from his

16   brother.  He contended that he was extremely

17   intoxicated at the time and that the amount of

18   alcohol consumed impaired his judgment.  I was

19   drunk out of my mind.  The common theme here is

20   that there -- it seems to be that alcohol's to

21   blame here and not the inmate.  But what strikes

22   me when you went through the narration of the

23   facts of the current crime is that they show a

24   mind that doesn't appear to be impaired to that

25   degree.  In other words, the planning done, the

26   driving from the lake, which it's not clear in

27   here, but I'm assuming he's talking about Lake

57

1   (indiscernible) here, little northeast of Exeter

2   and also east of Woodlake.  So he's able to

3   drive this car around, they're able to stake the

4   place out, check the amount of traffic going in

5   and out of the store.  Four other people are in

6   the car.  I conclude that the impairment was not

7   that bad if none of those four people at that

8   time said, for their own safety, holy cow, get

9   this guy away from the wheel if he's that

10  intoxicated to where he's blacked out.  Get him

11  away from the wheel.  I don't want to be a

12  passenger in this car because he's too drunk.

13  But we don't see any of that in the report.  So

14  it's somewhat troubling.  I don't want to say

15  the inmate's not telling you the truth here, but

16  I just wonder if he's really accounting for what

17  happened back then.  I don't believe he is.  He

18  accounted back in June of '89 to some degree,

19  but since then it seems -- it seems to be I

20  don't remember anything, I was drunk, if I

21  wouldn't have got drunk, it wouldn't have

22  happened.  And I don't know if that's taking

23  accountability for what happened.  I don't

24  believe it is.  We're also concerned by the

25  128's seen in the report.  Now I note that the

26  possession of contraband, it appears to be

27  before he attended his AA meetings.  But if it's

58

1    the alcohol that that's the problem, well here

2    we see in 1993 an attempt to get contraband

3    while he was in custody.  We have all these

4    letters saying once he's on the outside, hey, we

5    got a place for him to work, why don't you come

6    with us, it sounds like he has a family who's

7    very supportive.  But here when I look at his

8    disciplinary histories I see quite a few

9    failures to report to work and refusing to work.

10   I don't know the circumstances behind those, but

11   those also cause us some concern too.  For these

12   reasons we feel he's not a suitable candidate

13   for release.  Thank you.

14          PRESIDING COMMISSIONER SAWYER:  Thank

15   you.  Ms. Tardiff.

16          ATTORNEY TARDIFF:  I just have a

17   question.  The '93 possession of contraband,

18   what was that for?

19          INMATE HULSEY:  Just a bunch of crap.

20          ATTORNEY TARDIFF:  The 128's are not

21   alcohol related.  Contraband can be a rubber

22   band I guess, anything that they're not supposed

23   to have is contraband.

24          DEPUTY COMMISSIONER YACONO:  Do you want

25   me to read it, counsel?

26          ATTORNEY TARDIFF:  Sure.

27          DEPUTY COMMISSIONER YACONO:  Three 24,

59

1   '93, during a cell search of inmates Hulsey and

2   Bishop, found and confiscated numerous items of

3   contraband, some of which were inmate

4   manufactured tools, screwdrivers, utility knife,

5   numerous strips of civilian clothing, prints,

6   two civilian shirts, black and white, wax for

7   sealing televisions, one television set, seals

8   broken.  These items were found in Hulsey's

9   living space, under and near his bunk.  He

10  admitted to using dental epoxy resin which he

11  obtained from the dental lab.  And there was an

12  evaluation it might be used to aid in an escape

13  attempt.  All the above listed contraband will

14  be pending investigation.  And that's the most

15  significant part of that.  So no, it is not

16  substance abuse.

17      ATTORNEY TARDIFF:  So it was not alcohol

18  related.  Okay.  Thanks.  So I would -- those

19  remarks regarding the 128's by the District

20  Attorney I don't think were appropriate since

21  they did not involve any kind of substance

22  abuse.  Further, 128's are counseling chronos

23  and disciplinary actions, making his last 115 in

24  '99.  So were going almost on seven years since

25  he's had a 115 which I think is excellent

26  behavior.  Only two 115's, no force or violence.

27  Again, almost seven-years-old.  So his

60

1    performance in terms of disciplinary or abiding

2    by institutional standards I submit is

3    excellent.  But let me go to his

4    pre-incarceration history first.  He appeared to

5    have a stable social history.  He was a high

6    school graduate.  His family appeared to be

7    stable and intact.  And currently that seems to

8    be the case as well.  He's got a lot of letters

9    from his family which appear to be very

10   supportive of him.  All mention that they were a

11   close knit family.  So his pre-incarceration

12   history, non-criminal, appears to be supportive.

13   His post -- And his criminal history, he didn't

14   have any prior criminal history at all.  He had

15   an arrest for minor in possession of alcohol and

16   public intoxication when he was 15 and 17, but

17   that was it.  No force or violence either before

18   the commitment offense.  This was the only

19   indication of any violence.  And I'd like to

20   point out that Mr. Hulsey was not the shooter.

21   And in his sentencing report the judge noted

22   that:  "And I realize that Mr. Hulsey was a

23   participant by reason of the aider and abetter

24   rule and I -- "  And then it goes on to say:

25          "I am well aware -- I am well

26          aware of the particular problems

27          that all of us face with the

61

1          felony murder rule and there have

2          been other cases in this

3          courthouse where other individuals

4          were outside a particular

5          residence and/or commercial

6          establishment where a homicide's

7          occurred and they too suffered the

8          consequences of the main principal

9          in the action.  And I am afraid

10         that in Mr. Hulsey's circumstance

11         because of the fact perhaps that

12         he was drinking alcohol that day

13         or because of the other factors

14         that were mentioned in the 25 page

15         report supplied by defense counsel

16         he found himself in a situation

17         that he now has to pay his debt to

18         society.  Again, I am shocked and

19         distressed that I have to impose

20         these types of sentences on a

21         young man with no record."

22    And he's referring to granting a motion to have

23    this reduced to a manslaughter.  So even the

24    court, I believe by those statements, had no

25    discretion at all and had to impose, but the

26    court was troubled by the fact that Mr. Hulsey

27    did not have any prior record and was in the car

62

1    at the time of the offense.  And I submit that

2    in mitigating his factors in the commitment

3    offense.  Also, the probation officer's report

4    noted that he was highly intoxicated which

5    significantly reduced his culpability for the

6    crime.  And I believe it was a .17 was his

7    alcohol reading at the time of the commitment

8    offense if I'm not mistaken.

9         PRESIDING COMMISSIONER SAWYER:  Counsel,

10   I read it two one.

11        ATTORNEY TARDIFF:  Did you, two one.

12        PRESIDING COMMISSIONER SAWYER:  From

13   testimony from a doctor.

14        ATTORNEY TARDIFF:  Okay.  So he was -- It

15   was pretty high that's for sure.  Way over the

16   limit, twice over the limit either reading and

17   that's significant.  Not that that should

18   diminish his culpability in terms of this young

19   clerk's demise.  But I think it does

20   substantiate Mr. Hulsey's testimony regarding

21   how intoxicated he was.  And I think also in

22   reference to some of the remarks made by the

23   District Attorney for -- I don't think

24   particularly then young teens were not going to

25   say, hey, maybe he better not be driving.  I

26   just can't see teenage boys even doing that.

27   They're reckless, particularly if they're

63

1   involved with companions that are drinking a
2   lot.  It's not just something that's done.
3   Since he's been incarcerated, I've addressed the
4   115's and the 128's.  He has participated in
5   programming when it's available.  Due to the
6   lockdowns and his custody level, he hasn't been
7   able to do as much as I believe he would like to
8   do.  And I don't think there's any indication
9   that he would not want to be participating more.
10  He does get good work reports, satisfactory to
11  above average.  Been a clerk for the watch
12  commander.  He's volunteered a lot of his time
13  in terms of literacy group.  He seems to have
14  found some sort of niche in his artwork.  I'll
15  also submit that that is also a form of
16  self-help for many individuals I'm sure,
17  including Mr. Hulsey.  He has good psych
18  reports, two of them only, but the most recent,
19  '06, the high GAF at 90.  No mental health
20  diagnosis.  Average citizen.  And the one before
21  that was also good.  His regret for instant
22  offense appears authentic.  This is from '93,
23  that's a long time ago.  And his violence
24  potential appears to be considerably less than
25  that of the average inmate population.  He's
26  done some college since he's been incarcerated.
27  So I believe that Mr. Hulsey has programmed in a

64

1    very positive fashion.  And up to this point

2    he's done everything he can.  If he is not found

3    suitable, I think he should only be given a one

4    year denial due to his good programming.  Thank

5    you.

6         PRESIDING COMMISSIONER SAWYER:  Thank

7    you.  Mr. Hulsey, this is your opportunity to

8    tell this Board why you feel you're suitable for

9    parole at this time.

10        INMATE HULSEY:  Wow.

11        PRESIDING COMMISSIONER SAWYER:  You

12   didn't realize you were going to have this

13   opportunity?

14        INMATE HULSEY:  Well, I did but I went

15   over in my head many times what I think I would

16   say why I should be found suitable.  But I think

17   my lawyer's pretty much covered it all.

18        PRESIDING COMMISSIONER SAWYER:  Well you

19   don't have to say anything if you don't -- if

20   you don't want to.

21        INMATE HULSEY:  The only thing I can add

22   is if I'm found suitable and I'm paroled, I'll

23   still have a chance to make something of my

24   life.  Go out work, pay taxes and complain about

25   them being too high.

26        PRESIDING COMMISSIONER SAWYER:  Okay.

27   And gasoline too.

65

1          INMATE HULSEY:  Yeah.  Yeah.

2          PRESIDING COMMISSIONER SAWYER:  That's

3     it?

4          INMATE HULSEY:  Yes.

5          PRESIDING COMMISSIONER SAWYER:  Okay.

6     Thank you.  It's 2:30 and we will recess for

7     deliberations.

8                    R E C E S S

9                    --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

66

1   CALIFORNIA BOARD OF PAROLE HEARINGS

2   D E C I S I O N

3   DEPUTY COMMISSIONER YACONO:  Okay.  Our

4   tape's rolling.

5   PRESIDING COMMISSIONER SAWYER:  Okay.

6   The time is 2:50 in the afternoon in the matter

7   of Mr. Hulsey.  And everyone has returned to the

8   hearing.  The Panel's reviewed all the

9   information received from the public and relied

10   on the following circumstances in concluding

11   that the prisoner is not suitable for parole and

12   would pose an unreasonable risk of danger to

13   society or a threat to public safety if released

14   from prison.  First of all we'll talk about the

15   commitment offense.  It was carried out in an

16   especially cruel and callous manner in that his

17   crime partner, who I read in the legal documents

18   got life without the possibility of parole.

19   INMATE HULSEY:  I think so, yeah.

20   PRESIDING COMMISSIONER SAWYER:  His crime

21   partner, Mr. Abele, ultimately after spending

22   the time with Mr. Hulsey and three juveniles

23   went into a store and robbed it with

24   Mr. Hulsey's brother's .22 rifle with three

25   rounds in it.  The storekeeper was ultimately

26   murdered in this particular case which earned

27   CLEVE HULSEY   E-53226   DECISION PAGE 1   5/9/06

67

1   them five dollars.  Five dollars in this

2   robbery.  While Mr. Hulsey did not do the

3   robbery himself, he was in the car.  He was a

4   participant and was found -- Did you have a

5   court trial or a jury trial?

6           INMATE HULSEY:  Court trial.

7           PRESIDING COMMISSIONER SAWYER:  Court

8   trial.  He's ultimately found guilty of murder

9   in the first degree, armed with a firearm and

10  the second count of robbery to run concurrent

11  with the -- with the murder and an enhancement

12  on both for the -- for the weapon which he

13  received a 12022.5 of the Penal Code.  The facts

14  that he -- The fact is that he and his crime

15  partner had been drinking.  He's 18 years of

16  age.  He had a history -- And so he was only 18.

17  He had a brief history, three years of history

18  with alcohol abuse.  There was an attempt made

19  to get him squared away with that by sending him

20  to Narcotics Anonymous or a program and he

21  wasn't successful obviously at that time of his

22  life.  This certainly demonstrated -- The way it

23  was carried out demonstrated an exceptional

24  callous disregard for human suffering in that a

25  life was taken for five dollars, which the

26  motive for this crime is certainly inexplicable.

27  CLEVE HULSEY    E-53226    DECISION PAGE 2    5/9/06

68

1    Mr. Hulsey, as said before, does not have a

2    serious previous record, has no violence in his

3    previous record as a juvenile.  Did have an

4    alcohol problem and has -- did not -- certainly

5    did not benefit from the program that he

6    attended.  And unfortunately continued to drink;

7    otherwise, he probably wouldn't be sitting here

8    today as he claims he if wasn't under the

9    influence he wouldn't have happened.  Is that

10   correct, sir?

11        INMATE HULSEY:  Yes.

12        PRESIDING COMMISSIONER SAWYER:  He

13   remembers some of the events leading up to this

14   but claims that he was blacked out.  He did have

15   a high blood alcohol when it was calculated as

16   to what he drank.  It was somewhere around two

17   -- .20 which certainly by today's standards

18   would be almost three times the legal limit, two

19   and a half times the legal limit of .08.  And

20   certainly was a danger while driving around in

21   that condition.  His institutional behavior, he

22   has -- he's programmed in a -- has done -- has

23   done well given the circumstances of his custody

24   level.  He's gotten -- Up until recently he was

25   the watch commander's clerk, received above

26   average work reports.  He was a patio clerk in

27   CLEVE HULSEY    E-53226    DECISION PAGE 3    5/9/06

69

1    '01.  He was also -- did a stint as watch clerk.

2    He was a porter in 1999.  In 1998 he worked at

3    PIA in textiles for a brief period of time.  He

4    was a sergeant's clerk or with the sergeant's

5    yard crew in '01, above average or average work

6    reports and above average work reports.  The --

7    Most recently and currently he's in the dental

8    lab which he expressed that he likes and his

9    body language indicated that as well.  He kind

10   of lit up.  And his self-help programs, the most

11   critical program, AA, he did get a start in '97.

12   But again, based on custody level had some

13   difficulty but he started again when he came

14   here in '01 to the present and claims to be

15   working the first two steps.  And if there's

16   some alternative program that isn't so

17   spiritually based that you find, whether it's

18   correspondence or a program in the institution

19   that might suit you better based on the fact of

20   the higher power issue that would do similar --

21   same thing as a 12-step program -- We're big

22   fans of -- 12-step program because we see

23   results, positive -- very positive results if

24   people stick to it.  And there -- And they take

25   -- they take the stress off of people when

26   they're on the outside (indiscernible) and they

27   CLEVE HULSEY    E-53226    DECISION PAGE 4    5/9/06

70

1  continue to go and they have sponsors and they

2  have a safety net so to speak that they can --

3  You know, if you look at all the steps, you'll

4  see the last two steps are maintenance. And you

5  know -- And you develop a relapse prevention

6  program and things like that that help you --

7  help you deal with the day to day life without

8  alcohol and/or drugs. So if you can, you know,

9  find something. It doesn't have to be AA. None

10  of the Panels will say go to AA. We'll just

11  tell you to get self-help in some sort of

12  12-step program, something to deal with

13  addictions. Do you understand what I'm saying?

14          INMATE HULSEY:  Yes.

15          PRESIDING COMMISSIONER SAWYER:  Okay.

16  That will help you -- That should help you in

17  the future. Nineteen '98, the Captive Audience

18  Literacy Group. In '99 you took a series of

19  courses for Hepatitis, HIV and AIDS courses.

20  You know about Hepatitis C?

21          INMATE HULSEY:  Yeah.

22          PRESIDING COMMISSIONER SAWYER:  You know

23  how to get it?

24          INMATE HULSEY:  Yes.

25          PRESIDING COMMISSIONER SAWYER:  Okay. So

26  you don't do any of that?

27  CLEVE HULSEY    E-53226    DECISION PAGE 5    5/9/06

71

1        INMATE HULSEY:  No.

2        PRESIDING COMMISSIONER SAWYER:  You don't

3    have any tattoos, do you?

4        INMATE HULSEY:  None.

5        PRESIDING COMMISSIONER SAWYER:  Very

6    good.  Okay.  Arts In Corrections.  You did a

7    stint in that and explained a little about that,

8    what he was doing in 1998 and 1999.  He's gotten

9    six units in -- three in psychology, three in

10   English from college courses.  He's done Inmate

11   Peer Education and gotten some certificates for

12   those particular things.  While all these -- any

13   one of these things isn't much, all of them

14   together are much.  You know what I mean?

15       INMATE HULSEY:  Yeah.

16       PRESIDING COMMISSIONER SAWYER:  You just

17   kind of keep stacking up, making that stack

18   bigger and bigger, it's the scale of justice

19   here.  And you want all the good stuff on one

20   side and all the bad stuff you can't change on

21   the outside.  That stuff being 115's.

22       INMATE HULSEY:  Yeah.

23       PRESIDING COMMISSIONER SAWYER:  Last one

24   was 1999 for refusing to work.  The previous one

25   was 1994 for performance.  And then received

26   four counseling chronos, 128's, last one being

27   CLEVE HULSEY    E-53226    DECISION PAGE 6    5/9/06

72

1    in the year 2000, nearly seven years ago.  Are

2    you aware of how a date's determined for you?

3    If we feel you're ready for parole today, you

4    know how we calculate it?

5         INMATE HULSEY:  No, no idea.

6         PRESIDING COMMISSIONER SAWYER:  Okay.

7    Well we have a -- And your attorney can explain

8    it to you and maybe even show you.  We have a

9    matrix.

10        INMATE HULSEY:  This I've heard of.

11        PRESIDING COMMISSIONER SAWYER:  Okay.  We

12   have a matrix and we go, you know, we put you in

13   a category on the top and a category on the side

14   and bring them together and then we've got a

15   choice of three different years that we can give

16   you.  And we pick -- we pick out where you fall

17   into the matrix.  Now what's real important that

18   you know is for every year that you go without a

19   115 you get four months of credit, good time.

20        INMATE HULSEY:  Okay.

21        PRESIDING COMMISSIONER SAWYER:  Okay.  So

22   you've done, what, 16 years?

23        INMATE HULSEY:  Sixteen, seventeen.

24        PRESIDING COMMISSIONER SAWYER:  Yeah.

25   Since you've come to the prison.

26        INMATE HULSEY:  Yeah, 16.

27   CLEVE HULSEY    E-53226    DECISION PAGE 7    5/9/06

73

1       PRESIDING COMMISSIONER SAWYER:  Sixteen

2   years.  Sixteen years minus two in your case.

3   So you get 14 times four, whatever that works

4   out to be, number of months, and then we take

5   that off of that matrix number.  So every year

6   that you go without a 115, you're picking up

7   four months, you're picking up a third of a

8   year.  And that's particularly important to you.

9   Again, your -- your attorney can show you how

10   that works.

11       INMATE HULSEY:  Okay.

12       PRESIDING COMMISSIONER SAWYER:  So it's

13   real important you stay discipline-free.  That's

14   what -- That's the bottom line I'm getting at.

15   You get rewarded immensely for this.

16       INMATE HULSEY:  Okay.

17       PRESIDING COMMISSIONER SAWYER:  Plus, if

18   you got a 115 today, it's almost like starting

19   all over again with your -- with your time.

20       INMATE HULSEY:  Yeah.

21       PRESIDING COMMISSIONER SAWYER:  We look

22   at -- we look -- we look -- You know, it's a --

23   it's a violation of the rules which equate to a

24   violation of the law on the outside.  And if you

25   can't follow the rules in here, especially with

26   your history here, history being the time you

27   CLEVE HULSEY    E-53226    DECISION PAGE 8    5/9/06

74

1    spent here, knowing how it works and working it,

2    you've got to be real careful and continue to --

3    continue to do what you're doing.  We did -- I

4    did mention the dental lab that you're currently

5    in that and that that's certainly a very

6    positive vocational tool that you might get,

7    that you might want to look at.  You might want

8    to look at what else -- As time goes on, you're

9    going to have more and more opportunities for

10   vocation, something that obviously is

11   interesting to you and something that you can

12   use on the outside as a marketable skill in the

13   future.  So your -- your -- you're doing well.

14   You present very well.

15        INMATE HULSEY:  Thank you.

16        PRESIDING COMMISSIONER SAWYER:  You

17   present yourself as very intelligent.  You're

18   making this hearing go real easy for us because

19   you seem to absorb what we have to say and you

20   communicate very, very well.  So you know, you

21   can look at this as one of the hardest job

22   interviews you'll ever go to, you know.  This is

23   a tough job interview.

24        INMATE HULSEY:  Yeah.

25        PRESIDING COMMISSIONER SAWYER:  Nothing

26   will ever be this tough.  Especially on your

27   CLEVE HULSEY    E-53226    DECISION PAGE 9    5/9/06

75

1    initial hearing when you're not quite sure what

2    to expect and you've heard rumors and those

3    rumors are generally not true.  But we're not

4    all that bad.  Psychiatric factors.

5    Commissioner.

6              DEPUTY COMMISSIONER YACONO:  I was going

7    to say speak for yourself, you're not that bad.

8    Okay.  Just a quick review of the psych.  What

9    I'm keying in on is the alcohol dependence issue

10   and in this case the psychiatric evaluation

11   showed it in institutional remission.  And the

12   other axis show basically no other problems and

13   actually a GAF score of 90 out of 100 is quite

14   high.  The assessment of dangerousness noted as

15   lower than the inmate population.  And for a

16   community base as long as -- maintain current

17   sobriety and commitment to remain abstinent then

18   the assessment would be no more than average

19   than the average person in a non-prison

20   population.  I guess that would be the

21   community.  Significant risk factor of course is

22   the alcohol use.  And the prior evaluation

23   basically hits on the same point of alcohol

24   dependence and to maintain sobriety.

25              [Thereupon, tape two was recorded.]

26              DEPUTY COMMISSIONER YACONO:  Okay.  We're

27   CLEVE HULSEY · E-53226   DECISION PAGE 10   5/9/06

76

1     rolling on both.

2          PRESIDING COMMISSIONER SAWYER:   Okay.   As

3     I was talking about -- asked the question of the

4     inmate do you see the connection of the

5     psychological report to your programming.

6     Psychological report says that your risk factors

7     are much higher if you're not abstinent.

8          INMATE HULSEY:   Yes.

9          PRESIDING COMMISSIONER SAWYER:   And so

10    that's why the AA or equivalent program is so

11    important to make us feel that you have that

12    safety net, you have that -- you have something

13    to fall back on so you don't relapse and start

14    drinking again and get yourself -- and do

15    something -- something that you're going to

16    regret.

17         INMATE HULSEY:   Yeah.

18         PRESIDING COMMISSIONER SAWYER:   You see

19    what I'm -- that's -- That's where it ties

20    together.   Your parole plans, excellent.   You've

21    got wonderful letters from your family.   Sounds

22    like you've got just a great family and it

23    sounds like they're very interested in taking

24    care of you.   Sounds like they're loving.

25    Sounds like they'd be a good -- good support --

26    support.   And not just using that word

27    CLEVE HULSEY    E-53226    DECISION PAGE 11    5/9/06

77

1    willy-nilly.  I'm talking about support when --

2    You know, if you don't have the stresses of

3    finances, a place to live or you know -- You may

4    get a job initially that doesn't pay a lot and

5    you couldn't survive on your own because the

6    price of housing is nuts even in the valley now.

7         INMATE HULSEY:  Yeah.

8         PRESIDING COMMISSIONER SAWYER:  It's just

9    going -- It's getting wild.  So you know, you

10   look ahead and you say I don't think I could

11   ever, you know, take care of myself.  You've got

12   your -- You got your family there and your

13   friends that -- that -- that you can confide in.

14   I mean, your whole life's on this table at this

15   point in time of your life and you know

16   everybody knows about you and -- inside and out.

17   There's no -- hopefully no secrets.  But you

18   know, you've got to have people out there

19   that'll be -- that'll be on your side.  And this

20   certainly looks like -- based on the letters

21   that were written and that we went through

22   today.  As far as employment's concern, that's

23   yet to come.  I do believe you have a marketable

24   skill clearly in your artwork.  Your artwork was

25   fabulous.

26        INMATE HULSEY:  Thank you.

27   CLEVE HULSEY    E-53226    DECISION PAGE 12    5/9/06

78

1       PRESIDING COMMISSIONER SAWYER:  And

2   thanks for bringing it in and sharing it with

3   us.  It shows a tremendous amount of talent

4   there.  But you know the old story on artists.

5   They're starving.

6       INMATE HULSEY:  Yeah.

7       PRESIDING COMMISSIONER SAWYER:  Okay.

8   You know, there are artists and there's actors

9   and there's -- You know there's people out there

10  that have a lot of talent but there's a lot of

11  competition.

12      INMATE HULSEY:  Yes.

13      PRESIDING COMMISSIONER SAWYER:  But I --

14  In looking at your work, it's -- it's quite --

15  quite beautiful and -- and you certainly have --

16  you certainly have a talent there and very

17  marketable skill.  But I would -- We would

18  encourage you to continue to get vocational

19  skills that you possibly can, whether it's

20  dental lab or whatever else you can get into.

21  Encourage you maybe to stay away from some of

22  the things that -- that -- You want to evaluate

23  the particular vocation.  Like upholstery.

24  There's lots of upholsterers out there.  And

25  that's a pretty competitive market and you don't

26  make a lot of money, not that it's not

27  CLEVE HULSEY    E-53226    DECISION PAGE 13    5/9/06

79

1    necessary.  I mean we're all sitting on soft

2    seats because of PIA.  But still some of the

3    manufacturing jobs that are in the institutions

4    are offshore, you know, textiles and things like

5    that.  They're -- they're -- While they're

6    self-serving while they're in -- in -- in the

7    institution and you get good -- good job skills,

8    the question is where am I going to use it, you

9    know.  If you're a (indiscernible) that in

10   quality control on t-shirts, you have to go to

11   Bangladesh or Malaysia or someplace because

12   that's where all the stuff is made --

13              INMATE HULSEY:  Yeah.

14              PRESIDING COMMISSIONER SAWYER:   --

15   anymore.  Very little textile going on in -- in

16   the -- in the United States.  So continue to

17   keep those parole plans fresh.  We did have a

18   response from Tulare County in opposition to a

19   parole date being set for you today.  And I

20   again want to commend you for your behavior, for

21   your self-help that you've been doing, for all

22   the work that you've -- that you've done even

23   though they've been pretty low-level jobs.  We

24   understand.  And you continue to get your

25   classification -- and put yourself in a position

26   where you can get better -- better and better

27   CLEVE HULSEY    E-53226    DECISION PAGE 14    5/9/06

80

1    jobs, continue, you know -- Get those better
2    jobs so that you can pay off that restitution
3    that you owe or try to seek some outside --
4    outside help with that. And so we want to
5    commend you for that. However, these positive
6    aspects of your behavior doesn't outweigh the
7    crime that you were committed for. In a
8    separate decision, the hearing Panel finds the
9    prisoner has been convicted of murder and
10   robbery to run concurrent. It's not reasonable
11   to expect parole would be granted in the next
12   three years. So you're getting a three year
13   denial here based on the crime, based on your
14   alcohol and you need programming, continue
15   programming, and you've -- you've got the
16   longest stint in AA from '01 to now. You need
17   longer. You need three more years on top of
18   that. You need to get some marketable skills
19   under your belt so that you've got options when
20   you do get released. I'm confident -- We're
21   confident, and we talked about this during our
22   deliberations, how -- how well you interview,
23   how -- what a pleasant guy you are in terms of
24   your presentation today. And for the -- for the
25   first hearing normally -- not normally,
26   sometimes we see four and five years, and I'm
27   CLEVE HULSEY    E-53226    DECISION PAGE 15    5/9/06

81

1    sure your attorney mentioned that, denial.  We

2    want to keep -- We want to keep you encouraged.

3    We don't again believe that you'll be paroled

4    within the next three years.  There's no

5    possibility that you'll be paroled in the next

6    three years.  So let's take this time to bolster

7    up your -- your preparations for that parole.

8    And I can't guarantee you what's going to happen

9    in three years.  But I can say that you need --

10   you need -- we say that you need these three

11   years to -- to get yourself in a better position

12   for parole.  So our recommendations to you,

13   continue your self-help, stay discipline-free,

14   learn a trade and earn those positive chronos.

15   Okay.  Do you understand?

16            INMATE HULSEY:  Yes.

17            PRESIDING COMMISSIONER SAWYER:  Do you

18   have any questions?  I don't normally let the

19   inmate talk during this period of time, during

20   our decision.  But I want you to be perfectly

21   clear because this is your initial hearing.  Do

22   you have any questions for us?

23            INMATE HULSEY:  No, actually I don't.

24            PRESIDING COMMISSIONER SAWYER:  Okay.

25   Very good.  Do you have anything you'd like to

26   say, Commissioner?

27   CLEVE HULSEY    E-53226    DECISION PAGE 16    5/9/06

82

1          DEPUTY COMMISSIONER YACONO:  No, you've

2   covered it all.  Thank you.

3          PRESIDING COMMISSIONER SAWYER:  Very

4   good.  Good luck to you, sir.

5          INMATE HULSEY:  Okay.

6          PRESIDING COMMISSIONER SAWYER:  Okay.

7          INMATE HULSEY:  Thank you.

8          PRESIDING COMMISSIONER SAWYER:  Thank

9   you.

10                    --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED THREE YEARS

SEP  6 2006

24   THIS DECISION WILL BE FINAL ON _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED

27   CLEVE HULSEY    E-53226    DECISION PAGE 17    5/9/06

83

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 82, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of CLEVE HULSEY, CDC No. E-53226 on MAY 9, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 12, 2006 at Sacramento County, California.

_____
Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

E X H I B I T

2

Probation Officer's Report
March 26, 1990

MAR 23 1990

JAY ~~~~ CLERK

_Lorraine_ DEPUTY
_Baltazar_

The People of the State of California,)
                                Plaintiff,)
                                          )
                                          )
                    vs.                   )
                                          )
CLEVE OTIS HULSEY,                        )
                                          )
                         Defendant.       )
                                          )
_____  )

COURT NUMBER: 27850

HEARING DATE: 3-26-90
<u>REPORT AND RECOMMENDATION</u>
<u>OF THE PROBATION OFFICER</u>

Probation No: A-18731
SO ID No: 176673
CII No:    None
FBI No:    None
SS No:     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

Judge:      ROBERT C. VAN AUKEN
Department: No. 2
Attorney:   James Wilson
Address:    3714 West Mineral King Avenue
            Visalia, CA

Defendant's Address:  1176 West Maple, Exeter, CA

DOB: 5-20-71   AGE: 18

Birthplace:    Tulare, CA

Citizenship:   United States

Education:     12 Years

Marital Status: Single

Spouse:   N/A

Children:  None

Ages:      N/A

COURT PROCEEDINGS:

| CASE # | PLEA DATE | COUNT | OFFENSE | ACTION | INDICATED SENTENCE |
|--------|-----------|-------|---------|--------|--------------------|
| 27850 | 2-28-90 | 1 | Fel 187 P.C., 1st Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |
| | | 2 | Fel 211 P.C., 1st Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |
| | | 3 | Fel 459 P.C., 2nd Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |

1

BRIEF SUMMARY OF FACTS:

In the commission of a robbery of a Woodlake convenience store on June 26, 1989, the defendant shot and killed a 17-year-old store clerk, Amed Al-Kobadi.

OFFENSE:

Testimony presented during the course of a two week trial indicates that the defendant and alleged co-participant, Charles Abele, to be tried separately in September, formulated a plan to rob the A & H Market located in the rural Tulare County community of Woodlake for the purpose of obtaining money with which to buy beer. The pair obtained a .22 caliber semi-automatic bolt action rifle and ammunition and drove to the small family-owned business which they had targeted in advance.

Accounts of eyewitnesses and the confession by the defendant provided subsequent to his arrest concur that while the defendant waited in the car with the motor running, Abele, wearing a ski mask, entered the store displaying the firearm and demanded money. Store clerk Amed Al-Kobadi, 17, produced several bills from the cash register while Abele allegedly maintained the rifle pointed at him in a ready-to-fire position with his finger inside the trigger-guard. Reportedly the youthful clerk grabbed the rifle at the front site, causing the firearm to discharge. Al-Kobadi suffered a single gunshot wound in the right side of his chest. The bullet reportedly perforated his lung and he expired within minutes due to exsanguination.

The crime netted the perpetrators $5. According to accounts, before leaving Woodlake the defendant drove to another convenience store and with the proceeds from the robbery the co-participant purchased a quantity of gas, a pack of cigarettes and a quart of beer.

The series of events which subsequently unfolded linking the defendant with the crime were as follows:

A Woodlake resident reported observing a male subject wearing a black ski mask and carrying a rifle run from the store and enter the front passenger side of a waiting vehicle bearing California license No. 1GOP367. She reported that the vehicle was parked on the north side of the store and that she also observed "some kids" in the rear seat of the car. Investigation revealed the vehicle was registered to Neal Cave of 711 West Maple Avenue. Cave reported to authorities that he lent his automobile on June 26, 1989, to Charles Abele. Cave said that Abele was in possession of the car most of the day and upon returning the vehicle to him made statements concerning a "stick up" of a store located in the Woodlake area.

On June 27, 1989, Charles Abele provided investigating officers a voluntary statement in which he admitted involvement in the robbery and shooting death of the store clerk.

The following day investigating officers were contacted by the brother of the defendant, Marvin Hulsey, who reported that he had been reading a newspaper account of the incident. He testified that the defendant came to his house together with Abele and asked to borrow his father's rifle. As they were borrowing the weapon, they explained that they wanted to use it for shooting bottles at a canal. He reported that he told the defendant he did not have any bullets, but in fact had removed cartridges from the clip because he felt both defendants had been drinking. He stated that both defendants returned to his home later in the day and returned the rifle.

2

Cody Grim testified that on June 26, 1989, he was contacted by Abele who asked him for some .22 caliber ammunition, and specifically asked for three bullets. About the time that Grim handed Abele the bullets, Hulsey approached and stated that the pair was planning to go to the canal and do some target shooting. Grim also observed that at the time Anthony Chavira was in the back seat of the car with another young man whose name he did not recall. Through investigation, officers eventually obtained statements from teenagers Anthony Chavira, 16, Darren Stephens, 17, and Chad Stephens, 15, all of Exeter. In essence, they reported that while at the R & N Market in Exeter cashing in aluminum cans, they were invited to go swimming in the area of Slick Rock on Kaweah Lake. The teenagers agreed to give the $6.00 which they had earned from the cans to the defendants for the purchase of beer. After leaving Slick Rock, about an hour and a half later, that Abele was overheard discussing the possibility of committing a robbery "for booze and stuff".

Abele reportedly bragged that he knew of a store which would be easy to knock off. The teenagers requested to be let go, however, Abele refused.

Reports indicate that prior to the commission of the robbery, Abele pulled over and switched seats with Hulsey. Hulsey pulled up to the north side of the store, but then drove away because there were people in the area. He drove down the street, turned around and returned to the same location. Abele inserted the clip into the chamber of the rifle and positioned the bolt forward before exiting the car. While the teenagers were laying down on the back seat, scared, Abele exited the store and Hulsey kept the motor running. A short time later, he returned to the vehicle, made a statement to the effect that he shot someone for $5. After Abele reentered the car, Hulsey checked the rifle to see how many bullets were left.

The defendant provided a voluntary statement on June 28, 1989. Initially he claimed that he had suffered an alcohol blackout and was unable to recall his activities. He subsequently admitted that talk about committing a robbery began while they were at the river. He acknowledged that it was his idea to attempt to obtain a weapon from his brother. He contended that he was extremely intoxicated at the time and that the amount of alcohol consumed impaired his judgment. He told authorities, "I was drunk out of my mind."

## DEFENDANT'S STATEMENT:

Interviewed by the undersigned writer on March 19, 1990, the defendant declined a full disclosure outlining his involvement in the crime.

He stated, "It's real terrible that someone died. It shouldn't have happened and had I been sober it wouldn't have. That's all I can say."

Regarding his confession to authorities, the defendant stated, "I told them what they wanted to hear. I was so damned scared. I felt they would let me go if I told them what they wanted to hear, but they didn't. I really don't have anything else to say."

## INVESTIGATION:

As of this dictation, a statement regarding the crime and restitution has not been received from the family of the victim.

3

PRIOR RECORD:

A check of the usual sources revealed no prior arrest record.

SOCIAL AND FAMILY HISTORY:

The defendant is a native and lifelong county resident with significant family ties. He is youthful, in satisfactory physical and mental health and has lived in the home of his parents all of his life.

The defendant is a graduate of Kaweah High School in Exeter. He reportedly enlisted in the Navy following graduation in June, 1989, but was discharged as a consequence of arrest on the present case. The defendant reported it was his plan to further his education following tenure with the service. "I figured I'd be doing something right for myself. I planned to go to college on the G.I. Bill and with a good education I'd be able to make a place for myself, you know, get a good job, settle down with a wife and a few kids."

The defendant is the seventh of eight children born to his parents, Coy and Martha Hulsey of 1176 West Maple in Exeter. The defendant's father reportedly is employed as a heavy equipment mechanic by Ditch Witch of Central California. The defendant's mother, currently unemployed, previously worked as a shortorder cook. The defendant's siblings include four brothers and three sisters, ranging in age 15 to 35 years. The defendant described his family as a very close and supportive one. "We've always been very close and looked out for each other," he stated.

The defendant has previously never married nor fathered any children. He reportedly is not affiliated with any social or religious organizations.

EMPLOYMENT HISTORY:

The defendant's employment history is limited, for the most part due to his age and previous status as a student. He reported having worked as a clerk at Mountain Mike's Pizza and as a dishwasher at Carroll's Restaurant, both in Exeter, for brief durations.

FINANCIAL STATUS:

The defendant's assets and liabilities are negligible.

ALCOHOL/DRUG USE:

The defendant acknowledged a problem with alcohol abuse. He reported that he began consuming intoxicants about four years ago and that until his arrest on the instant matter, he consumed alcoholic beverages on a daily basis, frequently "just to get drunk". The defendant indicated previous participation in alcohol abuse counseling. He reported that at age 15 and again at age 17, he attended meetings of Narcotics Anonymous following arrests for minor in possession of alcohol and public intoxication. He indicated that participation in NA sessions did not ameliorate his drinking pattern except for a short time.

Regarding the use of controlled substances, the defendant acknowledged prior experimentation with marijuana. He indicated that he had used the substance infrequently, claiming that he had "tried it once when I was 15 years old" and on the date of the offense now before the court.

PROBATION FACTORS:

Penal Code Section 1203.06 prohibits the grant of probation in this case. (Rule 414(a))

MITIGATING FACTORS:

The defendant has no known prior record of criminal conduct. (Rule 423(b)(1))

At the time of the commission of the crime, the defendant claims that he was highly intoxicated which significantly reduced his culpability for the crime. (Rule 423(b)(2)

CIRCUMSTANCES IN AGGRAVATION:

The defendant was armed with or used a weapon at the time of the commission of the crime, charged and found true as an enhancement under Section 12022. (Rule 421(a)(2))

The victim was particularly vulnerable. (Rule 421(a)(3))

The crime was preplanned. (Rule 421(a)(8))

The defendant engaged in conduct indicating a danger to society. (Rule 408)

CRITERIA AFFECTING CONCURRENT/CONSECUTIVE SENTENCES:

The crimes (Counts 1 and 2) and their objectives were predominantly independent of each other. (Rule 425(b))

The crimes (Counts 1 and 2) involved separate acts of violence or threats of violence. (Rule 425(c))

ANALYSIS:

Before the Court for a sentencing is 18-year-old Cleve Otis Hulsey, convicted of murder in the first degree, robbery in the first degree and burglary in the second degree. Also found true were special allegations, attendant to each offense respectively that the defendant was armed with a firearm.

Circumstances in the presenting matter indicate that the defendant and an alleged co-participant preplanned a robbery at a rural Woodlake convenience store in order to

obtain money with which to buy beer.  The defendant was instrumental in obtaining a
firearm for that purpose and drove to said location to accomplish the act.  During the
commission of the crime on June 26, 1989, a 17-year-old store clerk was fatally shot
in the chest.  The defendant confessed his involvement in the crime, but claims that
his judgment was impaired due to the amount of alcoholic beverage he had consumed that
date.

Statutory provisions prohibit the grant of probation in this case.  In the present
case, the defendant was convicted of two crimes for which three terms of imprisonment
are specified and also for a crime with an indeterminate term.  Inasmuch as the
killing was unnecessary to accomplish Counts 2 and 3, consecutive terms appear
warranted.  Section 669 of the Penal Code specifies when both types of terms are being
considered for sentencing purposes, the determinate term of imprisonment shall be
served first.  Therefore, Count 2 should be deemed the principal determinate term.  It
is recommended that the term of imprisonment for Count 3 be stayed pursuant to Section
654 of the Penal Code, and that Count 1 be served consecutively to Count 2.

CUSTODY:

| FACILITY | DATES | ACTUAL TIME SERVED | 4019 CREDITS | TOTAL |
|---|---|---|---|---|
| Tul Co Jail | 6-28-89 to 3-26-90 | 272 Days | 68 Days Good Time 68 Days Work Time | 408 Days |

TERM:

| CASE NO. | COUNT | OFFENSE | RANGE | BASE | ENHANCEMENTS | TOTAL |
|---|---|---|---|---|---|---|
| 27850 | 1 | Fel 187 P.C., 1st Degree w/ s/a 12022(a)PC | 25 Yrs to Life | N/A | 1 Year | 25 Yrs to life + 1 Yr |
|  | 2 | Fel 211 P.C., 1st Degree w/ s/a 12022(a)PC | 2,3,5 Years | 3 Yrs | 1 Year | 4 Yrs |
|  | 3 | Fel 459 P.C., 2nd Degree w/ s/a 12022(a)PC | 16 Mos, 2, 3 Yrs | 2 Yrs | 1 Year | 3 Yrs |

IT IS THEREFORE RESPECTFULLY RECOMMENDED:

1.  That the defendant's application for probation be DENIED.

2.  That in Count 2, the defendant be committed to state prison for the total term of
    FOUR (4) YEARS; that he receive credit for 272 days spent in custody awaiting
    sentence plus 68 days good conduct credit and 68 days work time credit.



6

3.  That in Count 3, the defendant be committed to state prison for the total term of THREE (3) YEARS. It is recommended this term be stayed pursuant to Section 654 of the Penal Code.

4.  That in Count 1, the defendant be committed to state prison for TWENTY-FIVE (25) YEARS TO LIFE. Regarding the enhancement of Section 12022(a) of the Penal Code, it is recommended that this one year term be served consecutive to any other term imposed. Further, it is recommended that this term run consecutively to the term imposed in Count 2. Further, pursuant to the rules of the state Board of Prison Terms, it is recommended the court direct the clerk to prepare two abstracts of judgment in this case; one to delineate the determinate sentence and the other to delineate the indeterminate sentence.

Further, it is recommended the defendant be advised pursuant to Section 1170(c) and 3000 of the California Penal Code that he may be placed on parole for a period not to exceed five (5) years.

It is further recommended the defendant pay a restitution fine pursuant to Section 13967 of the Government Code in the amount of $10,000.

Respectfully submitted,

LARRY R. PRICE
CHIEF PROBATION OFFICER

DATED: March 26, 1990
EAS:sc
3-22-90

By _____
EVA A. SMITH
PROBATION OFFICER II


Read and Approved:

By _____
RICHARD W. HOUTS
SUPERVISING PROBATION OFFICER


Pursuant to the provisions of Section 1203 of the Penal Code, I have read and considered the Report and Recommendation of the Probation Officer on file.

_____
ROBERT C. VAN AUKEN
JUDGE OF THE SUPERIOR COURT

7

**E X H I B I T**

3

Abstract of Judgment
April 19, 1990
(Amendment to Abstract of Judgment, August 1, 1991)

in and for the County of _____ Tulare _____

# Abstract of Judgment

## Commitment to State Prison

TULARE COUNTY

APR 1 9 1990

JAY C. BAYLESS, CLERK
BY BOBBYE COMER DEPUTY

Dept. No. ___2___ Case No. ___27850___

The People of the State of California

Present:

vs.

Cleve Otis Hulsey

Hon. Robert C. Van Auken
Judge of the Superior Court

James Kordell, Deputy DA
Prosecuting Attorney

Defendant.

James Wilson
Counsel for Defendant

This certifies that on the __19__ day of __April__, 19 _90_, judgment of conviction of the above-named defendant was entered as follows:

1) In Case No. __27850__ Count No. __1__ he was convicted by __Court__; on his plea of _____
(court or jury)

__Not Guilty__
(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of _____ murder, first degree _____

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of _____ 187 of the Penal Code
(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

Defendant has been held in jail custody for ___0___ days as a result of the same criminal act or acts for which he has been convicted.

Defendant __was not__ armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weap-
(was or was not)
on at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code.

Defendant __was not__ armed with a deadly weapon at the time of his commission of the offense within the meaning of Sec-
(was or was not)
tions 969c and 12022 of the Penal Code.

Defendant __did not__ a firearm in his commission of the offense within the meaning of Sections 969d and 12022.5 of
(used or did not use)
the Penal Code.

(Repeat foregoing with respect to each count of which defendant was convicted.)

ABSTRACT OF JUDGMENT

(as or is not)

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County of ..... Tularfe ............................. and by him delivered to the Director of Corrections of the State of California at ..........
25 years to life

   Duel Vocational Facility, Tracy
--------------------------------------------------------------------------------

It is ordered that sentences shall be served in respect to one another as follows (concurrently or consecutively as to each count):

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

and in respect to any prior incompleted sentence(s) as follows (concurrently or consecutively as to all incomplete sentences from other jurisdictions):

--------------------------------------------------------------------------------

(4) To the Sheriff of the County of _____ Tulare _____ and to the Director of Corrections at the _____

   Duel Vocational Facility, Tracy
--------------------------------------------------------------------------------

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the custody of the Director of Corrections at _____ Duel Vocational Facility, Tracy _____

California, at your earliest convenience.

Witness my hand and seal of said court

this _____ 19th _____ day of _____ April, 1990 _____

                    Jay C. Bayless
--------------------------------------------------------------- Clerk,

by _____ Deputy

State of California,

County of _____ Tulare _____ } ss.

            I do hereby certify the foregoing to be a true and correct abstract of judgment duly

SEAL        made and entered on the minutes of the Superior Court in the above entitled action as
            provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court this _19_ day of _____ April _____
19:90

Jay C. Bayless By: _____ Deputy

County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of _____
      Tulare

The Honorable _____
            Robert C. Van Aiken

Judge of the Superior Court of the State of California, in and for the County of _____

      Tulare
--------------------------------------------------------------------------------

NOTE: If probation was granted in any sentence of which abstract of judgment is certified, attach a minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF _____ Tulare

COURT I.D. ___ BRANCH _____

**FILED**
**TULARE COUNTY**

| | | |
|---|---|---|
| COURT I.D. | 5 4 | |

PEOPLE OF THE STATE OF CALIFORNIA versus
DEFENDANT: Cleve Otis Bulsey
AKA:

☒ PRESENT
☐ NOT PRESENT

CASE NUMBER (S)
27859 - A
- B
- C
- D
- E

APR 19 1990

JAY C. BAYLESS, CLERK
BY BOBBYE COMER DEPUTY

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT

AMENDED
ABSTRACT ☐

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| April 19, 1990 | 2 | Robert C. Van Auken | Bobbye Comer |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| Susan Nelson | James Kordell | James Wilson | Eva Smith |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS)
☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES) _____

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY | | | | SENTENCE RELATION | | | | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 211* | Robbery | 89 | 02 | 28 | 90 | X | M | | X | | | | | (3) |
| | PC | 459** | Burglary | 89 | 02 | 28 | 90 | X | M | | X | | | | | |

2. ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022(a) | 1 | | | | | | | | | 1 |
| 2 | 12022(a) | (1) Concurrent to Count 1 | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

4. INCOMPLETED SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

5. OTHER ORDERS

Use additional sheets of plain paper if necessary.

6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A)
7. TIME STAYED TO COMPLY WITH 5-YEAR OR 10-YEAR LIMIT ON SUBORDINATE TERMS, DOUBLE-BASED TERM LIMIT, ETC. (Do not include § 654 stays or discretionary stays of term for enhancements.)
8. TOTAL TERM IMPOSED:
9. EXECUTION OF SENTENCE IMPOSED:

A. ☒ AT INITIAL SENTENCING HEARING  B. ☐ AT RESENTENCING PURSUANT TO DECISION ON APPEAL  C. ☐ AFTER REVOCATION OF PROBATION  D. ☐ AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))  E. ☐ OTHER _____

| 10. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| April 19, 1990 | | XXXX 444 INCLUDING: | 296 | 148 | ☐ DMH   ☐ CDC |

11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
☒ FORTHWITH
☐ AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS
INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:
☐ CALIF. INSTITUTION FOR WOMEN – FRONTERA
☐ CALIF. MEDICAL FACILITY – VACAVILLE
☐ CALIF. INSTITUTION FOR MEN – CHINO
☒ DEUEL VOC. INST.
☐ SAN QUENTIN
☐ OTHER (SPECIFY)

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE _____ DATE _____ April 19, 1990

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for determinate sentences. Attachments may be used but need not be referred to in this document.

Form Adopted by the Judicial Council of California
Effective April 1, 1990

**ABSTRACT OF JUDGMENT — PRISON COMMITMENT**
FORM DSL 290

Pen.C. 1213.5

DISTRIBUTION: PINK COPY – COURT FILE   YELLOW COPY – DEPARTMENT OF CORRECTIONS   WHITE COPY – ADMINISTRATIVE OFFICE OF THE COURTS

| The People of the State of California | ) | Visalia, California ___April 19, 1990___ |
|---|---|---|
| Plaintiff | ) | No. ___27850___ Dept. ___2___ |
| | ) | Judge, Hon. ___ROBERT C. VAN AUKEN___ |
| vs | ) | Clerk ___Bobbye Comer___ |
| | ) | Bailiff ___Daniel Fernandez___ |
| Cleve Otis Hulsey   Defendant | ) | Reporter ___Susan Nelson___ |
| | ) | Interpreter _____ |

Nature of Hearing: _____ JUDGMENT PROCEEDINGS _____

Counsel for the People:   James Kordell, Deputy District Attorney

Counsel for the Defendant:   James Wilson

Defendant ( ✓ ) present ( ) not present ( ) formal arraignment for judgment waived
Or ': The motion for reduction of the conviction is denied.
Court finds offense to be:

        Count 1 – Felony violation §187 PC, 1st degree w/SA 12022(a) PC
        Count 2 – Felony violation §211 PC, 1st degree w/SA 12022(a) PC
        Count 3 – Felony violation §459 PC, 2nd degree w/SA 12022(a) PC

ORDER:   Probation ( ✓ ) denied  ( ) granted for a period of _____ subject to
        the following terms and conditions ( ) additional terms and conditions on page two
        (Imposition of sentence suspended during this term)

        Defendant committed to ( ✓ ) State Prison  ( ) California Youth Authority;
        ( ) Tulare County Jail for the term as follows:
            Count 1 – 25 years to life with 1 year for the enhancement for a total of
                26 years to life
            Count 2 – 3 years plus 1 year for the enhancement; total 4 years; concurrent
                to Count 1
            Count 3 – 2 years plus 1 year for the enhancement; total 3 years; stayed pursuant
                to 654 PC

        Defendant given credit for _296_ days actual time plus _148_ days conduct
        credit for a total of _444_ days served awaiting sentence; as to counts 2 and 3.

        Defendant shall pay a restitution fine in the sum of $ _10,000.00_ pursuant
        to Government Code §13967 ( ) stayed during term of probation after which time
        it shall become permanent.

( ✓ )   Defendant advised of ( ) appeal rights; ( ✓ ) parole obligation upon release
        from prison; ( ) consequences of violation of probation.

( )   Court finds the defendant ( ) does not have the ability to pay attorney fees;
        ( ) has the ability to pay attorney fees in the sum of $ _____.

Notice of appeal filed with the court.


( ) Remaining counts dismissed
( ✓ ) Defendant remanded
( ) Bail Bond ( ) Cash Bail Exonerated
( ) Defendant released on probation

_____ Clerk

The People of the State of California )
)
)
vs )
)
)
Cleve Otis Hulsey )
)
)

Visalia, California __August 1, 1991__

No. __27850__    Dept. No. __4__

Judge, Honorable __ROBERT C. VAN AUKEN__

Clerk __Bobbye Comer__

Bailiff _____

Reporter _____

Nature of Hearing _____AMENDMENT TO ABSTRACT OF JUDGMENT_____

Pursuant to instructions from the Fifth District

Court of Appeal and good cause appearing therefor,

it is hereby ordered that the abstract of judgment

dated April 19, 1990 be amended as follows:

The sentence imposed as to Count 2, robbery
and the use of a gun, are stayed, said stay
to become permanent upon the completion of
serving the sentence imposed in Count 1.

The document to which this certificate is affixed is a full,
true and correct copy of the original on file and of record
in my office.
Attest: __8-1-91__ __19___
NADINE SALAZAR, County Clerk and ___ of the
Superior Court of the State of California, in and for the
County of Tulare.
By _____ , D.y

Copy to Department of Corrections.

Clerk

C-208

**E X H I B I T**

4

Psychological Evaluation
February 25, 1993

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
APRIL, 1993, CALENDAR
DOCUMENTATION HEARING
FOLSOM STATE PRISON

HULSEY, E-53226

Cleve Otis Hulsey is a 21-year-old White inmate who was committed
to the Department of Corrections from Tulare County on April 23,
1990, for the First Degree Murder of a convenience store clerk and
for the Robbery of that store.  According to the record, his code-
fendant shot the clerk.  At the time of incarceration, the defen-
dant's statement included, "It's real terrible that someone died.
It shouldn't have happened, and had I been sober, it would not
have."  At the time of the current evaluation he stated, "I had
just turned 18.  I was drunk as a skunk, I was an alcoholic for a
while.  I was involved in a robbery and the store clerk was mur-
dered.  I did not shoot the clerk, I drove the car.  It was the
codefendant's idea, and I did not know until the crime was commit-
ted.  My need was to be in bed."  He had an apparent partial black-
out for the incident.

He denies any past psychiatric illness.  He completed high school.
He has no disciplinary reports.  A chrono in his record dated
May 29, 1992, includes a recommendation for a transfer to Calipat-
ria IV.  His extensive drug record began at age 13, and he indi-
cates he began having blackouts regularly at age 14.  He used alco-
hol, "just to get drunk."  Though he had attended Narcotics Anony-
mous meetings at age 15 and at age 17, they seemed to have had no
major impact on him.  Since his incarceration, he feels that his
attitude in general has changed, and then adds, "I do feel bitter
at times."

He was cooperative throughout the evaluation, demonstrates good
abstract thinking abilities, and appears to have an intelligence
that is above average.  There are no signs or symptoms of psychotic
nor of neurotic illness. His regret for the instant offense appears
authentic.  The most appropriate psychiatric diagnosis would be
that of Alcohol Dependence, in institutional remission.  His
expressed interest in college as well as in Alcoholics Anonymous
appears sincere.  He hopes to major in psychology, though expresses
an interest in physical sciences, such as chemistry.  His violence
potential appears to be considerably less than that of the average
inmate population.  To this evaluator, he appears to be an individ-
ual who should, when it is administratively possible, do as much of
his programming as possible at CMC, eventually entering into a Cat-
egory "T" program.  College is encouraged, if available.

E. A. LARSON, M.D.
Staff Psychiatrist

Noted:

G. HOLLINGSWORTH, M.D.
Chief Psychiatrist

HULSEY, E-53226      FOLSOM STATE PRISON      2-25-93      EAL:mh

**E X H I B I T**

5

Psychological Evaluation
April 25, 2006

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS UPDATE CLINICAL EVALUATION
April 2006

CORRECTIONAL TRAINING FACILITY SOLEDAD
APRIL 25, 2006

I.    IDENTIFYING INFORMATION:

This is the second BPH psychological evaluation of Cleve Hulsey, CDC#
E53226. However, it is the first time he has actually appeared before the Board.
Hulsey is a single, 34-year-old Caucasian male. He has no unusual physical
characteristics. He was convicted of Murder in the First Degree, Robbery in the
First Degree and Burglary in the Second Degree.

SOURCES OF INFORMATION:

This is a psychological evaluation for the Board of Parole Hearings on inmate
Hulsey. This report is the product of a personal interview of his central file and
unit health record. This interview was a single contact for the purpose of
preparing this report.

II.    DEVELOPMENTAL HISTORY:

He had no known prenatal or perinatal concerns or birth defects. He had no
abnormalities of speech, language or motor development. His peer interactions
and socialization skills were normal. He had no history of cruelty to animals or
arson. His childhood medical history was normal. He had no history of physical
or sexual abuse, either as a perpetrator or victim.

III.    EDUCATION:

He is a high school graduate with at least average intelligence. He took some
college courses at Old Folsom before they discontinued that program.

IV.    FAMILY HISTORY:

Hulsey is the seventh of eight children born to his parents. His siblings include
four brothers and three sisters. He described his family as being very close and
supportive. He reportedly enlisted in the U.S. Navy following his high school
graduation but never made it to boot camp, due to being discharged as a result of
the instant conviction.

Hulsey          E-53226          CTF-Soledad          4/26/06          KB

HULSEY, CLYDE
CDC # E-53226
PAGE 2

V.    PSYCHOSEXUAL DEVELOPMENT / SEXUAL ORIENTATION:

Hulsey describes a normal psychosexual development and says he is heterosexual in orientation.

VI.    MARITAL HISTORY:

Hulsey has never been married.

VII.    MILITARY HISTORY:

Hulsey enlisted in the Navy to become a Machinist's Mate.

VIII.    EMPLOYMENT / INCOME HISTORY:

His employment history is limited due to his age at the time of arrest and his previous status as a student. He had jobs in the service industry, prior to his arrest. His work reports at CTF Soledad have been "above average."

IX.    SUBSTANCE ABUSE HISTORY:

Hulsey has a history of alcohol and minimal marijuana use. His alcohol use at the time of his arrest was obviously heavy, as he said he was "drunk out of his mind", the night of the offense. His prior criminal activities are for Minor in Possession of Alcohol and Public Intoxication.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Hulsey has no identified psychiatric or psychological history. His medical health is "good."

XI.    PLANS IF GRANTED RELEASE:

If granted parole, Hulsey plans to live with his parents. He has other family members who would help him keep on the "straight and narrow". He plans to work in construction as he says he is able to do "anything in construction." He would like to go to night school, obtain a degree in Computers and "better my living conditions."

Hulsey            E-53226            CTF-Soledad            4/26/06            KB

CDC # E-53226
PAGE 3

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Hulsey is currently in no psychological distress and requires no psychological or psychiatric intervention or treatment. He has been attending AA and should continue alcohol programming, if released.

### CURRENT DIAGNOSTIC IMPRESSIONS:

Axis I:    Alcohol Dependence, in institutional remission
Axis II:    None
Axis III:    Back problems
Axis IV:    Incarceration
Axis V:    GAF: 90

### XIII.    REVIEW OF LIFE CRIME

A co-defendant in a car that Hulsey was driving shot and killed a store clerk during a robbery of the store. According to Hulsey's file, it was his idea to obtain a weapon from his brother to rob the store. Hulsey said he was "extremely intoxicated at the time and that the amount of alcohol he consumed impaired his judgment." He regrets his involvement in the committed offense and "wishes it had never happened." He has resolved to ensure nothing like it occurs again.

### XIV.    ASSESSMENT OF DANGEROUSNESS

For the past six years, Hulsey has remained disciplinary-action free and has been able to follow rules in an institutional setting and, therefore, his dangerousness within a controlled setting is lower than the inmate population.

If released to the community, it appears he would be able to maintain his current sobriety and commitment to remaining abstinent. His assessment of dangerousness in the community is no more than the average person in a non-prison population.

A significant risk factor or precursor to violence for Hulsey would be a return to alcohol use. He should be periodically tested and attendance at Alcoholic Anonymous (or some other alcohol treatment modality) should be a mandatory requirement of parole.

Hulsey            E-53226            CTF-Soledad            4/26/06            KB

HULSEY, CLEVE
CDC # E-53226
PAGE 4

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS**

Hulsey is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has done so since 2000. Hulsey should do well in the future, as long as he remains drug and alcohol free. Any treatment program is recommended that will help him maintain long-term sobriety. He does not have a mental health disorder which would necessitate treatment either during his incarceration or on parole.

W.K. Marek, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

WM/kb

D:    4/25/06
T:    4/25/06

**E X H I B I T**

**6**

Proceedings On Sentencing Transcript
April 19, 1990, pages 1 and 14

1              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   IN AND FOR THE COUNTY OF TULARE

3          DEPARTMENT 2   HONORABLE ROBERT C. VAN AUKEN, JUDGE

4

5    THE PEOPLE OF THE STATE OF     )
     CALIFORNIA,                    )
6                                   )
                      Plaintiff,    )
7                                   )
              vs.                   )    CASE NO. 27850
8                                   )
     CLEVE OTIS HULSEY,             )    PROCEEDINGS ON SENTENCE
9                                   )
                      Defendant.    )
10   _____)

11   Visalia, California                    April 19, 1990

12

13

14                                                    **FILED**
                                                  **TULARE COUNTY**
15                   REPORTER'S TRANSCRIPT         JUN 1 4 1990

16                                               JAY C. BAYLESS, CLERK
                                                 BY_____ DEPUTY
17

18

19   APPEARANCES:

20     For the Plaintiff:    GERALD SEVIER,
                             District Attorney
21                           224 County Civic Center
                             Visalia, California 93291
22                           BY:  JAMES KORDELL

23     For the Defendant:    JAMES T. WILSON,
                             Attorney at Law
24                           3714 W. Mineral King Avenue
                             Visalia, California 93291
25
                                                  4/27/90
26

1    court that as long as they have no prior record and

2    are youthful that they can go out and commit a

3    homicide?

4        And I realize that Mr. Hulsey was a

5    participant by reason of the aider and abettor rule,

6    and that he was outside of the particular store in

7    question, and there was a young man, 17 years of age,

8    behind a counter who's no longer on earth because of

9    the fact that Mr. Hulsey's cohort -- however that

10   occurred, we don't know how that occurred, but

11   apparently the gun went off and killed that

12   individual.

13       And I am well aware of the particular

14   problems that all of us face with the felony murder

15   rule. And there have been other cases in this

16   courthouse where other individuals were outside a

17   particular residence and/or commercial establishments

18   where homicides occurred and they too suffered the

19   consequences of the main principal in the action.

20       And I am afraid that in Mr. Hulsey's

21   circumstance, because of the fact perhaps that he was

22   drinking alcohol that day or because of the other

23   factors that were mentioned in the 25-page report

24   supplied by defense counsel, he found himself in a

25   situation that he now has to pay his debt to

26   society.

## DECLARATION OF SERVICE

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-350L, Soledad, CA 93960-0705; I served the attached document entitled:

**PETITION FOR WRIT OF HABEAS CORPUS**

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as followed:

**Superior Court of California**
**County of Tulare**
**County Civic Center, Room 303**
**Visalia, CA 93291-1228**


**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**


There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above.  I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 11th day of March, 2007, at the Correctional Training Facility in Soledad, California.

Cleve Hulsey

# EXHIBIT 2

1

MAR 2 6 2007

2                                    LARAYNE CLEEK, CLERK
                                     BY:

3

4              SUPERIOR COURT OF THE STATE OF CALIFORNIA

5                  IN AND FOR THE COUNTY OF TULARE

6

7   In Re                          )    Case    No180809
                                   )
8        CLEVE HULSEY              )
                                   )    **RULING RE: PETITION**
9                                  )    **FOR WRIT OF HABEAS**
                                   )    **CORPUS**
10  For Writ of Habeas Corpus     )
                                   )
11                                 )
                                   )
12  _____    )

13  Petitioner has failed to state a basis for relief.

14       The Court applies the "some evidence" standard of review to the denial of a parole release date

15  by the Board of Prison Terms: *In Re Michael Lowe (2005) 130 Cal.App.4th; 31 Cal Rptr. 3d 1; In re*

16  *Ramirez (2001) 94 Cal.4th 549, 563; In re Rosenkrantz (2000) 80 Cal. App.4th 409, 423, In re Powell*

17  *(1988) 45 Cal.3d 894, 904.* Under the "some evidence" standard the Board of Prison term's decision will

18  be upheld as long as there is "some basis in fact" for the decision.

19       In the case of *Irons v Carey (2007) 2007 DJDAR 3072*, the court stated as follows:

20       *"The Board must determine whether a prisoner is presently too dangerous to be deemed suitable*

21  *for parole based on the "circumstances tending to show unsuitability" and the "circumstances tending*

22  *to show suitability" set forth in Cal. Code. Regs., tit. 15 Paragraph 2402(c)(d). A prisoner's*

23  *commitment offense may constitute a circumstance tending to show that a prisoner is presently too*

24  *dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's*

25  *commitment offense only where the Board can "point to factors beyond the minimum elements of the*

26  *crime for which the inmate was committed" that demonstrate the inmate will, at the time of the*

27  *suitability hearing, present*

28                                    -1-

1
2
3  a danger to society if released.  **In Re Dannenburg (2005) 34 Cal.4th 1061, 1071.** Factors beyond the
4  minimum elements of the crime include, inter alia, that 'the offense was carried out in a dispassionate
5  and calculated manner," that "the offense was carried out in a manner which demonstrates an
6  exceptionally callous disregard for human suffering" and that "the motive for the crime is inexplicable
7  or very trivial in relation to the offense."  **Cal. Code. Regs., tit. 15 Paragraph 2402(c)(B), (D)(E).**
8
9        The record shows that there were relevant facts upon which the Board of Prison Terms could and
10 did base their decisions. In arriving at their decision of May 9, 2006 the Board of Prison Terms used the
11 following in denying the petitioner parole in finding he poses an unreasonable risk of danger to society:
12 1:    (Decision Page 1, Lines 14-18 "First of all we'll talk about the commitment offense. It was
13       carried out in a very dispassionate and calculated manner such as an execution style murder. The
14       offense was carried out in a manner an especially cruel and callous manner." (Line 20-26) His
15       crime partner Mr. Abele, ultimately after spending the time with Mr. Hulsey and three juveniles
16       went into a store and robbed it with Mr. Hulsey's brother's 22 rifle with three rounds in it. The
17       storekeeper was ultimately murdered in this particular crime. (Page 2, Lines 1-5) ...Five dollars
18       in this robbery. While Mr. Hulsey did not do the robbery himself, he was in the car. He was a
19       participant and was found guilty of murder in the first degree."
20 2.    (Decision Page 2, Line 15-18) "He had a brief history, three years of history of alcohol abuse"
21       He was 18 at the time of the crime.
22 3.    The BPT found that the petitioner needed further time to address his alcohol issues. Alcohol was
23       a prime factor in the commitment crime.
24 4.    The BPT found that the petitioner has incurred additional disciplinary 115s which concerned the
25       petitioner's ability to stay out of trouble.
26       It is clear from the record that there was more than enough evidence to justify the denial of
27 petitioner's parole.
28                                              -2-

1

2   Petitioner's Petition for Writ of Habeas Corpus is denied.

3

4   Date received by judge:    3-24-07

5   Dated: 3-26-07

6                                          Darryl B. Ferguson
                                           Judge of the Superior Court
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              -3-

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF TULARE**
**Visalia Division**
**County Civic Center, Room 303**
**Visalia, CA 93291-4593**

| | | |
|---|---|---|
| **People** | ) | |
| Plaintiff/Petitioner, | ) | Case No. **VHC180809** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Hulsey, Cleve** | ) | |
| Defendant/Respondent. | ) | |
| | ) | |

## CLERK'S CERTIFICATE OF MAILING (CCP 1013a(4))

I certify that I am not a party to this action.

The Ruling Re: Writ of Habeas Corpus was mailed first class, in a sealed envelope, postage prepaid, to the parties at the addresses shown. The mailing and this certification occurred at the place and on the date shown.

Dated: March 26, 2007 at Visalia, California.

**LARAYNE CLEEK, CLERK OF THE**
**SUPERIOR COURT, COUNTY OF TULARE**

By _Sherry Fawcett_
Deputy Clerk

Cleve Hulsey
P.O. Box 705, WA-35OL
Soledad, Ca. 93960-0705

# EXHIBIT 3
# Part 1 of 3

MC-275

Name  **Cleve Otis Hulsey**

Address  **P. O. Box 705, WA-350L**

**Soledad, CA 93960-0705**

CDC or ID Number  **E-53226**

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
**F I L E D**

MAY 2 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR

By_____
Deputy

## IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

(Court)

**Cleve Otis Hulsey**

Petitioner

vs.

**Board of Parole Hearings, et al**

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No. ___**F052769**___

*(To be supplied by the Clerk of the Court)*

### INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

- [ ] A conviction
- [X] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other *(specify):* _____

1. Your name: Cleve Otis Hulsey

2. Where are you incarcerated? Correctional Training Facility, Soledad, CA

3. Why are you in custody? [X] Criminal Conviction [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder, First Degree

   b. Penal or other code sections: 187

   c. Name and location of sentencing or committing court: Superior Court of California,
   County of Tulare

   d. Case number: 27850

   e. Date convicted or committed: March 28, 1990

   f. Date sentenced: April 19, 1990

   g. Length of sentence: 25 years to life

   h. When do you expect to be released? Unknown

   i. Were you represented by counsel in the trial court? [X] Yes. [ ] No. If yes, state the attorney's name and address:

   James T. Wilson, Attorney At Law, 3714 W. Mineral King Ave.,
   Visalia, CA 93291

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty [ ] Guilty [ ] Nolo Contendere [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury [X] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

MC-275 [Rev. July 1, 2005]   **PETITION FOR WRIT OF HABEAS CORPUS**   Page three of six

7. **Ground 2 or Ground** _____ *(if applicable):*

   See attached petition

   _____
   _____
   _____

   a. Supporting facts:

   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

   b. Supporting cases, rules, or other authority:

   _____
   _____
   _____
   _____
   _____
   _____

8. Did you appeal from the conviction, sentence, or commitment?    ☐ Yes.  ☒ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

          (2) _____

          (3) _____

   f. Were you represented by counsel on appeal?   ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court?   ☐ Yes  ☒ No.   If yes, give the following information:

   a. Result _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

          (2) _____

          (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   N/A _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

   N/A _____

   _____

   _____

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available?   ☐ Yes.  ☐ No.
      *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

    b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

    c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

    _____

    _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    N/A

    _____

    _____

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

    _____

    _____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

    _____

    _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    N/A

    _____

    _____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: APRIL 29, 2007

▶ _____
(SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]        **PETITION FOR WRIT OF HABEAS CORPUS**                Page six of six

IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA
FIFTH APPELLATE DISTRICT


In re Cleve Otis Hulsey,     )     Case No.
                                )
          Petitioner,     )
                                )     Tulare County Superior Court
On Habeas Corpus.      )     Case No. 180809
_____)


---

### PETITION FOR WRIT OF HABEAS CORPUS

---


Petitioner In Pro Per


Cleve Hulsey  E-53226
P.O. Box 705, WA-350L
Soledad, Ca  93960-0705

## TABLE OF CONTENTS

Table of Authorities                                      ii

Petition for Writ of Habeas Corpus                        1

Introduction                                              1

Conclusion                                                9

Verification                                             11

List of Exhibits                                         12

Proof of Service                                  Last Page

i

**TABLE OF AUTHORITIES**

### CASES

#### STATE

In re Dannenberg (2005) 34 Cal.4th 1061                 2,3,5

In re Lee (2006) 49 Cal.Rptr.3d 931                       7

In re Ramirez (2001) 94 Cal.App.4th 549                 2,5

In re Rosenkrantz (2002) 29 Cal.4th 616        2,3,4,5,6,9

In re Scott (2004) 119 Cal.App.4th 871                   9

In re Scott (2005) 133 Cal.App.4th 573                   7

#### FEDERAL

Apprendi v. New Jersey, 530 U.S. 466 (2000)             8

Blakley v. Washington, 542 U.S. 296 (2004)              8

Cummingham v. California, ___ U.S. ___ (2007)           7

Jones v. United States, 526 U.S. 227 (1999)             8

### STATUTES

Penal Code
    § 3041 (a)                                        9
    § 3041 (b)                                      3,4,9

### CONSTITUTIONS

United States Constitution                             4,7,8
California Constitution                                   4

### MISCELLANEOUS

California Code of Regulations
    Division 2, Title 15
    § 2402                                          3,4,9
    § 2402 (a)                                        7
    § 2402 (c)                                        9

ii

1    IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA
2    FIFTH APPELLATE DISTRICT

3

4

5

6   In re Cleve Otis Hulsey,          )    Case No.
                                       )
7             Petitioner,             )
                                       )    Tulare County Superior Court
8   On Habeas Corpus                  )    Case No. 180809
                                       )
9   ─────────────────────────────

10

11

12                   PETITION FOR WRIT OF HABEAS CORPUS

13        Petitioner, Cleve Otis Hulsey, in pro per, petitions for a

14   Writ of Habeas Corpus, and by this verified petition states as

15   follows:

16                                    I

17                              INTRODUCTION

18        Thirty-five-year-old state prisoner Cleve Otis Hulsey is

19   petitioning this Court for a writ of habeas corpus seeking to

20   overturn the Board of Parole Hearings' [hereinafter Board]

21   denial of parole on the grounds that his rights secured under

22   the State and Federal Constitutions, and various provisions of

23   the California Penal Code and Division 2, Title 15 of the

24   California Code of Regulations [hereinafter CCR], were violated

25   by agents of the California Board of Parole Hearings.

26        At the May 9, 2006 parole hearing, the Board determined that

27   petitioner, who was sentenced to 25 years to life for first

28   degree murder in 1990, should remain in prison on three

                                     1

1  purported grounds: the crime was perpetrated in a dispassionate

2  and calculated manner, the crime demonstrated an exceptionally

3  callous disregard for human suffering and the motive for the

4  crime was inexplicable.

5     Our Supreme Court's decision in *Rosenkrantz* holds that a

6  Board parole decision violates due process and must be reversed

7  if there is not "some evidence" in the record to support it.

8  Also, although parole may in some cases be denied on the basis

9  of the crime, there must be evidence to support a finding that

10  the crime was particularly egregious. (*In re Rosenkrantz* (2002)

11  29 Cal.4th 616, 683.)

12     In *Dannenberg* our Supreme Court held "[S]ole reliance on

13  the commitment offense might, in particular cases, violate

14  section 3041, subdivision (a)'s provision that a parole date

15  'shall normally be set' under 'uniform term' principles, and

16  might thus also contravene the inmate's constitutionally

17  protected expectation of parole.  We explained that such a

18  violation could occur, 'for example[,] where no circumstances of

19  the offense reasonable could be considered more aggravated or

20  violent than the minimum necessary to sustain a conviction for

21  that offense.' (*Rosenkrantz, supra*, 29 Cal.4th 616, 683.)

22  Quoting *Ramirez, supra*, 94 Cal.App.4th 549, 570, we suggested

23  that, in order to prevent that parole authority's case-by-case

24  suitability determination from swallowing the rule that parole

25  should 'normally' be granted, an offense must be '*particularly*

26  *egregious*' to justify the denial of parole. (*Rosenkrantz, supra*,

27  at 683.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095.)

28  The Supreme Court then held "As we have explained, however,

2

1    the Board must apply detailed standards when evaluating whether

2    an individual inmate is unsuitable for parole on public safety

3    grounds.  (See § 3041, subd. (b); CCR § 2402.)  When the Board

4    bases unsuitability on the circumstances of the commitment

5    offense, it must cite 'some evidence' of aggravating facts

6    *beyond the minimum elements of that offense.*  (*Rosenkrantz,*

7    *supra,* 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg, supra,* 34

8    Cal.4th 1061, 1095.)

9        Therefore, the Board must follow and apply the standards

10    articulated and set forth by our Supreme Court in determining

11    that the circumstances of the commitment offense were

12    "particularly egregious" and that there existed aggravating

13    facts "beyond the minimum elements of that offense" and support

14    that determination with "some evidence" in the record.  As will

15    be shown below, the Board failed to meet these requirements

16    resulting in the violation of petitioner's due process rights

17    and the Superior Court of Tulare County failed to apply

18    controlling legal precedent to the facts that were before it.

19                                II

20        This petition is addressed to this court's jurisdiction in

21    the second instance and based on the material herein and the

22    full record that was before the Superior Court of Tulare County,

23    Case No. 180809.  (See Attachment One, Petition for Writ of

24    Habeas Corpus)

25                               III

26        Petitioner would incorporate the grounds, claims, facts and

27    legal arguments in the attached petition and memorandum by

28    reference herein.

                                 3

1                                    IV

2        *Claim*:  The Board failed to follow or apply the controlling

3   legal principles, the decision was devoid of the "some evidence"

4   required by law and was arbitrary and capricious, resulting in a

5   due process violation of Article I, § 7 of the California

6   constitution and the Fifth, Sixth and Fourteenth Amendment to

7   the United States Constitution.

8        *Argument*:  Our Supreme Court has held "that the judicial

9   branch is authorized to review the factual basis of a decision

10  of the Board denying parole in order to ensure that the decision

11  comports with the requirements of due process of law, but that

12  in conducting such review, the court may inquire only whether

13  *some evidence* in the record before the Board supports the

14  decision to deny parole, based upon *the factors specified by*

15  *statute and regulation.*  If the decision's consideration of the

16  specified factors is not supported by some evidence in the

17  record and thus is devoid of a factual basis, the court should

18  grant the prisoner's petition for writ of habeas corpus and

19  should order the board to vacate its decision denying parole and

20  therefore to proceed in accordance with due process of law."

21  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658, emphasis added.)

22       The Supreme Court held "As we have explained, however, the

23  Board must apply detailed standards when evaluating whether an

24  individual inmate is unsuitable for parole on public safety

25  grounds.  (See § 3041, subd. (b); CCR § 2402.)  When the Board

26  bases unsuitability on the circumstances of the commitment

27  offense, it must cite 'some evidence' of aggravating facts

28  *beyond the minimum elements of that offense.*  (*Rosenkrantz,*

                                    4

1  *supra,* 29 Cal.4th 616, 658, 683.)"  (*In re Dannenberg* (2005), 34

2  Cal.4th 1061, 1095, emphasis in original.)

3      For the Board's, and lower Court's, decision to withstand

4  judicial review it must have cited some evidence, from the

5  record, that petitioner's commitment offense: 1) Was committed

6  in an especially egregious manner; and 2) Contained aggravating

7  facts beyond the minimum elements of that offense.  Also, the

8  evidence cited by the Board must rationally indicate that the

9  prisoner currently presents an unreasonable public safety risk

10  if released from prison.  ("[A] life term offense or any other

11  offenses underlying an indeterminate sentence must be

12  particularly egregious to justify the denial of parole date."

13  (*In re Ramirez* (2001) 94 Cal.App.4th 549, 570; disapproved on

14  other grounds in *In re Dannenberg, supra,* 34 Cal.4th 1061.)

15  When the Board bases unsuitability on the circumstances of the

16  commitment offense, it must cite "some evidence" of aggravating

17  facts *beyond the minimum elements of that offense.*

18  (*Rosenkrantz, supra*, at 658, 683; *In re Dannenberg,* supra, 34

19  Cal.4th 1061, 1095, emphasis in original.)

20      The Superior Court of Tulare County denied the petition for

21  writ of habeas corpus on the grounds that there were relevant

22  facts supporting the Board's decision.  However, none of the

23  facts cited by the lower Court in support of the denial complied

24  with either the regulations, statutes or California Supreme

25  Court precedence.  The Superior Court, referencing the hearing

26  transcript, stated "1: (Decision Page 1, Lines 14-18 'First of

27  all we'll talk about the commitment offense.  It was carried out

28  in a very dispassionate and calculated manner such as an

5

1  execution style murder.  The offense was carried out in a manner
2  an especially cruel and callous manner."  (Attachment Two, p. 2,
3  L 12-14.).  The actual hearing transcript states, "First of all
4  we'll talk about the commitment offense.  It was carried out in
5  an especially cruel and callous manner in that his crime
6  partner, who I read in the legal documents got life without the
7  possibility of parole." (Attachment One, Exhibit 1, Initial
8  Parole Consideration Hearing Transcript, p. 66, L 14-18.)  There
9  is absolutely no evidence in the record of this case that
10 supports the allegation that the commitment offense was an
11 execution-style murder.  The fact that petitioner's crime
12 partner received a term of life without the possibility of
13 parole is not "some evidence" that petitioner committed an
14 especially egregious crime.  "[Petitioner] is entitled to have
15 his application for these benefits [parole] 'duly considered'
16 based upon an *individualized consideration* of all relevant
17 factors."  (*Rosenkrantz, supra*, 29 Cal.4th at p. 655, emphasis
18 added.)  Neither the Board nor the Superior Court can ascribe
19 acts committed by one party to another.  To assign to petitioner
20 the act committed by his crime partner, and then rely upon this
21 "fact" as "some evidence" that petitioner's release unreasonably
22 endangers public safety, is untenable.  Petitioner willingly
23 participated in a robbery.  While petitioner sat in the getaway
24 car, his crime partner entered the store and during the robbery
25 an innocent victim was killed.  Petitioner was convicted under
26 the felony murder rule.  Petitioner did not shoot or murder
27 anyone.
28      "The test is not whether some evidence supports the *reasons*

6

1  the [Board] cites for denying parole, but whether some evidence

2  indicates a parolee's release *unreasonably endangers public*

3  *safety.* (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole

4  denied if prisoner 'will pose an unreasonable risk of danger to

5  society if released from prison']; see e.g. *In re Scott* (2005)

6  133 Cal.App.4th 573, 595 ['The commitment offense can negate

7  suitability [for parole] only if circumstances of the crime...

8  rationally indicate the offender will present an unreasonable

9  public safety risk if released from prison'].) Some evidence of

10 the existence of a particular factor does not necessarily equate

11 to some evidence the parolee's release unreasonably endangers

12 public safety." (*In re Lee* (2006) 49 Cal.Rptr.3d 931, 936-937.)

13     The Board, and the Superior Court, failed to demonstrate or

14 cite any reliable evidence which would indicate that

15 petitioner's release would unreasonably endanger public safety

16 as required by statute. Based on California law the Board's

17 decision resulted in a violation of petitioner's due process

18 rights. (Petitioner would respectfully request that this court

19 take judicial notice of Argument I in the original petition for

20 writ of habeas corpus, Amendment One, pp. 11-20.)

21                           V

22     *Claim*: The Board violated the Due Process Clause of the

23 Fifth Amendment and the notice and jury trial guarantees of the

24 Sixth and Fourteenth Amendments of the United States

25 Constitution.

26     *Argument*: The United States Supreme Court held in

27 *Cunningham v. California*, ___ U.S. ___ (2007), "[P]lacing

28 sentence-elevating fact-finding within the judge's [or Board's]

1   province, violate[d] a defendant's right to trial by jury

2   safeguarded by the Sixth and Fourteenth Amendments."   In

3   *Apprendi v. New Jersey*, 530 U.S. 466, 490, the United States

4   Supreme Court held that, under the Sixth Amendment, "[A]ny fact

5   (other than a prior conviction) that exposes a defendant to a

6   sentence in excess of the relevant statutory maximum must be

7   found by a jury, not a judge, and established beyond a

8   reasonable doubt, not merely by a preponderance of the

9   evidence." (See also *Jones v. United States*, 526 U.S. 227, 244

10  (1999).) The "statutory maximum" in this case is 25 years.

11      The Board relied on facts and elements of the crime that

12  were neither charged in the original indictment nor admitted by

13  petitioner.  (i.e., That the crime was an execution-style

14  murder.)  This is a violation of the Due Process Clause of the

15  Fifth Amendment as well as the Sixth and Fourteenth Amendments

16  to the Unite States Constitution.

17      The United States Supreme court held that "[T]he relevant

18  'statutory maximum,' is not the maximum sentence a judge may

19  impose after finding additional facts, but the maximum he may

20  impose *without* any additional findings."  (*Blakley v.

21  Washington*, 542 U.S. 296, 303-304, emphasis in original.)

22  (Petitioner would respectfully request that this court take

23  judicial notice of Argument II in the original writ of habeas

24  corpus, Attachment One, pp. 20-23.)

25      The Board's reliance on facts not charged in the indictment,

26  proven beyond a reasonable doubt to a judge or jury, or admitted

27  by petitioner, resulted in a constitutional violation of his

28  Fifth, Sixth and Fourteenth Amendment rights.  The Judge of the

1 Superior Court for the County of Tulare failed to address the

2 merits of this issue.

3     Therefore, the decision of unsuitability should be reversed

4 and the Board should be ordered to schedule a new hearing at

5 which a parole release date will be set in accordance with the

6 law.

7 **CONCLUSION**

8     The California rules governing parole in murder cases, for

9 which parole eligibility is provided by statute, [See CCR §

10 2402] are as follows: "[P]arole eligibility is the rule, rather

11 than the exception." (*In re Scott*, (2004) 119 Cal.App.4th at p.

12 891.) "[P]arole is 'normally' to be granted." (*Id.* [quoting

13 Penal Code § 3041 (a)].) The murder giving rise to the

14 prisoner's incarceration must be "particularly egregious" for

15 parole to be denied. (*In re Rosenkrantz, supra*, 29 Cal.4th at

16 p. 683.) Indeed, a murder must be "heinous, atrocious or cruel"

17 if, as here, the offense is to serve as the basis for parole

18 denial. (CCR § 2402 (c)(1).) In addition, in such cases, the

19 prisoner must *presently* present a danger to society. (Penal

20 Code § 3401 (b).) In short, in petitioner's case, the

21 circumstances surrounding the crime or the manner in which it

22 was committed must show not only that the first degree murder at

23 issue was more cruel or vicious than the ordinary first degree

24 murder, but also that petitioner would likely pose a current

25 risk to public safety if released. The record in this case

26 contains absolutely *no* evidence that would meet *either* of the

27 two requirements. The record establishes that petitioner does

28 not pose an unreasonable risk to public safety. Any contrary

9

1  conclusion lacks any evidentiary support.  Thus, there can be

2  little doubt that the Board violated the applicable laws and

3  regulations when it found petitioner unsuitable for parole.

4

5      WHEREFORE, petitioner respectfully requests that this court:

6  1.  Take judicial notice of the full record;

7  2.  Issue a Writ of Habeas Corpus or Order to Show Cause to

8  the Director of Corrections and the Chairperson, Board of Parole

9  Hearings, to inquire into the illegal and unconstitutional

10 actions stated in the petition;

11 3.  Appoint counsel;

12 4.  Declare the rights of the parties;

13 5.  Not allow intuitional transfer until the full outcome of

14 this case; and

15 6.  Grant any other and further relief the court deems just.

16

17 DATED:   April 29, 2007                    Respectfully submitted,

18

19                                            Cleve Otis Hulsey
                                              Petitioner, In Pro Per
20

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

## VERIFICATION

I, Cleve Otis Hulsey, state:

I am the petitioner in this action.  All the facts in the above document, not otherwise supported by citations to the record, attachments, or other documents, are true of my own personal knowledge, except as to matters that are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 29, 2007, at the Correctional Training Facility, Soledad, California.

Cleve Otis Hulsey

## LIST OF EXHIBITS

Attachment One
    Petition for Writ of Habeas Corpus (Case No. 180809),
    Superior Court of Tulare County

Attachment Two
    Order Denying Petition for Writ of Habeas Corpus
    Superior Court of Tulare County

**A T T A C H M E N T**

**ONE**

Petition for Writ of Habeas Corpus
Superior Court of Tulare County

MC-275

Name    Cleve Hulsey

Address    P. O. Box 705, WA-350L

Soledad, CA 93960-0705

CDC or ID Number    E-53226

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF TULARE

(Court)

PETITION FOR WRIT OF HABEAS CORPUS

Cleve Hulsey

Petitioner

vs.

No. _____

Board of Parole Hearings, et. al

*(To be supplied by the Clerk of the Court)*

Respondent

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 al seq.;
Cal. Rules of Court, rule.60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction                    ☒ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name:   Cleve Hulsey

2. Where are you incarcerated?   Correctional Training Facility, Soledad,   CA

3. Why are you in custody?   ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a.  State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder, First Degree

   b.  Penal or other code sections:   187

   c.  Name and location of sentencing or committing court:   Superior Court of California, County

   of Tulare

   d.  Case number:   27850

   e.  Date convicted or committed:   March 28, 1990

   f.  Date sentenced:   April 19, 1990

   g.  Length of sentence:   25 years to life

   h.  When do you expect to be released?   unknown

   i.  Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

   James T. Wilson, Attorney At Law, 3714 W. Mineral King Ave.

   Visalia, CA 93291

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☒ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached petition

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at *what time (when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim).*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

7. Ground 2 or Ground _____ (*if applicable*):

See attached petition

_____

_____

_____

_____

a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☒ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result: _____   c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

           (2) _____

           (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.  If yes, give the following information:

   a. Result: _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

           (2) _____

           (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   N/A

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   N/A

   b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
   *Attach documents that show you have exhausted your administrative remedies.*

PETITION FOR WRIT OF HABEAS CORPUS

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

       (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b.  (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

       (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
    N/A

_____

_____

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No.  If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No.  If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    N/A

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: March 11, 2007

▶ _____
                      (SIGNATURE OF PETITIONER)

1  Cleve Hulsey, E-53226
   P. O. Box 705, WA-350L
2  Soledad, CA 93960-0705

3  Petitioner, In Pro Per

4

5

6

7

8

9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                        COUNTY OF TULARE

12

13

14  _____
                                    )
15  Cleve Hulsey,                   )
                                    )    Case No.
16              Petitioner,         )
                                    )
17        v.                        )    PETITION FOR WRIT OF
                                    )    HABEAS CORPUS
18  Board of Parole Hearings, et al.,)
                                    )
19              Respondent.         )
    _____)

20

21        TO THE HONORABLE JUDGE OF THE SUPERIOR COURT OF
            CALIFORNIA, IN AND FOR THE COUNTY OF TULARE
22

23      Petitioner hereby petitions for a Writ of Habeas Corpus and

24  by this verified petition states as follows:

25                              I

26                         INTRODUCTION

27      1.  The Board of Parole Hearings [hereinafter Board] failed

28  to make its suitability determination in a manner consistent

                              1

1  with its obligation under the California Penal Code, California

2  Code of Regulations and settled California law.  The Board's

3  decision failed to follow or apply controlling legal principles

4  and its own regulations in finding petitioner unsuitable for

5  parole, the decision was devoid of the "some evidence" required

6  by law, and was arbitrary and capricious resulting in a due

7  process violation of Article 1, § 7 of the California

8  Constitution and the Fifth and Fourteenth Amendments to the

9  United States Constitution.  The Board violated the Due Process

10  Clause of the Fifth Amendment and the notice and jury trial

11  guarantees of the Sixth Amendment of the United States

12  Constitution.  For these reasons the Board's finding that

13  petitioner is unsuitable for parole should be reversed.

14                                II

15                             PARTIES

16     2.  Petitioner Cleve Hulsey is a prisoner of the State of

17  California and is currently incarcerated at the Correctional

18  Training Facility in Soledad, California.

19     3.  Respondent Ben Curry is the Acting Warden of the

20  Correctional Training Facility, Soledad, California.

21     4.  Respondent J. Dovey is the Director of the California

22  Department of Corrections and Rehabilitations.

23     5.  Respondent James Davis is the Chairperson of the Board

24  of Parole Hearings and is responsible for its operations.

25  (Penal Code § 5075.)

26     6.  Respondent Arnold Schwarzenegger is the Governor of the

27  State of California and is responsible for the Board's

28  operation.  (Penal Code §§ 5075, 3041.1 and 3041.2.)

                                2

III

STATEMENT OF FACTS

7.   Petitioner was convicted of first degree murder on March 28, 1990, and sentenced to 25 years-to-life on April 19, 1990.

8.   On May 9, 2006, Petitioner's Initial Parole Consideration Hearing was held before the Board.   Petitioner was found unsuitable and denied parole for a period of three years.

9.   Petitioner has no other plain or adequate remedy in the ordinary course of the law.   This petition is addressed to this courts original habeas corpus jurisdiction because the issues raised are of constitutional dimension, questioning the legality of petitioner's confinement.   A petition for a Writ of Habeas Corpus based upon factual allegations to be determined by reviewing court is generally first brought in the Superior Court.   (*In re Hillery* (1972) 202 Cal.App.2nd 293.)   Petitioner alleges that the Board violated his due process rights by failing to find him suitable for parole, thus depriving him of a liberty interest.   The Fifth and Fourteenth Amendments of the United States Constitution and the California Constitution, Article I, section 7, subdivision (a), prohibit the government from depriving an inmate of life, liberty, or property without due process of law.   Petitioner has been denied due process of law in violation of not only the United States Constitution but also the Constitution of the State of California, the California Penal Code, the California Code of Regulations, and established law.   This is petitioner's first request for habeas relief, and thus is properly filed in this court.

10.   The accompanying Memorandum of Points and Authorities

3

1  and factual allegations contained herein, as well as the exhibits

2  appended to this petition are incorporated herein by reference.

3      WHEREFORE, petitioner respectfully prays that this Court:

4      A.  Issue a Writ of Habeas Corpus directing the Director of

5  the Department of Corrections and Rehabilitation to inquire into

6  the legality of petitioner's incarceration;

7      B.  Order the immediate release of the petitioner; or

8      C.  Order the Board to schedule and commence a new term-

9  fixing hearing within thirty days, and to render a new

10  determination in strict accordance with both the letter and

11  spirit of the regulations and law;

12      D.  Conduct an evidentiary hearing;

13      E.  Appoint counsel;

14      F.  Declare the rights of the parties; and

15      G.  Grant any and all relief the court deems appropriate.

16

17  DATED:  March 11, 2007           Respectfully submitted,

18

19

20                      Cleve Hulsey
                    Petitioner, In Pro Per

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## VERIFICATION

I, Cleve Hulsey, state:

I am the petitioner in this action.  I have read the foregoing petition for writ of habeas corpus and the attached memorandum of points of authority, and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on March 11, 2007.

Cleve Hulsey
Petitioner, In Pro Per

5

1    MEMORANDUM AND POINTS OF AUTHORITY

2                    INTRODUCTION

3        "The Board of Prison Terms is authorized by statute to

4    determine parole suitability, and to exercise its discretion in

5    deciding whether to grant or deny parole." (*In re Rosenkrantz*

6    (2000) 80 Cal.App.4th 409, 423; Penal Code, § 3040.)

7        Penal Code section 3041 sets forth criteria for determining

8    parole and provides in pertinent part: "(a) ... One year prior

9    to the inmate's minimum eligible release date a panel consisting

10   of at least two commissioners on the Board of Prison Terms shall

11   ... meet with the inmate and shall normally set a parole release

12   date.... The release date shall be set in a manner that will

13   provide uniform terms for offenses of similar gravity and

14   magnitude in respect to their threat to the public, and that

15   will comply with the sentencing rules that the Judicial Council

16   may issue and any sentencing information relevant to the setting

17   of parole release dates.  The Board shall establish criteria for

18   setting of parole release dates and in doing so shall consider

19   the number of victims of the crime for which the prisoner was

20   sentenced and other factors in mitigation or aggravation of the

21   crime ...  [¶] (b) The panel or board shall set a release date

22   unless it determines that the gravity of the current convicted

23   offenses, or the timing and gravity of current or past convicted

24   offense, or offenses, is such that consideration of the public

25   safety requires a more lengthy period of incarceration for this

26   individual, and that a parole date, therefore, cannot be fixed

27   at this meeting."

28       The California Code of Regulations (hereinafter CCR), title

                              6

1   15, division 2, chapter 3, article 11, section 2400 et seq. set

2   forth additional criteria for determining parole suitability for

3   persons found guilty of murders committed after November 7,

4   1978.  Subdivision (a) of section 2402 provides: "The panel

5   shall first determine whether the life prisoner is suitable for

6   release on parole.  Regardless of the length of time served, a

7   life prisoner shall be found unsuitable for and denied parole if

8   in the judgment of the panel the prisoner will pose an

9   unreasonable risk of danger to society if released from prison."

10      Subdivision (b) of section 2402 directs the Board to

11  consider "[a]ll relevant, reliable information available to the

12  panel ... in determining suitability for parole.  Such

13  information shall include [(1)] the circumstances of the

14  prisoner's social history; [(2)] past and present mental state;

15  [(3)] past criminal history; including involvement in other

16  criminal misconduct which is reliable documented; [(4)] the base

17  and other commitment offenses, including behavior before, during

18  and after the crime; [(5)] past and present attitude towards the

19  crime; [(6)] any conditions of treatment or control, including

20  the use of special conditions under which the prisoner may

21  safely be released to the community; and [(7)] any other

22  information which bears on the prisoner's suitability for

23  release.  Circumstances which taken alone may not firmly

24  establish unsuitability for parole may contribute to a pattern

25  which results in a finding of unsuitability."

26      Subdivision (c) of section 2402 sets forth the

27  "circumstances tending to show unsuitability" for parole, which

28  "include: [¶] (1) Commitment Offense.  The prisoner committed

7

1  the offense in an especially heinous, atrocious or cruel manner.

2  The factors to be considered include: [¶] (A) Multiple victims

3  were attacked, injured or killed in the same or separate

4  incidents.   [¶] (B) the offense was carried out in a

5  dispassionate and calculated manner, such as an execution-style

6  murder.  [¶] (C) The victim was abused, defiled or mutilated

7  during or after the offense.  [¶] (D) The offense was carried

8  out in a manner which demonstrates an exceptionally callous

9  disregard for human suffering.  [¶] (E) The motive for the crime

10 is inexplicable or very trivial in relation to the offense.  [¶]

11 (2) Previous Record of Violence.  The prisoner on previous

12 occasions inflicted or attempted to inflict serious injury on a

13 victim, particularly if the prisoner demonstrated serious

14 assaultive behavior at an early age.  [¶] (3) Unstable Social

15 History.  The prisoner has a history of unstable or tumultuous

16 relationships with others.  [¶] (4) Sadistic Sexual Offenses.

17 The prisoner has previously sexually assaulted another in a

18 manner calculated to inflict unusual pain or fear upon the

19 victim.  [¶] (5) Psychological Factors.  The prisoner has a

20 lengthy history of severe mental problems related to the

21 offense.  [¶] (6) Institutional Behavior.  The prisoner has

22 engaged in serious misconduct in prison or jail."

23      Subdivision (d) of section 2402 sets forth the

24 "circumstances tending to show suitability" for parole, which

25 "include: [¶] (1) No Juvenile record.  The prisoner does not have

26 a record of assaulting others as a juvenile or committing crimes

27 with a potential of personal harm to victims.  [¶] (2) Stable

28 Social History.  The prisoner has experienced reasonable stable

1  relationships with others.  [¶] (3) Signs of Remorse.  The

2  prisoner performed acts which tends to indicate the presence of

3  remorse, such as attempting to repair the damage, seeking help

4  for or relieving suffering of the victim, or indicating that he

5  understands the nature and magnitude of the offense.  [¶] (4)

6  Motivation for Crime.  The prisoner committed his crime as the

7  result of significant stress in his life, especially if the

8  stress has built over a long period of time. ... [¶] (6) Lack of

9  Criminal History.  The prisoner lacks any significant history of

10  violent crime.  [¶] (7) Age.  The prisoner's present age reduces

11  the probability of recidivism.  [¶] (8) Understanding and Plans

12  for Future.  The prisoner has made realistic plans for release

13  or has developed marketable skills that can be put to use upon

14  release.  [¶] (9) Institutional Behavior.  Institutional

15  activities indicate an enhanced ability to function within the

16  law upon release."

17      In *Rosenkrantz*, our Supreme Court held "that the judicial

18  branch is authorized to review the factual basis of a decision

19  of the Board denying parole in order to ensure that the decision

20  comports with the requirements of due process of law, but that

21  in conducting such a review, the court may inquire only whether

22  *some evidence* in the record before the Board supports the

23  decision to deny parole, based upon *the factors specified by*

24  *statute and regulation.*  If the decision's consideration of the

25  specified factors is not supported by some evidence in the record

26  and thus is devoid of a factual basis, the court should grant

27  the prisoner's petition for writ of habeas corpus and should

28  order the Board to vacate its decision denying parole and

9

1  therefore to proceed in accordance with due process of law."

2  (*In re Rosenkrantz (2002)* 29 Cal.4th 616, 658, emphasis added.)

3      In *Dannenberg* the Supreme Court held "In that regard, we

4  noted that 'the nature of the prisoner's offense, alone, can

5  constitute a sufficient basis for denying parole. [Citations.]'

6  (*Rosenkrantz, supra,* 29 Cal.4th 616, 682.)  While neither the

7  board nor the Governor may adopt a blanket no-parole policy for

8  particular offenses, we said, 'the [parole] authority properly

9  may weigh heavily the degree of violence used and the amount of

10  viciousness shown by a defendant.'  (*Id.*, at p. 683.) [¶]

11  However, we cautioned, sole reliance on the commitment offense

12  might, in particular cases, violate section 3041, subdivision

13  (a)'s provision that a parole date 'shall normally be set' under

14  'uniform term' principles, and might thus also contravene the

15  inmate's constitutionally protected expectation of parole.  We

16  explained that such a violation could occur, 'for example[,]

17  where no circumstances of the offense reasonable could be

18  considered more aggravated or violent than the minimum necessary

19  to sustain a conviction for that offense.'  (*Rosenkrantz, supra*,

20  29 Cal.4th 616, 683.)  Quoting *Ramirez, supra*, 94 Cal.App.4th

21  549, 570, we suggested that, in order to prevent the parole

22  authority's case-by-case suitability determinations from

23  swallowing the rule that parole should 'normally' be granted, an

24  offense must be '*particularly egregious*' to justify the denial

25  of parole.  (*Rosenkrantz, supra*, at 683.)" (*In re Dannenberg*,

26  (2005) 34 Cal.4th 1061, 1094-1095.)

27      The Supreme Court then held "As we have explained, however,

28  the Board must apply detailed standards when evaluating whether

1   an individual inmate is unsuitable for parole on public safety

2   grounds.   (See § 3041, subd. (b); CCR § 2402.)   When the Board

3   bases unsuitability on the circumstances of the commitment

4   offense, it must cite 'some evidence' of aggravating facts

5   *beyond the minimum elements of that offense.   (Rosenkrantz,*

6   *supra*, 29 Cal.4th 616, 658, 683.)"   (*In re Dannenberg, supra*, 34

7   Cal.4th 1061, 1095.)

8        Therefore, the Board must follow and apply the standards

9   set forth above in determining that the circumstances of the

10  commitment offense were "particularly egregious" and support

11  that determination with "some evidence" in the record.   As will

12  be shown below, the Board failed to meet this requirement, as

13  well as controlling legal principles, which resulted in a

14  violation of petitioner's due process rights and other state and

15  federal constitutional rights.

16                              I

17       *Claim*:   The Board failed to follow or apply the controlling

18  legal principles, the decision was devoid of the "some evidence"

19  required by law and was arbitrary and capricious, resulting in a

20  due process violation of Article I, § 7 of the California

21  Constitution and the Fifth and Fourteenth Amendment to the

22  United States Constitution.

23       *Argument*:   In finding petitioner unsuitable for parole the

24  Board relied on CCR, § 2402, subdivisions (c)(1)(B), (c)(1)(D),

25  and (c)(1)(E), as "some evidence" that petitioner's crime was

26  "particularly egregious," making him unsuitable for parole, and

27  that he *currently* poses a threat to public safety if released at

28  this time.

                              11

1    First, a cursory review of the record in this case

2  demonstrates that the Board's decision was unreasonable under

3  the applicable "some evidence" rule.  The record simply does not

4  contain *any* evidence that petitioner's first degree murder was

5  *particularly* egregious.  Nor does the record contain *any*

6  evidence that petitioner is currently a threat to society.

7  Given that both findings are required by California Law, there

8  is *zero* evidence in the record to support the Board's decision.

9    Second, the nature of the offense may justify a denial of

10  parole if the crime was committed in an "especially heinous,

11  atrocious or cruel manner."  An offense that was "no more

12  aggravated or violent than the minimum necessary to sustain a

13  conviction" for first degree murder does not justify a finding

14  of unsuitability for parole.  (*Rosenkrantz* at p. 682.)

15    To guide this determination, CCR, § 2402, subd. (c)(1)(A)-

16  (E) establishes the specified criteria the Board must rely on to

17  demonstrate that a prisoner committed his offense in an

18  "especially heinous, atrocious or cruel manner."  It is

19  axiomatic that absent the required "some evidence" supporting

20  any of the specified factors that decision would be arbitrary

21  and capricious and result in a due process violation.

22    Petitioner will demonstrate that each of the Board's

23  unsuitability findings failed to meet the specified regulatory

24  requirements.

25  A.   The Board's finding that petitioner's crime was perpetrated
       in a dispassionate and calculated manner, such as an
26     execution-style murder, lacks any supporting evidence.

27    CCR, § 2402 (c)(1)(B) states, "The offense was carried out

28  in a dispassionate and calculated manner, such as an execution-

12

1    style murder."

2         In support of this factor the Board found, "It [the

3    commitment offense] was carried out in an especially cruel and

4    callous manner in that his crime partner, who I read in the

5    legal documents got life without the possibility of parole."

6    (Exhibit 1, Initial Parole Consideration Hearing Transcript, May

7    9, 2006 [hereinafter HT], p. 66, L 15:18.)

8         The relevant evidence does not merely fail to support but

9    refutes the conclusion that petitioner committed his offense in

10   a dispassionate and calculated manner, such as an execution-

11   style murder.

12        The Probation Officer's Report [hereinafter POR] states,

13   "Circumstances in the presenting matter indicates that the

14   defendant and an alleged co-participant preplanned a robbery at

15   a rural Woodlake convenience store in order to obtain money with

16   which to buy beer."  (Exhibit 2, POR, pp. 5-6.)

17        The circumstances of the offense, as noted by the Board,

18   were, "At some point Abele [the co-defendant] had began – had

19   begun to talk about robbing a store in Woodlake." (Exhibit 1,

20   HT, p. 16, L 11:14.)

21        During the Proceedings On Sentencing hearing, held on April

22   19, 1990, the Honorable Robert C. Van Auken, Judge, stated, "And

23   I realize that Mr. Hulsey was a participant by reason of the

24   aider and abettor rule, and that he was outside of the

25   particular store in question, and there was a young man, 17

26   years of age, behind a counter who's no longer on earth because

27   of the fact that Mr. Hulsey's cohort – however that occurred,

28   but apparently the gun went off and killed that individual."

                                  13

1  (Exhibit 6, Proceedings On Sentencing, p. 14, L 4:12.)

2        To sum up the evidence and the circumstances of the offense

3  as reported in the record: 1) Petitioner, at worst, aided and

4  abetted a plan to commit an armed robbery; and 2) Petitioner was

5  found guilty of first degree murder based on the felony-murder

6  rule in that a person died during the commission of a robbery.

7  There is absolutely no evidence that petitioner premeditated or

8  planned to commit a murder. Was the *robbery* calculated?  Yes.

9  Was the murder committed in an execution-style manner?  No.  Was

10 petitioner found guilty of special circumstances that could have

11 resulted in either life without the possibility of parole or the

12 death penalty?  No.  The judge convicted petitioner on the

13 felony-murder rule, which does not require malice or

14 premeditation.

15       The Board's finding that petitioner acted "in a

16 dispassionate and calculated manner, such as an execution-style

17 murder" was wholly inconsistent for the record provides not a

18 scintilla of evidence in support.  Because the record lacks even

19 the "modicum" of evidence required by law, the Board's decision

20 is arbitrary and capricious and resulted in a due process

21 violation.

22 B.    The Board's finding that petitioner demonstrated an
        exceptionally callous disregard for human suffering is not
23      supported by any evidence.

24       CCR, § 2402 (c)(1)(D) states, "The offense was carried out

25 in a manner which demonstrates an exceptionally callous

26 disregard for human suffering."

27       The Board stated, "The way it was carried out demonstrated

28 an exceptional callous disregard for human suffering in that a

                                  14

1 life was taken for five dollars..." (HT, p. 67, L 22:25.)

2 All first degree murders by definition involve some

3 callousness – i.e., lack of emotion or sympathy, emotional

4 insensitivity, indifference to the feelings and suffering of

5 others. As noted, however, parole is the rule, rather than the

6 exception, and a conviction for first degree murder does not

7 automatically render one unsuitable." (*In re Smith* (2003) 114

8 Cal.App.4th 343, 366.) In *In re Ramirez* (2001) 94 Cal.App.4th

9 549, as in this case, the Board denied a parole release date on

10 the basis of a finding that the nature of the inmate's offense

11 displayed a "callous disregard for human suffering." (*Id.* at pp.

12 558, 568.) Setting aside that determination, the court agreed

13 that "the gravity of the commitment offense or offenses alone

14 *may* be a sufficient basis for denying a parole application, so

15 long as the board does not fail to consider all other relevant

16 factors," *Id.* at p. 569, but attached an important caveat. As

17 the court explained, "[a]ll violent crime demonstrates the

18 perpetrator's potential for posing a grave risk to public

19 safety, yet parole is mandatory for violent felons serving

20 determinate sentences. (Pen. Code, § 3000, subd. (b)(1).) And

21 the Legislature has clearly expressed its intent that when

22 murderers – who are the great majority of inmates serving

23 indeterminate sentences – approach their minimum eligible parole

24 date, the Board 'shall normally set a parole release date.'

25 (Pen. Code, § 3041, subd. (a).) The Board's authority to make

26 an exception based on the gravity of a life term inmate's

27 current or past offenses should not operate so as to swallow the

28 rule that parole is 'normally' to be granted. Otherwise, the

1  Board's case-by-case rulings would destroy the proportionality

2  contemplated by Penal Code section 3041, subdivision (a), and

3  also the murder statutes, which provide distinct terms of life

4  without possibility of parole, 25 years to life, and 15 years to

5  life for various degrees and kinds of murder.  (Pen. Code, § 190

6  et seq.)."  (*Ramirez*, at p. 570.)  Therefore, to demonstrate "an

7  exceptionally callous disregard for human suffering" (§ 2402,

8  subd. (c)(1)(D)) the offense in question must have been

9  committed in a more aggravated or violent manner than that

10  ordinarily shown in the commission of first degree murder.

11      *In re Van Houten* (2004) 116 Cal.App.4th 339 illustrates the

12  sort of gratuitous cruelty required.  The prisoner in that case

13  was involved in multiple stabbings of a woman with a knife and

14  bayonet.  While she was dying, the victim was made aware her

15  husband was suffering a similarly gruesome fate.  As stated by

16  the court, "[t]hese acts of cruelty far exceeded the minimum

17  necessary to stab a victim to death."  (*Id.* at p. 351.)  Other

18  examples of aggravated conduct reflecting an "exceptionally

19  callous disregard for human suffering," are set forth in Board

20  regulations relating to the matrix used to set base terms for

21  life prisoners (§ 2282, subd. (b)); namely, "torture," as where

22  the "[v]ictim was subjected to the prolonged infliction of

23  physical pain through the use of non-deadly force prior to act

24  resulting in death," and "severe trauma," as where "[d]eath

25  resulted from severe trauma inflicted with deadly intensity;

26  e.g., beating, clubbing, stabbing, strangulation, suffocation,

27  burning, multiple wounds inflicted with a weapon not resulting

28  in immediate death or actions calculated to induce terror in the

16

1  victim." (*Ibid.*)  No such facts or anything remotely similar

2  are present in this case.  As in *In re Smith, supra,* 114

3  Cal.App.4th 343, there is no evidence petitioner "tormented,

4  terrorized, or injured the victim before his crime partner shot

5  the victim, or that he gratuitously increased or unnecessarily

6  prolonged the victim's pain and suffering.  As the *Scott* court

7  stated, "Was the crime callous? Yes.  However, are the facts of

8  the crime some evidence that [he] acted with exceptionally

9  callous disregard for [the victim's] suffering; or do the facts

10  distinguished this crime from other [first] degree murders as

11  exceptionally callous?  No.  (*Id.* at p. 367.)" (*In re Scott,*

12  (2004) 119 Cal.App.4th 871, 891-892.)

13      Because the relevant evidence shows no more callous

14  disregard for human suffering than is shown by most first degree

15  murder offenses, the Board's use of this factor to conclude that

16  petitioner committed his offense "in an especially cruel and

17  callous manner" was arbitrary and capricious.

18  C.   The Board's finding that petitioner's motive for the crime
           was inexplicable lacks evidentiary support.

19

20      CCR, § 2402 (c)(1)(E) states, "The motive for the crime is

21  inexplicable or very trivial in relation to the offense."

22      The final factor relied upon by the Board was the motive

23  for the crime.  The Board stated, "The way it was carried out

24  demonstrated an exceptional callous disregard for human

25  suffering in that a life was taken for five dollars, which the

26  motive for this crime is certainly inexplicable." (HT, p. 67, L

27  22:26.)

28      "The epistemological and ethical problems involved in the

                              17

1  ascertainment and evaluation of motive are among the reasons the
2  law has sought to avoid the subject.  As one authority has
3  stated, '[h]ardly any part of penal law is more definitely
4  settled than that motive is irrelevant.'  (Hall, General
5  Principles of Criminal Law (2d ed. 1960) at p. 88; see also
6  Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim.
7  Justice Ethics 3.)  An 'inexplicable' motive is one that is
8  unexplained or unintelligible, as where the commitment offense
9  does not appear to be related to the conduct of the victim and
10  has no other discernible purpose.  A person whose motive for a
11  criminal act cannot be explained or is unintelligible is
12  therefore unusually unpredictable and dangerous."  (*Scott* at pp.
13  892-893.) The finding that petitioner's motive was
14  "inexplicable" ignores the evidence.  Not even a "modicum of
15  evidence" shows petitioner's motive was anything other than to
16  commit a robbery, not a murder, and that his release would
17  therefore pose a greater threat to society than the release of
18  most life prisoners.  To permit petitioner's motive to be used
19  to deny him release would allow almost any motive to be used to
20  deny a prisoner release, making a mockery of the legislative
21  declaration that life prisoner are "normally" entitled to
22  receive a release date shortly before they first become eligible
23  for parole.  (Penal Code, § 3041, subd. (a).)
24      As it was required to do, the Board considered whether
25  petitioner was suitable for parole – that is, whether he
26  presented an unreasonable risk of danger to society if released.
27  (See Penal Code § 3041 (b); CCR, § 2402.)  It decided that
28  petitioner posed an unreasonable risk of danger (and, therefore,

1  was unsuitable for parole) because his crime was especially

2  heinous.   While relying upon the nature of petitioner's crime as

3  an indicator of his dangerousness -- after nearly two decades of

4  incarceration -- violates due process because petitioner's

5  commitment offense has become such an unreliable predictor of

6  his present and future dangerousness that it does not satisfy

7  the "some evidence" standard.   After nearly twenty years of

8  rehabilitation, the ability to predict a prisoner's future

9  dangerousness based simply on the circumstances of his or her

10  crime is nil.   (See *Irons v. Warden of California State Prison -*

11  *Solano*, 358 F.Supp.2d 936, 947 n1 ["To a point, it is true, the

12  circumstances of the crime and motivation for it may indicate a

13  petitioner's instability, cruelty, impulsiveness, violent

14  tendencies and the like.   However, after fifteen or so years in

15  the caldron of prison life, not exactly an ideal therapeutic

16  environment to say the least, and after repeated demonstrations

17  that despite the recognized hardships of prison, this petitioner

18  does not possess those attributes, the predictive ability of the

19  circumstances of the crime is near zero."]   Even California

20  courts have said as much.   (*In re Scott* (2005) 133 Cal.App.4th

21  573, 595 ["The commitment offense can negate suitability only if

22  circumstances of the crime reliably established by evidence in

23  the record rationally indicate that the offender will present an

24  unreasonable public safety risk if released from prison.   Yet,

25  the predictive value of the commitment offense may be very

26  questionable after a long period of time."].)

27      Regardless of whether the Board ever was entitled to rely

28  upon the commitment offense to find that petitioner posed an

19

1   unreasonable risk of danger and was unsuitable for parole, in

2   the exceptional circumstances presented by this case, the

3   Board's reliance on the commitment offense violates due process

4   because it resulted in an arbitrary decision and because the

5   facts surrounding the offense do not now constitute "some

6   evidence" possessing "some indicia of reliability" that

7   petitioner poses a danger to the community.

8       Because there is no reliable evidence supporting the

9   Board's conclusion that petitioner is unsuitable for parole,

10  that determination violates due process.

11                              II

12      *Claim:*  The Board violated the Due Process Clause of the

13  Fifth Amendment and the notice and jury trial guarantees of the

14  Sixth Amendment of the United States Constitution.

15      *Argument:*  The Board, in finding petitioner unsuitable for

16  parole, relied on facts and elements of the crime that were

17  neither charged in the original indictment nor admitted by

18  petitioner.  This is a violation of the Due Process Clause of

19  the Fifth Amendment and of petitioner's right to trial by jury

20  which offended the Sixth Amendment to the United States

21  Constitution.  "Under the Due Process Clause of the Fifth

22  Amendment and the notice and jury trial guarantees of the Sixth

23  Amendment, any fact (other than prior conviction) that increases

24  the maximum penalty for a crime must be charged in an

25  indictment, submitted to a jury, and proven beyond a reasonable

26  doubt."  (*Jones v. United States*, 526 U.S. 227, 244 (1999).)  As

27  Justice Stevens, in his concurring opinion, stated, "I am

28  convinced that it is unconstitutional for a legislature to

                              20

1  remove from the jury the assessment of facts that increase the
2  prescribed range of penalties to which a criminal defendant is
3  exposed.   It is equally clear that such facts must be
4  established by proof beyond a reasonable doubt." (*Id.* at pp.
5  252-253.)

6      The Board found that petitioner was unsuitable for parole
7  because it found the following "facts" proved that he posed an
8  unreasonable risk of danger to society if granted a parole
9  release date, and this increased the prescribed range of his
10  sentence.

11     The Board found that: 1) "The offense was carried out in
12  dispassionate and calculated manner, such as an execution-style
13  murder" (Exhibit 1, HT, p. 66, L 15:18); 2)  "The offense was
14  carried out in a manner which demonstrated an exceptional
15  callous disregard for human suffering" (Exhibit 1, HT, p. 67, L
16  22:25); and 3). "The motive for the crime is inexplicable or
17  very trivial in relation to the offense."  (Exhibit 1, HT, p.
18  64, L 22:26.)  The Board then extended petitioner's
19  incarceration period for at least another three years.  (Exhibit
20  1, HT p. 81, L 3:4.)

21     "The Sixth Amendment by its terms is not a limitation on
22  judicial power, but a reservation of jury power.  It limits
23  judicial power only to the extent that the claimed judicial
24  power infringes on the province of the jury.  Indeterminate
25  sentencing does not do so.  It increases judicial discretion, to
26  be sure, but not at the expense of the jury's traditional
27  function of finding the facts essential to lawful imposition of
28  the penalty.  Of course indeterminate schemes involve judicial

1    factfinding, in that a judge (like a parole board) may

2    implicitly rule on those facts he deems important to the

3    exercise of his discretion. But the facts do not pertain to

4    whether the defendant has a legal *right* to a lesser sentence –

5    and that makes all the difference insofar as judicial

6    impingement upon the traditional role of the jury is concerned."

7    (*Blakely v. Washington*, 542 U.S. 206, 308-309 (2004).)

8      "The governing rule in this area was articulated by the

9    Supreme Court in *Greenholtz v. Inmates of Nebraska Penal*, 442

10    U.S. 1 (1979), and *Board of Pardons v. Allen*, 482, U.S. 369

11    (1987). *Greenholtz* and *Allen* established that, while '[t]here

12    is no constitutional or inherent right of a convicted person to

13    be conditionally released before the expiration of a valid

14    sentence[,]' *Greenholtz*, 442 U.S. at 7, a state's statutory

15    scheme, if it uses mandatory language, 'creates a presumption

16    that parole release will be granted' when or unless certain

17    designated findings are made, and thereby gives rise to a

18    constitutional liberty interest. *Id* at 12; *Allen*, 482 U.S. at

19    377-78. The California parole scheme uses mandatory language

20    and is largely parallel to the schemes found in *Greenholtz* and

21    *Allen* to give rise to such an interest." (*McQuillon v. Duncan*,

22    306 F.3d 895, 901 (2002).)

23      "Under the 'clearly established' framework of *Greenholtz*

24    and *Allen*, we hold that California's parole scheme gives rise to

25    a cognizable liberty interest in release on parole. The scheme

26    'creates a presumption that parole release will be granted'

27    unless the statutorily defined determinations are made. *Allen*,

28    482 U.S. at 378 (quoting *Greenholtz*, 442 U.S. at 12.)" (*Id.* at

1  902.)

2      Petitioner would contend that his "statutory maximum"

3  period of confinement is 25 years based on the finding of facts

4  at the time of his trial. Petitioner has a legal right to a

5  sentence of less that life. The Board's reliance on facts not

6  charged in the indictment, proven beyond a reasonable doubt to a

7  judge or jury, or admitted by petitioner, resulted in a

8  constitutional violation of his Fifth and Sixth Amendment

9  rights. (See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)

10  ["Other than the fact of a prior conviction, any fact that

11  increases the penalty for a crime beyond the prescribed

12  statutory maximum must be submitted to a jury, and proved beyond

13  a reasonable doubt"; see also *Ring v. Arizona*, 536 U.S. 584, 602

14  ["'the maximum he would receive if punished according to the

15  facts reflected in the jury verdict alone'" )quoting *Apprendi*,

16  *supra*, at 483).)

17      The facts relied on by the Board, had they been found

18  beyond a reasonable doubt by the judge, would have resulted in a

19  sentence of death or life without the possibility of parole. As

20  this was not the case, the Board's increase of petitioner's

21  sentence beyond the legally defined 25 years is a clear

22  violation of the United States Constitution.

23      Therefore, the decision of unsuitability should be reversed

24  and the Board should be ordered to schedule a new hearing at

25  which a parole release date will be set.

26                        CONCLUSION

27      The California rules governing parole in murder cases, for

28  which parole eligibility is provided by statute, [See CCR §

23

1  2402] are as follows: "[P]arole eligibility is the rule, rather

2  than the exception." (In re Scott, supra, 119 Cal.App.4th at p.

3  891.) "[P]arole is 'normally' to be granted." (Id. [quoting

4  Penal Code § 3041 (a)].) The murder giving rise to the

5  prisoner's incarceration must be "particularly egregious" for

6  parole to be denied. (In re Rosenkrantz, supra, 29 Cal.4th at p.

7  683.) Indeed, a murder must be "heinous, atrocious or cruel"

8  if, as here, the offense is to serve as the basis for parole

9  denial. (CCR, § 2402 (c)(1).) In addition, in such cases, the

10  prisoner must presently present a danger to society. (Penal

11  Code § 3401 (b).) In short, in petitioner's case, the

12  circumstances surrounding the crime or the manner in which it

13  was committed must show not only that the first degree murder at

14  issue was more cruel or vicious than the ordinary first degree

15  murder, but also that petitioner would likely pose a current

16  risk to public safety if released. The record in this case

17  contains absolutely no evidence that would meet either of the

18  two requirements. Thus, there can be little doubt that the

19  Board violated the applicable rules when it denied petitioner

20  parole solely on the basis of his commitment offense.

21      All murders represent the basest form of human behavior.

22  Our laws, however, provide for mechanisms by which even

23  murderers, in limited circumstances, are entitled to be paroled.

24  The judiciary has an obligation to execute those laws. The

25  record establishes that petitioner does not pose an unreasonable

26  risk to public safety. Any contrary conclusion lacks any

27  evidentiary support. Therefore, petitioner prays that this

28  court will grant the petition for habeas corpus.

                                24

1     DATED: March 11, 2007            Respectfully submitted,

2

3                              Cleve Hulsey

                              Petitioner, In Pro Per

4     ///

5     ///

6     ///

7     ///

8     ///

9     ///

10     ///

11     ///

12     ///

13     ///

14     ///

15     ///

16     ///

17     ///

18     ///

19     ///

20     ///

21     ///

22     ///

23     ///

24     ///

25     ///

26     ///

27     ///

28     ///

## TABLE OF EXHIBITS

EXHIBIT 1
  Initial Parole Consideration Hearing Transcript
  May 9, 2006

EXHIBIT 2
  Probation Officer's Report
  March 26, 1990

EXHIBIT 3
  Abstract of Judgment
  April 19, 1990
  (Amendment to Abstract of Judgment, August 1, 1991)

EXHIBIT 4
  Psychological Evaluation
  February 25, 1993

EXHIBIT 5
  Psychological Evaluation
  April 25, 2006

EXHIBIT 6
  Proceedings On Sentencing Transcript
  April 19, 1990, pages 1 and 14

**E X H I B I T**

1

Initial Parole Consideration Hearing Transcript
May 9, 2005

# EXHIBIT 3
# Part 2 of 3

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )     CDC Number E-53226
Hearing of: )
                         )
CLEVE HULSEY )

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2006

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DAVID YACONO, Deputy Commissioner

OTHERS PRESENT:

CLEVE HULSEY, Inmate
MARY ANN TARDIFF, Attorney for Inmate
DANIEL UNDERWOOD, Deputy District Attorney
CORRECTIONAL OFFICER, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

**Marsha Mees, Peters Shorthand Reporting**

ii

INDEX

Page

Proceedings........................................ 1

Case Factors...................................... 14

Pre-Commitment Factors............................ 22

Post-Commitment Factors........................... 37

Parole Plans...................................... 27

Closing Statements................................ 55

Recess............................................ 65

Decision.......................................... 66

Adjournment....................................... 82

Transcriber Certification......................... 83

--oOo--

1

P R O C E E D I N G S

1    **DEPUTY COMMISSIONER YACONO:**  And our tape

2    is rolling.

3    **PRESIDING COMMISSIONER SAWYER:**  Very

4    good.  This is an initial hearing for Mr. Cleve,

5    C-L-E-V-E, Hulsey, H-U-L-S-E-Y, CDC number E as

6    in Edward 53226.  Today's date is Tuesday, May 9

7    and it's 2006.  We're located at the

8    Correctional Training Facility in Soledad.  Date

9    received was 4-23-1990 from the County of

10   Tulare.  The offense is murder in the first

11   degree with armed with a firearm, case number

12   27850.  Count number one is 187 and 12022(a) PC.

13   The term is 25 plus one to life.  Minimum

14   eligible parole date was 11-27-2000.  And we

15   have some other commitment offenses.  In count

16   two is robbery, first degree, 211 PC, Tulare

17   County, same case number.  Also an enhancement

18   on that, armed with a firearm, 12022(a).  And

19   count three a burglary, 459 PC, Tulare County,

20   same case in all those case numbers.

21   **DEPUTY COMMISSIONER YACONO:**  Excuse me,

22   Commissioner, I think the minimum date is 2006.

23   My handwriting version didn't but

24   (indiscernible).

25   **PRESIDING COMMISSIONER SAWYER:**  Is that

26   what they're saying.  Okay.  We're going to --

2

1    Let's verify that first of all.

2          **ATTORNEY TARDIFF:**  What is it?

3          **PRESIDING COMMISSIONER SAWYER:**  Minimum

4    eligible parole date is 2006.  I misstated that,

5    yes, thank you.  Because on my legal status

6    report it says the year 2000 minimum eligible

7    parole date.  I was going -- The next question I

8    was going to ask is what have you been doing

9    since 2000.  But I've corrected it on my sheet

10   and corrected it in the record.  This hearing is

11   being tape recorded.  And for the purpose of

12   identification we are required to state our

13   first and last name, spelling our last name.

14   When it comes to your turn, after you spell you

15   last name then I want you to also give us your

16   CDC number.  I'll start and go to my left.  Tom

17   Sawyer, S-A-W-Y-E-R, Commissioner.

18         **DEPUTY COMMISSIONER YACONO:**  David

19   Yacono, that's Y-A-C-O-N-O, Deputy Commissioner.

20         **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

21   T-A-R-D-I double F, attorney for Mr. Hulsey.

22         **INMATE HULSEY:**  Cleve Hulsey,

23   H-U-L-S-E-Y, E-53226.

24         **PRESIDING COMMISSIONER SAWYER:**  Very

25   good.  Thank you.  Mr. Underwood.

26         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**

27   Daniel Underwood, U-N-D-E-R-W-O-O-D, Deputy

3

1 District Attorney, Tulare County.

2   **PRESIDING COMMISSIONER SAWYER:** Thank

3 you. We also have two correctional peace

4 officers in the room for security purposes.

5 Mr. Hulsey, before you taped to the table

6 underneath your file there is an ADA

7 self-identification statement which I'll ask you

8 to read out loud and then I'll ask you what it

9 means. Could you read that for us into the

10 record.

11   **INMATE HULSEY:**

12   "ADA, Americans With Disabilities

13   Act. The Americans With

14   Disabilities Act, ADA, is a law to

15   help people with disabilities.

16   Disabilities are problems that

17   make it harder for some people to

18   see, hear, breathe, talk, walk,

19   learn, think, work or take care of

20   themselves than it is for others.

21   Nobody can be kept out of public

22   places or activities because of a

23   disability. If you have a

24   disability, you have the right to

25   ask for help to get ready for your

26   BPT hearing, get to the hearing,

27   talk, read forms and papers and

4

1       understand the hearing process.

2       BPT will look at what you asked

3       for to make sure that you have a

4       disability that is covered by the

5       ADA and that you have asked for

6       the right kind of help.  If you do

7       not get help or if you don't think

8       you got the kind of help you need,

9       ask for a BPT 1074 Grievance Form.

10      You can also get help to fill it

11      out."

12              PRESIDING COMMISSIONER SAWYER:  Okay.

13  What does that mean to you, sir?

14          INMATE HULSEY:  It means if I got

15  problems understanding what's going on or

16  participating in the hearing then I can get

17  help.

18          PRESIDING COMMISSIONER SAWYER:  That's

19  correct.  Okay.  I have a form, BPT Form 1073

20  which was signed by you on October -- looks

21  like, yeah, 30, 2002.  And you indicate on here

22  you do not have a disability.  Is that correct,

23  sir?

24          INMATE HULSEY:  Yeah.

25          PRESIDING COMMISSIONER SAWYER:  Okay.

26  Tell me about your glasses.

27          INMATE HULSEY:  I'm nearsighted.

5

1         PRESIDING COMMISSIONER SAWYER:  Okay.  So

2  you need those to see me or to read?

3         INMATE HULSEY:  To see you.

4         PRESIDING COMMISSIONER SAWYER:  Okay.

5         INMATE HULSEY:  I can up close just fine.

6         PRESIDING COMMISSIONER SAWYER:  Okay.

7  Very good.  That would -- we would -- If you

8  didn't have those glasses, we may have to -- we

9  may have -- have to accommodate you.  Okay.  So

10  that is --

11         INMATE HULSEY:  Yeah.

12         PRESIDING COMMISSIONER SAWYER:  --

13  essentially -- disability.  Okay.  That's fine.

14  The information on this form is current and

15  correct?

16         INMATE HULSEY:  As far as I can tell,

17  yes.

18         PRESIDING COMMISSIONER SAWYER:  As far as

19  you know, okay.  I'm going to ask you some

20  questions.  Do you have any problems walking up

21  and down stairs or for distances of 100 yards or

22  more?

23         INMATE HULSEY:  No.

24         PRESIDING COMMISSIONER SAWYER:  Do you

25  have any hearing impairments?

26         INMATE HULSEY:  No.

27         PRESIDING COMMISSIONER SAWYER:  Have you

6

1    ever been included in Triple CMS or EOP

2    programs?

3         INMATE HULSEY:  No.

4         PRESIDING COMMISSIONER SAWYER:  How far

5    did you get through school?

6         INMATE HULSEY:  Graduated high school and

7    took some college courses at Old Folsom when

8    they were available.

9         PRESIDING COMMISSIONER SAWYER:  Okay.

10   Graduated high school outside?

11        INMATE HULSEY:  Yeah.

12        PRESIDING COMMISSIONER SAWYER:  Did you

13   take any special education while you were

14   growing up?

15        INMATE HULSEY:  No.

16        PRESIDING COMMISSIONER SAWYER:  Suffer

17   from any disability that would prevent you from

18   participating in today's hearing?

19        INMATE HULSEY:  No.

20        PRESIDING COMMISSIONER SAWYER:  Very

21   good.  Okay.  I'm going to read the outline of

22   the hearing procedure.  And as I read along

23   here, I'll be asking you if you understand some

24   of the critical areas.  Okay.

25        INMATE HULSEY:  Okay.

26        PRESIDING COMMISSIONER SAWYER:  This

27   hearing is being conducted pursuant to Penal

7

1  Code Sections 3041 and 3042 and the rules and

2  regulations of the Board of Prison Terms

3  governing parole consideration hearings for life

4  inmates.  The purpose of the hearing today is to

5  consider your suitability for parole.  In doing

6  so we'll consider the number and the nature of

7  the crimes you were committed for, your prior

8  criminal and social behavior and your behavior

9  and programming since your commitment.  We've

10  had an opportunity to review your Central File

11  and you'll be given the opportunity to correct

12  or clarify the record.  We'll consider your

13  progress since your commitment, your counselor's

14  report and your psychological report.  Any

15  change in parole plans should be brought to our

16  attention.  We'll reach a decision today and

17  inform you whether or not we find you suitable

18  for parole and the reasons for our decision.  If

19  you are found suitable for parole, the length of

20  your confinement will be explained to you.

21  Before we go any further we want to advise you

22  that we expect you to be totally honest with us

23  today.  You understand?

24        **INMATE HULSEY:**  Yes.

25        **PRESIDING COMMISSIONER SAWYER:**  If you do

26  not get a date today, the hearing will form a

27  foundation for all future hearings.  If you do

8

1    not get a date today, any false statements that

2    you make could have an adverse effect on your

3    ability to get a date in the future.  Do you

4    understand?

5            INMATE HULSEY:  Yes.

6            PRESIDING COMMISSIONER SAWYER:  Nothing

7    that happens here today will change the findings

8    of the court.  We are not here to retry your

9    case.  We're here for the sole purpose of

10   determining your suitability for parole.  This

11   hearing will be conducted in two phases.  I'll

12   discuss with you the crime that you're committed

13   for, your prior criminal and social history,

14   your parole plans and any letters of support or

15   opposition that may be in your file.

16   Commissioner Yacono will discuss with you your

17   progress since your commitment, your counselor's

18   report and your psychological evaluation.  Once

19   that's concluded, the District Attorney and the

20   -- and your attorney will be given the

21   opportunity to ask you questions.  Questions

22   from the District Attorney will be -- actually

23   he'll ask the Board to ask -- ask you if he has

24   any questions.  And your response then would be

25   to hear his questions so I don't have to repeat

26   it and then you respond back to us.  Okay?

27           INMATE HULSEY:  All right.

9

1    **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

2    we're acting as his questioner.  Before we

3    recess for deliberations, the District Attorney,

4    your attorney and you will be given an

5    opportunity to make a final statement regarding

6    your suitability for parole.  We'll then recess,

7    clear the room and deliberate.  Once we've

8    completed our deliberation, we'll resume the

9    hearing and announce our decision.  California

10   Code of Regulations states that regardless of

11   time served a life inmate shall be found

12   unsuitable and denied parole if in the judgment

13   of the Panel the inmate would pose an

14   unreasonable risk of danger to society if

15   released from prison.  You have certain rights.

16   These rights include the right to a timely

17   notice of this hearing, the right to review your

18   Central File and the right to present relevant

19   documents.  Ms. Tardiff, has the inmate's rights

20   been met?

21          **ATTORNEY TARDIFF:**  They have.

22          **PRESIDING COMMISSIONER SAWYER:**  You also

23   have the right to be heard by an impartial

24   Panel.  Is there any objection to this Panel?

25          **INMATE HULSEY:**  No.

26          **PRESIDING COMMISSIONER SAWYER:**  Thank

27   you.  You'll receive a copy of our written

10

1   tentative decision today.  The decision is

2   subject to review by the Decision Review Unit

3   and by the entire Board meeting as a body.  It

4   will become effective within 120 days.  It's

5   also subject to review by the Governor.  A copy

6   of the tentative decision and a copy of the

7   transcript will be sent to you.  As of May 1,

8   2004 there were major changes limiting your

9   former rights to appeal Board decisions or

10  actions directly to the Board.  Old Board

11  regulations were repealed.  The current policy's

12  entitled Administrative Appeals, Correspondence

13  And Grievances Concerning Board Of Prison Terms

14  Decisions and it's available at the prison

15  library.  The real important here, you are not

16  required to admit your offense or discuss your

17  offense if you do not wish to do so.  However,

18  this Panel does accept as true the finding of

19  the court and you're invited to discuss the

20  facts and circumstances of the offenses if you

21  desire.  The Board will review and consider your

22  prior statements you have made regarding the

23  offense in determining your suitability for

24  parole.  Commissioner Yacono, is there any

25  confidential material?

26          **DEPUTY COMMISSIONER YACONO:**  No, Sir.

27          **PRESIDING COMMISSIONER SAWYER:**  Thank

11

1    you.  Mr. Underwood, if you'd check your hearing

2    checklist, I'm going to pass mine to -- Exhibit

3    One to Ms. Tardiff.  And I'm going to mark on it

4    that we do have a new psychiatric report.

5         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  I do

6    have all the contents including the psychiatric

7    report which was faxed to me this afternoon.

8         **PRESIDING COMMISSIONER SAWYER:**  Thank

9    you.

10        **ATTORNEY TARDIFF:**  I have these documents

11   as well.  I have nothing further to submit.

12        **PRESIDING COMMISSIONER SAWYER:**  Okay.

13   Let the record reflect that you did bring in --

14   before we started the hearing today you did

15   bring in six pages of artwork.

16        **ATTORNEY TARDIFF:**  Correct.

17        **PRESIDING COMMISSIONER SAWYER:**  That

18   Mr. Hulsey sells, you sell these?

19        **INMATE HULSEY:**  I try.

20        **PRESIDING COMMISSIONER SAWYER:**  You try.

21        **INMATE HULSEY:**  Yeah.

22        **PRESIDING COMMISSIONER SAWYER:**  But

23   you're not starving.

24        **INMATE HULSEY:**  No.

25        **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

26   think I'll mention them right -- just right now

27   because I'm not sure where to put them.  And I

12

1    don't want -- certainly don't want to lose them.

2    He's got -- He's got his name, address and CDC

3    number and where he lives.  And it says

4    Mr. Cleve Hulsey has sent us two magnificent

5    drawings which are able -- which are please --

6    which we are pleased to post.  Who's posting

7    these?

8        INMATE HULSEY:  It's a website,

9    prisoners.com.  I'm not even sure if it's still

10   up and running.  I haven't had any contact with

11   the person that runs it in almost a year.

12       PRESIDING COMMISSIONER SAWYER:  I see.

13       INMATE HULSEY:  Yeah.

14       PRESIDING COMMISSIONER SAWYER:  We need

15   to take a short recess.

16                [Off the record]

17       ATTORNEY TARDIFF:  It's not a good way to

18   start out your initial hearing.

19       PRESIDING COMMISSIONER SAWYER:  Okay.

20   We're back on tape.  The reason we stopped the

21   tape and took about a five minute recess to talk

22   about a potential legal conflict or discipline

23   conflict.  But for the purpose of this hearing

24   we're not going to expand on that.  I do want to

25   recognize the fact that I do have the six pages

26   of six different drawings.  You drew all of

27   these?

13

1        INMATE HULSEY:  Yes.

2        PRESIDING COMMISSIONER SAWYER:  And

3    what's the medium?

4        INMATE HULSEY:  Some of them -- Three of

5    them are penned in ink and three are pencil.

6        PRESIDING COMMISSIONER SAWYER:  And I

7    think we all were impressed by your artistic

8    ability.  These are dynamite.

9        INMATE HULSEY:  Thank you.

10        PRESIDING COMMISSIONER SAWYER:

11    Absolutely dynamite.  Don't you agree,

12    Commissioner?

13        DEPUTY COMMISSIONER YACONO:  Absolutely.

14        PRESIDING COMMISSIONER SAWYER:  So I

15    guess we can include that in a marketable skill

16    down the road.

17        DEPUTY COMMISSIONER YACONO:  I think

18    definitely graphic arts category.

19        PRESIDING COMMISSIONER SAWYER:  Right.

20    Okay.  Very good.  Do you have any preliminary

21    objections, counsel?

22        ATTORNEY TARDIFF:  I do not.

23        PRESIDING COMMISSIONER SAWYER:  Will the

24    inmate be speaking with the Panel?

25        ATTORNEY TARDIFF:  Yes.

26        PRESIDING COMMISSIONER SAWYER:  On all

27    matters?

14

1           ATTORNEY TARDIFF:  It's my understanding

2    he has no memory of the commitment offense.

3           PRESIDING COMMISSIONER SAWYER:  Okay.

4    Then there you have it.  Would you raise your

5    right hand.  Do you solemnly swear or affirm the

6    testimony you're about to give in this hearing

7    will be the truth, the whole truth and nothing

8    by the truth?

9           INMATE HULSEY:  Yes.

10          PRESIDING COMMISSIONER SAWYER:  Thank

11   you.  I'm going to be reading from the October

12   2005 calendar Board report, commitment offense,

13   summary of the crime, page one.

14              "On the morning of June 26, 1989

15              18-year-old Cleve Hulsey was

16              drinking beer with Charles Abele,

17              A-B-E-L-E, in Exeter.  On the same

18              morning three minors, Michael

19              Darren, D-A-R-R-E-N, and Anthony

20              -- I'm sorry -- Michael and

21              because they're minors we have no

22              last name, Michael S., Darren S.

23              and Anthony C. were collecting

24              cans and had turned them in for

25              seven dollars.  The three minors

26              were walking when Abele drove by

27              with Hulsey in Abele's car.

15

1    Hulsey and Abele stopped and asked

2    them if they would like to go

3    swimming at the lake.  They

4    agreed.  Abele used minors' seven

5    dollars and earnings to buy

6    gasoline and a 12-pack of beer.

7    Once they arrived at the lake,

8    everyone drank beer except

9    Michael.  They swam for about one

10    and a half hours.  Abele then

11    suggested that they go and get a

12    gun so they could target shoot.

13    After Anthony and Michael were

14    unsuccessful in their attempt to

15    get a gun, Hulsey suggested

16    borrowing a gun from his brother

17    Marvin.  After driving to Marvin's

18    house, Hulsey, along with Abele,

19    walked inside.  The three minors

20    remained outside in the car.

21    Abele and Hulsey told Marvin they

22    wanted to borrow the gun so they

23    could go shooting.  Marvin was

24    hesitant to give them the gun

25    because it appeared Abele and

26    Hulsey had been drinking.  Marvin

27    agreed to give them the gun but

16

1    first removed all the live rounds.

2    Hulsey and Abele left, placing the

3    gun in the trunk of the car.   In

4    search of ammunition, the group

5    went to the home of Cody Grim,

6    G-R-I-M.  Abele asked to borrow

7    three bullets from Cody.  Hulsey

8    was present during parts -- during

9    part of this conversation.  The

10   three minors remained in the car.

11   Cody gave Abele three bullets.  At

12   some point Abele had began -- had

13   begun to talk about robbing a

14   store in Woodlake.  Apparently for

15   this purpose Abele who -- was

16   driving headed towards Woodlake.

17   Darren asked Abele to stop so he

18   could relieve his bladder.  Abele

19   pulled to the side of the road.

20   Darren went off into the bushes.

21   While Darren was in the bushes,

22   the gun was retrieved from the

23   trunk.  Hulsey took over as the

24   driver and Abele sat in the front

25   passenger's seat.  The three

26   minors remained in the back.  At

27   this point, the three minors

17

1    became frightened and asked to be

2    let out of the car.  Abele refused

3    and Hulsey said there's not enough

4    gasoline to keep -- and kept

5    driving.  Hulsey stopped the car

6    at the A&H Market to observe the

7    flow of customers at the market.

8    Hulsey waited for all the cars --

9    for all the cars to leave.  Abele

10   went in -- Abele went in quickly

11   and returned to the car saying

12   there was no one in the store.

13   Lorenzo Valencia, V-A-L-E-N-C-I-A,

14   had gone to help his friend Amed,

15   A-M-E-D, last name of A-L dash

16   capital K-A-B-A-B-I, I'll spell it

17   again, A-L dash capital

18   K-A-B-A-D-I, who was working as a

19   clerk in the market.  He was

20   helping Mr. Kabadi, Al-Kabadi in

21   the back of the store when

22   Al-Kabadi thought he saw a masked

23   person run in and out of the

24   store.  The two went outside and

25   looked but saw no one.  After

26   Abele returned to the car, Hulsey

27   drove off and returned to the

18

1   store -- then returned to the

2   store.  The three minors were

3   crouched down in the backseat and

4   afraid of what might happen.

5   Abele again went into the market

6   armed with a rifle and a ski mask

7   pulled over his face.  At this

8   time, Valencia and Al-Kabadi were

9   in the front of the store.  Abele

10  pointed the gun at Al-Kabadi and

11  demanded money.  Al-Kabadi gave

12  Abele five dollars and Abele shot

13  him in the chest, fatally wounding

14  him.  Reportedly, a youthful --

15  the youthful clerk grabbed the

16  rifle at the front side causing

17  the firearm to discharge.  When

18  Abele left the store, he was seen

19  by Barbara Bidwell, B-I-D-W-E-L-L,

20  and her daughter.  Bidwell wrote

21  down the license plate number of

22  the car.  Abele returned to the

23  car and said he shot someone for

24  five dollars.  Abele told Hulsey

25  to take off.  He did.  The group

26  drove to another store where Abele

27  got out and purchased gas, beer

19

1       and cigarettes.  Hulsey discovered

2       that one of -- discovered that one

3       of the casings in the gun was

4       used.  He chewed on it and spit it

5       out the window.  The group

6       returned to Exeter after dropping

7       off the three minors.  Hulsey and

8       Abele returned the rifle to Marvin

9       Hulsey.  Hulsey provided a

10      voluntary statement on June 28,

11      1989 -- initially claimed that

12      he'd suffered -- alcohol blackout

13      and was unable to recall his

14      activities.  He subsequently

15      admitted that talk about

16      committing a robbery began while

17      they were at the river.  He

18      acknowledged that it was his idea

19      to attempt to obtain a weapon from

20      his brother.  He contended that he

21      was extremely intoxicated at the

22      time and that the amount of

23      alcohol consumed impaired his

24      judgment.  He told authorities, I

25      was drunk out of my mind."

26  In your version it says you stated that you were

27  drunk and doesn't remember anything.  But you do

20

1  remember getting the gun, right?  That's what it

2  says here.

3      INMATE HULSEY:  I don't remember anything

4  after leaving the river.

5      PRESIDING COMMISSIONER SAWYER:  After

6  leaving the river?

7      INMATE HULSEY:  After leaving the lake,

8  no.

9      PRESIDING COMMISSIONER SAWYER:  Do you

10  remember talking about -- at the lake about

11  getting a gun from your brother to Abele?  Maybe

12  I'll ask this question, what do you remember?

13  You remember -- with other guys at the -- at the

14  river?

15      INMATE HULSEY:  I remember going up there

16  and swimming for a little while.  Then we're all

17  sitting around drinking.  And Charles said it

18  was time to go or something like that, something

19  to that effect.

20      PRESIDING COMMISSIONER SAWYER:  And then

21  you don't remember anymore?

22      INMATE HULSEY:  After that, no, it was

23  all --

24      PRESIDING COMMISSIONER SAWYER:  How much

25  did you have to drink?

26      INMATE HULSEY:  A lot.

27      PRESIDING COMMISSIONER SAWYER:  Well you

21

1    bought a six-pack, right, or a 12-pack?

2          INMATE HULSEY:  That was with him.

3          PRESIDING COMMISSIONER SAWYER:  With the

4    original seven dollars.

5          INMATE HULSEY:  When we met the minors,

6    yeah.

7          PRESIDING COMMISSIONER SAWYER:  Yeah.

8    Okay.  Had you been drinking prior to that?

9          INMATE HULSEY:  Yes.

10          PRESIDING COMMISSIONER SAWYER:  What were

11   you drinking prior?

12          INMATE HULSEY:  Beer.

13          PRESIDING COMMISSIONER SAWYER:  You drink

14   anything else?

15          INMATE HULSEY:  No.

16          PRESIDING COMMISSIONER SAWYER:  Do any

17   dope?

18          INMATE HULSEY:  No, not that I can

19   remember.  I think at some point someone lit up

20   a joint and passed it to me.  And I thought it

21   was a cigarette so I might have took a hit or

22   two off of it.  But I was never really into

23   that.

24          PRESIDING COMMISSIONER SAWYER:  Okay.

25   The aggravating factors in this case, had an

26   opportunity -- "Hulsey had an opportunity to

27   cease by continued with the crime.  The murder

22

1   was senseless, served no purpose in completing

2   the crime and a weapon, the rifle was used.

3   Mitigating factors.  Hulsey has minimal or no

4   history of criminal behavior."  And as I see

5   here, at age 15 and again at 17 attended

6   meetings of Narcotics Anonymous following

7   arrests for minor in possession of alcohol and

8   public intoxication.  When did you start

9   drinking?  What age?

10          INMATE HULSEY:  It was before I started

11  high school.  It was actually the summer between

12  eighth grade and my freshman year in high

13  school.

14          PRESIDING COMMISSIONER SAWYER:  Why was

15  that?

16          INMATE HULSEY:  You know what, I have no

17  idea.

18          PRESIDING COMMISSIONER SAWYER:  You don't

19  know why you were drinking?

20          INMATE HULSEY:  No, none whatsoever.  I

21  don't know why I started.  I claim peer

22  pressure, but that's not a good excuse.  That's

23  terrible.

24          PRESIDING COMMISSIONER SAWYER:  And did

25  you do any drugs during that period of your

26  life?

27          INMATE HULSEY:  No.

23

1      PRESIDING COMMISSIONER SAWYER:  You had

2  to think about it.

3      INMATE HULSEY:  I tried marijuana one

4  before earlier when I was younger and didn't

5  like it.

6      PRESIDING COMMISSIONER SAWYER:  Yeah.

7  Have you tried meth or LSD or --

8      INMATE HULSEY:  No, no.

9      PRESIDING COMMISSIONER SAWYER:  -- coke?

10     INMATE HULSEY:  Nothing like that.

11     PRESIDING COMMISSIONER SAWYER:  PCP?

12     INMATE HULSEY:  No.

13     PRESIDING COMMISSIONER SAWYER:  Okay.

14  You were the seventh of eight children born to

15  your parents Coy and Martha Hulsey.

16     INMATE HULSEY:  Yes.

17     PRESIDING COMMISSIONER SAWYER:  Siblings

18  included four brothers and three sisters.

19  Family is very close and supportive.  Graduated

20  from Kaweath --

21     INMATE HULSEY:  Yeah.

22     PRESIDING COMMISSIONER SAWYER:  --

23  K-A-W-E-A-T-H -- High School in Exeter.

24  Reportedly enlisted in the Navy following

25  graduation in June of 1989 but was discharged as

26  a consequence of the arrest in the present case.

27  His employment history was limited to -- for the

24

1   most part due to his age time of arrest.  You

2   were 18 at the time, right?

3            INMATE HULSEY:  Yes.

4            PRESIDING COMMISSIONER SAWYER:  He

5   acknowledged a problem with alcohol abuse.

6   Reported that he began consuming alcohol,

7   intoxicants about four years before his arrest

8   and then -- and that until his arrest in the

9   instant matter he consumed alcoholic beverages

10   on a daily basis frequently just to get drunk.

11   Indicates previous participation in alcohol

12   abuse counseling.  That didn't do much good

13   then, huh?  He reported that at 15 and 17 he

14   attended Narcotics Anonymous following arrests

15   for possession of alcohol and public

16   intoxication.  Was that a condition of the

17   arrest?

18            INMATE HULSEY:  Sorry, what?

19            PRESIDING COMMISSIONER SAWYER:  Was that

20   a condition of the -- of the probation --

21   probation?

22            INMATE HULSEY:  Yeah.

23            PRESIDING COMMISSIONER SAWYER:  That you

24   -- Did you do any time in juvenile hall?

25            INMATE HULSEY:  Nope.

26            PRESIDING COMMISSIONER SAWYER:  They just

27   took you home?

25

1    INMATE HULSEY:  Yeah, took me back to my

2    parents.

3    PRESIDING COMMISSIONER SAWYER:  All

4    right.  Write you a ticket?

5    INMATE HULSEY:  Yeah, I think so.

6    PRESIDING COMMISSIONER SAWYER:  Regarding

7    the use of controlled substance, acknowledge

8    prior experimentation with marijuana.  Indicated

9    that he's used the substance infrequently,

10   claiming that he tried once when he was 15 and

11   on the date of the offense now before the court.

12   Okay.  Your future plans, well let me ask you

13   this before I get off your personal -- who

14   visits with you?

15   INMATE HULSEY:  At the moment, my mother

16   and my sister.  My oldest sister.

17   PRESIDING COMMISSIONER SAWYER:  And

18   where's your father?

19   INMATE HULSEY:  He's not able to travel

20   as well as he used to.

21   PRESIDING COMMISSIONER SAWYER:  He's

22   infirmed?

23   INMATE HULSEY:  Kind of, yeah.  He's

24   getting up there.

25   PRESIDING COMMISSIONER SAWYER:  How old

26   is he?

27   INMATE HULSEY:  Late 60's.

26

```
1              PRESIDING COMMISSIONER SAWYER:  Okay.
2    Retired?
3              INMATE HULSEY:  Yes.
4              PRESIDING COMMISSIONER SAWYER:  How's
5    your mom's health?
6              INMATE HULSEY:  It's fair.
7              PRESIDING COMMISSIONER SAWYER:  Okay.
8    And your sister, your oldest sister --
9              INMATE HULSEY:  Yeah.
10             PRESIDING COMMISSIONER SAWYER:  -- visits
11   with you?  How about your other siblings?
12   You've got six other ones.
13             INMATE HULSEY:  Yeah, they have lives.
14   They'd come if they could, but --
15             PRESIDING COMMISSIONER SAWYER:  Do they
16   write?
17             INMATE HULSEY:  Sometimes.  Infrequently.
18             PRESIDING COMMISSIONER SAWYER:  Phone
19   calls?
20             INMATE HULSEY:  Yeah, I call them quite a
21   bit.
22             PRESIDING COMMISSIONER SAWYER:  Are you
23   in touch -- Everybody's okay?  Nobody's in
24   prison?
25             INMATE HULSEY:  No, no one.  I'm the only
26   one.
27             PRESIDING COMMISSIONER SAWYER:  Okay.
```

27

1    Did you conceive any children?

2          **INMATE HULSEY:**  No.

3          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do

4    you have a girlfriend now?

5          **INMATE HULSEY:**  No.

6          **PRESIDING COMMISSIONER SAWYER:**  No.  No

7    wife?

8          **INMATE HULSEY:**  No.

9          **PRESIDING COMMISSIONER SAWYER:**  Okay.

10   Your future plans include a primary residence.

11   You plan to live with your mother Coy and your

12   father Coy -- Martha Hulsey in Exeter.  It this

13   the old family home?

14         **INMATE HULSEY:**  Yep.

15         **PRESIDING COMMISSIONER SAWYER:**  On West

16   Maple Street?

17         **INMATE HULSEY:**  Yes, Sir.

18         **PRESIDING COMMISSIONER SAWYER:**  Also has

19   other family members who'd be willing to help

20   him and keep him on the straight and narrow.

21   Hulsey states he can do practically anything in

22   construction.  His brother Coy Albert Hulsey is

23   an independent contractor who would give me a

24   job.  And you don't have any INS holds on you.

25   Okay.  Let's look at your letters.  I did

26   receive a letter today from the County of

27   Tulare, the Office of the Sheriff/Coroner Bill

28

1   Whitman.

2           "The Sheriff's Office, citizens of

3           Tulare County strongly oppose the

4           release of Cleve Hulsey.  He's

5           convicted of murder first degree

6           and justice -- not be served

7           unless he serves his entire

8           sentence.  Because of the serious

9           nature of the crime we

10          respectfully request you keep

11          Hulsey incarcerated for the crime

12          as long as legally possible."

13  Okay.  Then I have a handwritten letter received

14  on November 14, 2005.

15          "I'm writing this for my brother.

16          I'm the oldest brother of four

17          brothers and three sisters.  Large

18          family.  I'm the boss of a

19          construction crew.  I would give

20          my brother a job when he gets out.

21          I also own my own home and Cleve

22          can live with me and my family.

23          If Cleve needs money or help with

24          anything, I can -- I can and will

25          help him.  I know Cleve won't be a

26          threat to anyone.  He will obey

27          the laws.  I know he's learned

29

1        from his mistake. All his family

2        is willing to help any way they

3        can. We all live close where

4        Cleve was raised. We would love

5        to have him home. Cleve will be

6        took care of by all the family."

7  And he gives -- He lives in Farmersville. How

8  close is that to Exeter?

9        INMATE HULSEY: I think it's about three

10  miles.

11       PRESIDING COMMISSIONER SAWYER: Okay. I

12  have a letter undated, this is Shirley Cotta.

13  This is your -- This is your aunt. C-O-T-T-A.

14  Says -- Says you're a nephew.

15       INMATE HULSEY: Yeah. I never got a copy

16  of this.

17       PRESIDING COMMISSIONER SAWYER: Aunt

18  Shirley.

19       INMATE HULSEY: Yeah.

20       PRESIDING COMMISSIONER SAWYER: Okay.

21  Always been a good person, very decent, law

22  abiding citizen. If released to the community,

23  his attitude, behavior, maturity is excellent.

24  Very proud of Cleve. Cleve has wonderful

25  parents. Stood by him all the way. Shirley

26  Cotta and she gives a phone number. And then

27  from Albuquerque, New Mexico dated September 22,

30

1    '05, this is from Margaret Trujillo,

2    T-R-U-J-I-L-L-O.  I'm the sister of Cleve

3    Hulsey.  We've grown up together.  I'm only

4    three years younger than him.  She talks about

5    what a great guy you are.  He's never been in

6    trouble.  I still remember when he came home

7    that afternoon.  He'd been drinking.  He had a

8    big cut on the bottom of his foot.  How did you

9    cut you foot?

10           INMATE HULSEY:  I have no idea.

11           PRESIDING COMMISSIONER SAWYER:  Okay.  Do

12    you remember her cleaning it up and --

13           INMATE HULSEY:  Nope.

14           PRESIDING COMMISSIONER SAWYER:  Okay.  So

15    you felt no pain, huh.  Do you remember when you

16    sobered up that you had a cut on your foot?

17           INMATE HULSEY:  Yeah, I think so.  It was

18    a long time ago.

19           PRESIDING COMMISSIONER SAWYER:  Okay.

20    She talks about you.  Has always kept a steady

21    job.  She feels you've been rehabilitated, speak

22    with him frequently over the phone.  Loving and

23    caring, has many job opportunities if given the

24    chance.  He's a great artist, a hard worker.  "I

25    will help him find a great job or go to school,

26    get his college degree in any field he desires.

27    I know that my children are looking forward to

31

1    meeting their Uncle Cleve outside the prison

2    walls someday." And she's just very, very

3    supportive here. Thank you for taking care of

4    my brother for all these years. You're welcome.

5    The utmost trust and belief in your decision,

6    trust you'll see my brother outside prison soon.

7    It's a very nice letter. She writes a good

8    letter. What does she do for a living?

9            **INMATE HULSEY:** She is -- I think she's a

10   receptionist at a major hotel, hotel resort in

11   Albuquerque.

12           **PRESIDING COMMISSIONER SAWYER:** Okay. I

13   have a handwritten letter on 9-2-05 from your

14   mother. Talks about the large family, talks

15   about where you were born. Unfortunately, the

16   copy machine cut off both ends of the sentences

17   so I know -- I have no problems with him. Does

18   anybody have a better copy? Do you have the

19   original letter for this?

20           **INMATE HULSEY:** No, all I ever get are

21   the photocopies.

22           **PRESIDING COMMISSIONER SAWYER:** Okay.

23   It's a terrible copy. Let me -- I'm looking for

24   the offer to come home and live with her. I'm

25   sure it's here.

26           **INMATE HULSEY:** Oddly enough my copy

27   hasn't been cut off.

32

1      ATTORNEY TARDIFF:  He's got --

2      INMATE HULSEY:  I got a copy.

3      PRESIDING COMMISSIONER SAWYER:  You got a

4  better copy?

5      INMATE HULSEY:  This copy's got both

6  sides.

7      PRESIDING COMMISSIONER SAWYER:  Can I

8  borrow that?  Okay.

9      DEPUTY COMMISSIONER YACONO:  I have the

10  original.

11      PRESIDING COMMISSIONER SAWYER:  You have

12  the -- this is -- This is fine.

13      DEPUTY COMMISSIONER YACONO:  Okay.

14      PRESIDING COMMISSIONER SAWYER:  Yeah,

15  it's clearly a bad copy in his file.  Okay.  She

16  talks about your history, no problems with him.

17  That's not entirely true.  She knew about you

18  getting arrested for drinking.  Graduated from

19  -- was speaker of his class.  Were you

20  valedictorian?

21      INMATE HULSEY:  Yeah, but it was a very

22  small class.  There was only like about eight or

23  nine graduating students.

24      PRESIDING COMMISSIONER SAWYER:  You were

25  tops, huh.  You had also joined the Navy as I

26  read before.  Loves to draw.  We know that.

27  He's sold some of his work.  He will be -- This

33

1    is what I'm looking for.  He will be living with

2    myself and his dad and his two twin nephews who

3    are 14-years-old.  She's caring for some

4    nephews?

5           INMATE HULSEY:  Yeah.

6           PRESIDING COMMISSIONER SAWYER:  Why is

7    that?

8           INMATE HULSEY:  Long story.

9           PRESIDING COMMISSIONER SAWYER:  Can you

10   make it like one sentence?  Your sister or your

11   brother?

12          INMATE HULSEY:  Sister got pregnant too

13   early, couldn't take care of them.

14          PRESIDING COMMISSIONER SAWYER:  Okay.

15          INMATE HULSEY:  Gave them to mom and dad

16   to keep them in the family.

17          PRESIDING COMMISSIONER SAWYER:  Okay.

18   Very good.  Certainly commendable from your mom

19   and dad's point of view.  Fourteen-year-olds,

20   she obviously needs you home.  They could be a

21   handful.  They've visited with you?

22          INMATE HULSEY:  Yes.

23          PRESIDING COMMISSIONER SAWYER:  You know

24   them?

25          INMATE HULSEY:  Yes.

26          PRESIDING COMMISSIONER SAWYER:  Okay.

27   Your dad's been sick.  High blood pressure and

34

1    the gout.  Using a breathing machine.  We're
2    getting old.  He's 68, she's 66.  Okay.  Nice
3    letter.  I don't want to lose that
4    (indiscernible).  Okay.  Then I have a letter,
5    two-page letter from Hazel Lopez, Farmersville.
6    Who's Hazel Lopez?  Your sister?

7        INMATE HULSEY:  My sister, yeah.

8        PRESIDING COMMISSIONER SAWYER:  Okay.
9    This is your older sister.  Talks about your
10   history.  He's grown up a lot, understands what
11   happened, was very wrong, feels if he could
12   change it, he would.  He's learned a lot.  And
13   will not break any laws.  Is a very decent
14   person.  He tries to help us with our problems
15   by talking with us.  I know when he gets out, be
16   right there when any of us need him or his help.
17   She thinks you've improved.  Says you're
18   respectful.  Okay.  Here's what I'm looking for.
19           "My husband and I are more than
20           willing to help my brother in any
21           way he needs in housing, money,
22           transportation.  We will help him
23           find work.  My husband's company
24           is always looking for help.  He's
25           willing to give Cleve a job.  My
26           brother means everything to us.
27           Love to have him come home again.

35

```
 1          Family hasn't been complete since
 2          this happened.  We miss him
 3          badly."
 4     And that's signed by Hazel Lopez.  What does her
 5     husband do?
 6          INMATE HULSEY:  He works for an
 7     irrigation company installing pumps, at least
 8     that's what he did when I was out there.  I'm
 9     pretty sure he's still doing that.  I think he
10     might have moved up.
11          PRESIDING COMMISSIONER SAWYER:  Okay.
12     And I have a letter, another poorly copied
13     letter.  Could you find me a letter that's dated
14     8-23-05 from someone, Lemus.  Is there a Lemus?
15          INMATE HULSEY:  Yes.
16          PRESIDING COMMISSIONER SAWYER:  What's
17     her first name or his first name?
18          INMATE HULSEY:  It's Mark Lemus.
19          PRESIDING COMMISSIONER SAWYER:  Mark
20     Lemus and who's that?
21          INMATE HULSEY:  He's just a friend.
22          PRESIDING COMMISSIONER SAWYER:  Just a
23     friend.
24          INMATE HULSEY:  And about the only one I
25     got left.
26          PRESIDING COMMISSIONER SAWYER:  Yeah,
27     addressed to Studebaker.  Sending this letter on
```

36

1    behalf of Cleve Hulsey.  Known all of our

2    childhood lives.  I believe he would be a law

3    abiding citizen -- released in the community.

4    Good decent young man.  I'm sure he's learned a

5    very tough lesson.  He's matured and aged

6    (indiscernible) ready to get on with his life.

7    I'm willing to help with transportation when

8    needed.  Also ready to see his friend -- be his

9    friend once -- once again and help him adapt to

10   public work.  Mark Lemus.  Very nice letter.

11   What does Mr. Lemus do for a living?

12        INMATE HULSEY:  Last I heard he was

13   working for a plastics company.  Not exactly

14   sure what he was doing.

15        PRESIDING COMMISSIONER SAWYER:  You were

16   kind of a hippie then, weren't you?

17        INMATE HULSEY:  What's that?

18        PRESIDING COMMISSIONER SAWYER:  You were

19   kind of a hippie.  I'm looking at your pictures

20   in your C-File back in '93.

21        DEPUTY COMMISSIONER YACONO:  This is --

22   he came in.

23        PRESIDING COMMISSIONER SAWYER:  Back in

24   '90 you had semi-long hair but you -- really got

25   long in '93.  Okay.  You have any additional

26   letters that you'd like to share with us?

27        INMATE HULSEY:  No.

37

1       **PRESIDING COMMISSIONER SAWYER:** At this

2   time. None, okay. Very good. I'll turn it

3   over to Commissioner Yacono.

4       **DEPUTY COMMISSIONER YACONO:** Okay.

5   Because this is the initial hearing we have a

6   lot of ground to cover. And I'm going to try

7   and make sure that I hit all the points, all the

8   documents but I'm going to also, during this

9   timeframe and before we get done, I'll ask you

10  and your attorney if there's anything additional

11  if some of the facts don't jive quite right.

12  Because I have a couple of question marks on

13  these. But I'm going to try and run through

14  this as close to chronologically as I can on

15  some of the -- especially on the work and the

16  self-help group area. You got a lot of material

17  to cover on this one. So what I'm looking at is

18  the Central File, a life prisoner evaluation

19  report prepared for the October '05 calendar by

20  Correctional Counselor J. Studebaker and signed

21  off on 7-20-2005. Now, the post-conviction

22  reports, Correctional Counselor (indiscernible)

23  signed off 3-10-93 and covered the period

24  4-23-90 until 3 of '93. Then Correctional

25  Counselor Jordine (phonetic) signed off 3-14-96

26  for the period of 3-1-93 through 3-3-96.

27  Correctional Counselor Donnelly signed off

38

1   1-27-99 on a report from 3-96 to January of '99.

2   Then E. Washington was the correctional

3   counselor on a report signed 10-29-02 covering

4   the period of 2-99 until 3 of '02.  And I have a

5   month break.  But from April of '02 until

6   July 20, '05 signature date by Correctional

7   Counselor Studebaker.  Looking at psychiatric

8   evaluation prepared by Dr. Merrick, Ph.D., April

9   25, 2006, and I see one prior from a Dr. Larson,

10  M.D., dated 2-25-93.  The documentation hearings

11  show me April 27, '93, April 2, '96, April 14,

12  '99, November 7, 2002.  Obtain -- The

13  recommendations.  Obtain vocational trades, stay

14  disciplinary-free, participate in self-help

15  programs and the '96 specified AA.  The records

16  reflect that coming into Department of

17  Corrections on 4-23-90 at DVI reception center,

18  then 5-22-90 to Folsom, 8-3-93 to Lancaster as a

19  Close B.  You started off at Close A with 67

20  points.  Then 9-14-93, Corcoran, was a Close B.

21  Pleasant Valley, 11-39-93, Close -- Close B.

22  And then here to Soledad on 5-28-93 as a

23  Medium A.  Nine one of '98, Close B.  Four

24  thirteen of 2000, Medium A where you are today.

25  Your points range from the high 67 when you came

26  in, dropping steadily and then November 16, '99

27  I'm seeing 11 points.  It used to be you could

39

1   go to zero but 19 is minimum now.  But it looks

2   like you've been pretty much -- low points since

3   '99.  I see an April 29, '99 at 25 and then by

4   November you're 11.  And from that point on it's

5   been minimal points.  The one thing I don't see

6   is any vocational instruction.  Am I missing

7   something?  Ever done any voc?

8           INMATE HULSEY:  No.

9           DEPUTY COMMISSIONER YACONO:  Okay.  You

10  need to be in graphic arts.  Anyhow, the

11  academic education.  We do have your diploma

12  from your high school and that graduation date

13  was June 9, '89.  In 1990 we did an assessment

14  of you.  Your level at that time was 12.9 which

15  is as high as we do.  There are some other

16  notations in there and I put it under academic.

17  I probably should have put it under laudatory

18  because I read it a couple of times.  But I'd

19  already written it.  Reader I, 7-17-91,

20  satisfactory or exceptional ratings on that.

21  And then what I found later on is basically

22  you're doing like books for the blind.

23          INMATE HULSEY:  Yes.

24          DEPUTY COMMISSIONER YACONO:  So get that

25  on the record even though it's in the wrong

26  category.  I do note college classes.  You got

27  three semester units in English with grades of B

1    as of a chrono 6-19-91 and psychology one, three

2    units with A grade and that was 6-10-91.  So you

3    took pretty much six units all at the same time.

4              INMATE HULSEY:  Yeah.

5              DEPUTY COMMISSIONER YACONO:

6    Correspondence?

7              INMATE HULSEY:  No, they actually had

8    college instructors coming into Old Folsom at

9    the time.

10              DEPUTY COMMISSIONER YACONO:  That's

11    right.  You were at Folsom then.  Okay.  All

12    right.  This is where it gets hard.  It's good

13    for you.  It's hard for me.  First entry I show

14    is assignment to the dental lab on 8-11-92

15    showing satisfactory or exceptional ratings.

16    Then I show a Corcoran work crew October '94

17    through November 18, '94 and I show porter and

18    lieutenant's clerk December of '94 with evals

19    continuing January of '95.  Then assignment to

20    the clothing room, January of '95, satisfactory

21    exceptional marks as of 4-17-96.  Then I'm

22    showing a clerk 5-31-95 with exceptional grades;

23    5-15-98 which is -- I don't understand why the

24    dates flip flop but May of '98.  I also found

25    one that I believe was 3-19-98 showing again

26    exceptional marks.  I was a little confused on

27    that one so I put on the clerk.  Then I'm

41

1    showing PIA textiles 6-13-98 through 9-1-98.

2    Reassignment to porter in '99 with evals

3    4-20-2000, 7-6-2000 at satisfactory.  Now, I had

4    one in here as well that show me 11-16-99 you

5    were put out of the assignment based on 128(g)

6    of 4-2-2000.  So I'm confused how you're getting

7    good grades, good marks on your work but it

8    seems like you were put out.  But obviously they

9    must have put you back in again for the porter

10    duties.  Okay.  And this is where I got

11    contradictory.  I'm showing a patio clerk

12    1-12-2001 but I'm showing the date as sergeant's

13    work crew.

14          [Thereupon, the tape was turned over.]

15          DEPUTY COMMISSIONER YACONO:  Okay.  All

16    right.  So again my problem is I got patio

17    clerk, showing me evals and then I've got

18    sergeant's work crew.  And it seems to be kind

19    of the same timeframe for the work crew,

20    3-12-02, above average.  Then I'm showing

21    July 26, August 9 and August 31 for the patio

22    clerk, above average.  Is sergeant's work crew

23    and patio clerk kind of the same?

24          INMATE HULSEY:  Yeah.

25          DEPUTY COMMISSIONER YACONO:  Okay.  So

26    I've got dates from two different sources.  Next

27    I'm showing, confusing again, because I'm

42

1   showing you as watch clerk May 18, 2002 with

2   above average evaluation on 8-6-2002.  Then a

3   movement to statistics clerk, 4-22-04,

4   satisfactory and above, 6-1-2004.  Then the

5   watch commander's clerk, 6-5-04.  Again, how do

6   we get a satisfactory evaluation or you got a

7   satisfactory evaluation or above, noting

8   4-14-05, 4-6-05, 4-20-05 and then 5-31-05

9   exceptional.  And then I got nothing for the

10  last year.  What have you been doing for the

11  last year?

12          INMATE HULSEY:  Up until January of this

13  year I was in the same job.  I was a clerk, the

14  patio clerk or watch commander's clerk.  And as

15  of January of this year, I think it was

16  effective January this year, it might have been

17  late last year, I was put in the dental lab.

18  They have a dental lab here.  A position came

19  open and I went back in there.

20          DEPUTY COMMISSIONER YACONO:  And I'm not

21  seeing any chronos for it, which is a little

22  unfortunate.  This is your initial, but it makes

23  sense.  Will suffice it to say that you have

24  never gotten less than a satisfactory

25  evaluation.  You know what, I did see something

26  for January.

27          ATTORNEY TARDIFF:  There was an AA

43

1   chrono.

2           DEPUTY COMMISSIONER YACONO:   Thank you.

3   For that same timeframe?

4           ATTORNEY TARDIFF:   One three '06.

5           DEPUTY COMMISSIONER YACONO:   All right.

6   Okay.  While we're talking about self-help and

7   specifically AA, I've got one chrono showing me

8   10-4-97, participation, and then a December 31,

9   '97.  From there I've got nothing until July

10  2001.  Is there a break there?  What happened?

11          INMATE HULSEY:   In -- What was it, '97?

12          DEPUTY COMMISSIONER YACONO:   So we're

13  talking '98, '99, 2000 and it looks like

14  probably the first two quarters of 2001 or the

15  first quarter of 2000 --

16          INMATE HULSEY:   That's when I was

17  transferred here from Pleasant Valley.

18          DEPUTY COMMISSIONER YACONO:   Got it.

19  Okay.  Then I'm showing chronos July '01,

20  October, December '01, April '02, July '02,

21  September '02, December '02.  I don't show

22  anything in '03.  There was something 4-03 but

23  it may be a reference but it wasn't specific.

24  And then 7-03, 10-3, January '04, April '04,

25  July, October, December '04.  Then I don't show

26  anything for first and second quarter of 2005.

27  Then I got a January 3, '06 which refers to

44

1    third and fourth quarter for AA.  So we had a

2    break for first and second quarter in 2005?

3         INMATE HULSEY:  I think there might have

4    been in between sponsors.  I'm not sure why I

5    never got a chrono.

6         DEPUTY COMMISSIONER YACONO:  Okay.  And

7    anything since January of this year?

8         INMATE HULSEY:  I haven't been able to

9    go.  Our facility's been locked down since

10   February 7.

11        DEPUTY COMMISSIONER YACONO:  Okay.  Now,

12   I'm out of chronology here, but I want to do all

13   those -- that run.  Pretty consistent AA

14   attendance.  I've got a Men's Advisory Council,

15   March '95.  Then I'm showing Captive Audience

16   Literacy Group, 5-9-98.  The classes for

17   Hepatitis C, July '99, HIV slash AIDS.  I've

18   seen you've taken that April '99 and August '99.

19   And then Arts In Correction for the period of

20   '98 to '99 with a chrono dated 6-24-99.  Under

21   laudatories, although -- should have done the

22   Reader one here, but I'm seeing Literacy Action

23   certificate 3-22-94, 12-hour workshop tutoring.

24   I had Inmate Peer Education program and I

25   crossed it out.

26        ATTORNEY TARDIFF:  He's got some chronos.

27        DEPUTY COMMISSIONER YACONO:  Well I'm

45

1    showing Literacy Group, 5-9-98 and then a
2    12-16-05 Children's Holiday Festival.
3        ATTORNEY TARDIFF:  You should have those.
4    Inmate Peer --
5        INMATE HULSEY:  Yeah, those are --
6        DEPUTY COMMISSIONER YACONO:  Those are --
7        INMATE HULSEY:  -- miscellaneous.
8        DEPUTY COMMISSIONER YACONO:  -- HIV and
9    the Hep C's.
10       ATTORNEY TARDIFF:  Yeah.
11       DEPUTY COMMISSIONER YACONO:  Okay.  I
12   think the Inmate Peer Education program was part
13   and party of the Literacy Action certificate.
14   It was mentioned somewhere else.
15       ATTORNEY TARDIFF:  Okay.
16       DEPUTY COMMISSIONER YACONO:  And that's
17   why I crossed it out.  Okay.  Let's do the
18   psych.  I'm looking at April 25, 2006.  The
19   diagnostic impression shows me Axis I, Alcohol
20   Dependence In Institutional Remission.  Axis II,
21   None.  Axis III, Back Problem.  Axis IV,
22   Incarceration and Axis V shows us a GAF of 90 --
23   of 100.  Assessment of dangerousness is showing
24   past six years disciplinary-free.  Dangerousness
25   within a controlled setting is lower than the
26   inmate population.  Released to the community,
27   it appears he would be able to maintain his

1    current sobriety and commitment to remain

2    abstinent.  His assessment of dangerousness in

3    the community is no more than the average person

4    in a non-prison population.  Significant risk

5    factor or precursor to violence for Hulsey would

6    be return to alcohol use.  He should be

7    periodically tested and attendance at Alcoholics

8    Anonymous or some other alcohol treatment

9    modality should be a mandatory requirement of

10    parole.  Hulsey is competent, responsible for

11    his behavior.  Capacity to abide by institution

12    standards.  Should do well in the future as long

13    as he remains drug and alcohol free.  Any

14    treatment program is recommended -- will help

15    him maintain long term sobriety.  Does not have

16    mental health disorder which would necessitate

17    treatment either during his incarceration or on

18    parole.  That was one by Dr. Merrick (phonetic).

19    And I'm showing an April '93 for --

20    documentation hearing, short one-pager by

21    Dr. Larson (phonetic).  My specific note on this

22    was the most appropriate psychiatric diagnosis

23    would be that of alcohol dependence in

24    institutional remission.  Express interest in

25    college as well as Alcoholics Anonymous.

26    Appears sincere.  Hopes to major in psychology,

27    though express an interest in physical sciences

47

1  such as chemistry.  His violence potential

2  appears to be considerably less than that of the

3  average inmate population.  "To this evaluator,

4  he appears to be an individual who should, when

5  it is administratively possible, do as much of

6  his programming as possible at CMC, eventually

7  entering into a Category T program.  College is

8  encouraged if available."  And that seems to be

9  February 25, '93 on that.  Okay.  And lastly,

10  115's, 128's.  I'm showing four 128's, 3-24-93,

11  possession of contraband; 8-20-95, unauthorized

12  window covering; 5-17-99, failure to report to

13  work; 11-01-00, failure to report to work.  And

14  115's, 12-8-94 for performance, guilty,

15  counseled and reprimanded.  Eight four '99,

16  refusing to work, guilty, assessed 30 days, 10

17  days loss of privilege, counseled, warned and

18  reprimanded.  Did I miss anything?

19      INMATE HULSEY:  Not that I can tell.

20      DEPUTY COMMISSIONER YACONO:  Counsel, did

21  you have anything else?

22      ATTORNEY TARDIFF:  No.

23      DEPUTY COMMISSIONER YACONO:  Okay.

24  Commissioner.

25      PRESIDING COMMISSIONER SAWYER:  How much

26  of your $10,000 restitution have you paid off?

27      INMATE HULSEY:  I think just under

48

1    $1,500.

2        PRESIDING COMMISSIONER SAWYER:    Okay.

3    Are you -- Is this current dental lab job of

4    yours a pay number?

5        INMATE HULSEY:    Yes.

6        PRESIDING COMMISSIONER SAWYER:    What are

7    you getting paid there?

8        INMATE HULSEY:    It's 36 a month.

9        PRESIDING COMMISSIONER SAWYER:    Okay.

10   And why no vocation?

11       INMATE HULSEY:    For a great deal of time

12   vocations weren't available to Close Custody

13   inmates.    And I've only been Medium Custody

14   since I think it was 2000, since I've been here.

15       PRESIDING COMMISSIONER SAWYER:    April 13.

16       INMATE HULSEY:    Yeah, of 2000.

17       PRESIDING COMMISSIONER SAWYER:    That's

18   six years.

19       INMATE HULSEY:    Yeah.    Where I was at

20   over at north facility, they don't have any

21   vocations that particularly interest me.    They

22   have a graphic arts program over here, it's the

23   print shop, which I would like to take, and a

24   drafting class, computer aided drafting class at

25   that, here that I would like to take.    But --

26       PRESIDING COMMISSIONER SAWYER:    You on

27   the waiting list?

49

1       INMATE HULSEY:  I'm not even on the

2  waiting list.  They won't put me on it because

3  I'm not here in central facility.

4       PRESIDING COMMISSIONER SAWYER:  I see.

5  Okay.  How many college units have you -- six?

6       DEPUTY COMMISSIONER YACONO:  That's what

7  I'm showing.

8       PRESIDING COMMISSIONER SAWYER:  Okay.

9  And those are in English?

10      INMATE HULSEY:  Three in English and I

11  think three in psychology.

12      PRESIDING COMMISSIONER SAWYER:  Yeah,

13  three units so looks like two classes.

14      INMATE HULSEY:  Yeah.

15      PRESIDING COMMISSIONER SAWYER:  Is there

16  anything you can do in terms of vocation or

17  self-help with a correspondence course?

18      INMATE HULSEY:  If I have the means,

19  yeah.  If I can just -- If I know who to write

20  to start, I wouldn't have a problem doing

21  anything like that at all.

22      PRESIDING COMMISSIONER SAWYER:  Do you

23  meet with other lifers?  Is there any kind of

24  lifers group meetings here?

25      INMATE HULSEY:  Not where I'm at.

26      PRESIDING COMMISSIONER SAWYER:  What are

27  you doing now in the dental lab?

50

1          INMATE HULSEY:  Making dentures.

2    Partials and full dentures.  Well, actually I

3    haven't started doing the full's yet.  I just do

4    partial dentures.

5          PRESIDING COMMISSIONER SAWYER:  Are you

6    just learning that?  You've been in the dental

7    lab once before.

8          INMATE HULSEY:  Yeah.

9          PRESIDING COMMISSIONER SAWYER:  Right?

10          INMATE HULSEY:  But that was a long time

11    before.

12          PRESIDING COMMISSIONER SAWYER:  Things

13    change?

14          INMATE HULSEY:  The procedures, no, not

15    really.  It's just getting back in the swing of

16    doing it.

17          PRESIDING COMMISSIONER SAWYER:  Enjoy it?

18          INMATE HULSEY:  Yes, very much so.

19          PRESIDING COMMISSIONER SAWYER:  You see

20    that as a potential vocation?

21          INMATE HULSEY:  Yeah.  I wouldn't mind

22    doing it out on the streets.

23          PRESIDING COMMISSIONER SAWYER:

24    Somebody's got to do it.

25          INMATE HULSEY:  Yeah, everybody needs

26    teeth.

27          PRESIDING COMMISSIONER SAWYER:  Not

51

1    everybody, but most of us do.  What did you

2    learn when you were in PIA in textiles?

3            INMATE HULSEY:  I didn't.

4            PRESIDING COMMISSIONER SAWYER:  You

5    didn't learn?

6            INMATE HULSEY:  I was only there for

7    three months.  And when I was assigned, they

8    were at their -- some kind of break where they

9    do an inventory.  So they had just a minimal

10   crew coming in.  I think it was maybe like eight

11   or nine guys, like a skeleton crew just to keep

12   the sewing machines running so to speak.

13           PRESIDING COMMISSIONER SAWYER:  And what

14   did you learn in Arts In Corrections?

15           INMATE HULSEY:  That was voluntary.  And

16   it was just art classes.  Some of it -- one

17   thing -- Part of it taught me was to loosen up,

18   not try to be so -- it's hard to describe, not

19   try to be so rigid in what I did, loosen up and

20   kind of just do different things.  They had one

21   instructor come in that showed us -- working

22   with ceramics, did a little bit of that.  That's

23   really it.  Just go in there and do artwork.

24           PRESIDING COMMISSIONER SAWYER:  So they

25   taught you how to color outside the lines, huh?

26           INMATE HULSEY:  Basically, yeah.

27           PRESIDING COMMISSIONER SAWYER:  And tell

52

1    me about this reading for the blind, what was

2    that?

3          INMATE HULSEY: That was the Folsom

4    Project for the Visually Impaired. And what we

5    do is we'd sit down and we would read books onto

6    tapes. And it was like a lending library.

7    People that have vision problems would -- it was

8    done through another company, not a company,

9    another organization outside the prison. The

10    visually impaired people, they would call this

11    organization. This organization would get a

12    hold of the institution and say, okay, do you

13    have this, do you have that, this book, that

14    book. If we didn't, if they could provide the

15    book, we'd get the permission to read it on the

16    tape and then loan it them. Just like a

17    library.

18          PRESIDING COMMISSIONER SAWYER:

19    Interesting. Did you ever make license plates

20    in Folsom?

21          INMATE HULSEY: No. No, never did that.

22          PRESIDING COMMISSIONER SAWYER: Okay.

23    And you started AA in 1997. But then got back

24    into in '01?

25          INMATE HULSEY: Yeah, I think so.

26          PRESIDING COMMISSIONER SAWYER: How many

27    years did you have in the AA in '97?

53

1          INMATE HULSEY:  Prior to '97?

2          PRESIDING COMMISSIONER SAWYER:  Yeah, did

3    you have some prior to '97?

4          INMATE HULSEY:  No.  Closed Custody, in

5    '97 was when they got a Closed Custody AA

6    program going.

7          PRESIDING COMMISSIONER SAWYER:  And how

8    many years did you do it in '97 until when?

9          INMATE HULSEY:  Well, I'm unsure of when

10   they started it in '97 but it only lasted until

11   like May of '98 when I got transferred here.

12         PRESIDING COMMISSIONER SAWYER:  And then

13   it took you all this time to get it here

14   (indiscernible) --

15         INMATE HULSEY:  (Indiscernible) --

16         PRESIDING COMMISSIONER SAWYER:  --

17   position here?

18         INMATE HULSEY:  Yeah.  Because I was

19   still Closed Custody.  Well, I was Medium

20   Custody and then Closed Custody again.  And they

21   didn't have an AA program for Closed Custody's

22   because Closed Custody's could not leave the

23   cells in the evening.

24         PRESIDING COMMISSIONER SAWYER:  So you've

25   got AA regularly from -- did I read that right,

26   regularly from '01 until now?

27         INMATE HULSEY:  Yeah.

54

1          PRESIDING COMMISSIONER SAWYER:   As

2     regular as it can be?

3          INMATE HULSEY:   Well, yeah, barring any

4     --

5          PRESIDING COMMISSIONER SAWYER:

6     Lockdowns.

7          INMATE HULSEY:   Yeah, lockdowns, lack of

8     program which has been happening a lot since

9     2001.

10         PRESIDING COMMISSIONER SAWYER:   You know

11    your steps?

12         INMATE HULSEY:   I've only gotten -- far

13    as number two and that's the one I have the

14    biggest problem with.

15         PRESIDING COMMISSIONER SAWYER:   What step

16    is that?

17         INMATE HULSEY:   Put myself in the hands

18    of a higher power.   I've always felt I'm

19    responsible for my own actions.

20         PRESIDING COMMISSIONER SAWYER:   Is that

21    -- Is that what that means?

22         INMATE HULSEY:   No, well, to me it kind

23    of does.   To me it's like asking me to say,

24    okay, it's not my fault.   It's asking me to do

25    something that I don't believe in.   I guess you

26    could say, for lack of a better term, I'm an

27    atheist.   And I don't -- By putting myself in

55

1   the hands of a higher power, they're asking me

2   to basically quit taking the blame for my

3   alcoholism. And I can't do that. I know I have

4   a problem with alcohol and I'm the only one

5   that's going to be able to solve it.

6          PRESIDING COMMISSIONER SAWYER: Okay.

7   Very good. Mr. Underwood, do you have any

8   questions for the inmate?

9          DEPUTY DISTRICT ATTORNEY UNDERWOOD: No,

10  I don't. Thank you.

11         PRESIDING COMMISSIONER SAWYER: Thank

12  you. Ms. Tardiff?

13         ATTORNEY TARDIFF: I have none.

14         PRESIDING COMMISSIONER SAWYER: Okay.

15  Mr. Underwood, would you like to make a closing

16  statement.

17         DEPUTY DISTRICT ATTORNEY UNDERWOOD: I

18  would. Thank you. I see a lot -- a lot of good

19  that I don't (indiscernible) when I come to

20  these hearings of what the inmate's doing to

21  better himself in prison. But I see some things

22  that are troubling. And I'm sure the citizens

23  of our community would find them troubling. And

24  I begin there with the defendant's memory of the

25  crime, what he's told people happened at various

26  stages. And beginning in the current report the

27  inmate says he was drunk and he doesn't remember

56

1    anything.  Going back to the probation report

2    after the defendant was convicted he made the

3    statement that it's real terrible that someone

4    died, it shouldn't have happened, and had I been

5    sober, it wouldn't have, that's all I can say.

6    Going back before -- That was on March 19, 1990,

7    so about nine months or so after the crime was

8    committed.  Going back to two days after the

9    crime was committed, on page three of the

10   probation report he initially said he had a

11   blackout and was unable to recall his

12   activities.  He subsequently admitted that talk

13   about committing -- robbery began while they

14   were at the river.  He acknowledged that it was

15   his idea to attempt to obtain a weapon from his

16   brother.  He contended that he was extremely

17   intoxicated at the time and that the amount of

18   alcohol consumed impaired his judgment.  I was

19   drunk out of my mind.  The common theme here is

20   that there -- it seems to be that alcohol's to

21   blame here and not the inmate.  But what strikes

22   me when you went through the narration of the

23   facts of the current crime is that they show a

24   mind that doesn't appear to be impaired to that

25   degree.  In other words, the planning done, the

26   driving from the lake, which it's not clear in

27   here, but I'm assuming he's talking about Lake

1    (indiscernible) here, little northeast of Exeter

2    and also east of Woodlake.  So he's able to

3    drive this car around, they're able to stake the

4    place out, check the amount of traffic going in

5    and out of the store.  Four other people are in

6    the car.  I conclude that the impairment was not

7    that bad if none of those four people at that

8    time said, for their own safety, holy cow, get

9    this guy away from the wheel if he's that

10    intoxicated to where he's blacked out.  Get him

11    away from the wheel.  I don't want to be a

12    passenger in this car because he's too drunk.

13    But we don't see any of that in the report.  So

14    it's somewhat troubling.  I don't want to say

15    the inmate's not telling you the truth here, but

16    I just wonder if he's really accounting for what

17    happened back then.  I don't believe he is.  He

18    accounted back in June of '89 to some degree,

19    but since then it seems -- it seems to be I

20    don't remember anything, I was drunk, if I

21    wouldn't have got drunk, it wouldn't have

22    happened.  And I don't know if that's taking

23    accountability for what happened.  I don't

24    believe it is.  We're also concerned by the

25    128's seen in the report.  Now I note that the

26    possession of contraband, it appears to be

27    before he attended his AA meetings.  But if it's

58

1    the alcohol that that's the problem, well here

2    we see in 1993 an attempt to get contraband

3    while he was in custody.  We have all these

4    letters saying once he's on the outside, hey, we

5    got a place for him to work, why don't you come

6    with us, it sounds like he has a family who's

7    very supportive.  But here when I look at his

8    disciplinary histories I see quite a few

9    failures to report to work and refusing to work.

10    I don't know the circumstances behind those, but

11    those also cause us some concern too.  For these

12    reasons we feel he's not a suitable candidate

13    for release.  Thank you.

14            PRESIDING COMMISSIONER SAWYER:  Thank

15    you.  Ms. Tardiff.

16            ATTORNEY TARDIFF:  I just have a

17    question.  The '93 possession of contraband,

18    what was that for?

19            INMATE HULSEY:  Just a bunch of crap.

20            ATTORNEY TARDIFF:  The 128's are not

21    alcohol related.  Contraband can be a rubber

22    band I guess, anything that they're not supposed

23    to have is contraband.

24            DEPUTY COMMISSIONER YACONO:  Do you want

25    me to read it, counsel?

26            ATTORNEY TARDIFF:  Sure.

27            DEPUTY COMMISSIONER YACONO:  Three 24,

59

1    '93, during a cell search of inmates Hulsey and

2    Bishop, found and confiscated numerous items of

3    contraband, some of which were inmate

4    manufactured tools, screwdrivers, utility knife,

5    numerous strips of civilian clothing, prints,

6    two civilian shirts, black and white, wax for

7    sealing televisions, one television set, seals

8    broken. These items were found in Hulsey's

9    living space, under and near his bunk. He

10   admitted to using dental epoxy resin which he

11   obtained from the dental lab. And there was an

12   evaluation it might be used to aid in an escape

13   attempt. All the above listed contraband will

14   be pending investigation. And that's the most

15   significant part of that. So no, it is not

16   substance abuse.

17       **ATTORNEY TARDIFF:** So it was not alcohol

18   related. Okay. Thanks. So I would -- those

19   remarks regarding the 128's by the District

20   Attorney I don't think were appropriate since

21   they did not involve any kind of substance

22   abuse. Further, 128's are counseling chronos

23   and disciplinary actions, making his last 115 in

24   '99. So were going almost on seven years since

25   he's had a 115 which I think is excellent

26   behavior. Only two 115's, no force or violence.

27   Again, almost seven-years-old. So his

# EXHIBIT 3
# Part 3 of 3

60

1   performance in terms of disciplinary or abiding

2   by institutional standards I submit is

3   excellent.  But let me go to his

4   pre-incarceration history first.  He appeared to

5   have a stable social history.  He was a high

6   school graduate.  His family appeared to be

7   stable and intact.  And currently that seems to

8   be the case as well.  He's got a lot of letters

9   from his family which appear to be very

10  supportive of him.  All mention that they were a

11  close knit family.  So his pre-incarceration

12  history, non-criminal, appears to be supportive.

13  His post -- And his criminal history, he didn't

14  have any prior criminal history at all.  He had

15  an arrest for minor in possession of alcohol and

16  public intoxication when he was 15 and 17, but

17  that was it.  No force or violence either before

18  the commitment offense.  This was the only

19  indication of any violence.  And I'd like to

20  point out that Mr. Hulsey was not the shooter.

21  And in his sentencing report the judge noted

22  that:  "And I realize that Mr. Hulsey was a

23  participant by reason of the aider and abetter

24  rule and I -- "  And then it goes on to say:

25       "I am well aware -- I am well

26        aware of the particular problems

27        that all of us face with the

61

1        felony murder rule and there have

2        been other cases in this

3        courthouse where other individuals

4        were outside a particular

5        residence and/or commercial

6        establishment where a homicide's

7        occurred and they too suffered the

8        consequences of the main principal

9        in the action.  And I am afraid

10       that in Mr. Hulsey's circumstance

11       because of the fact perhaps that

12       he was drinking alcohol that day

13       or because of the other factors

14       that were mentioned in the 25 page

15       report supplied by defense counsel

16       he found himself in a situation

17       that he now has to pay his debt to

18       society.  Again, I am shocked and

19       distressed that I have to impose

20       these types of sentences on a

21       young man with no record."

22  And he's referring to granting a motion to have

23  this reduced to a manslaughter.  So even the

24  court, I believe by those statements, had no

25  discretion at all and had to impose, but the

26  court was troubled by the fact that Mr. Hulsey

27  did not have any prior record and was in the car

62

1   at the time of the offense.  And I submit that

2   in mitigating his factors in the commitment

3   offense.  Also, the probation officer's report

4   noted that he was highly intoxicated which

5   significantly reduced his culpability for the

6   crime.  And I believe it was a .17 was his

7   alcohol reading at the time of the commitment

8   offense if I'm not mistaken.

9        PRESIDING COMMISSIONER SAWYER:  Counsel,

10  I read it two one.

11       ATTORNEY TARDIFF:  Did you, two one.

12       PRESIDING COMMISSIONER SAWYER:  From

13  testimony from a doctor.

14       ATTORNEY TARDIFF:  Okay.  So he was -- It

15  was pretty high that's for sure.  Way over the

16  limit, twice over the limit either reading and

17  that's significant.  Not that that should

18  diminish his culpability in terms of this young

19  clerk's demise.  But I think it does

20  substantiate Mr. Hulsey's testimony regarding

21  how intoxicated he was.  And I think also in

22  reference to some of the remarks made by the

23  District Attorney for -- I don't think

24  particularly then young teens were not going to

25  say, hey, maybe he better not be driving.  I

26  just can't see teenage boys even doing that.

27  They're reckless, particularly if they're

1    involved with companions that are drinking a
2    lot.  It's not just something that's done.
3    Since he's been incarcerated, I've addressed the
4    115's and the 128's.  He has participated in
5    programming when it's available.  Due to the
6    lockdowns and his custody level, he hasn't been
7    able to do as much as I believe he would like to
8    do.  And I don't think there's any indication
9    that he would not want to be participating more.
10   He does get good work reports, satisfactory to
11   above average.  Been a clerk for the watch
12   commander.  He's volunteered a lot of his time
13   in terms of literacy group.  He seems to have
14   found some sort of niche in his artwork.  I'll
15   also submit that that is also a form of
16   self-help for many individuals I'm sure,
17   including Mr. Hulsey.  He has good psych
18   reports, two of them only, but the most recent,
19   '06, the high GAF at 90.  No mental health
20   diagnosis.  Average citizen.  And the one before
21   that was also good.  His regret for instant
22   offense appears authentic.  This is from '93,
23   that's a long time ago.  And his violence
24   potential appears to be considerably less than
25   that of the average inmate population.  He's
26   done some college since he's been incarcerated.
27   So I believe that Mr. Hulsey has programmed in a

64

1    very positive fashion.  And up to this point

2    he's done everything he can.  If he is not found

3    suitable, I think he should only be given a one

4    year denial due to his good programming.  Thank

5    you.

6         PRESIDING COMMISSIONER SAWYER:  Thank

7    you.  Mr. Hulsey, this is your opportunity to

8    tell this Board why you feel you're suitable for

9    parole at this time.

10        INMATE HULSEY:  Wow.

11        PRESIDING COMMISSIONER SAWYER:  You

12   didn't realize you were going to have this

13   opportunity?

14        INMATE HULSEY:  Well, I did but I went

15   over in my head many times what I think I would

16   say why I should be found suitable.  But I think

17   my lawyer's pretty much covered it all.

18        PRESIDING COMMISSIONER SAWYER:  Well you

19   don't have to say anything if you don't -- if

20   you don't want to.

21        INMATE HULSEY:  The only thing I can add

22   is if I'm found suitable and I'm paroled, I'll

23   still have a chance to make something of my

24   life.  Go out work, pay taxes and complain about

25   them being too high.

26        PRESIDING COMMISSIONER SAWYER:  Okay.

27   And gasoline too.

65

1          **INMATE HULSEY:**  Yeah.   Yeah.

2          **PRESIDING COMMISSIONER SAWYER:**   That's

3     it?

4          **INMATE HULSEY:**  Yes.

5          **PRESIDING COMMISSIONER SAWYER:**   Okay.

6     Thank you.   It's 2:30 and we will recess for

7     deliberations.

8                    **R E C E S S**

9                    --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

66

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER YACONO:  Okay.  Our

4    tape's rolling.

5    PRESIDING COMMISSIONER SAWYER:  Okay.

6    The time is 2:50 in the afternoon in the matter

7    of Mr. Hulsey.  And everyone has returned to the

8    hearing.  The Panel's reviewed all the

9    information received from the public and relied

10   on the following circumstances in concluding

11   that the prisoner is not suitable for parole and

12   would pose an unreasonable risk of danger to

13   society or a threat to public safety if released

14   from prison.  First of all we'll talk about the

15   commitment offense.  It was carried out in an

16   especially cruel and callous manner in that his

17   crime partner, who I read in the legal documents

18   got life without the possibility of parole.

19   INMATE HULSEY:  I think so, yeah.

20   PRESIDING COMMISSIONER SAWYER:  His crime

21   partner, Mr. Abele, ultimately after spending

22   the time with Mr. Hulsey and three juveniles

23   went into a store and robbed it with

24   Mr. Hulsey's brother's .22 rifle with three

25   rounds in it.  The storekeeper was ultimately

26   murdered in this particular case which earned

27   CLEVE HULSEY    E-53226    DECISION PAGE 1    5/9/06

67

1    them five dollars.  Five dollars in this

2    robbery.  While Mr. Hulsey did not do the

3    robbery himself, he was in the car.  He was a

4    participant and was found -- Did you have a

5    court trial or a jury trial?

6              INMATE HULSEY:  Court trial.

7              PRESIDING COMMISSIONER SAWYER:  Court

8    trial.  He's ultimately found guilty of murder

9    in the first degree, armed with a firearm and

10   the second count of robbery to run concurrent

11   with the -- with the murder and an enhancement

12   on both for the -- for the weapon which he

13   received a 12022.5 of the Penal Code.  The facts

14   that he -- The fact is that he and his crime

15   partner had been drinking.  He's 18 years of

16   age.  He had a history -- And so he was only 18.

17   He had a brief history, three years of history

18   with alcohol abuse.  There was an attempt made

19   to get him squared away with that by sending him

20   to Narcotics Anonymous or a program and he

21   wasn't successful obviously at that time of his

22   life.  This certainly demonstrated -- The way it

23   was carried out demonstrated an exceptional

24   callous disregard for human suffering in that a

25   life was taken for five dollars, which the

26   motive for this crime is certainly inexplicable.

27   CLEVE HULSEY   E-53226   DECISION PAGE 2   5/9/06

68

1    Mr. Hulsey, as said before, does not have a
2    serious previous record, has no violence in his
3    previous record as a juvenile.  Did have an
4    alcohol problem and has -- did not -- certainly
5    did not benefit from the program that he
6    attended.  And unfortunately continued to drink;
7    otherwise, he probably wouldn't be sitting here
8    today as he claims he if wasn't under the
9    influence he wouldn't have happened.  Is that
10   correct, sir?
11          INMATE HULSEY:  Yes.
12          PRESIDING COMMISSIONER SAWYER:  He
13   remembers some of the events leading up to this
14   but claims that he was blacked out.  He did have
15   a high blood alcohol when it was calculated as
16   to what he drank.  It was somewhere around two
17   -- .20 which certainly by today's standards
18   would be almost three times the legal limit, two
19   and a half times the legal limit of .08.  And
20   certainly was a danger while driving around in
21   that condition.  His institutional behavior, he
22   has -- he's programmed in a -- has done -- has
23   done well given the circumstances of his custody
24   level.  He's gotten -- Up until recently he was
25   the watch commander's clerk, received above
26   average work reports.  He was a patio clerk in
27   **CLEVE HULSEY    E-53226    DECISION PAGE 3    5/9/06**

69

1    '01.  He was also -- did a stint as watch clerk.

2    He was a porter in 1999.  In 1998 he worked at

3    PIA in textiles for a brief period of time.  He

4    was a sergeant's clerk or with the sergeant's

5    yard crew in '01, above average or average work

6    reports and above average work reports.  The --

7    Most recently and currently he's in the dental

8    lab which he expressed that he likes and his

9    body language indicated that as well.  He kind

10   of lit up.  And his self-help programs, the most

11   critical program, AA, he did get a start in '97.

12   But again, based on custody level had some

13   difficulty but he started again when he came

14   here in '01 to the present and claims to be

15   working the first two steps.  And if there's

16   some alternative program that isn't so

17   spiritually based that you find, whether it's

18   correspondence or a program in the institution

19   that might suit you better based on the fact of

20   the higher power issue that would do similar --

21   same thing as a 12-step program -- We're big

22   fans of -- 12-step program because we see

23   results, positive -- very positive results if

24   people stick to it.  And there -- And they take

25   -- they take the stress off of people when

26   they're on the outside (indiscernible) and they

27   **CLEVE HULSEY    E-53226    DECISION PAGE 4    5/9/06**

70

1    continue to go and they have sponsors and they

2    have a safety net so to speak that they can --

3    You know, if you look at all the steps, you'll

4    see the last two steps are maintenance.  And you

5    know -- And you develop a relapse prevention

6    program and things like that that help you --

7    help you deal with the day to day life without

8    alcohol and/or drugs.  So if you can, you know,

9    find something.  It doesn't have to be AA.  None

10   of the Panels will say go to AA.  We'll just

11   tell you to get self-help in some sort of

12   12-step program, something to deal with

13   addictions.  Do you understand what I'm saying?

14          INMATE HULSEY:  Yes.

15          PRESIDING COMMISSIONER SAWYER:  Okay.

16   That will help you -- That should help you in

17   the future.  Nineteen '98, the Captive Audience

18   Literacy Group.  In '99 you took a series of

19   courses for Hepatitis, HIV and AIDS courses.

20   You know about Hepatitis C?

21          INMATE HULSEY:  Yeah.

22          PRESIDING COMMISSIONER SAWYER:  You know

23   how to get it?

24          INMATE HULSEY:  Yes.

25          PRESIDING COMMISSIONER SAWYER:  Okay.  So

26   you don't do any of that?

27   CLEVE HULSEY    E-53226    DECISION PAGE 5    5/9/06

71

1          INMATE HULSEY:  No.

2          PRESIDING COMMISSIONER SAWYER:    You don't

3    have any tattoos, do you?

4          INMATE HULSEY:  None.

5          PRESIDING COMMISSIONER SAWYER:    Very

6    good.  Okay.  Arts In Corrections.  You did a

7    stint in that and explained a little about that,

8    what he was doing in 1998 and 1999.  He's gotten

9    six units in -- three in psychology, three in

10   English from college courses.  He's done Inmate

11   Peer Education and gotten some certificates for

12   those particular things.  While all these -- any

13   one of these things isn't much, all of them

14   together are much.  You know what I mean?

15         INMATE HULSEY:  Yeah.

16         PRESIDING COMMISSIONER SAWYER:    You just

17   kind of keep stacking up, making that stack

18   bigger and bigger, it's the scale of justice

19   here.  And you want all the good stuff on one

20   side and all the bad stuff you can't change on

21   the outside.  That stuff being 115's.

22         INMATE HULSEY:  Yeah.

23         PRESIDING COMMISSIONER SAWYER:    Last one

24   was 1999 for refusing to work.  The previous one

25   was 1994 for performance.  And then received

26   four counseling chronos, 128's, last one being

27   CLEVE HULSEY   E-53226   DECISION PAGE 6   5/9/06

72

1    in the year 2000, nearly seven years ago.  Are

2    you aware of how a date's determined for you?

3    If we feel you're ready for parole today, you

4    know how we calculate it?

5         INMATE HULSEY:  No, no idea.

6         PRESIDING COMMISSIONER SAWYER:  Okay.

7    Well we have a -- And your attorney can explain

8    it to you and maybe even show you.  We have a

9    matrix.

10        INMATE HULSEY:  This I've heard of.

11        PRESIDING COMMISSIONER SAWYER:  Okay.  We

12   have a matrix and we go, you know, we put you in

13   a category on the top and a category on the side

14   and bring them together and then we've got a

15   choice of three different years that we can give

16   you.  And we pick -- we pick out where you fall

17   into the matrix.  Now what's real important that

18   you know is for every year that you go without a

19   115 you get four months of credit, good time.

20        INMATE HULSEY:  Okay.

21        PRESIDING COMMISSIONER SAWYER:  Okay.  So

22   you've done, what, 16 years?

23        INMATE HULSEY:  Sixteen, seventeen.

24        PRESIDING COMMISSIONER SAWYER:  Yeah.

25   Since you've come to the prison.

26        INMATE HULSEY:  Yeah, 16.

27   CLEVE HULSEY    E-53226    DECISION PAGE 7    5/9/06

73

1        PRESIDING COMMISSIONER SAWYER:   Sixteen

2   years.   Sixteen years minus two in your case.

3   So you get 14 times four, whatever that works

4   out to be, number of months, and then we take

5   that off of that matrix number.   So every year

6   that you go without a 115, you're picking up

7   four months, you're picking up a third of a

8   year.   And that's particularly important to you.

9   Again, your -- your attorney can show you how

10   that works.

11        INMATE HULSEY:   Okay.

12        PRESIDING COMMISSIONER SAWYER:   So it's

13   real important you stay discipline-free.   That's

14   what -- That's the bottom line I'm getting at.

15   You get rewarded immensely for this.

16        INMATE HULSEY:   Okay.

17        PRESIDING COMMISSIONER SAWYER:   Plus, if

18   you got a 115 today, it's almost like starting

19   all over again with your -- with your time.

20        INMATE HULSEY:   Yeah.

21        PRESIDING COMMISSIONER SAWYER:   We look

22   at -- we look -- we look -- You know, it's a --

23   it's a violation of the rules which equate to a

24   violation of the law on the outside.   And if you

25   can't follow the rules in here, especially with

26   your history here, history being the time you

27   **CLEVE HULSEY    E-53226    DECISION PAGE 8    5/9/06**

74

1    spent here, knowing how it works and working it,

2    you've got to be real careful and continue to --

3    continue to do what you're doing. We did -- I

4    did mention the dental lab that you're currently

5    in that and that that's certainly a very

6    positive vocational tool that you might get,

7    that you might want to look at. You might want

8    to look at what else -- As time goes on, you're

9    going to have more and more opportunities for

10   vocation, something that obviously is

11   interesting to you and something that you can

12   use on the outside as a marketable skill in the

13   future. So your -- your -- you're doing well.

14   You present very well.

15        INMATE HULSEY:  Thank you.

16        PRESIDING COMMISSIONER SAWYER:  You

17   present yourself as very intelligent. You're

18   making this hearing go real easy for us because

19   you seem to absorb what we have to say and you

20   communicate very, very well. So you know, you

21   can look at this as one of the hardest job

22   interviews you'll ever go to, you know. This is

23   a tough job interview.

24        INMATE HULSEY:  Yeah.

25        PRESIDING COMMISSIONER SAWYER:  Nothing

26   will ever be this tough. Especially on your

27   **CLEVE HULSEY    E-53226    DECISION PAGE 9    5/9/06**

75

1    initial hearing when you're not quite sure what

2    to expect and you've heard rumors and those

3    rumors are generally not true.  But we're not

4    all that bad.  Psychiatric factors.

5    Commissioner.

6         DEPUTY COMMISSIONER YACONO:  I was going

7    to say speak for yourself, you're not that bad.

8    Okay.  Just a quick review of the psych.  What

9    I'm keying in on is the alcohol dependence issue

10   and in this case the psychiatric evaluation

11   showed it in institutional remission.  And the

12   other axis show basically no other problems and

13   actually a GAF score of 90 out of 100 is quite

14   high.  The assessment of dangerousness noted as

15   lower than the inmate population.  And for a

16   community base as long as -- maintain current

17   sobriety and commitment to remain abstinent then

18   the assessment would be no more than average

19   than the average person in a non-prison

20   population.  I guess that would be the

21   community.  Significant risk factor of course is

22   the alcohol use.  And the prior evaluation

23   basically hits on the same point of alcohol

24   dependence and to maintain sobriety.

25        [Thereupon, tape two was recorded.]

26        DEPUTY COMMISSIONER YACONO:  Okay.  We're

27   CLEVE HULSEY    E-53226    DECISION PAGE 10    5/9/06

1    rolling on both.

2         PRESIDING COMMISSIONER SAWYER:   Okay.   As

3    I was talking about -- asked the question of the

4    inmate do you see the connection of the

5    psychological report to your programming.

6    Psychological report says that your risk factors

7    are much higher if you're not abstinent.

8         INMATE HULSEY:   Yes.

9         PRESIDING COMMISSIONER SAWYER:   And so

10   that's why the AA or equivalent program is so

11   important to make us feel that you have that

12   safety net, you have that -- you have something

13   to fall back on so you don't relapse and start

14   drinking again and get yourself -- and do

15   something -- something that you're going to

16   regret.

17        INMATE HULSEY:   Yeah.

18        PRESIDING COMMISSIONER SAWYER:   You see

19   what I'm -- that's -- That's where it ties

20   together.   Your parole plans, excellent.   You've

21   got wonderful letters from your family.   Sounds

22   like you've got just a great family and it

23   sounds like they're very interested in taking

24   care of you.   Sounds like they're loving.

25   Sounds like they'd be a good -- good support --

26   support.   And not just using that word

27   CLEVE HULSEY    E-53226    DECISION PAGE 11    5/9/06

77

1    willy-nilly.  I'm talking about support when --
2    You know, if you don't have the stresses of
3    finances, a place to live or you know -- You may
4    get a job initially that doesn't pay a lot and
5    you couldn't survive on your own because the
6    price of housing is nuts even in the valley now.
7              INMATE HULSEY:  Yeah.
8              PRESIDING COMMISSIONER SAWYER:  It's just
9    going -- It's getting wild.  So you know, you
10   look ahead and you say I don't think I could
11   ever, you know, take care of myself.  You've got
12   your -- You got your family there and your
13   friends that -- that -- that you can confide in.
14   I mean, your whole life's on this table at this
15   point in time of your life and you know
16   everybody knows about you and -- inside and out.
17   There's no -- hopefully no secrets.  But you
18   know, you've got to have people out there
19   that'll be -- that'll be on your side.  And this
20   certainly looks like -- based on the letters
21   that were written and that we went through
22   today.  As far as employment's concern, that's
23   yet to come.  I do believe you have a marketable
24   skill clearly in your artwork.  Your artwork was
25   fabulous.
26             INMATE HULSEY:  Thank you.
27   CLEVE HULSEY   E-53226   DECISION PAGE 12   5/9/06

78

1          PRESIDING COMMISSIONER SAWYER:    And

2     thanks for bringing it in and sharing it with

3     us.    It shows a tremendous amount of talent

4     there.    But you know the old story on artists.

5     They're starving.

6          INMATE HULSEY:    Yeah.

7          PRESIDING COMMISSIONER SAWYER:    Okay.

8     You know, there are artists and there's actors

9     and there's -- You know there's people out there

10    that have a lot of talent but there's a lot of

11    competition.

12         INMATE HULSEY:    Yes.

13         PRESIDING COMMISSIONER SAWYER:    But I --

14    In looking at your work, it's -- it's quite --

15    quite beautiful and -- and you certainly have --

16    you certainly have a talent there and very

17    marketable skill.    But I would -- We would

18    encourage you to continue to get vocational

19    skills that you possibly can, whether it's

20    dental lab or whatever else you can get into.

21    Encourage you maybe to stay away from some of

22    the things that -- that -- You want to evaluate

23    the particular vocation.    Like upholstery.

24    There's lots of upholsterers out there.    And

25    that's a pretty competitive market and you don't

26    make a lot of money, not that it's not

27    CLEVE HULSEY    E-53226    DECISION PAGE 13    5/9/06

79

1   necessary.  I mean we're all sitting on soft

2   seats because of PIA.  But still some of the

3   manufacturing jobs that are in the institutions

4   are offshore, you know, textiles and things like

5   that.  They're -- they're -- While they're

6   self-serving while they're in -- in -- in the

7   institution and you get good -- good job skills,

8   the question is where am I going to use it, you

9   know.  If you're a (indiscernible) that in

10  quality control on t-shirts, you have to go to

11  Bangladesh or Malaysia or someplace because

12  that's where all the stuff is made --

13          INMATE HULSEY:  Yeah.

14          PRESIDING COMMISSIONER SAWYER:  --

15  anymore.  Very little textile going on in -- in

16  the -- in the United States.  So continue to

17  keep those parole plans fresh.  We did have a

18  response from Tulare County in opposition to a

19  parole date being set for you today.  And I

20  again want to commend you for your behavior, for

21  your self-help that you've been doing, for all

22  the work that you've -- that you've done even

23  though they've been pretty low-level jobs.  We

24  understand.  And you continue to get your

25  classification -- and put yourself in a position

26  where you can get better -- better and better

27  CLEVE HULSEY    E-53226    DECISION PAGE 14    5/9/06

80

1    jobs, continue, you know -- Get those better

2    jobs so that you can pay off that restitution

3    that you owe or try to seek some outside --

4    outside help with that.  And so we want to

5    commend you for that.  However, these positive

6    aspects of your behavior doesn't outweigh the

7    crime that you were committed for.  In a

8    separate decision, the hearing Panel finds the

9    prisoner has been convicted of murder and

10   robbery to run concurrent.  It's not reasonable

11   to expect parole would be granted in the next

12   three years.  So you're getting a three year

13   denial here based on the crime, based on your

14   alcohol and you need programming, continue

15   programming, and you've -- you've got the

16   longest stint in AA from '01 to now.  You need

17   longer.  You need three more years on top of

18   that.  You need to get some marketable skills

19   under your belt so that you've got options when

20   you do get released.  I'm confident -- We're

21   confident, and we talked about this during our

22   deliberations, how -- how well you interview,

23   how -- what a pleasant guy you are in terms of

24   your presentation today.  And for the -- for the

25   first hearing normally -- not normally,

26   sometimes we see four and five years, and I'm

27   **CLEVE HULSEY    E-53226    DECISION PAGE 15    5/9/06**

81

1    sure your attorney mentioned that, denial.  We

2    want to keep -- We want to keep you encouraged.

3    We don't again believe that you'll be paroled

4    within the next three years.  There's no

5    possibility that you'll be paroled in the next

6    three years.  So let's take this time to bolster

7    up your -- your preparations for that parole.

8    And I can't guarantee you what's going to happen

9    in three years.  But I can say that you need --

10   you need -- we say that you need these three

11   years to -- to get yourself in a better position

12   for parole.  So our recommendations to you,

13   continue your self-help, stay discipline-free,

14   learn a trade and earn those positive chronos.

15   Okay.  Do you understand?

16          INMATE HULSEY:  Yes.

17          PRESIDING COMMISSIONER SAWYER:  Do you

18   have any questions?  I don't normally let the

19   inmate talk during this period of time, during

20   our decision.  But I want you to be perfectly

21   clear because this is your initial hearing.  Do

22   you have any questions for us?

23          INMATE HULSEY:  No, actually I don't.

24          PRESIDING COMMISSIONER SAWYER:  Okay.

25   Very good.  Do you have anything you'd like to

26   say, Commissioner?

27   CLEVE HULSEY    E-53226    DECISION PAGE 16    5/9/06

82

1          DEPUTY COMMISSIONER YACONO:  No, you've

2    covered it all.  Thank you.

3          PRESIDING COMMISSIONER SAWYER:  Very

4    good.  Good luck to you, sir.

5          INMATE HULSEY:  Okay.

6          PRESIDING COMMISSIONER SAWYER:  Okay.

7          INMATE HULSEY:  Thank you.

8          PRESIDING COMMISSIONER SAWYER:  Thank

9    you.

10                    --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED THREE YEARS          SEP  6 2006

24    THIS DECISION WILL BE FINAL ON _____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    CLEVE HULSEY   E-53226   DECISION PAGE 17   5/9/06

83

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 82, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of CLEVE HULSEY, CDC No. E-53226 on MAY 9, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 12, 2006 at Sacramento County, California.

Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

**E X H I B I T**

2

Probation Officer's Report
March 26, 1990

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF TULARE

FILED
TULARE COUNTY

MAR 23 1990

JAY C. BAYLESS, CLERK
_Lorraine Baltazar_ DEPUTY

The People of the State of California,)
                              Plaintiff,)
                                        )
              vs.                       )
                                        )
CLEVE OTIS HULSEY,                      )
                                        )
                         Defendant.     )
                                        )

COURT NUMBER: 27850

HEARING DATE: 3-26-90
REPORT AND RECOMMENDATION
OF THE PROBATION OFFICER

| Judge: | ROBERT C. VAN AUKEN |
| Department: | No. 2 |
| Attorney: | James Wilson |
| Address: | 3714 West Mineral King Avenue Visalia, CA |

| Probation No: | A-18731 |
| SO ID No: | 176673 |
| CII No: | None |
| FBI No: | None |
| SS No: | 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 |

Defendant's Address: 1176 West Maple, Exeter, CA

DOB: 5-20-71    AGE: 18

Birthplace:    Tulare, CA

Citizenship:    United States

Education:    12 Years

Marital Status: Single

Spouse:    N/A

Children:    None

Ages:    N/A

COURT PROCEEDINGS:

| CASE # | PLEA DATE | COUNT | OFFENSE | ACTION | INDICATED SENTENCE |
|--------|-----------|-------|---------|--------|--------------------|
| 27850 | 2-28-90 | 1 | Fel 187 P.C., 1st Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |
| | | 2 | Fel 211 P.C., 1st Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |
| | | 3 | Fel 459 P.C., 2nd Degree | Convicted in trial | |
| | | | S/A 12022(a) PC | Found True | |

REPORT OF THE PROBATION ~~OFFICER~~
CLEVE OTIS HULSEY

## BRIEF SUMMARY OF FACTS:

In the commission of a robbery of a Woodlake convenience store on June 26, 1989, the defendant shot and killed a 17-year-old store clerk, Amed Al-Kobadi.

## OFFENSE:

Testimony presented during the course of a two week trial indicates that the defendant and alleged co-participant, Charles Abele, to be tried separately in September, formulated a plan to rob the A & H Market located in the rural Tulare County community of Woodlake for the purpose of obtaining money with which to buy beer. The pair obtained a .22 caliber semi-automatic bolt action rifle and ammunition and drove to the small family-owned business which they had targeted in advance.

Accounts of eyewitnesses and the confession by the defendant provided subsequent to his arrest concur that while the defendant waited in the car with the motor running, Abele, wearing a ski mask, entered the store displaying the firearm and demanded money. Store clerk Amed Al-Kobadi, 17, produced several bills from the cash register while Abele allegedly maintained the rifle pointed at him in a ready-to-fire position with his finger inside the trigger guard. Reportedly, the youthful clerk grabbed the rifle at the front site, causing the firearm to discharge. Al-Kobadi suffered a single gunshot wound in the right side of his chest. The bullet reportedly perforated his lung and he expired within minutes due to exsanguination.

The crime netted the perpetrators $5. According to accounts, before leaving Woodlake the defendant drove to another convenience store and with the proceeds from the robbery the co-participant purchased a quantity of gas, a pack of cigarettes and a quart of beer.

The series of events which subsequently unfolded linking the defendant with the crime were as follows:

A Woodlake resident reported observing a male subject wearing a black ski mask and carrying a rifle run from the store and enter the front passenger side of a waiting vehicle bearing California license No. 1GOP367. She reported that the vehicle was parked on the north side of the store and that she also observed "some kids" in the rear seat of the car. Investigation revealed the vehicle was registered to Neal Cave of 711 West Maple Avenue. Cave reported to authorities that he lent his automobile on June 26, 1989, to Charles Abele. Cave said that Abele was in possession of the car most of the day and upon returning the vehicle to him made statements concerning a "stick up" of a store located in the Woodlake area.

On June 27, 1989, Charles Abele provided investigating officers a voluntary statement in which he admitted involvement in the robbery and shooting death of the store clerk.

The following day investigating officers were contacted by the brother of the defendant, Marvin Hulsey, who reported that he had been reading a newspaper account of the incident. He testified that the defendant came to his house together with Abele and asked to borrow his father's rifle. As they were borrowing the weapon, they explained that they wanted to use it for shooting bottles at a canal. He reported that he told the defendant he did not have any bullets, but in fact had removed cartridges from the clip because he felt both defendants had been drinking. He stated that both defendants returned to his home later in the day and returned the rifle.

2

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

Cody Grim testified that on June 26, 1989, he was contacted by Abele who asked him for some .22 caliber ammunition, and specifically asked for three bullets. About the time that Grim handed Abele the bullets, Hulsey approached and stated that the pair was planning to go to the canal and do some target shooting. Grim also observed that at the time Anthony Chavira was in the back seat of the car with another young man whose name he did not recall. Through investigation, officers eventually obtained statements from teenagers Anthony Chavira, 16, Darren Stephens, 17, and Chad Stephens, 15, all of Exeter. In essence, they reported that while at the R & N Market in Exeter cashing in aluminum cans, they were invited to go swimming in the area of Slick Rock on Kaweah Lake. The teenagers agreed to give the $6.00 which they had earned from the cans to the defendants for the purchase of beer. After leaving Slick Rock, about an hour and a half later, that Abele was overheard discussing the possibility of committing a robbery "for booze and stuff".

Abele reportedly bragged that he knew of a store which would be easy to knock off. The teenagers requested to be let go, however, Abele refused.

Reports indicate that prior to the commission of the robbery, Abele pulled over and switched seats with Hulsey. Hulsey pulled up to the north side of the store, but then drove away because there were people in the area. He drove down the street, turned around and returned to the same location. Abele inserted the clip into the chamber of the rifle and positioned the bolt forward before exiting the car. While the teenagers were laying down on the back seat, scared, Abele exited the store and Hulsey kept the motor running. A short time later, he returned to the vehicle, made a statement to the effect that he shot someone for $5. After Abele reentered the car, Hulsey checked the rifle to see how many bullets were left.

The defendant provided a voluntary statement on June 28, 1989. Initially he claimed that he had suffered an alcohol blackout and was unable to recall his activities. He subsequently admitted that talk about committing a robbery began while they were at the river. He acknowledged that it was his idea to attempt to obtain a weapon from his brother. He contended that he was extremely intoxicated at the time and that the amount of alcohol consumed impaired his judgment. He told authorities, "I was drunk out of my mind."

DEFENDANT'S STATEMENT:

Interviewed by the undersigned writer on March 19, 1990, the defendant declined a full disclosure outlining his involvement in the crime.

He stated, "It's real terrible that someone died. It shouldn't have happened and had I been sober it wouldn't have. That's all I can say."

Regarding his confession to authorities, the defendant stated, "I told them what they wanted to hear. I was so damned scared. I felt they would let me go if I told them what they wanted to hear, but they didn't. I really don't have anything else to say."

INVESTIGATION:

As of this dictation, a statement regarding the crime and restitution has not been received from the family of the victim.

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

PRIOR RECORD:

A check of the usual sources revealed no prior arrest record.

SOCIAL AND FAMILY HISTORY:

The defendant is a native and lifelong county resident with significant family ties.
He is youthful, in satisfactory physical and mental health and has lived in the home
of his parents all of his life.

The defendant is a graduate of Kaweah High School in Exeter.  He reportedly enlisted
in the Navy following graduation in June, 1989, but was discharged as a consequence of
arrest on the present case.  The defendant reported it was his plan to further his
education following tenure with the service.  "I figured I'd be doing something right
for myself.  I planned to go to college on the G.I. Bill and with a good education I'd
be able to make a place for myself, you know, get a good job, settle down with a wife
and a few kids."

The defendant is the seventh of eight children born to his parents, Coy and Martha
Hulsey of 1176 West Maple in Exeter.  The defendant's father reportedly is employed as
a heavy equipment mechanic by Ditch Witch of Central California.  The defendant's
mother, currently unemployed, previously worked as a shortorder cook.  The defendant's
siblings include four brothers and three sisters, ranging in age 15 to 35 years.  The
defendant described his family as a very close and supportive one.  "We've always been
very close and looked out for each other," he stated.

The defendant has previously never married nor fathered any children.  He reportedly
is not affiliated with any social or religious organizations.

EMPLOYMENT HISTORY:

The defendant's employment history is limited, for the most part due to his age and
previous status as a student.  He reported having worked as a clerk at Mountain Mike's
Pizza and as a dishwasher at Carroll's Restaurant, both in Exeter, for brief
durations.

FINANCIAL STATUS:

The defendant's assets and liabilities are negligible.

ALCOHOL/DRUG USE:

The defendant acknowledged a problem with alcohol abuse.  He reported that he began
consuming intoxicants about four years ago and that until his arrest on the instant
matter, he consumed alcoholic beverages on a daily basis, frequently "just to get
drunk".  The defendant indicated previous participation in alcohol abuse counseling.
He reported that at age 15 and again at age 17, he attended meetings of Narcotics
Anonymous following arrests for minor in possession of alcohol and public
intoxication.  He indicated that participation in NA sessions did not ameliorate his
drinking pattern except for a short time.

4

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

Regarding the use of controlled substances, the defendant acknowledged prior experimentation with marijuana. He indicated that he had used the substance infrequently, claiming that he had "tried it once when I was 15 years old" and on the date of the offense now before the court.

## PROBATION FACTORS:

Penal Code Section 1203.06 prohibits the grant of probation in this case. (Rule 414(a))

## MITIGATING FACTORS:

The defendant has no known prior record of criminal conduct. (Rule 423(b)(1))

At the time of the commission of the crime, the defendant claims that he was highly intoxicated which significantly reduced his culpability for the crime. (Rule 423(b)(2)

## CIRCUMSTANCES IN AGGRAVATION:

The defendant was armed with or used a weapon at the time of the commission of the crime, charged and found true as an enhancement under Section 12022. (Rule 421(a)(2))

The victim was particularly vulnerable. (Rule 421(a)(3))

The crime was preplanned. (Rule 421(a)(8))

The defendant engaged in conduct indicating a danger to society. (Rule 408)

## CRITERIA AFFECTING CONCURRENT/CONSECUTIVE SENTENCES:

The crimes (Counts 1 and 2) and their objectives were predominantly independent of each other. (Rule 425(b))

The crimes (Counts 1 and 2) involved separate acts of violence or threats of violence. (Rule 425(c))

## ANALYSIS:

Before the Court for a sentencing is 18-year-old Cleve Otis Hulsey, convicted of murder in the first degree, robbery in the first degree and burglary in the second degree. Also found true were special allegations, attendant to each offense respectively that the defendant was armed with a firearm.

Circumstances in the presenting matter indicate that the defendant and an alleged co-participant preplanned a robbery at a rural Woodlake convenience store in order to

5

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

obtain money with which to buy beer.  The defendant was instrumental in obtaining a
firearm for that purpose and drove to said location to accomplish the act.  During the
commission of the crime on June 26, 1989, a 17-year-old store clerk was fatally shot
in the chest.  The defendant confessed his involvement in the crime, but claims that
his judgment was impaired due to the amount of alcoholic beverage he had consumed that
date.

Statutory provisions prohibit the grant of probation in this case.  In the present
case, the defendant was convicted of two crimes for which three terms of imprisonment
are specified and also for a crime with an indeterminate term.  Inasmuch as the
killing was unnecessary to accomplish Counts 2 and 3, consecutive terms appear
warranted.  Section 669 of the Penal Code specifies when both types of terms are being
considered for sentencing purposes, the determinate term of imprisonment shall be
served first.  Therefore, Count 2 should be deemed the principal determinate term.  It
is recommended that the term of imprisonment for Count 3 be stayed pursuant to Section
654 of the Penal Code, and that Count 1 be served consecutively to Count 2.

CUSTODY:

| FACILITY | DATES | ACTUAL TIME SERVED | 4019 CREDITS | TOTAL |
|---|---|---|---|---|
| Tul Co Jail | 6-28-89 to 3-26-90 | 272 Days | 68 Days Good Time 68 Days Work Time | 408 Days |

TERM:

| CASE NO. | COUNT | OFFENSE | RANGE | BASE | ENHANCEMENTS | TOTAL |
|---|---|---|---|---|---|---|
| 27850 | 1 | Fel 187 P.C., 1st Degree w/ s/a 12022(a)PC | 25 Yrs to Life | N/A | 1 Year | 25 Yrs to life + 1 Yr |
| | 2 | Fel 211 P.C., 1st Degree w/ s/a 12022(a)PC | 2,3,5 Years | 3 Yrs | 1 Year | 4 Yrs |
| | 3 | Fel 459 P.C., 2nd Degree w/ s/a 12022(a)PC | 16 Mos, 2, 3 Yrs | 2 Yrs | 1 Year | 3 Yrs |

IT IS THEREFORE RESPECTFULLY RECOMMENDED:

1.  That the defendant's application for probation be DENIED.

2.  That in Count 2, the defendant be committed to state prison for the total term of
    FOUR (4) YEARS; that he receive credit for 272 days spent in custody awaiting
    sentence plus 68 days good conduct credit and 68 days work time credit.



296
148
444

6

REPORT OF THE PROBATION OFFICER
CLEVE OTIS HULSEY

3. That in Count 3, the defendant be committed to state prison for the total term of THREE (3) YEARS. It is recommended this term be stayed pursuant to Section 654 of the Penal Code.

4. That in Count 1, the defendant be committed to state prison for TWENTY-FIVE (25) YEARS TO LIFE. Regarding the enhancement of Section 12022(a) of the Penal Code, it is recommended that this one year term be served consecutive to any other term imposed. Further, it is recommended that this term run consecutively to the term imposed in Count 2. Further, pursuant to the rules of the state Board of Prison Terms, it is recommended the court direct the clerk to prepare two abstracts of judgment in this case; one to delineate the determinate sentence and the other to delineate the indeterminate sentence.

Further, it is recommended the defendant be advised pursuant to Section 1170(c) and 3000 of the California Penal Code that he may be placed on parole for a period not to exceed five (5) years.

It is further recommended the defendant pay a restitution fine pursuant to Section 13967 of the Government Code in the amount of $10,000.

Respectfully submitted,

LARRY R. PRICE
CHIEF PROBATION OFFICER

DATED: March 26, 1990          By _____
EAS:sc                              EVA A. SMITH
3-22-90                             PROBATION OFFICER II


Read and Approved:

By _____
RICHARD W. HOUTS
SUPERVISING PROBATION OFFICER


Pursuant to the provisions of Section 1203 of the Penal Code, I have read and considered the Report and Recommendation of the Probation Officer on file.

ROBERT C. VAN AUKEN
_____
JUDGE OF THE SUPERIOR COURT

7

E X H I B I T

3

Abstract of Judgment
April 19, 1990
(Amendment to Abstract of Judgment, August 1, 1991)

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF TULARE

| | |
|---|---|
| The People of the State of California ) | Visalia, California   April 19, 1990 |
| Plaintiff ) | No.   27850     Dept.     2 |
| ) | Judge, Hon.     ROBERT C. VAN AUKEN |
| vs ) | Clerk       Bobbye Comer |
| ) | Bailiff       Daniel Fernandez |
| Cleve Otis Hulsey     Defendant ) | Reporter     Susan Nelson |
| ) | Interpreter |

Nature of Hearing: _____ JUDGMENT PROCEEDINGS

Counsel for the People:     James Kordell, Deputy District Attorney

Counsel for the Defendant:   James Wilson

Defendant (✓) present  ( ) not present  ( ) formal arraignment for judgment waived
OR:  The motion for reduction of the conviction is denied.
Court finds offense to be:

    Count 1 – Felony violation §187 PC, 1st degree w/SA 12022(a) PC
    Count 2 – Felony violation §211 PC, 1st degree w/SA 12022(a) PC
    Count 3 – Felony violation §459 PC, 2nd degree w/SA 12022(a) PC

ORDER:  Probation (✓) denied  ( ) granted for a period of _____subject to
the following terms and conditions ( ) additional terms and conditions on page two
(Imposition of sentence suspended during this term)

  Defendant committed to (✓) State Prison  ( )California Youth Authority;
( ) Tulare County Jail for the term as follows:

    Count 1 – 25 years to life with 1 year for the enhancement for a total of
    26 years to life

    Count 2 – 3 years plus 1 year for the enhancement; total 4 years; concurrent
    to Count 1

    Count 3 – 2 years plus 1 year for the enhancement; total 3 years; stayed pursuant
    to 654 PC

  Defendant given credit for  296  days actual time plus      148     days conduct
credit for a total of     444     days served awaiting sentence. as to counts 2 and 3.

  Defendant shall pay a restitution fine in the sum of $ 10,000.00     pursuant
to Government Code §13967 ( ) stayed during term of probation after which time
it shall become permanent.

(✓)  Defendant advised of ( ) appeal rights; (✓) parole obligation upon release
from prison; ( ) consequences of violation of probation.

( )  Court finds the defendant ( ) does not have the ability to pay attorney fees;
( ) has the ability to pay attorney fees in the sum of $_____.

Notice of appeal filed with the court.

( ) Remaining counts dismissed
(✓) Defendant remanded
( ) Bail Bond ( ) Cash Bail Exonerated
( ) Defendant released on probation

                                                   Clerk

E 53226
FOL

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF TULARE

|  | Visalia, California __August 1, 1991__ |
|---|---|
| The People of the State of California ) | No. __27850__    Dept. No. __4__ |
| ) | Judge, Honorable __ROBERT C. VAN AUKEN__ |
| vs. ) | Clerk _____ Bobbye Comer _____ |
| ) | Bailiff _____ |
| Cleve Otis Hulsey ) | Reporter _____ |

Nature of Hearing _____ AMENDMENT TO ABSTRACT OF JUDGMENT _____

( )

Pursuant to instructions from the Fifth District

Court of Appeal and good cause appearing therefor,

it is hereby ordered that the abstract of judgment

dated April 19, 1990 be amended as follows:

The sentence imposed as to Count 2, robbery
and the use of a gun, are stayed, said stay
to become permanent upon the completion of
serving the sentence imposed in Count 1.

( )

The document to which this certificate is affixed is a full,
true and correct copy of the original on file and of record
in my office. Attest: __8-1-91__ 19__

NADINE SYGSUDA, County Clerk and _____ of the
Superior Court of the State of California in and for the
County of Tulare.
By _____ , ny

Copy to Department of Corrections.

-208

_____
Clerk

# In the Superior Court of the State of California

in and for the County of _____Tulare_____

## Abstract of Judgment

Commitment to State Prison

(ENDORSED)
FILED
TULARE COUNTY

APR 1 9 1990

JAY C. BAYLESS, CLERK
BY   BOBBYE COMER    DEPUTY

Dept. No. ___2___   Case No. _27850_

The People of the State of California

vs.

Cleve Otis Hulsey

Defendant.

Present:

Hon.  Robert C. Van Auken
_____
Judge of the Superior Court

James Kordell, Deputy DA
_____
Prosecuting Attorney

James Wilson
_____
Counsel for Defendant

This certifies that on the __19__ day of __April__, 19 _90_, judgment of conviction of the above-named defendant was entered as follows:

1) In Case No. _27850_ Count No. _1_ he was convicted by _Court_____; on his plea of _____
(court or jury)

__Not Guilty_____
(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of ___murder, first degree_____

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of ___187 of the Penal Code_____
(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

Defendant has been held in jail custody for _____0_____ days as a result of the same criminal act or acts for which he has been convicted.

Defendant __was not__ armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weapon at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code.
(was or was not)

Defendant __was not__ armed with a deadly weapon at the time of his commission of the offense within the meaning of Sections 969c and 12022 of the Penal Code.
(was or was not)

Defendant __did not__ a firearm in his commission of the offense within the meaning of Sections 969d and 12022.5 of the Penal Code.
(used or did not use)

(Repeat foregoing with respect to each count of which defendant was convicted.)

(2) Defendant <u>was not</u> adjudged a <del>habitual</del> criminal within the meaning of Subd a <u>a/b</u> of Section 644 of the Penal
<span style="font-size:smaller">(was or was not)</span> <span style="font-size:smaller">(a or b)</span>

Code; and the defendant <u>is not</u> a habitual criminal in accordance with Subdivision (c) of that Section.
<span style="font-size:smaller">(is or is not)</span>

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in
the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County
of ............ Tularfe ............................ and by him delivered to the Director of Corrections of the State of California at ..........
25 years to life

Duel Vocational Facility, Tracy

It is ordered that sentences shall be served in respect to one another as follows (concurrently or consecutively as to each count):

and in respect to any prior incompleted sentence(s) as follows (concurrently or consecutively as to all incomplete sentences
from other jurisdictions):

(4) To the Sheriff of the County of ........ Tulare ............ and to the Director of Corrections at the ..............

Duel Vocational Facility, Tracy

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at .... Duel Vocational Facility, Tracy
California, at your earliest convenience.

Witness my hand and seal of said court

this ........ 19th ........ day of ...... April, 1990 ........

Jay C. Bayless                                          Clerk,

by _____ Deputy

State of California,
                                                        } ss.
County of ...... Tulare ........

I do hereby certify the foregoing to be a true and correct abstract of judgment duly
made and entered on the minutes of the Superior Court in the above entitled action as
provided by Penal Code Section 1213.

SEAL

Attest my hand and seal of the said Superior Court this 19 day of ...... April ........
19:90.

Jay C. Bayless  By _____ Deputy
County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of __
Tulare

The Honorable _____
                    Robert C. Van Aiken

Judge of the Superior Court of the State of California, in and for the County of ____

Tulare

NOTE: If probation was granted in any sentence of which abstract of judgment is certified, attach
a minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

ABSTRACT OF JUDGMENT – PRISON COMMITMENT

FORM DSL 290

ENDORSED
FILED
TULARE COUNTY

APR 19 1990

JAY C. BAYLESS, CLERK
BY BOBBYE COMER    DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Tulare
BRANCH

COURT NO. 154

CASE NUMBER(S)

PEOPLE OF THE STATE OF CALIFORNIA versus    ☒ PRESENT    27850 - A
DEFENDANT: Cleve Otis Hulsey    - B
AKA:    ☐ NOT PRESENT    - C

COMMITMENT TO STATE PRISON    AMENDED    - D
ABSTRACT OF JUDGMENT    ABSTRACT ☐    - E

DATE OF HEARING (MO) (DAY) (YR)    April 19, 1990    DEPT. NO 2    JUDGE Robert C. Van Auken    CLERK Bobbye Comer

REPORTER Susan Nelson    COUNSEL FOR PEOPLE James Kordell    COUNSEL FOR DEFENDANT James Wilson    PROBATION NO. OR PROBATION OFFICER Eva Smith

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS):    SENTENCE RELATION

☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT    (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION | | | CONVICTED BY | | | | | | | | | | PRINCIPAL OR CONSECUTIVE TIME IMPOSED |
| | | | | | MO | DAY | YEAR | | | | | | | | | | | YEARS | MONTHS |
| 2 | PC | 211* | Robbery | 89 | 02 | 26 | 90 | | X | | | | N | | | | | | |
| | PC | 459* | Burglary | 89 | 02 | 26 | 90 | | X | | | | N | | | | | | |

2. ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.:

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | 12022(a) | | | | | | | | | | |
| | 12022.5(b) (b) Concurrent as Count 1 | | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Total |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

4. INCOMPLETED SENTENCE(S) CONSECUTIVE:    5. OTHER ORDERS:

| | CASE NUMBER | CREDIT FOR TIME SERVED |
| | | |

Use additional sheets of plain paper, if necessary.

6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A)

7. TIME STAYED TO COMPLY WITH 5 YEARS or 3 YEAR LIMITION: SUBORDINATE TERMS; DOUBLE BASED TERM LIMITED

8. TOTAL TERM IMPOSED:

9. EXECUTION OF SENTENCE IMPOSED:
A. ☒ AT INITIAL SENTENCING HEARING    B. ☐ AT RESENTENCING PURSUANT TO DECISION ON APPEAL    C. ☐ AFTER REVOCATION OF PROBATION    D. ☐ AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))    E. ☐ OTHER

10. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) April 19, 1990    CREDIT FOR TIME SPENT IN CUSTODY XXXX 424 INCLUDING:    TOTAL DAYS    ACTUAL LOCAL TIME 296    LOCAL CONDUCT CREDITS 148    STATE INSTITUTIONS ☐ DMH    ☐ CDC

11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
☐ FORTHWITH    ☐ AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS    INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION/GUIDANCE CENTER LOCATED AT:    ☐ CALIF. INSTITUTION FOR WOMEN - FRONTERA    ☐ CALIF. MEDICAL FACILITY - VACAVILLE    ☐ CALIF. INSTITUTION FOR MEN - CHINO    ☒ DEUEL VOC. INST.
☐ OTHER (SPECIFY):    ☐ SAN QUENTIN

CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE    April 19, 1990

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Form adopted by the Judicial Council of California
Effective April 1, 1990

ABSTRACT OF JUDGMENT – PRISON COMMITMENT
FORM DSL 290    Pen.C. 1213.5

E X H I B I T

4

Psychological Evaluation
February 25, 1993

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
APRIL, 1993, CALENDAR
DOCUMENTATION HEARING
FOLSOM STATE PRISON

HULSEY, E-53226

Cleve Otis Hulsey is a 21-year-old White inmate who was committed
to the Department of Corrections from Tulare County on April 23,
1990, for the First Degree Murder of a convenience store clerk and
for the Robbery of that store. According to the record, his code-
fendant shot the clerk. At the time of incarceration, the defen-
dant's statement included, "It's real terrible that someone died.
It shouldn't have happened, and had I been sober, it would not
have." At the time of the current evaluation he stated, "I had
just turned 18. I was drunk as a skunk, I was an alcoholic for a
while. I was involved in a robbery and the store clerk was mur-
dered. I did not shoot the clerk, I drove the car. It was the
codefendant's idea, and I did not know until the crime was commit-
ted. My need was to be in bed." He had an apparent partial black-
out for the incident.

He denies any past psychiatric illness. He completed high school.
He has no disciplinary reports. A chrono in his record dated
May 29, 1992, includes a recommendation for a transfer to Calipat-
ria IV. His extensive drug record began at age 13, and he indi-
cates he began having blackouts regularly at age 14. He used alco-
hol, "just to get drunk." Though he had attended Narcotics Anony-
mous meetings at age 15 and at age 17, they seemed to have had no
major impact on him. Since his incarceration, he feels that his
attitude in general has changed, and then adds, "I do feel bitter
at times."

He was cooperative throughout the evaluation, demonstrates good
abstract thinking abilities, and appears to have an intelligence
that is above average. There are no signs or symptoms of psychotic
nor of neurotic illness. His regret for the instant offense appears
authentic. The most appropriate psychiatric diagnosis would be
that of Alcohol Dependence, in institutional remission. His
expressed interest in college as well as in Alcoholics Anonymous
appears sincere. He hopes to major in psychology, though expresses
an interest in physical sciences, such as chemistry. His violence
potential appears to be considerably less than that of the average
inmate population. To this evaluator, he appears to be an individ-
ual who should, when it is administratively possible, do as much of
his programming as possible at CMC, eventually entering into a Cat-
egory "T" program. College is encouraged, if available.

E. A. LARSON, M.D.
Staff Psychiatrist

Noted:

G. HOLLINGSWORTH, M.D.
Chief Psychiatrist

HULSEY, E-53226    FOLSOM STATE PRISON    2-25-93    EAL:mh

E X H I B I T

5

Psychological Evaluation
April 25, 2006

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS UPDATE CLINICAL EVALUATION
April 2006


CORRECTIONAL TRAINING FACILITY SOLEDAD
APRIL 25, 2006

## I.   IDENTIFYING INFORMATION:

This is the second BPH psychological evaluation of Cleve Hulsey, CDC# E53226. However, it is the first time he has actually appeared before the Board. Hulsey is a single, 34-year-old Caucasian male. He has no unusual physical characteristics. He was convicted of Murder in the First Degree, Robbery in the First Degree and Burglary in the Second Degree.

### SOURCES OF INFORMATION:

This is a psychological evaluation for the Board of Parole Hearings on inmate Hulsey. This report is the product of a personal interview of his central file and unit health record. This interview was a single contact for the purpose of preparing this report.


## II.   DEVELOPMENTAL HISTORY:

He had no known prenatal or perinatal concerns or birth defects. He had no abnormalities of speech, language or motor development. His peer interactions and socialization skills were normal. He had no history of cruelty to animals or arson. His childhood medical history was normal. He had no history of physical or sexual abuse, either as a perpetrator or victim.

## III.   EDUCATION:

He is a high school graduate with at least average intelligence. He took some college courses at Old Folsom before they discontinued that program.

## IV.   FAMILY HISTORY:

Hulsey is the seventh of eight children born to his parents. His siblings include four brothers and three sisters. He described his family as being very close and supportive. He reportedly enlisted in the U.S. Navy following his high school graduation but never made it to boot camp, due to being discharged as a result of the instant conviction.

HULSEY, CLEVE
CDC # E-53226
PAGE 2

V.    **PSYCHOSEXUAL DEVELOPMENT / SEXUAL ORIENTATION:**

Hulsey describes a normal psychosexual development and says he is heterosexual in orientation.

VI.    **MARITAL HISTORY:**

Hulsey has never been married.

VII.    **MILITARY HISTORY:**

Hulsey enlisted in the Navy to become a Machinist's Mate.

VIII.    **EMPLOYMENT / INCOME HISTORY:**

His employment history is limited due to his age at the time of arrest and his previous status as a student. He had jobs in the service industry, prior to his arrest. His work reports at CTF Soledad have been "above average."

IX.    **SUBSTANCE ABUSE HISTORY:**

Hulsey has a history of alcohol and minimal marijuana use. His alcohol use at the time of his arrest was obviously heavy, as he said he was "drunk out of his mind", the night of the offense. His prior criminal activities are for Minor in Possession of Alcohol and Public Intoxication.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Hulsey has no identified psychiatric or psychological history. His medical health is "good."

XI.    **PLANS IF GRANTED RELEASE:**

If granted parole, Hulsey plans to live with his parents. He has other family members who would help him keep on the "straight and narrow". He plans to work in construction as he says he is able to do "anything in construction." He would like to go to night school, obtain a degree in Computers and "better my living conditions."

HULSEY, CLEVE
CDC # E-53226
PAGE 3

## CLINICAL ASSESSMENT

XII.    ## CURRENT MENTAL STATUS/TREATMENT NEEDS

Hulsey is currently in no psychological distress and requires no psychological or psychiatric intervention or treatment. He has been attending AA and should continue alcohol programming, if released.

### CURRENT DIAGNOSTIC IMPRESSIONS:

Axis I:     Alcohol Dependence, in institutional remission
Axis II:    None
Axis III:   Back problems
Axis IV:    Incarceration
Axis V:     GAF = 90

XIII.    ## REVIEW OF LIFE CRIME

A co-defendant in a car that Hulsey was driving shot and killed a store clerk during a robbery of the store. According to Hulsey's file, it was his idea to obtain a weapon from his brother to rob the store. Hulsey said he was extremely intoxicated at the time and that the amount of alcohol he consumed impaired his judgment." He regrets his involvement in the committed offense and "wishes it had never happened." He has resolved to ensure nothing like it occurs again."

XIV.    ## ASSESSMENT OF DANGEROUSNESS

For the past six years, Hulsey has remained disciplinary-action free and has been able to follow rules in an institutional setting and, therefore, his dangerousness within a controlled setting is lower than the inmate population.

If released to the community, it appears he would be able to maintain his current sobriety and commitment to remaining abstinent. His assessment of dangerousness in the community is no more than the average person in a non-prison population."

A significant risk factor or precursor to violence for Hulsey would be a return to alcohol use. He should be periodically tested and attendance at Alcoholic Anonymous (or some other alcohol treatment modality) should be a mandatory requirement of parole.

HULSEY, CLEVE
CDC # E-53226
PAGE 4

XV.     **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS**

Hulsey is competent and responsible for his behavior. ~~He has the capacity to abide by institutional standards and has done so since 2000.~~ ~~Hulsey should do well in the future, as long as he remains drug and alcohol free.~~ Any treatment program is recommended that will help him maintain long-term sobriety. He does not have a mental health disorder which would necessitate treatment either during his incarceration or on parole.

*W.M. K Marek, phd*

W.K. Marek, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**WM/kb**

D:    4/25/06
T:     4/25/06

Hulsey      E-53226      CTF-Soledad      4/26/06      KB

E X H I B I T

6

Proceedings On Sentencing Transcript
April 19, 1990, pages 1 and 14

1  court that as long as they have no prior record and

2  are youthful that they can go out and commit a

3  homicide?

4         And I realize that Mr. Hulsey was a

5  participant by reason of the aider and abettor rule,

6  and that he was outside of the particular store in

7  question, and there was a young man, 17 years of age,

8  behind a counter who's no longer on earth because of

9  the fact that Mr. Hulsey's cohort -- however that

10 occurred, we don't know how that occurred, but

11 apparently the gun went off and killed that

12 individual.

13        And I am well aware of the particular

14 problems that all of us face with the felony murder

15 rule.  And there have been other cases in this

16 courthouse where other individuals were outside a

17 particular residence and/or commercial establishments

18 where homicides occurred and they too suffered the

19 consequences of the main principal in the action.

20        And I am afraid that in Mr. Hulsey's

21 circumstance, because of the fact perhaps that he was

22 drinking alcohol that day or because of the other

23 factors that were mentioned in the 25-page report

24 supplied by defense counsel, he found himself in a

25 situation that he now has to pay his debt to

26 society.

1

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            IN AND FOR THE COUNTY OF TULARE

3     DEPARTMENT 2   HONORABLE ROBERT C. VAN AUKEN, JUDGE

4

5   THE PEOPLE OF THE STATE OF    )
    CALIFORNIA,                    )
6                                  )
                     Plaintiff,    )
7                                  )
            vs.                    )    CASE NO. 27850
8                                  )
    CLEVE OTIS HULSEY,             )  PROCEEDINGS ON SENTENCE
9                                  )
                     Defendant.    )
10  _____)

11  Visalia, California                 April 19, 1990

12

13

14                                          **FILED**
                                       **TULARE COUNTY**
15              REPORTER'S TRANSCRIPT        JUN 1 4 1990

16                                     JAY C. BAYLESS, CLERK
                                       BY _____ DEPUTY
17

18

19  APPEARANCES:

20    For the Plaintiff:   GERALD SEVIER,
                           District Attorney
21                         224 County Civic Center
                           Visalia, California 93291
22                         BY:  JAMES KORDELL

23    For the Defendant:   JAMES T. WILSON,
                           Attorney at Law
24                         3714 W. Mineral King Avenue
                           Visalia, California 93291

25                                              4/27/90

26

## DECLARATION OF SERVICE

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in
Soledad, California; I am over the age of eighteen (18) years; I
am a party to the attached action; My address is P. O. Box 705,
WA-350L, Soledad, CA 93960-0705; I served the attached document
entitled:

**PETITION FOR WRIT OF HABEAS CORPUS**

on the person/parties specified below by placing a true copy of
said document into a sealed envelope with a Trust Account
Withdrawal for the appropriate postage affixed thereto and
surrendering said envelopes to the staff of the Correctional
Training Facility entrusted with logging and mailing of inmate
legal mail, addressed as followed:

Superior Court of California
County of Tulare
County Civic Center, Room 303
Visalia, CA 93291-1228

State of California
Office of the Attorney General
Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

There is First Class mail delivery service by the United
States Post Office between the place of mailing and the
addresses indicated above. I declare under the penalty of
perjury under the laws of the United States that the foregoing
is true and correct, and I executed this service this 11th day of
March, 2007, at the Correctional Training Facility in Soledad,
California.

Cleve Hulsey

# A T T A C H M E N T

## TWO

Order Denying Petition for Writ of Habeas Corpus
Superior Court of Tulare County

FILED
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

MAR 2 6 2007

LARAYNE CLEEK, CLERK
BY: _____

1

2

3

4      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

5      **IN AND FOR THE COUNTY OF TULARE**

6

7    In Re                                     )        Case    No180809
                                               )
8         CLEVE HULSEY                         )
                                               )        **RULING RE: PETITION**
9                                              )        **FOR WRIT OF HABEAS**
                                               )        **CORPUS**
10   For Writ of Habeas Corpus                 )
                                               )
11                                             )
                                               )
12   _____       )

13   Petitioner has failed to state a basis for relief.

14         The Court applies the "some evidence" standard of review to the denial of a parole release date

15   by the Board of Prison Terms: *In Re Michael Lowe (2005) 130 Cal.App.4th; 31 Cal Rptr. 3d 1;  In re*

16   *Ramirez (2001) 94 Cal.4th 549, 563; In re Rosenkrantz (2000) 80 Cal. App.4th 409, 423, In re Powell*

17   *(1988) 45 Cal.3d 894, 904.* Under the "some evidence" standard the Board of Prison term's decision will

18   be upheld as long as there is "some basis in fact" for the decision.

19         In the case of *Irons v Carey (2007) 2007 DJDAR 3072*, the court stated as follows:

20         *"The Board must determine whether a prisoner is presently too dangerous to be deemed suitable*

21   *for parole based on the "circumstances tending to show unsuitability" and the "circumstances tending*

22   *to show suitability" set forth in Cal. Code. Regs., tit. 15 Paragraph 2402(c)(d). A prisoner's*

23   *commitment offense may constitute a circumstance tending to show that a prisoner is presently too*

24   *dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's*

25   *commitment offense only where the Board can "point to factors beyond the minimum elements of the*

26   *crime for which the inmate was committed" that demonstrate the inmate will, at the time of the*

27   *suitability hearing, present*

28                                            -1-

1

2

3   *a danger to society if released.* ***In Re Dannenburg (2005) 34 Cal.4th 1061, 1071.*** *Factors beyond the*

4   *minimum elements of the crime include, inter alia, that 'the offense was carried out in a dispassionate*

5   *and calculated manner," that "the offense was carried out in a manner which demonstrates an*

6   *exceptionally callous disregard for human suffering" and that "the motive for the crime is inexplicable*

7   *or very trivial in relation to the offense."* ***Cal. Code. Regs., tit. 15 Paragraph 2402(c)(B), (D)(E).***

8

9          The record shows that there were relevant facts upon which the Board of Prison Terms could and

10   did base their decisions. In arriving at their decision of May 9, 2006 the Board of Prison Terms used the

11   following in denying the petitioner parole in finding he poses an unreasonable risk of danger to society:

12   1:     (Decision Page 1, Lines 14-18 "First of all we'll talk about the commitment  offense. It was

13          carried out in a very dispassionate and calculated manner such as an execution style murder. The

14          offense was carried out in a manner an especially cruel and callous manner." (Line 20-26) His

15          crime partner Mr. Abele, ultimately after spending the time with Mr. Hulsey and three juveniles

16          went into a store and robbed it with Mr. Hulsey's brother's 22 rifle with three rounds in it. The

17          storekeeper was ultimately murdered in this particular crime. (Page 2, Lines 1-5) ...Five dollars

18          in this robbery. While Mr. Hulsey did not do the robbery himself, he was in the car. He was a

19          participant and was found guilty of murder in the first degree."

20   2.     (Decision Page 2, Line 15-18) "He had a brief history, three years of history of alcohol abuse"

21          He was 18 at the time of the crime.

22   3.     The BPT found that the petitioner needed further time to address his alcohol issues. Alcohol was

23          a prime factor in the commitment crime.

24   4.     The BPT found that the petitioner has incurred additional disciplinary 115s which concerned the

25          petitioner's ability to stay out of trouble.

26          It is clear from the record that there was more than enough evidence to justify the denial of

27   petitioner's parole.

28                                                    -2-

1

2   Petitioner's Petition for Writ of Habeas Corpus is denied.

3

4   Date received by judge: _____3-24-07_____

5   Dated: _3-26-07_            _(signature)_

6                               Darryl B. Ferguson
                                Judge of the Superior Court
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    -3-

SUPERIOR COURT OF CALIFORNIA
COUNTY OF TULARE
Visalia Division
County Civic Center, Room 303
Visalia, CA 93291-4593

People
    Plaintiff/Petitioner,

vs.

Hulsey, Cleve
    Defendant/Respondent.

)
)
)
)
)
)
)
)
)
)

Case No. **VHC180809**

## CLERK'S CERTIFICATE OF MAILING (CCP 1013a(4))

I certify that I am not a party to this action.

The Ruling Re: Writ of Habeas Corpus was mailed first class, in a sealed envelope, postage prepaid, to the

parties at the addresses shown.  The mailing and this certification occurred at the place and on the date

shown.

Dated: March 26, 2007 at Visalia, California.

LARAYNE CLEEK, CLERK OF THE
SUPERIOR COURT, COUNTY OF TULARE

By _Sherri Pauller_

Deputy Clerk

Cleve Hulsey
P.O. Box 705, WA-35OL
Soledad, Ca. 93960-0705

## DECLARATION OF SERVICE

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-350L, Soledad, CA 93960-0705; I served the attached document entitled:

## PETITION FOR WRIT OF HABEAS CORPUS

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

State of California
Court of Appeals
Fifth Appellate District
2525 Capitol Street
Fresno, CA 93721-2227


State of California
Office of the Attorney General
Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004


There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 29th day of April, 2007, at the Correctional Training Facility in Soledad, California.

Cleve Otis Hulsey

# EXHIBIT 4

ORIGINAL

Cleve O. Hulsey, E-53226
P. O. Box 705, WA-350L
Soledad, CA 93960-0705

# S157961

SUPREME COURT
FILED

NOV - 5 2007

Frederick K. Ohlrich Clerk

Deputy

## IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In the matter of | ) | Case No. |
| | ) | |
| CLEVE O. HULSEY | ) | **REQUEST FOR REVIEW** |
| | ) | |
| On Habeas Corpus. | ) | (Fifth App. Ct. No.F052769) |
| | ) | (Tulare Sup. Ct. No.180809) |

TO THE HONORABLE CHIEF JUSTICE OF THE CALIFORNIA SUPREME
COURT AND THE ASSOCIATE JUSTICES OF THE COURT:

Cleve O. Hulsey, petitioner herein, respectfully requests
review following the decision of the Court of Appeal, Fifth
Appellate District, filed on October 25, 2007 and received on
October 29, 2007, denying his petition for writ of habeas
corpus. A copy of the denial from the court of appeal is
attached hereto as Exhibit A.

1

I

## QUESTIONS FOR REVIEW

This case presents the following questions for review:

1.  Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner's offense was particularly egregious?

2.  Is it a due process violation for the Board to deny parole without supporting evidence that the offense contained elements or aggravating facts beyond the minimum necessary to sustain a conviction for first degree murder?

3.  Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner currently poses an unreasonable risk of danger or poses a threat to public safety?

4.  Is it a due process violation for the Board to rely on unchanging factors to deny a prisoner parole?

II

## NECESSITY FOR REVIEW

This case presents questions of law of first impression that are of statewide importance.

This court's decision in *In re Rosenkrantz* (2002) 29 Cal.4th 616, holds that a Board of Parole Hearings decision violates due process and must be reversed if there is not "some evidence" in the record to support it. This court's decision in *In re Dannenburg* (2005) 34 Cal.4th 1061, holds that although parole may in some cases be denied on the basis of the crime, the Board must cite some evidence to support a finding that there were aggravating facts beyond the minimum necessary to sustain a conviction of first degree murder. The Board must also cite some evidence that indicates a parolee's release unreasonably

2

endangers public safety.

The Board of Parole Hearings [hereafter Board] has totally ignored the mandates of this Court and the laws and regulations that govern it.  The Courts in this state have allowed this abrogation of the law to go unchallenged.  Petitioner would ask "What good are the California Supreme Court decisions if the courts in this state ignore or refuse to abide or enforce the precedents?"

### III

### JURISDICTION OF THE COURT

Petitioner has exhausted all lower court remedies.  Thus, petitioner having been placed in jeopardy and danger of irreparable harm, this court has jurisdiction.  (*Employees Association v. City of Glendale,* 15 Cal.3d 328, 342 (1975).)

There is no issue of "comity" since both state and federal due process standards are offended.  This is particularly true since the California standard of due process is more stringently protective of the individual.  (*People v. Ramirez,* 25 Cal.3d 260 (1979).)

### IV

### HISTORY OF THE CASE

Petitioner was convicted of first degree murder on March 28, 1990 and was sentenced to a term of 25 years-to-life on April 19, 1990.  On May 9, 2006, petitioner's initial parole suitability hearing was conducted and he was found unsuitable and denied parole for a period of three years.  On March 11, 2007, petitioner filed a petition for Writ of Habeas Corpus in

3

the Superior Court for the County of Tulare.  On March 26, 2007,
the petition was denied.  On April 26, 2007, petitioner filed a
petition for Writ of Habeas Corpus in the Court of Appeal, Fifth
Appellate District.  On October 29, 2007 petitioner received the
denial from the Fifth Appellate District.

V

**ARGUMENT**

1.  **Is it a due process violation for the Board to deny parole
    without supporting evidence that the prisoner's offense was
    particularly egregious?**

The Court's decision in *Rosenkrantz* holds that a Board's
parole decision violates due process and must be reversed if
there is not "some evidence" in the record to support it.  Also,
although parole may in some cases be denied on the basis of the
crime, there must be evidence to support a finding that the
crime was particularly egregious.  (*In re Rosenkrantz* (2002) 29
Cal.4th 616, 683.)

In petitioner's case, as in all Boards decisions, the
commitment offense is the evidence relied on by the Board to
support a finding that the crime was particularly egregious.
That is to say in the eyes of the Board all indeterminate
sentenced prisoner's committed particularly egregious crimes.
Petitioner would submit that all indeterminate offenses could be
considered egregious, yet not all of them could be classified as
"particularly" so.  But that is precisely what the Board has
done.  Petitioner would contend that if all indeterminate
offenses are particularly egregious, then none are particularly
egregious.

This Court has held "[S]ole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date 'shall normally be set' under 'uniform term' principles, and might thus also contravene the inmate's constitutionally protected expectation of parole. We explained that such a violation could occur, 'for example[,] where no circumstances of the offense reasonable could be considered more aggravated or violent that the minimum necessary to sustain a conviction for that offense.' (*Rosenkrantz, supra,* 29 Cal.4th 616, 683.) Quoting *Ramirez, supra,* 94 Cal.App.4th 549, 570, we suggested that, in order to prevent that parole authority's case-by-case suitability determination from swallowing the rule that parole should 'normally' be granted, an offense must be '*particularly egregious*' to justify the denial of parole. (*Rosenkrantz, supra,* at 683.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-1095, italics added.)

The Board may deny parole if a defendant committed his crime "in an *especially* heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1), italics added.) The measure of atrociousness is not general notions of common decency or society norms, for by that yardstick all murders are atrocious. (See *In re Scott,* (2004) 119 Cal.4th 871, 891 ["'[A]ll second degree murders by definition involve some callousness - i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others'"].) Rather, the inquiry is whether among murders the

5

one committed by petitioner was particularly heinous, atrocious or cruel. (*In re Ramirez, supra,* 94 Cal.App.4th at 570, disapproved on another point by *In re Dannenberg, supra,* 34 Cal.4th at 1082-1083, 1100.) By that measure, petitioner's crime was more commonplace than egregious.

2. **Is it a due process violation for the Board to deny parole without supporting evidence that the offense contained elements or aggravating facts beyond the minimum necessary to sustain a conviction for first degree murder?**

This Court has stated "When the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence' of aggravating facts *beyond the minimum elements of that offense. (In re Rosenkrantz, supra,* 29 Cal.4th 1061, 1095, italics in original.)

It is therefore axiomatic that the absence of such a citing would rise to the level of a due process violation. In petitioner's case, and in almost every other parole consideration hearing, the Board merely recites the circumstances of the commitment offence to satisfy the aggravating facts requirement. That the Board is allowed to propagate such a miscarriage of justice is beyond rational explanation. Petitioner would contend that at some point the Board, or the Courts, will have to clarify this constitutional vague requirement by establishing exactly what constitutes aggravating facts. Until then surely the Board must be required to pay more than lip service to this Court's holding in *Dannenberg.*

3. **Is it a due process violation for the Board to deny parole without supporting evidence that the prisoner currently**

6

**poses an unreasonable risk of danger or poses a threat to public safety?**

This court has held that "[T]he Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See § 3041, subd. (b); CCR § 2402.) A prisoner may be found unsuitable for parole so long as "some evidence," which may be as little as a "modicum," supports the Board's decision. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676-677; *In re Smith,* (2003) 114 Cal.App.4th 343, 361; *In re McClendon* (2003) 113 Cal.App.4th 315, 321.)

However, as the *Lee* court held, "The test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonable endangers public safety.* (Cal. Code Regs., tit. 15, § 2402, subd. (a) [parole denied if prisoner 'will pose an unreasonable risk of danger to society if released from prison']; see *In re Scott* (2005) 133 Cal.App.4th 573, 595 ['The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicates that the offender will present an unreasonable public safety risk if released from prison']); ... Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*In re Lee,* (2006) 49 Cal.Rptr.3d 931, 936-937, italics in original.) Thus a finding that a particular unsuitability factor applies to a prisoner does not automatically establish that he poses an unreasonable risk to public safety if released on parole.

7

Therefore, absent a rational indication that the unsuitability factors proves or demonstrates that a prisoner is a threat to public safety the unsuitability factors fail to meet the "modicum" requirement of the "some evidence" standard.

The Board illegally concludes that if an unsuitability factor can be applied to a prisoner then this factor alone establishes proof of an unreasonable risk to public safety if he/she is released on parole.  This is not what the Legislature intended when it enacted Penal Code section 3041 (a) and (b).

The record in this case establishes that petitioner does not pose an unreasonable risk to public safety.  Any contrary conclusion lacks any evidentiary support.

**4.  Is it a due process violation for the Board to rely on unchanging factors to deny a prisoner parole?**

In the circumstances of this case, the Board's continued reliance upon the nature of petitioner's crime to deny him parole in 2006 violates due process.

In finding petitioner unsuitable at his initial parole suitability hearing, the panel relied exclusively on an unchanging factor: the commitment offense.  In *Biggs*, the Ninth Circuit stated that the Board was "*initially* justified" in finding Mr. Biggs unsuitable based on the circumstances of the offense and his conduct prior to imprisonment.  The Ninth Circuit added that "[a] continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process

8

violation." (*Biggs v. Turhune,* 334 F.3d 910, 917 (9th Cir. 2003).)

The Ninth Circuit Court of Appeals has articulated when the reliance on unchanging factors, i.e. the reliance on the commitment offense to deny parole, triggers a violation of the Due Process Clause of the Fifth Amendment of the United States Constitution. The Ninth Circuit held, "We note that in all the cases in which we have held that a parole Board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum numbers of years to which they have been sentenced at the time of the challenged parole denial by the Board. *Biggs, Sass,* and here, the petitioners had not served the minimum numbers of years to which they had been sentenced at the time of the challenged parole denial by the Board. *Biggs,* 334 F.3d at 912; *Sass,* 461 F.3d 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." (*Irons v. Carey,* 479 F.3d 658 (9th Cir. 2007).)

This decision by the Ninth Circuit in *Irons* failed to consider that the State, in an effort to entice prisoners to behave well and participate in work, education or vocational programs, has offered a reduction in the minimum term if the prisoner meets certain conditions. The Legislature established

9

guidelines under which an inmate can receive a reduction in his term.  Penal Code § 2931 allows for a four month term reduction for every eight months of good behavior and participation in an appropriate program.  The Board has established that a life prisoner may earn four months of term reduction credits for each year of good behavior and program participation.  These credits are to be applied after a parole release date has been established.  (Cal. Code Regs., tit. 15, § 2401, subd. (a) and (b).)

Therefore, based on the above, an inmate with a first degree murder conviction who did not actually kill anyone, whether by the felony murder rule or a conspiracy, is entitled to a maximum term of 25 years once found suitable for parole.  (Cal. Code Regs., tit. 15, § 2403, subd. (b).)  If the prisoner has served the minimum term of 25 years when the release date is established, then the total time served on the sentence will be 25 years plus 8.25 years of earned credit for a total term served of 33.25 years.  The State currently requires every life prisoner to serve a period on parole.  The actual parole period differs based upon the law in effect at the time the crime was committed.  In petitioner's case the parole period is five years.  If the reduction credits are applied only against the base term then an inmate assessed a base term of 25 years, who has served 25 years, would have his term set at 16 years 9 months.  What happens to the 8.25 years earned credit?  The State discards the credits.  The State's promise of a reduction in the minimum term for life prisoners who qualify becomes

10

nothing more than a sham.  The Ninth Circuit's ruling in *Irons* allows the State to further this injustice.  The Board denies all life prisoners a parole date until they have reached or surpassed their minimum term and then requires the prisoner to forfeit all earned credits the Legislature has authorized by law for life prisoners to receive.  This is a gross miscarriage of justice and violates a prisoner's due process rights.

Because there is no reliable evidence supporting the conclusion that petitioner is unsuitable for parole, the Board's determination of unsuitability violated petitioner's due process rights.  (*Hill,* 472 U.S. at 455.)

Therefore, according to this Court, the Board must follow and apply the factors specified by statute and regulation in determining that the circumstances of the commitment offense were "particularly egregious" and cite aggravating facts that were beyond the minimum elements of the offense and support these determinations with "some evidence" in the record.  The Board must also cite "some evidence" that reliably and rationally indicates a prisoner's release would unreasonably endanger public safety.

A cursory review of the record in this case demonstrates that the Board's decision was unreasonable under the applicable "some evidence" rule.  The record simply does not contain *any* evidence that petitioner's first degree murder was *particularly* egregious.  Nor does the record contain *any* evidence that petitioner is currently a threat to society.  Given that both findings are required by California law, there is *zero* evidence

11

in the record to support the Board's decision.

## CONCLUSION

All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record establishes that petitioner does not pose an unreasonable risk of danger or poses a threat to public safety. Any contrary conclusion lacks any evidentiary support.

For the foregoing reasons, it is respectfully requested that this petition for review be granted in the interest of justice to address the important questions of law of a statewide importance.

DATE: October 31, 2007                    Respectfully submitted,

Cleve Otis Hulsey
Petitioner, In Pro Per

12

## DECLARATION OF SERVICE

I, Cleve Hulsey, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-350L, Soledad, CA 93960-0705; I served the attached document entitled:

### REQUEST FOR REVIEW

on the person/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdrawal for the appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as follows:

**California State Supreme Court**
**350 McAllister Street**
**San Francisco, CA 94102**

**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
2424 VENTURA STREET
FRESNO, CA 93721

*R Gilmore*
*11.7.07*

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above.  I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 31st day of October, 2007, at the Correctional Training Facility in Soledad, California.

*Cleve Otis Hulsey*

Cleve Otis Hulsey

**EXHIBIT**

**A**

IN THE

# Court of Appeal of the State of California

COURT OF APPEAL
APPELLATE DISTRICT
FILED

IN AND FOR THE

OCT 2 5 2007

# Fifth Appellate District

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

| | |
|---|---|
| In re<br>CLEVE OTIS HULSEY,<br><br>On Habeas Corpus. | F052769<br>(Tulare County Sup. Ct. No. 27850) |

BY THE COURT:*

The petition for writ of habeas corpus filed in this court on May 2, 2007, is denied.

_____ Acting Presiding Justice

*Before Vartabedian, Acting P.J., Dawson, J. and Kane, J.

# EXHIBIT 5

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

# Fifth Appellate District

COURT OF APPEAL
APPELLATE DISTRICT
FILED

OCT 2 5 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR

By_____
Deputy

|  |  |
|---|---|
| In re<br>CLEVE OTIS HULSEY,<br><br>On Habeas Corpus. | F052769<br>(Tulare County Sup. Ct. No. 27850) |

BY THE COURT:*

The petition for writ of habeas corpus filed in this court on May 2, 2007, is denied.

_____ Acting Presiding Justice

*Before Vartabedian, Acting P.J., Dawson, J. and Kane, J.

# EXHIBIT 6

Court of Appeal, Fifth Appellate District - No. F052769
**S157961**

# IN THE SUPREME COURT OF CALIFORNIA

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

JAN 11 2008

**En Banc**

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

In re CLEVE OTIS HULSEY on Habeas Corpus

The petition for review is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JAN - 3 2008

Frederick K. Ohlrich Clerk
_____
Deputy

_____
**GEORGE**
Chief Justice